David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA  90067
Phone:  (310) 552-5300
Fax:  (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA  94103
Phone:  (415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken
Jenner & Block LLP
One IBM Plaza
Chicago, IL  60611-7603
Phone:  (312) 923-2938
Fax:  (312) 840-7338
rsteinken@jenner.com

Attorneys For Plaintiff MICHAEL ANGELO MORALES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ANGELO MORALES,<br><br>Plaintiff,<br><br>v.<br><br>RODERICK Q. HICKMAN, Secretary of the California Department of Corrections; STEVEN ORNOSKI, Warden, San Quentin State Prison, San Quentin, CA; and DOES 1-50,<br><br>Defendants. | Case No. C 06 0219 (MCC)<br><br>**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Date: January 26, 2006**<br>**Time: 9am**<br>**Courtroom:  7** |

# TABLE OF CONTENTS

**Page**

NOTICE OF APPLICATION AND APPLICATION ........................................................1

I.  INTRODUCTION ...........................................................................................2

II.  FACTUAL BACKGROUND ...........................................................................3

III.  ARGUMENT ..................................................................................................4

    A.  THE LEGAL STANDARD ...................................................................5

    B.  PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ...............5

        1.  Plaintiff's Claim Is Cognizable Under Section 1983 ...............5

        2.  California's Lethal Injection Protocol Violates the Eighth Amendment ...................5

            a.  Procedure No. 770 Creates a Tremendous Risk of Unnecessary Pain During Executions by Imposing Conditions Conducive to Botched Executions and Failing to Compensate for these Conditions ...............8

            b.  The Use of Pancuronium Bromide in Combination With Sodium Pentothal Creates a Significant Risk that Inmates Will Be Conscious, But Unable to React, During Their Executions ...............14

            c.  The Risk Created by Procedure No. 770 Has Been Realized in California Executions ...............16

            d.  The Deficiencies in Procedure No. 770 are the Result of CDC's Conscious Choices ...............18

            e.  Conclusion ...............20

    C.  MR. MORALES WILL SUFFER IRREPARABLE HARM IF TEMPORARY RELIEF IS NOT GRANTED ...............21

    D.  THE BALANCE OF HARDSHIPS FAVORS MR. MORALES ...............21

    E.  GRANTING TEMPORARY RELIEF IS IN THE PUBLIC INTEREST ...............22

IV.  CONCLUSION ...............24

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

Associated General Contractors of California, Inc. v. Coalition for Economic
  Equity, 950 F.2d 1401 (9th Cir. 1991) ..............................................................21

*Beardslee v. Woodford*, 395 F.3d 1064 (9th Cir. 2005) ...................................passim

*Campbell v. Wood*, 18 F.3d 662 (9th Cir. 1994) ...............................................passim

*Cooper v. Rimmer*, 379 F.3d 1029 (9th Cir. 2004) ........................................7, 20, 22

*Fierro v. Gomez*, 77 F.3d 301 (9th Cir. 1996) ..................................................passim

*Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal.*, 966 F.2d 460 (9th Cir. 1992) ............21

*Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal.*, 503 U.S. 653 (1992) ...................22

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................5, 6

*Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427 (9th Cir. 1995) ...................5

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) .......................................................21

*LaGrand v. Stewart*, 170 F.3d 1158 (9th Cir. 1999) ...............................................22

*Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947) ..............................5, 20

*Morales v. Woodford*, 336 F.3d 1136 (9th Cir. 2003) ...............................................3

*Nelson v. Campbell*, 541 U.S. 637 (2004) ..............................................................5

*People v. Morales,* 770 P.2d 244 (Cal. 1989).........................................................3

*Rupe v. Wood*, 863 F. Supp. 1307 (W.D. Wash. 1994) ...........................................7

**CONSTITUTION**

U.S. Const. amend. VIII ..........................................................................................5

**STATUTES and RULES**

Cal. Penal Code § 190.2(a)(15), (18) .....................................................................3

Cal. Penal Code § 3604 ..................................................................................3, 6, 18

Conn. Gen. Stat. § 54-100 (West 2005) ................................................................19

Idaho Code § 19-2716 (Michie 2005) ...................................................................19

i

Kan. Crim. Proc. Code Ann. § 22-4001 (West 2005) ....................................... 19

Civil Local Rule 65-1 ........................................................................................ 1

Fed. R. Civ. P. 65(b) .......................................................................................... 1

Wash. Rev. Code § 10.95.180 ............................................................................ 8

15 Cal. Code Regs. § 3084.7 .............................................................................. 4

15 Cal. Code Regs. § 3084.3(c)(3) ..................................................................... 4

16 Cal. Admin. Code § 2039 ............................................................................ 11

42 U.S.C. § 1983 .......................................................................................... 5, 24

**ARTICLES**

S. Russell, *The Execution of Stanley Tookie Williams; Injection: Designed to Make Execution More Humane*, SFGate.com, available at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2005/12/14/MNG05G7QM61.DTL (last visited Jan. 12, 2006) ............................................................................. 23

*2000 Report of the AVMA Panel on Euthanasia*, 218 J. Am. Veterinary Med. Ass'n 669 (2001) ............................................................................... 11, 16, 19

J.D. Mortenson, *Earning the Right to be Retributive: Execution Methods, Culpability Theory, and the Cruel and Unusual Punishment Clause*, 88 Iowa L. Rev. 1099 (2003) .............. 7

J. Groner, *Lethal Injection: A Stain on the Face of Medicine*, available at http://bmj.bmjjournals.com/cgi/content/full/325/7371/1026 ...................................... 19

## NOTICE OF APPLICATION AND APPLICATION

Plaintiff Michael Morales is currently under a sentence of death.  On January 6, 2006, the clerk of the Superior Court of Ventura County issued a Notice of Public Session in the case of *People v. Morales*, No. CR 17960, scheduling a public session on January 18, 2006 for the purpose of the setting of the date of execution of judgment of death of February 21, 2006.  On January 12, 2006, the Superior Court of Ventura County entered an Order continuing the Notice of Public Session to January 31, 2006.   Mr. Morales seeks preliminary injunctive relief to prevent defendants Steven Ornoski, Warden of San Quentin Prison, and Roderick Hickman, Secretary of the California Department of Corrections ("CDC"), from executing Mr. Morales by means of lethal injection pending the resolution of this action.  Mr. Morales alleges that the Department of Correction's lethal injection protocol, as described in Procedure No. 770, which is attached hereto as Exhibit A, constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendment because it creates a substantial risk that Mr. Morales will be fully conscious and in agonizing pain for the duration of the execution process.

This application for a temporary restraining order is made pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65-1.  Mr. Morales will sustain irreparable harm if injunctive relief is not granted preventing the defendants from conducting Mr. Morales's execution in accordance with Procedure No. 770.  Mr. Morales is likely to prevail on the merits of the underlying action and the balance of hardships weighs decidedly in his favor.  This application is based on the verified complaint, the following memorandum of points and authorities, and exhibits including the declaration of Dr. Mark Heath.

Pursuant to Fed. R. Civ. P. 65(b), the complaint has been provided to opposing counsel.  Mr. Morales requests that the Court issue an order to show cause and determine a briefing schedule so that the hearing on this matter occurs no later than January 26, 2006, or as soon thereafter as the Court may set given the need for expedited resolution of this matter.

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3

# I.       INTRODUCTION

Under California law, Michael Morales, a death row inmate at San Quentin State Prison, will be executed by lethal injection.  A growing body of evidence, including medical evidence, eyewitness observations, and veterinary studies, persuasively demonstrates that CDC's lethal injection protocol creates a significant risk that inmates will fail to receive adequate anesthesia and will be conscious for the duration of their executions.  Without anesthesia, the inmate would experience first slow suffocation and then the "extraordinarily painful" activation of the sensory nerve fibers in the walls of the veins that is caused by potassium chloride.  *See* Declaration of Dr. Mark Heath ¶ 11, attached hereto as Exhibit C. Given this significant danger under the current protocol, Mr. Morales seeks to prevent the defendants from executing him in a manner that is likely to subject him to this excruciating pain.

Procedure No. 770 calls for the use of three drugs in succession: first, sodium pentothal, an ultrashort-acting barbiturate that under ideal conditions will cause the inmate to lose consciousness; pancuronium bromide, a neuromuscular blocking agent that paralyzes the muscles and has no apparent purpose other than to make the execution appear peaceful to witnesses; and finally, potassium chloride, which induces cardiac arrest.  Procedure No. 770 also establishes the conditions under which these drugs are administered.  These conditions – including the remote administration of the drugs, the absence of trained personnel, and a failure to monitor the inmate's condition – create a serious risk that the drugs, particularly the sodium pentothal, will not be properly administered.  Such an error could result, and has resulted, in inmates retaining consciousness during portions of their executions.  Yet Procedure No. 770 also fails to set forth any procedures for preventing or reacting to these obvious risks: It does not, for instance, explain how execution personnel should detect and react to problems with drug administration or provide for stopping the execution should it become clear that the inmate is conscious.

Thus, Mr. Morales's suit is not premised on the possibility that some unforeseen error or unavoidable accident might cause him to be aware and in excruciating pain during his execution.

2

On the contrary, he alleges that the significant risk of botched executions is an entirely foreseeable consequence of the conditions imposed by, and failings of, Procedure No. 770. It is surely unconstitutional for the State to institute an execution protocol that creates a significant risk of inflicting excruciating pain, and then to consciously disregard that risk. Mr. Morales therefore requests that the Court enjoin the defendants from executing him by means of lethal injection as it is currently administered under Procedure No. 770.

## II.     FACTUAL BACKGROUND

In 1983, Michael Morales was convicted in Ventura County court of murdering Traci Winchell. The jury found that two special circumstances – killing by torture and intentional killing by lying in wait – applied to the offense. Cal. Penal Code § 190.2(a)(15), (18). Following the penalty phase, the jury sentenced Mr. Morales to death. *See People v. Morales*, 770 P.2d 244 (Cal. 1989). The California Supreme Court affirmed the conviction and sentence in 1989, *id.* at 249, and the United States Supreme Court denied certiorari.

Mr. Morales filed a petition for habeas corpus in federal court in 1996, raising several constitutional challenges to his conviction and sentence. The district court denied the petition in full, and the Ninth Circuit affirmed in July 2003. *See Morales v. Woodford*, 336 F.3d 1136, 1153 (9th Cir. 2003). The Supreme Court denied certiorari on October 11, 2005, and the stay of execution was lifted shortly thereafter. Mr. Morales will not elect a form of execution, and therefore will be executed by means of lethal injection. *See* Cal. Penal Code § 3604(b) (providing that lethal injection is the presumptive means of execution). On January 6, 2006, the clerk of the Superior Court of Ventura County issued a Notice of Public Session in *People v. Morales*, No. CR 17960, setting a hearing on January 18, 2006 for the purpose of the setting the date of execution of judgment of death of February 21, 2006. On January 12, 2006, the Superior Court of Ventura County continued the Notice of Public Session to January 31, 2006.

On January 9, 2006, plaintiff filed an inmate appeal on CDC Form 602 alleging that his execution under the lethal injection protocol of the California Department of Corrections would constitute cruel and unusual punishment. A copy of the Form 602 is attached to the Verified

Complaint filed contemporaneously. Plaintiff asked that his appeal be processed as an emergency appeal pursuant to 15 Cal. Code Regs. §3084.7 because the State of California shortly intended to seek his execution date. Plaintiff's claim has not yet been ruled upon.

Notwithstanding his filing of an appeal on CDC Form 602, Plaintiff is not required to exhaust administrative remedies before bringing this claim because resolution of the grievance seeking modification of Procedure No. 770 is not possible through the appeal process and exhaustion is futile.

On November 24, 2004, Donald J. Beardslee, San Quentin Inmate No. C-82702, raised a challenge similar to plaintiff's claim here when he filed two inmate appeals on CDC Form 602 alleging that the Department of Correction's lethal injection procedure violated his rights under the First and Eighth Amendments to the United States Constitution. After being considered on an emergency basis, the appeals were first denied by the Warden and then denied by the Director of the Department of Corrections on Third Level Review. In denying Beardslee's appeal, the Director's Level Appeal Decision stated that Beardslee's "sentence and penalty were established by court in California; therefore relief at the Director's Level of Review cannot be afforded the appellant." Administrative review therefore cannot resolve the issues raised in plaintiff's appeal.

Moreover, pursuit of administrative review is futile for additional reasons. In subsequent proceedings in Beardslee's case, the Court of Appeals for the Ninth Circuit observed that "by regulation the California Department of Corrections does not permit challenges to anticipated action[s]. 15 Cal. Code Regs. §3084.3(c)(3)." *Beardslee v. Woodford*, 395 F.3d 1064, 1069 (9th Cir. 2005). No administrative challenge to the lethal injection protocol is possible here.

## III.   ARGUMENT

In moving for a temporary restraining order against defendants, Mr. Morales seeks only to preserve the status quo while he litigates his Eighth Amendment claim. Mr. Morales is likely to succeed on the merits, and will suffer irreparable harm in the absence of temporary relief. It is also in the public interest to grant temporary relief because doing so will allow the important question of the constitutionality of Procedure No. 770 to be resolved on the merits.

## A.     THE LEGAL STANDARD

In order to obtain a temporary restraining order or preliminary injunction, Plaintiff must demonstrate "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995).   As the Ninth Circuit has explained, the necessary showing of likelihood of success diminishes in proportion to the "relative hardship to the party seeking the preliminary injunction," *Beardslee v. Woodford*, 395 F.3d 1064, 1067-68 (9th Cir. 2005); thus, where the balance of hardships tips sharply in favor of the plaintiff, he need only demonstrate the existence of serious questions going to the merits, *see id.*

## B.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### 1.     Plaintiff's Claim Is Cognizable Under Section 1983

Mr. Morales does not challenge the legality of his conviction or sentence, nor does he seek to prevent the State from executing him in a lawful manner.   Mr. Morales's challenge therefore is a "method of execution" claim that is cognizable under 42 U.S.C. § 1983.   *See id.* at 1068-69 (holding that because Beardslee challenged "California's lethal injection protocol, rather than the punishment of lethal injection *per se*," his claim was cognizable under § 1983 rather than habeas corpus); *see also Nelson v. Campbell*, 541 U.S. 637, 647 (2004) (focusing on whether the petitioner's challenge "would *necessarily* prevent" the State from carrying out the execution (emphasis in original)).

### 2.     California's Lethal Injection Protocol Violates the Eighth Amendment

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishments.   U.S. Const. amend. VIII.   The prohibition includes the "infliction of unnecessary pain in the execution of the death sentence." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947); *see also Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (holding that the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain").   Whether a method of execution inflicts "unnecessary" pain is

inherently a relativistic inquiry. Thus, whether pain is "unnecessary" must be determined according to "evolving standards of decency," and "contemporary values concerning the infliction of a challenged sanction." *Gregg*, 428 U.S. at 173. A method of execution that was touted as more humane than available alternatives when it was first introduced therefore could, over time, come to offend contemporary values because, for example, experience with the method in question has demonstrated that it is not in fact as humane as first thought. *See Fierro v. Gomez*, 77 F.3d 301, 303 n.1 (9th Cir. 1996) (noting, in a challenge to the constitutionality of execution by lethal gas, that the California Supreme Court had last considered such a challenge in 1953, and that the court's consideration had been limited by then-existing scientific knowledge), vacated as moot in light of Cal. Penal Code § 3604, 519 U.S. 918.

In determining whether a particular method of execution offends contemporary standards of decency by inflicting unnecessary pain, the Ninth Circuit examines the "objective evidence of the pain involved in the challenged method." *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir. 1994). Such evidence can include the execution records of inmates executed using the same method; expert testimony regarding the effect of the method on both humans and animals; and scientific studies and other evidence analyzing the effects on humans and animals. *See Fierro*, 77 F.3d at 307 (listing the types of evidence considered by the district court in analyzing the effects of exposure to cyanide gas); *Campbell*, 18 F.3d at 683-87 (discussing expert testimony, scientific literature, and experiments on death by hanging considered by the district court). Moreover, the Ninth Circuit has established that evidence of an inmate's voluntary and involuntary movement, expression, and apparent consciousness during his execution, as observed by witnesses to the execution, can be probative of whether the inmate is suffering unnecessary pain. *See Fierro*, 77 F.3d at 307-08 (relying on eyewitness accounts of executions by lethal gas); *Campbell*, 18 F.3d at 685 (relying on physician's observations during an execution by hanging to conclude that the inmate had quickly lost consciousness and had not suffered).

Because it is impossible to determine with certainty before the fact whether a particular inmate will suffer unnecessary pain during his execution, the question whether a method of execution will inflict unnecessary pain on an individual inmate is fundamentally an inquiry as to whether the inmate is "subject to an unnecessary *risk* of unconstitutional pain or suffering." *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004) (emphasis added); *Fierro*, 77 F.3d at 307 ("*Campbell* also made clear that the method of execution must be considered in terms of the *risk* of pain." (emphasis in original)); *Campbell*, 18 F.3d at 687. "For any individual challenging a death sentence, evidence of botched executions can only be put in terms of probability." J.D. Mortenson, *Earning the Right to be Retributive: Execution Methods, Culpability Theory, and the Cruel and Unusual Punishment Clause*, 88 Iowa L. Rev. 1099, 1118-20 (2003). Of course, any medical or quasi-medical procedure inherently carries a risk that a mistake or accident might cause unforeseen pain. Thus, the Eighth Amendment does not require executioners to eliminate all possible risk of pain or accident from their execution protocols. *See Campbell*, 18 F.3d at 687. A risk of pain becomes *unnecessary*, however, when experience with an execution procedure demonstrates that there are foreseeable problems that could arise that would result in the inmate suffering intense pain and the procedure fails to minimize or at least account for those risks.

Thus, in the only two cases in which the Ninth Circuit has considered a method-of-execution challenge, the court drew a distinction between an execution protocol that was constitutional because it recognized and prevented a foreseeable risk of pain, and a procedure that was unconstitutional because it inherently involved a substantial risk of pain. In upholding Washington's use of judicial hanging, the Ninth Circuit acknowledged the possibility of "bungled" executions that could result in asphyxiation or decapitation, but held that the risk was "slight" because Washington's detailed execution protocol "minimized [the risk] as much as possible." *See Campbell*, 18 F.3d at 684-85, 687 & n.17. In contrast, the court held that execution by lethal gas was unconstitutional because it involved a "substantial risk" of several minutes of "intense physical pain." *Fierro*, 77 F.3d at 308; *see also Rupe v. Wood*, 863 F. Supp.

---

7

1  1307, 1313-15 (W.D. Wash. 1994) (holding that a "significant" risk (less than 24% probability)

2  of decapitation rendered judicial hanging unconstitutional as applied to an obese inmate),

3  vacated in part as moot in light of Wash. Rev. Code §10.95.180 (eff. June 6, 1996), 93 F.3d

4  1434 (9th Cir. 1996).

5  Under these standards, the CDC's lethal injection protocol is clearly unconstitutional

6  because it creates a significant and substantial risk that the inmate will experience a prolonged,

7  agonizing death.   Although executions following Procedure No. 770, if performed properly

8  under ideal circumstances, may not inherently involve unnecessary pain and suffering, Procedure

9  No. 770 creates a procedure that is rife with potential problems and opportunities for untrained

10  personnel to commit grave errors, all of which can lead to an excruciating death.  The Procedure

11  so utterly fails to account for these potential problems, which are inherent in allowing medically

12  untrained personnel to perform executions by remote control, that executions performed

13  according to Procedure No. 770 carry a significant and unconstitutional risk of unnecessary pain.

14      a.    **Procedure No. 770 Creates a Tremendous Risk of Unnecessary Pain During Executions by Imposing Conditions Conducive to Botched Executions and Failing to Compensate for these Conditions**

17  Procedure No. 770 instructs that executions shall be carried out by means of an IV line

18  inserted into a vein and monitored and controlled remotely, from a separate room.  Procedure

19  No. 770, at 36.[1]  This line is "inserted into a usable vein by a person qualified . . . or otherwise

20  authorized by law to initiate such a procedure."   *Id.* at 39.  Once a flow of saline solution has

21  been started, "injection team members vacate the chamber" and the chamber door is locked and

22  sealed.  *Id.*  The injection team then causes five grams of sodium pentothal, an ultrashort-acting

---

[1] Plaintiff is relying upon what the Office of the Attorney General describes as a "redacted version" of Procedure No. 770, provided to Mr. Morales on January 6, 2006.  It is impossible to tell what has been redacted, as the defendants have never produced a complete copy of the protocol in litigation.  *See Beardslee*, 395 F.3d at 1075 & n.12 ("Indeed, the State declined to produce significant portions of Procedure No. 770. . . . The State has advanced no legitimate reason, indeed, no reason at all, for its refusal to disclose the entire protocol to the condemned prisoner.").

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3

barbiturate anesthetic, to be administered through the IV.  This dosage, if properly administered, would be sufficient to induce unconsciousness in almost all people.  Heath Decl. ¶ 9.  Next, 100 milligrams of pancuronium bromide, which completely paralyzes both the inmate's voluntary muscles and his diaphragm, is administered.      Procedure No. 770, at 36; Heath Decl. ¶ 9. Finally, the inmate is given 100 milligrams of potassium chloride, *see* Procedure No. 770, at 27, which eventually – after two or more minutes – causes cardiac arrest.

Although the doses of sodium pentothal and pancuronium bromide each would, if given alone, eventually cause death by stopping breathing, neither drug has sufficient time to cause death before the potassium chloride is administered.  *See* Heath Decl. ¶10.  Thus, medical evidence indicates inmates are alive at the time that the potassium chloride is injected.  *Id*. Potassium chloride, when given in doses sufficient to cause death, is known to be excruciatingly painful, because it activates the nerves in the inmate's veins before it causes the heart to stop.  *Id.* ¶ 11.  It is therefore imperative that inmates be anesthetized before the potassium chloride is administered.  *Id.* ¶¶ 12-13.

Administering the lethal drugs in the manner dictated by Procedure No. 770 creates the risk that the sodium pentothal will not be administered properly and the inmate will not be rendered fully unconscious by the time that the other two drugs are administered.  Because Procedure No. 770 fails to ensure the proper administration of sodium pentothal, the risk of consciousness cannot be mitigated by the fact that the five- gram dose of sodium pentothal may be excessive in comparison to the dose that would be used in a surgical setting.  Although the full five grams of sodium pentothal, if the dose reached the inmate, would be almost certainly sufficient to induce unconsciousness, that fact is irrelevant in light of the substantial danger that the full dose of sodium pentothal simply will not reach the inmate.

The risk that inmates will be conscious during their executions is in part inherent in the use of sodium pentothal itself; CDC has chosen to use an ultrashort-acting anesthetic that is extremely sensitive to errors in administration. In medical situations, sodium pentothal is used only for specific, expeditious tasks, and only by personnel who have considerable expertise in

anesthesia.  Heath Decl. ¶¶ 18, 23.  Monitoring the effects of sodium pentothal, like those of other ultrashort-acting anesthetics, requires considerable expertise in anesthesia.  *Id.* ¶ 23.  Moreover, because sodium pentothal is extremely unstable, it must be carefully and properly mixed so that it does not crystallize, a technical task that requires significant training in pharmaceutical calculations.  *Id.* ¶ 28.  Thus, sodium pentothal's instability makes it more likely to be administered incorrectly, and its fast-acting properties heighten the risk that improper administration will result in ineffective anesthesia and consciousness.

The danger of improper administration of sodium pentothal is exacerbated by the fact that Procedure No. 770 does not require medically trained personnel to supervise, or assist in the medical tasks necessary to prepare for the execution.  *See* Procedure No. 770, at 39 (stating only that the person who inserts the IV shall have either some unspecified training, or be "authorized by law" to initiate the procedure).  These tasks include mixing the sodium pentothal solution, Heath Decl. ¶¶ 20(a), 28;  setting up the IV line and associated equipment, including the "Y" injection site, in order to ensure that fluids do not leak and are not misdirected, *id.* ¶ 20(e), (f); and finding a usable vein, properly inserting the IV line in the proper direction, and verifying that the drugs are flowing into the inmate's vein rather than into surrounding tissue, *id.* ¶ 20(f), (h).  All of these tasks require a high degree of specialized training.  *See id.* ¶ 23.

Procedure No. 770 makes several of these tasks more prone to mistakes by deviating from established medical practice.  The protocol creates the risk that the drugs will be administered in the wrong order by requiring that the syringes be labeled by number, rather than by contents.  This is a serious deviation from accepted medical standards, which would never permit such ambiguous labeling.  *See id.* ¶ 20(b).  If an error in loading or labeling the syringes occurs, the personnel administering the drugs will have no means of detecting it.  Second, the protocol requires that the neoprene diaphragm on the "Y" injection site be pulled back to allow the insertion of syringe tips instead of a needle.  Procedure No. 770, at 36.  There is no medical reason for this modification of standard practice, which calls for a needle to be inserted *through* the diaphragm in order to ensure a sealed connection.  *See id.* ¶ 29.  In addition, because the

10

1    drugs are administered from another room, IV line extensions must be used, *see* Procedure No.

2    770, at 36, which increases the risk that a flaw or kink in the IV line will disrupt the flow of

3    drugs.   Heath Decl. ¶ 26.   A reasonable medical standard of care would not permit these

4    unnecessary line extensions.

5         The risk of inadequate anesthesia is compounded by the fact that Procedure No. 770

6    requires that *no* personnel be present in the execution chamber when *any* of the drugs are

7    administered.  The protocol thus prevents personnel from obtaining any sort of visual or other

8    verification that the drugs are actually being administered to the inmate, or that the sodium

9    pentothal anesthetic has taken effect.  Proper monitoring of the flow of fluids into the vein

10   requires a clear view of the IV site, and also tactile examination of the skin surrounding the IV

11   site to verify skin firmness and temperature.  *Id.* ¶¶ 20(f), 24.[2]

12        Proper monitoring of the inmate would also necessitate that a person trained specifically

13   in assessing anesthetic depth closely observe the inmate at all times after the sodium pentothal is

14   administered.  Only persons trained in anesthesia are able to assess properly whether the inmate

15   has attained the degree of unconsciousness necessary to render him insensitive to pain.  *Id.*

16   ¶¶ 21-23.  For this reason, the American Veterinary Medical Association (AVMA) requires that

17   persons euthanizing animals be "competent in assessing depth [of anesthesia] appropriate for

18   administration of potassium chloride."  *See 2000 Report of the AVMA Panel on Euthanasia*, 218

19   J. Am. Veterinary Med. Ass'n 669, 681 (2001).  Similarly, California requires extensive training

20   in the use of anesthesia for all technicians authorized to euthanize animals.  *See* 16 Cal. Admin.

21   Code § 2039.

22        Thus, Procedure No. 770, by requiring that non-medical personnel remotely inject an

23   unstable drug into inmates without proper monitoring, creates conditions that are highly

24

25   _____

26   [2] Although Procedure No. 770 provides that the flow of saline through the IV lines shall be
     observed when the lines are first put into place, *see* Procedure No. 770, at 39, the fact that the
27   injection team vacates the execution chamber thereafter prevents any further monitoring once the
     flow of drugs is begun.  Thus, the injection team would have no way of knowing if the inmate's
28   movement or some other event causes the IV lines to become dislodged or kinked.

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3

conducive to serious errors that could cause the sodium pentothal to be administered improperly. In the face of this danger, the protocol fails to take even the most rudimentary steps towards minimizing the obvious potential problems. Indeed, the protocol is stunning in its complete failure to acknowledge any risk or potential problem other than tampering with the lethal drugs in the days leading up to the execution. *See* Procedure No. 770, at 31.

Examples of Procedure No. 770's failure to account for the very risks that it creates are numerous. Despite the fact that the injection team personnel are not doctors or nurses who are capable of exercising competent medical judgment based on the situation at hand, Protocol No. 770 contains no specific instructions for inserting the angiocath into the vein; what size should be used; what to do if there is trouble finding an adequate vein; or how to compensate if any equipment malfunctions. Similarly, Procedure No. 770 does not attempt to account for the foreseeable issues that may arise when an inmate requires special consideration for any reason. There is no provision for individualized dosage calculation or medical care for, for instance, obese inmates who may require larger doses of sodium pentothal, or inmates on medications that may interfere with the anesthetic. Nor is there any indication of how personnel should go about exercising their discretion should these types of issues arise, or who bears responsibility for making medical decisions on the scene. Indeed, the protocol does not specify whether the injection team is in any way prepared to handle the contingencies that might occur during the course of an execution, or provide that training should encompass foreseeable contingencies. *See* Procedure No. 770, at 39.

Procedure No. 770 also does not attempt to minimize the risks inherent in handling the drugs themselves. There is no procedure specified for obtaining, storing, and appropriately labeling the drugs, all of which could affect their efficacy. There is no attempt to control the problems created by the instability of sodium pentothal: There are no instructions on mixing the sodium pentothal solution, beyond noting that the drug should be in "complete, clear suspension," *id.* at 37, or any instruction to verify that the sodium pentothal has not crystallized in the IV tubing or precipitated by the time it is actually used.

---

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)

CHICAGO_1358141_3

Despite Procedure No. 770's insistence on removing all personnel from the execution chamber before any drugs are administered, the protocol does not anticipate and provide for the problems that could arise as a result of this policy. There is no procedure for testing or verifying the efficacy of the extended IV tubing, or even any instruction on precisely how to set up the tubing. Nor is there a procedure for entering the chamber during the execution should any of the equipment malfunction or the inmate somehow indicate that something has gone awry. Although the protocol calls for a heart monitor, there is no indication of who observes the monitor or what the team would do if the monitor indicated a problem.

Finally, and most disturbingly, the protocol apparently does not require execution personnel to verify in *any* manner, even through the windows of the execution chamber, that the inmate has been rendered unconscious by the sodium pentothal. Nor does the protocol call for a backup syringe of sodium pentothal to be readied in case something goes wrong. *See* Procedure No. 770, at 37; *cf*. Heath Decl. ¶ 46 (noting use of a backup syringe of sodium pentothal in other states). Thus, despite the foreseeable risks created by the protocol and described above, Procedure No. 770 simply does not acknowledge, much less provide for, the possibility that the five-gram dose of sodium pentothal will fail to render the inmate unconscious.

Procedure No. 770 thus both creates an unacceptable quantum of risk that the inmate will not be anesthetized and therefore will suffer excruciating pain during his execution, and also fails utterly to account for these obvious contingencies and instruct personnel on how to react to or prevent them. In this respect, the lethal injection protocol is starkly different from the judicial hanging protocol that the Ninth Circuit upheld in *Campbell*, 18 F.3d at 683. Like the risk that an inmate will be conscious and in excruciating pain during the lethal injection process, Washington's judicial hanging procedure carried the risk that an inmate would die of asphyxiation, which is slow and painful, or decapitation, which mutilates the inmate's body. *See id.* at 683. Unlike the CDC's protocol, however, Washington's protocol carefully acknowledged these risks and provided detailed procedures specifically designed to minimize them. Thus, as the court noted, Washington's protocol reflected medical opinions as to the manner in which

different methods of hanging would kill inmates and which modes of causing death were the most humane.  *Id.*  In order to avoid death by asphyxiation or decapitation, the protocol included detailed instructions on numerous factors that would affect the manner of death, including the diameter of the rope; the method of tying the knot; treating the rope with wax and boiling it to reduce elasticity; and the length of the drop in relation to body weight and the manner in which that length should be calculated.  *Id.* at 683-85.   All of these instructions were the result of careful consideration of the available scientific and medical evidence.  In light of the Washington protocol's ample provision for the risks of an inhumane death, the Ninth Circuit concluded that the risk of a botched execution was "slight," and had been "minimized as much as possible."  *Id.* at 687 & n.17; *Fierro*, 77 F.3d at 307 (emphasizing that the *Campbell* court considered hanging in terms of the "*risk* of pain," and concluded that "under the Washington hanging protocol, the risk of a prolonged and agonizing death by asphyxiation or decapitation was negligible" (emphasis in original)).

In contrast to Washington's protocol, it is impossible to detect in the version of Procedure No. 770 currently available any attempt on CDC's part to account for any problems that could arise during an execution.  This failure is particularly egregious in light of the fact that simply having a qualified person verify, visually and tactically, that the inmate is indeed anesthetized following the administration of the sodium pentothal, would go a long way towards mitigating the risk of unnecessary pain.  Yet it does not appear that CDC has considered this or any other means of lessening the dangers created by the protocol.  This egregious failure renders the significant risk of error truly unnecessary.  *Cf. Campbell*, 18 F.3d at 687 & n.17.

> **b.**  **The Use of Pancuronium Bromide in Combination With Sodium Pentothal Creates a Significant Risk that Inmates Will Be Conscious, But Unable to React, During Their Executions**

In light of the fact that sodium pentothal is an ultrashort-acting anesthetic, and Procedure No. 770 creates the risk that the dose will not be properly administered, it is particularly important that the inmate have the opportunity to alert execution personnel should he regain – or never lose – consciousness, and that the execution personnel have the ability to ascertain whether

the inmate is properly anesthetized.  Yet the use of pancuronium bromide in combination with sodium pentothal effectively prevents any post-administration correction of problems with the sodium pentothal.  It also serves no purpose within the lethal injection process, raising the question why the State insists on employing it while refusing to justify its use.  *See Beardslee*, 395 F.3d 1075-76 & n.13 ("The State did not, even under repeated questioning at oral argument, provide a single justification for the use of pancuronium bromide, which is one of the key issues. This response is, to say the least, troubling.").

Pancuronium bromide  is a neuromuscular blocking agent that blocks nerve cells from interacting with muscle tissue, therefore paralyzing the inmate's muscles, including those of the chest and diaphragm.  Heath Decl. ¶¶ 37-38.  A patient given pancuronium bromide alone would slowly suffocate to death; thus, the unanesthetized experience of the effects of pancuronium bromide would in itself involve extraordinary suffering, as the inmate struggled to breathe.  *Id.* ¶ 41. Because the drug does not affect the brain or nerves themselves, however, so an unanesthetized patient would remain completely conscious, but due to the paralysis would be completely unable to communicate either verbally or by movement the fact that he is conscious. *Id.* ¶¶  39-40.

Pancuronium bromide also prevents observers from determining whether an inmate is conscious.  According to Dr. Heath, the drug's paralytic effect is so total that it would interfere with an *anesthesiologist's* ability to assess consciousness.  *Id.*  Thus, even if Procedure No. 770 provided some mechanism by which personnel could monitor the inmate's consciousness, the use of pancuronium bromide all but ensures that it will be impossible to determine visually whether the inmate is still able to feel pain.  Should an inmate retain consciousness after the sodium pentothal is administered, the inmate would suffer slow suffocation as well as the excruciating pain of the potassium chloride, all while being completely paralyzed and unable to communicate.  *Id.* ¶ 37-38.  This period would last at least a minute, until the inmate loses consciousness from suffocation or is killed by the potassium chloride.  *Id.*

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3

It is precisely this risk of the combination of ineffective anesthesia and paralyzed consciousness that has led at least nineteen states to prohibit the use of a sedative in conjunction with a neuromuscular blocking agent like pancuronium bromide to euthanize animals. *See Beardslee*, 395 F.3d at 1073 & n.9 (listing the relevant state laws and noting that this evidence is "somewhat significant"). The AVMA, moreover, has promulgated guidelines that prohibit this combination of drugs. *See 2000 Report of the AVMA Panel on Euthanasia*, *supra*, at 681. AVMA also prohibits the use of neuromuscular blocking agents alone, stating that because the drugs cause "respiratory arrest before loss of consciousness, . . . the animal may perceive pain and distress after it is immobilized." *Id.* at 696 app. 4. The fact that so many states and the nation's leading veterinary association have condemned as inhumane the use of anesthetics and neuromuscular blocking agents in tandem is persuasive evidence that this combination of drugs is not consistent with evolving standards of decency. Given that the Eighth Amendment prohibits the same infliction of unnecessary pain that we seek to avoid imposing on household pets and other animals, the veterinary avoidance of this method of euthanasia is compelling indeed.

Despite the evidence that employing pancuronium bromide is not consistent with basic standards of care for animals, and the fact that the use of pancuronium bromide increases the risk that an inmate will suffer unnecessary pain, the CDC insists on using it while refusing to explain its reasons for doing so. In previous execution challenges, the defendants' experts have conceded that pancuronium bromide is used primarily to prevent witnesses from observing movement that "could be interpreted as . . . pain or discomfort." *Beardslee*, 395 F.3d at 1076 n.13 (noting that "[t]he record does not contain any other explanation" for the use of pancuronium bromide). The paucity of the record accords with Dr. Heath's opinion that pancuronium bromide serves no legitimate purpose in the execution procedure while greatly increasing the risk of an inmate's suffering undetected agony.

     **c.**    **The Risk Created by Procedure No. 770 Has Been Realized in California Executions**

There is ample evidence that Procedure No. 770 has caused some inmates executed in California to experience unnecessary pain during their executions.  Both execution records and witnesses' accounts of these executions provide evidence that is consistent with consciousness following the administration of the sodium pentothal.  As the Ninth Circuit has held, both eyewitness accounts of, and medical information gleaned from, executions can be probative of whether an inmate has likely suffered pain during his execution.  *See Fierro*, 77 F.3d at 307-08; *Campbell*, 18 F.3d at 685.  This evidence in turn can help courts determine the overall risk of unnecessary pain created by a method of execution, even if the sample size of past executions is small.  *See Campbell*, 18 F.3d at 687 (relying in part on a physician's observations of the only hanging conducted according to the challenged protocol in upholding Washington's execution procedure).

Witness accounts of the 2002 execution of Stephen Wayne Anderson suggest that Mr. Anderson was not properly anesthetized when he died.  The execution took over 30 minutes, and during that time Mr. Anderson's chest and stomach "heaved more than 30 times."  Rocconi Decl. ¶ 6, Heath Decl. Ex. 3.  According to Dr. Heath, the typical reaction to sodium pentothal is yawning, drawing one or two deep breaths, or visibly exhaling so that the cheeks puff out.  Heath Decl. ¶ 45.  Irregular heaving of the chest is not consistent with the depression of the central nervous system caused by sodium pentothal.  *Id.*  Rather, chest heaving is indicative of labored respiratory activity, which in turn strongly suggests that Mr. Anderson was conscious, and indeed may have been laboring against the paralyzing effect of the pancuronium bromide.  *Id.*

The execution log of Manuel Babbit's 1999 execution also indicates that something went wrong during the process.  A minute after the pancuronium bromide was administered, Mr. Babbit had shallow respirations and brief spasms in his upper abdomen – again suggesting an attempt to fight against the effects of the pancuronium bromide.  *See id.* ¶ 47; Execution Log of Manuel Babbit, Heath Decl. Ex. 2.  In addition, Mr. Babbit's heart rate remained constant until the potassium chloride was administered; had the full five grams of sodium pentothal reached

Babbit, his heart rate would have changed significantly.  Heath Decl. ¶47.  His distress was evident to witnesses.  Declaration of Charles Patterson, Exhibit B.

The execution logs of William Bonin's 1996 execution also reflect irregularities that may have caused Bonin to die in excruciating pain.  Mr. Bonin was given a second dose of pancuronium bromide for reasons that remain unclear, even though the initial dose would paralyze an inmate for several hours.  Execution Log of William Bonin, Heath Decl. Ex. 2; Heath Decl. ¶ 46.  The redundant dose raises questions about whether Bonin received the initial doses of sodium pentothal and pancuronium bromide; whether the injection team believed that he was still conscious; and, more broadly, whether such an irregularity is indicative of the lack of training or judgment of injection personnel.  Heath Decl. ¶ 46.

These accounts of recent California executions, according to the Ninth Circuit, are "extremely troubling," because they indicate "that there were problems associated with the administration of the chemicals that may have resulted in the prisoners being conscious during portions of the executions."  *Beardslee*, 395 F.3d at 1075.

> **d.**    **The Deficiencies in Procedure No. 770 are the Result of CDC's Conscious Choices**

Procedure No. 770's failure to mitigate the obvious risks that it creates is the result of conscious choices made by CDC.  California's lethal injection statute, Cal. Penal Code § 3604(a), gives the Department of Corrections almost total discretion over the means by which inmates are executed: CDC is responsible for choosing the drugs that comprise the lethal injection cocktail; developing the procedures by which the drugs are administered; and determining what training and qualifications, if any, are required for the execution team.  CDC has chosen to exercise this discretion in a manner that creates a foreseeable and known risk that inmates will suffer excruciating pain before their deaths.

The choices made by other state corrections departments and legislatures highlight the irresponsibility of CDC's protocol.  Several states employ physicians or other qualified medical personnel to approve the design of the protocol or to ensure that executions are carried out in a medically acceptable manner.  *See* Heath Decl. ¶30.  Georgia, for instance, has doctors present

during the execution process to insert the IV lines if necessary.  See J. Groner, *Lethal Injection: A Stain on the Face of Medicine*, available at http://bmj.bmjjournals.com/cgi/content/full/ 325/7371/1026 (last visited Jan. 12, 2006).  Connecticut's protocol is developed in consultation with the Commissioner of Public Health.  *See* Conn. Gen. Stat. § 54-100 (West 2005).   Other states have mandated that the execution process must comply with accepted medical standards or be humane.  *See* Idaho Code § 19-2716 (Michie 2005) (requiring "expert technical assistance" where necessary to ensure that death does not cause "unnecessary suffering"); Kan. Crim. Proc. Code Ann. § 22-4001 (West 2005) (requiring that drug combination be sufficient to "cause death in a swift and humane manner").   CDC could commit itself to ensuring a humane process, or to seeking assistance from physicians, but it has chosen not to do so, and to deviate from accepted medical practice in several respects, thereby consciously disregarding the very real risk of botched executions.

Just as incomprehensibly, CDC has chosen to use drugs that are extremely sensitive to error, in that sodium pentothal can wear off quickly if not administered correctly, and pancuronium bromide will mask the inmate's resulting consciousness.  For precisely this reason, the AVMA has chosen to use pentobarbital, a longer-acting anesthetic, in animal euthanasia, and bars entirely the use of an anesthetic in combination with a neuromuscular blocker like pancuronium bromide.  *See 2000 Report of the AVMA Panel on Euthanasia*, *supra*, at 680-81.  Thus, it is clear that other means of causing death by injecting lethal chemicals are available, and that considerations of good medical practice and preventing pain and consciousness are not incompatible with the aim of causing death.

The CDC's deliberate decision to use volatile drugs in a manner conducive to error is unconscionable.  Although, as the *Beardslee* court noted, "objective evidence of contemporary values" may indicate "that lethal injection has been deemed an acceptable means for society to implement a death sentence," 395 F.3d at 1072, it is ultimately the manner in which the CDC has chosen to implement lethal injection that must withstand Eighth Amendment scrutiny.  The available alternatives to the CDC's callous protocol, and the relatively minimal changes in

procedure that could substantially mitigate the risk of excruciating pain, demonstrate that the protocol chosen by CDC creates a preventable, and therefore unnecessary, risk of an excruciatingly painful death.

### e.    Conclusion

Like the lethal gas method of execution held unconstitutional in *Fierro*, California's lethal injection protocol creates a significant risk that an inmate will experience excruciating pain for several minutes. *See Fierro*, 77 F.3d at 307. This risk is inherent in the design of the protocol, with its insistence on remote administration and its choice of drugs, and is aggravated by Procedure No. 770's failure to account for the problems that could arise as a result.

The risk of unnecessary pain is clearly more substantial than the slight or negligible risk that may be characterized as an "accident" or anomaly. *See Campbell*, 18 F.3d at 687. Available information from California executions and those performed in other states indicates the strong possibility that at least some of these inmates were not properly anesthetized during their executions. While it is impossible to quantify precisely the risk of pain that an individual inmate like Mr. Morales faces when he enters the execution chamber, the nature of the risk renders it more substantial than might otherwise be the case. Because the potential problems are *caused by* Procedure No. 770, every inmate, regardless of his health or size, faces the risk of unnecessary pain during his execution. The risk is not dependent on unforeseeable contingencies, such as an uncontrollable electrical problem, *see Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947), but simply increases if an inmate's individual characteristics make him less receptive to anesthesia.

The Ninth Circuit has twice affirmed a district court's refusal to stay an execution based on a challenge to California's lethal injection protocol, but both times the court has emphasized that it was not deciding the merits, but was merely reviewing whether the district court abused its discretion in denying a motion for preliminary relief. *See Beardslee*, 395 F.3d at 1076; *Cooper*, 397 F.3d at 1034 (Browning, J., concurring). Indeed, in *Beardslee*, the court repeatedly noted that Beardslee had raised "troubling" questions about the administration of Procedure No. 770,

20

but concluded that "ultimate resolution of the merits of this issue . . . will have to await another day." 395 F.3d at 1075-76. Since that decision, a growing body of evidence has dispelled any doubt that the problem of botched lethal injections is a real one. Mr. Morales deserves to have his challenge considered on a full record after discovery.

### C.   MR. MORALES WILL SUFFER IRREPARABLE HARM IF TEMPORARY RELIEF IS NOT GRANTED

If the State is not enjoined from executing Mr. Morales in accordance with Procedure No. 770, Mr. Morales will suffer irreparable harm. The excruciating pain that Mr. Morales will suffer during his execution clearly constitutes irreparable harm. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (holding that continued pain and suffering resulting from deliberate medical indifference is irreparable harm). Moreover, he will have no meaningful retrospective remedy, as he will no longer be alive. Indeed, the State's violation of Mr. Morales's Eighth Amendment rights in itself warrants a presumption of irreparable harm, as the Ninth Circuit "ha[s] stated that an alleged constitutional infringement will often alone constitute irreparable harm." *Associated General Contractors of California, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (internal quotation marks omitted).

### D.   THE BALANCE OF HARDSHIPS FAVORS MR. MORALES

The balance of hardships tips sharply in Mr. Morales' favor. In requesting preliminary relief, Mr. Morales seeks simply to maintain the status quo while he litigates his claim that the lethal injection procedure is unconstitutionally painful. Without this relief, Mr. Morales will be unable to build a record establishing the danger presented by Procedure No. 770 before he himself is executed. The State, in contrast, will suffer no harm if Mr. Morales's execution is stayed pending the resolution of this action. See *Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal.*, 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired."). The State has not yet set an execution date; thus, it will

21

1    not be forced to reschedule the execution, and the public as yet has no expectation that Mr.

2    Morales will be executed on a particular date.

3          Mr. Morales has not delayed unduly in bringing this claim, and his diligence in pursuing

4    the claim demonstrates that he is not attempting to manipulate the judicial process in any

5    manner.  *Cf. Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal.*, 503 U.S. 653, 654 (1992)

6    (holding that particularly where an inmate has engaged in "abusive delay," the court may

7    consider the State's interest in moving forward with the execution in balancing the equities).  Mr.

8    Morales's challenge to the method of execution did not become ripe until his appeals were

9    exhausted and it became clear that he would be executed by lethal injection. *See LaGrand v.*

10   *Stewart*, 170 F.3d 1158, 1159 (9th Cir. 1999) (stating that the petitioner's challenge to the

11   method of execution had previously been dismissed as premature because the method of

12   execution had not yet been chosen);  *see also Beardslee*, 395 F.3d at 1069 n.6 (stating that

13   uncertainty as to when method-of-execution challenge became ripe weighed in Beardslee's

14   favor).  Thus, Mr. Morales could not have filed this suit until after his federal habeas petition was

15   denied.

16         After the United States Supreme Court denied certiorari on Morales's habeas petition and

17   the stay of execution of execution was lifted, Mr. Morales moved promptly to assert his claim.

18   Unlike in *Cooper* and *Beardslee*, Mr. Morales has not waited until his execution is imminent to

19   file this suit.  *Cf. Beardslee*, 395 F.3d at 1066-67 (Beardslee filed suit one month before his

20   execution date, after it was already scheduled); *Cooper*, 379 F.3d at 1030-31 (Cooper filed suit

21   eight days before his scheduled execution).

22         **E.       GRANTING TEMPORARY RELIEF IS IN THE PUBLIC INTEREST**

23         An inmate's claim that California's lethal injection protocol causes unconstitutional

24   wanton pain and suffering implicates the public interest.  *See Beardslee*, 395 F.3d at 1067 ("In

25   cases where the public interest is involved, the district court must also examine whether the

26   public interest favors the plaintiff.").  Because Mr. Morales alleges that the State of California

27

28

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3

will violate his Eighth Amendment rights by executing him in accordance with Procedure No. 770, it is paramount to the public interest that Morales's claims be resolved on the merits.

Lethal injection has become the predominant method of execution because it is widely believed by officials to be, and is perceived by the general public as, the most humane form of execution. See S. Russell, *The Execution of Stanley Tookie Williams; Injection: Designed to Make Execution More Humane*, SFGate.com, available at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2005/12/14/MNG05G7QM61.DTL (last visited Jan. 12, 2006). In choosing lethal injection on the assumption that it is painless, the California state legislature has concluded that employing the most humane method of execution possible is in the public interest. There is now compelling evidence, in the form of eyewitness accounts and medical evidence and opinion, that lethal injection protocols like the one used in California create a significant and unacceptable risk of inflicting unnecessary pain. The Ninth Circuit has twice been denied the opportunity to consider the constitutionality of California's Procedure No. 770 because the district court declined to stay the inmates' executions, and both times the circuit court has indicated that it could decide the merits only on a full record. Definitively resolving the important and pressing question of the constitutionality of Procedure No. 770 is entirely in the public interest, and therefore granting temporary relief so that Mr. Morales may remain alive while the parties conduct discovery into this issue also furthers the public interest.

There are no countervailing considerations suggesting that granting temporary relief would hurt the public interest. Mr. Morales has not engaged in abusive delay, nor is this suit an attempt simply to put off his execution. As noted above, Mr. Morales's execution date has not been set, so there are no expectations that his sentence will be carried out by a given date. Where an inmate presents a meritorious claim of constitutional dimension and is not attempting to manipulate the judicial process, it cannot possibly be in the public interest to allow the State to execute him using the very method that he challenges.

**IV.     CONCLUSION**

Michael Morales is not attempting to prevent the State from executing him.  He simply is demanding the constitutional protection to which he is entitled, by requesting that this Court ensure that he is not executed in an unconstitutional manner.   To avoid the risk that Mr. Morales's execution will be performed in such a manner as to cause him to suffer minutes of torture immediately preceding his death, Mr. Morales is entitled to relief under 42 U.S.C. § 1983.

Accordingly, Mr. Morales requests that the Court issue a temporary restraining order preventing defendants from executing him by means of lethal injection under the protocol currently in effect in the State of California.

Respectfully submitted,

Dated: January 17, 2006

MICHAEL ANGELO MORALES

By:        /s/
John R Grele

Dated:  January 17, 2006

David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA  90067
Phone:  (310) 552-5300
Fax:  (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA  94103
Phone:  (415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

24

1    Richard P. Steinken
     Benjamin J. Bradford
2    Janice H. Lam
     Stephanie L. Reinhart
3    Jenner & Block LLP
     One IBM Plaza
4    Chicago, IL  60611-7603
     Phone:  (312) 923-2938
5    Fax:  (312) 840-7338
6    rsteinken@jenner.com

7    Ginger D. Anders
     Jenner & Block LLP
8    601 Thirteenth Street, NW
     Suite 1200 South
9    Washington DC 20005-3823
     Phone:  (202) 639-6000
10   Fax:  (202) 639-6066
11   ganders@jenner.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR TRO, Case No. C 06 0219 (MCC)
CHICAGO_1358141_3