David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA  90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA  94103
Phone：(415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken
Jenner & Block LLP
One IBM Plaza
Chicago, IL  60611-7603
Phone：(312) 923-2938
Fax:  (312) 840-7338
rsteinken@jenner.com

Attorneys For Plaintiff MICHAEL ANGELO MORALES

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL ANGELO MORALES, <br><br> Plaintiff, <br><br> v. <br><br> RODERICK Q. HICKMAN, Secretary of the California Department of Corrections; STEVEN ORNOSKI, Warden, San Quentin State Prison, San Quentin, CA; and DOES 1-50, <br><br> Defendants. | Case No.  C 06 219 (JF) <br> C 06 926 (JF) <br><br> **FOURTH DECLARATION OF DR. MARK HEATH** |

1

Declaration of Dr. Mark Heath
No. C 06 219 JF

Dr. Mark Heath, under penalty of perjury, both deposes and states as follows:

1.       I have reviewed the Court's Order of February 13, 2006, asking the parties to address two questions: (1) whether it would be feasible to proceed with the execution using only thiopental; and (2) whether it would be feasible to use an independent means such as a medical device or qualified individual to ensure that Mr. Morales is in fact unconscious prior to the administration of the pancuronium and potassium.  I have also reviewed the document entitled Defendants' Response to Court Inquiry, submitted on February 13, 2006.  Counsel for Mr. Morales has asked me to comment on the Court's inquiries and also on the Defendants' response.   In this declaration I will, as much as possible, use independent literature and commentary from the American Veterinary Medical Association (AVMA) and the American Society of Anesthesiologists (ASA) to support my statements and opinion.  The opinions offered here are ones I hold to a reasonable degree of medical certainty.

**A.  Use of Thiopental Alone**

2.       Removal from the execution protocol of the unnecessary and potentially painful drugs pancuronium and potassium would greatly reduce the possibility that the execution would be cruel and inhumane.  The administration of sufficient thiopental will, as the CDCR and its expert have stated, with certainty cause death, because in the doses planned by the CDCR thiopental will ablate all respiratory activity.  Thiopental itself cannot cause pain if it is properly injected into the venous system, and instead will act as a powerful anesthetic to render the prisoner deeply unconscious.

3.       The above reflects my opinion based on my knowledge and experience with the use of thiopental, and it is substantiated by the practice of veterinary euthanasia.  The 2000 Report of the American Veterinary Medical Association Panel on Euthanasia (attached as an exhibit to my declaration of January 12, 2006, and also attached as Exhibit 1 hereto) states at the top of page 680: "All barbituric acid derivatives used for anesthesia are acceptable for euthanasia when administered intravenously.  There is a rapid onset of action, and loss of consciousness induced by barbiturates".  The AVMA Euthanasia guidelines go on to discuss the "Advantages" and "Disadvantages" of barbiturates, and conclude that "The advantages of using barbiturates for euthanasia in small animals

2

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

far outweigh the disadvantages. Intravenous injection of a barbituric acid derivative is the preferred method for euthanasia of dogs, cats, other small animals, and horses." Parenthetically, it is notable that the AVMA euthanasia guidelines recommend the use of barbiturates that are "long-lasting" and "stable in solution," neither of which apply to thiopental, but do apply to the drug most widely used by veterinarians, pentobarbital. Nevertheless, thiopental would, if administered properly and in sufficient dose, provide a humane death for animals including humans. The AVMA does note that "an aesthetically objectionable terminal gasp may occur in unconscious animals." A gasp, yawn, brief sputter, cough, or sigh is often seen with the administration of thiopental, is often seen in executions, and is not prevented by pancuronium because it occurs immediately upon delivery of the thiopental to the brain and prior to the completion of the administration of the thiopental or the onset of the administration of the pancuronium. Therefore, such a "gasp" would not be any more or less of a concern if thiopental were the sole exaction than it could be under the current protocol.

4.     The elimination of pancuronium from the protocol would serve many important and legitimate interests. Most importantly, it would eliminate the possibility that the prisoner could suffer and be unable to express that suffering to the execution personnel so that they could intervene. In the absence of pancuronium, if the prisoner was suffering to any significant extent he would be able to vocalize and move, thus apprising a properly trained execution team of the need to provide further anesthetic. Also very importantly, in the absence of pancuronium the witnesses to the execution would be unhindered in their capacity to determine whether or not the execution was humane.

5.     The elimination of potassium from the protocol would further reduce the possibility of an extremely painful execution taking place. As stated by the CDCR and its expert, potassium is not necessary for achieving death (if thiopental is administered in sufficient quantity). Because the administration of concentrated potassium solution is extraordinarily painful, the AVMA Euthanasia Guidelines state that "it is of utmost importance that personnel performing this technique are trained and knowledgeable in anesthetic techniques, and are competent in assessing anesthetic depth appropriate for administration of potassium chloride intravenously" (page 681). Omission of the

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

needless use of potassium would to a very significant extent mitigate the CDCR's apparent failure to use qualified personnel in the conduct of the execution.

6.     To summarize thus far, it is my opinion, substantiated by the AVMA Euthanasia guidelines, that the use of thiopental as the sole agent in the lethal injection procedure would represent an enormous and easily-taken step toward minimizing the risk of an excruciatingly painful execution.  The use of thiopental alone would be a major step toward making the lethal injection protocol compliant with the AVMA Euthanasia Guidelines.  The use of pancuronium and potassium in lethal injection, in the absence of qualified personnel, is problematic on many grounds, and the removal of these drugs from the protocol is a very positive suggestion.

**B.  Use of a Medical Device to Insure Consciousness**

7.     Regarding the use of a "medical device" to "insure that Plaintiff is in fact unconscious" it is important to understand that there is presently no device that can reliably provide sufficient information to serve as the *sole* indicator of anesthetic depth.  While there are widely-used devices that monitor brain electrical activity ("brain function monitoring"), the readings from these devices must be incorporated into the totality of  clinical information that the anesthesiologist uses to gauge anesthetic depth.  This opinion is supported by the recently approved "Practice Advisory for Intraoperative Awareness and Brain Function Monitoring," attached hereto as Exhibit 2, which states that physicians should rely on "multiple modalities, including clinical techniques (e.g., checking for clinical signs such as purposeful or reflex movement) and conventional monitoring systems (e.g., electrocardiograms, blood pressure monitors, heart-rate monitors, end-tidal anesthetic analyzers and capnographs)" (page 21).  Notably, the ASA Practice Advisory does not conclude that brain function monitoring devices should be considered to be a standard of care when providing general anesthesia. Brain function monitoring devices are indeed widely-used adjuncts to the array of techniques that are used to assess anesthetic depth, but at present these devices do not provide sufficient information to be used as the sole method for achieving this essential goal.

8.     Further, brain function monitoring devices can be used only by personnel with significant training in their use and with substantial experience in the provision of general anesthesia.

4

Use of these devices requires the careful placement of electrodes at specific sites on the patient's head and the use of software algorithms to assess the reliability and integrity of the reading. Further, practitioners should be familiar with the advantages and limitations of the devices, the recognition of artifacts in the signal, and the significance of confounding signals. While an experienced anesthesiologist should easily be able to rapidly incorporate a brain monitoring device into their clinical practice, it would be extremely difficult and probably impossible to adequately train an unqualified individual who lacks the breadth of knowledge and experience imparted by years of practice in the field of anesthesiology.

9.     In summary, while the addition of a brain function monitoring device would be a reasonable and positive step toward decreasing the likelihood of consciousness during the execution, its use as the sole method or device, particularly by personnel lacking extensive anesthesiology training, would not by itself be sufficient to reasonably insure that the prisoner is unconscious prior to the administration of the pancuronium and potassium. However, in the hands of an experienced and qualified practitioner such a device may well serve as a useful adjunct in the assessment of anesthetic depth during executions.

**C. Presence of a Qualified Individual To Insure Unconsciousness**

10.     Regarding the possibility of "the presence of a qualified individual approved by the Court to insure that the Plaintiff is in fact unconscious," it is my strongly-held opinion that this would (like the removal of pancuronium and potassium) represent a very positive step toward resolving concerns about the humaneness of the lethal injection procedure. While no complex human endeavor can ever be completely error-free, it is not disputable that the probability of error is reduced when complex tasks are performed by trained and experienced personnel.

11.     The assessment of anesthetic depth is inherently a complex task that requires the real-time and continuous integration of multiple lines of evidence and information. Thus, a "qualified individual" would be someone with significant training and experience in the provision of general anesthesia, such as an anesthesiologist or Certified Registered Nurse Anesthetist (CRNA). The presence of a qualified individual at the "bedside" of the condemned prisoner, with the ability and

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

intent to physically examine the prisoner and to view vital sign monitors, would meet the standard of care for general anesthesia, would meet the standard of care for veterinary euthanasia by potassium chloride administration, and could, if properly done, reasonably "insure that Plaintiff is in fact unconscious."

12.     In this context it seems appropriate to consider whether it would be feasible to recruit adequately trained and credentialed personnel for the critically important role of insuring adequate anesthetic depth.  Based on published survey data, I think it is likely that the CDCR would indeed be able to identify and engage a suitably-trained and credentialed practitioner for this purpose.  In an article entitled "Physicians' attitudes about involvement in lethal injection for capital punishment," attached hereto as Exhibit 3, Neil Farber and colleagues surveyed U.S. physicians in 2000 and found that 34% approved of eight actions related to the conduct of lethal injection, including the injection of the lethal drugs. (Arch. Intern Med. 2000 Oct. 23; 160(19):2912-6).  In a related study, Farber and colleagues found that 25% of physicians would personally perform five or more actions intrinsic to the conduct of lethal injection.  ("Physicians' willingness to participate in the process of lethal injection for capital punishment," Ann Intern Med. 2001 Nov. 20; 135(10):884-8, attached hereto as Exhibit 4).  Nineteen percent of responding physicians stated that they would personally administer the lethal drugs.  The study concluded that "[d]espite medical society policies, many physicians would be willing to be involved in the execution of adults."  Based on these surveys, to me it appears likely that the CDCR would not encounter significant difficulty in recruiting and contracting for an adequately trained physician to provide and assess the general anesthetic that necessarily must precede the administration of pancuronium and potassium.  While these surveys did not specifically target anesthesiologists, it seems reasonable to assume that the attitudes of anesthesiologists toward participation in lethal injection would not significantly depart from the attitudes of physicians in general.

13.     In summary, it is my strongly-held opinion that the inclusion of an individual with demonstrated experience and training in the provision of general anesthesia and the assessment of

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

anesthetic depth is an easily-taken step that would greatly reduce the possibility of an inhumane execution.

**D. Comment Regarding Defendants' Response**

14.    I would respectfully like to comment on some of the statements made by Attorney General Lockyer and colleagues in the "Defendants' Response to the Court Inquiry." The Defendants express concern that the use of thiopental alone would "unnecessarily delay completion of the execution." I agree that the omission of potassium would likely increase the time required to produce death. I do not know, however, the source upon which the Defendants relied to assert that the 5-gram dose of thiopental would take up to 45 minutes to cause death, and I am not convinced that this value is correct. Veterinarians are able to use barbiturates in a manner that causes death in just a few minutes, and certainly substantially less than 45 minutes.

15.    In terms of it being "unfair" to the execution team, it does seem reasonable to be concerned that prolonging the procedure might operate to modestly increase the stress of participants. However, the certain knowledge that the prisoner is deeply unconscious should provide psychological comfort and relief to the executioners that would outweigh the stress of a slightly longer execution. Further, the knowledge that the procedure, while somewhat slower, is being done in a way that has been raised to compliance with the AVMA guidelines for animals should render the situation much less stressful. As noted above, it is common and routine for veterinary practitioners to use only barbiturates, and this apparently does not cause significant stress to the participants (the veterinary staff) or the witnesses (the pet owners).

16.    The Defendants state that they are "not aware of any easily obtainable medical equipment that could effectively be used by the prison execution team to monitor consciousness." I cannot ascertain from this statement whether the Defendants have considered the use of brain function monitoring and concluded that the personnel could not be trained to perform this, or whether they are unaware of the existence of this technology. If the CDCR has indeed considered the use of brain function monitoring, I agree with their conclusion that the members of the prison execution team, as currently constituted, most likely do not have the training and experience to use such devices

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

1   effectively.   Many anesthesiologists, however, find this technique to be a very useful addition to the

2   suite of monitors and signs that are used to assess anesthetic depth.

3       17.    Regarding the proposal by the Defendants that Warden Ornoski undertake the task of

4   insuring that the Plaintiff is in fact unconscious, it is my opinion that this represents an unfortunate

5   disregard for the complexity of the procedure and the necessity of having a qualified, trained,

6   experienced individual serving this purpose.  I believe it is safe to assume that in any other setting in

7   which a surgical plane of anesthesia is indicated, the CDCR would never consider having Warden

8   Ornoski assess the prisoner's level of consciousness.  I feel safe in assuming that instead the CDCR

9   ensures that during elective surgical procedures all prisoners are provided with anesthesiologists or

10  CRNAs, and therefore I find it difficult to understand the Defendants' proposal that the Warden

11  undertake this critical and complex task.  When commenting about the ASA "Practice Advisory for

12  Intraoperative Awareness and Brain Function Monitoring" the ASA President, Orin Guidry, M.D.,

13  stated "The most important monitor in the operating room is the anesthesiologist, who has 12 years of

14  medical training and a wealth of experience to draw on when deciding what is appropriate for each

15  individual patient."  I, and I believe all anesthesiologists and CRNAs, completely agree with Dr.

16  Guidry's statement.  The only way to learn how to assess anesthetic depth is to spend considerable

17  time undergoing "elbow-to-elbow" training under the supervision of experienced practitioners.  It

18  would not be possible for Warden Ornoski, or any person, even an experienced nurse or physician or

19  paramedic, to learn how to assess anesthetic depth by lectures or reading.  The only way to learn this

20  is from practical experience gained under hands-on supervision and teaching.

21      18.    Moreover, in order to assess anesthetic depth by mechanically stimulating the

22  prisoner, the Warden would have to apply a graded series of increasingly painful noxious stimuli to

23  ensure that the prisoner is anesthetized to the point where he will not regain consciousness upon the

24  extraordinarily painful administration of the potassium.  For instance, in the veterinary setting, the

25  veterinarian might clamp the animal's toe or tail with progressively increasing force, such that the

26  animal would respond if not fully anesthetized (and not paralyzed).  It is unclear whether the CDCR

27  envisions the Warden undertaking this use of noxious stimuli when it states that the Warden will

28

8

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

"touch" Mr. Morales to assess his response.  Simply "touching" Mr. Morales, without more, however, will not effectively measure anesthetic depth.  Moreover, one danger of the procedure is that the inmate will regain consciousness after the pancuronium has been administered; mechanical stimulation is obviously not effective in assessing anesthetic depth at that point, because the inmate will not be able to move in response to stimuli.  Because the only indications of consciousness following the administration of pancuronium would be extremely subtle -- such as increased heart rate and blood pressure, or dilated pupils -- they cannot be assessed by someone lacking training in anesthesia.  On this point, paragraphs 8 and 9 of the affidavit of Dr. Kevin Concannon, attached as Exhibit 5 hereto, provide a helpful description of the subtlety of indicia of consciousness in animals and the need for adequate training to detect these indicia.  It is therefore my opinion that the presence of a fully trained individual is necessary to insure unconsciousness throughout the procedure.  In sum, the notion that by simply "touching" the prisoner the Warden, or anybody, could meaningfully assess anesthetic depth indicates a complete lack of understanding of the issues at hand, including the need to establish and verify a surgical plane of anesthesia (as required by the AVMA when potassium is used for euthanasia).

19.     In summary, I believe that the CDCR's counterproposal is not adequate to ensure a humane execution.  The court's suggestions should be easy to implement.  I am therefore surprised that the CDCR is not willing to adopt all of them.  The steps proposed in the court's inquiry would, if taken together and properly implemented, in essence render the execution protocol compliant with the AVMA guidelines, and would therefore represent the establishment of a recognized standard of conduct.  Lethal injection can be humane or inhumane, depending on how it is done and who performs it.  When performed by qualified veterinary personnel in compliance with the AVMA guidelines lethal injection is reliably humane and reliably satisfactory for the practitioners and pet owners.  By contrast, lethal injection as currently performed by the CDCR is rife with unacceptable practices that with certainty create needless risk of grave harm.

Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF

1     I declare under penalty of perjury under the laws of the state of California and the United

2  States of America that the foregoing is true and correct.  Executed this 14th day of February, 2006 in

3  New York City, New York.

4

5

6

7                                                    By: _____

8                                                          Dr. Mark Heath

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                             10
Fourth Declaration of Dr. Mark Heath
No. C 06 219 JF