**EDITOR'S CORRESPONDENCE**

## Increased Coronary Events, HERS, and HRT: Any Connection?

On behalf of the American Society for Reproductive Medicine, Birmingham, Ala, the Menopause Special Interest Group, Birmingham, would like to comment on the recent review article by John A. Blakely,[1] who reassessed the findings of the Heart and Estrogen/Progestin Replacement Study (HERS).[2] The HERS study was conducted to determine if hormone replacement therapy (HRT) reduces the number of coronary events in women who already have coronary artery disease (ie, a secondary prevention trial). The results included the unexpected finding that an early increase in coronary events is associated with daily treatment with both 0.625 mg of conjugated equine estrogen and 2.5 mg of medroxyprogesterone acetate at the same time in women with established coronary disease. Over the 4-year period of observation, however, there was no statistical difference between the women receiving estrogen-progestin and those receiving placebo. Dr Blakely suggests that the HRT precipitated this increase in early cardiovascular events. He explains that women in this trial who experienced early cardiovascular events were actually identified, whereas in prior observational studies women having early events were not identified because they were lost to follow-up by the time the information would have been gathered.

This is one plausible explanation for the reported early events in the HERS trial. As noted, however, the overall event rate was the same in both the HRT and placebo groups. Dr Blakely's conclusion that HRT caused the net harm is not supported by the results of the HERS trial. His further implication that HRT would cause greater net harm in women without known coronary heart disease is not supported by the data from HERS or any other clinical trial. Interim data released earlier this year from the Women's Health Initiative (WHI)[3] suggested that there was a small early increase in reported cardiovascular events in a population that had very few women with prior coronary disease, but a continued expectation of long-term benefit. The safety monitors for the study concluded that the study should proceed.

The Menopause Special Interest Group supports efforts to study this question using well-designed therapeutic interventional studies. The HERS trial is important because it is the first secondary prevention clinical trial on this subject. Other studies are in progress addressing this important issue, including the WHI, which has enrolled more than 27 000 women who will be observed through the year 2005. While we share Dr Blakely's concerns about the reported increased early coronary events associated with HRT in HERS, the only way to confirm these findings and clarify this issue for clinical practice is to await the results of many important ongoing clinical trials. We urge the public and the medical community to support research efforts by helping to enroll and to retain women in these important medical research endeavors.

*Robert W. Rebar, MD*
*David Archer, MD*
*Norfolk, Va*
*for the Menopause Special Interest Group of*
*the American Society for Reproductive Medicine*
*Birmingham, Ala*

1. Blakely JA. The Heart and Estrogen/Progestin Replacement Study revisited: hormone replacement therapy produced net harm, consistent with the observational data. *Arch Intern Med.* 2000;180:2897-2900.
2. Hulley S, Grady D, Bush T, et al, for the Heart and Estrogen/Progestin Replacement Study (HERS) Research Group. Randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women. *JAMA.* 1998;280:605-613.
3. Rossouw JE, Finnegan LP, Harlan WR, Pinn VW, Clifford C, McGowan JA. The evolution of the Women's Health Initiative: perspective from the NIH. *J Am Med Womens Assoc.* 1995;50:50-55.

### In reply

The HERS trial[1] did in fact show harm. The event rate in the first year was 50% higher in patients undergoing HRT (19 excess events). Although the control group almost caught up later (with 17 excess events), these events occurred later, resulting in an overall loss of roughly 2.3 patient-years per 100 patients treated. Additionally, there were 22 more thromboembolic events and 11 more deaths (all due to coronary heart disease [CHD]) in the HRT group. Statistics are not particularly helpful in evaluating unexpected findings, but the play of chance on the anticipated positive effect would not plausibly produce the HERS result.

The HERS data are compatible with 2 effects, the initial one harmful, the later beneficial, with a net loss of event-free survival. It is of course correct that there are no trials showing that HRT is harmful in women without coronary artery disease. But treatments with early bad and late good effects are not uncommon; much surgery consists of "present pain for future gain," and trial data often have implications for patient groups not directly studied.

For example, patients undergoing coronary bypass surgery experience net benefit, despite occasional deaths due to the procedure. Although there is no direct evidence that patients without heart disease would experience net harm from the same treatment, most sensible physicians would advise against it.

Similarly, women at low cardiovascular risk would experience more harm from HRT than observed in HERS if they suffered any significant fraction of the early events observed in HERS. The mechanism by which HRT produces early harm is unknown, and there is no evidence that women at low cardiovascular risk are immune to these early adverse effects. What is absolutely clear is that this early harm will be counterbalanced by considerably less late benefit, since there are considerably fewer late events to be prevented. This issue is unlikely to be resolved prior to the report of the WHI

Downloaded from www.archinternmed.com, on February 14, 2006
©2001 American Medical Association. All rights reserved.

*study, but it is not reassuring that an increase in early events has already been reported.*

*The HERS trial demonstrated that the observed association between HRT and low CHD event rates does not necessarily mean that HRT reduces CHD events. In fact, there are no data whatever that show that HRT reduces CHD events. The association between HRT and low rates of CHD is based on studies that omitted the crucial period of early harm. As a group,[2] the small, randomized, prospective studies done for other purposes have noted more events in HRT-treated patients than in non–HRT-treated patients. Prescription of HRT in the expectation of CHD benefit is based on misinterpretation of the finding of association, on wishful thinking, or on disinclination to change traditional advice; it is not based on evidence. The idea that HERS did not show harm is based on an artifact of analysis that assumes that death or myocardial infarction now are equivalent to death or infarct in the future. Not many of our patients would agree.*

*John A. Blakely, BA, MD, FRCP*
*Toronto, Ontario*

1. Hulley S, Grady D, Bush T, et al, for the Heart and Estrogen/Progestin Replacement Study (HERS) Research Group. Randomized trial of estrogen plus progestin for secondary prevention of coronary heart disease in postmenopausal women. *JAMA.* 1998;280:605-613.
2. Hemminki E, McPherson K. Impact of postmenopausal hormone therapy on cardiovascular events and cancer: pooled data from clinical trials. *BMJ.* 1997; 315:149-153.

## Clinical Signs and Symptoms Predicting Influenza Infection

Because influenza vaccines are not fully protective against influenza A and B, immediate treatment with neuraminidase inhibitors could further reduce the annual morbidity and mortality associated with influenza (notably in the presence of high-risk conditions). As described by Monto et al,[1] more studies are needed on early recognition of influenza infection on the basis of demographics, comorbidity, and signs and symptoms. We believe, however, that owing to the selection of the study subjects and incomplete statistical analysis performed by Monto et al, their study results are of little value to practicing physicians.

Monto et al[1] included a highly select population of relatively young, healthy people with fever or a symptom of feverishness and 2 or more influenza-like symptoms. Also, most of the participants reported onset of symptoms within the preceding 36 hours. It is not surprising, therefore, to find laboratory-confirmed influenza infection in 66% of these patients. In primary care practice, however, most of the patients do not present within 2 days of the onset of symptoms.[2] Primary care physicians even discourage healthy patients with flulike symptoms to come to their office. In our view, the relevance of these results is therefore questionable as applied to the target population (ie, patients with high-risk conditions who consult physicians because of influenza-associated complications).

Furthermore, the statistical analysis of this diagnostic study does not reflect the actual medical practice of general practitioners with patients suspected of having influenza, and this also calls into question the relevance of the results.[3] More appropriate would have been for the researchers to quantify the importance of easily obtained demographic information such as age and sex to the estimation of influenza probability. Next, the added value of disease-specific signs and symptoms should have been estimated using multivariate logistic regression techniques and analysis of receiver operating curves.[3] In addition, it would be much more practical if the authors had developed a prediction rule including all of the independent determinants of influenza infection in Table 4 of their article. Prediction rules can be directly applied by primary care physicians to individual patients suspected of having influenza infection to estimate the probability of their actually having influenza.[4] Unfortunately, the present study did not perform the sequential analysis that could have resulted in a such a prediction rule.

The results of the study by Monto et al[1] are important for screening for influenza infection in relatively healthy, working-age adults. However, physicians often encounter individuals at high risk for influenza-associated morbidity.[5] Since influenza viruses predispose patients to more serious secondary infections, a directly applicable diagnostic scoring rule is needed to enable efficient monitoring of high-risk individuals.

*Eelko Hak, MSC*
*Karl G. M. Moons, MSC*
*Theo J. M. Verheij, MD, PhD*
*Arno W. Hoes, MD, PhD*
*Utrecht, the Netherlands*

1. Monto AS, Gravenstein S, Elliott M, Colopy M, Schweinle J. Clinical signs and symptoms predicting influenza infection. *Arch Intern Med.* 2000;160:3243-3247.
2. Carman WF, Wallace LA, Walker J, et al. Rapid virological surveillance of community influenza infection in general practice. *BMJ.* 2000;321:736-737.
3. Moons KGM, Van Es G, Michel BC, Bailer HR, Habbema JDF, Grobbee DE. Redundancy of single diagnostic test evaluation. *Epidemiology.* 1999;10:76-81.
4. Sox HC, Jr. Probability theory in the use of diagnostic tests. *Ann Intern Med.* 1986;104:60-66.
5. Hak E, Verheij TJM, Van Essen GA, Lafeber AB, Grobbee DE, Hoes AW. Prognostic factors for influenza-associated hospitalization and death during an epidemic. *Epidemiol Infect.* In press.

### In reply

*We agree with Mr Hak and his colleagues that the ability to diagnose influenza on the basis of clinical signs and symptoms has become important, especially in light of the reported ability of neuraminidase inhibitors to shorten influenza duration and to prevent complications.[1] However, we disagree with the conclusion that our study is of little value to practicing physicians in making critical decisions on treatment, that cannot wait for the results of definitive virologic assays.*

*The population studied was adult and mainly nonelderly, but otherwise could not be considered highly selected. To enter the study, participants were required only to be feverish or to have fever and to have at least 2 respiratory symptoms. This means that the patient pool used for analysis is similar to one that would result from physicians clinically identifying patients who could have influenza. The reason 66% of patients at that point had confirmed influenza was the further requirement that viral circulation be confirmed in the area.[2] Interestingly, the use of different criteria to select patients for evaluation of oseltamivir therapy[3] resulted in a similar proportion of positive findings for influenza; it too used the requirement that circulation of influenza must be confirmed.*

Downloaded from www.archinternmed.com , on February 14, 2006
©2001 American Medical Association. All rights reserved.

Using the patient pool so identified, we carried out a variety of analyses, including logistic regression, to identify the signs and symptoms best predicting influenza. Analysis of receiver operating characteristic curves represents another way to compare different predictive strategies. We believe that the information in our Table 5 provides sufficient and useful information to aid clinicians in deciding which set of signs and symptoms to use to assess the probability of influenza.[2]

Our findings that cough and fever, especially high fever, are the best predictors of influenza have been confirmed by 2 studies not cited in our article that used different methods.[4,5] In particular, Govaert et al[4] reported an analysis involving older individuals in a practice setting in the Netherlands. They stressed the importance of the positive predictive value for decision making by general practitioners. However, the value they found for cough and fever was considerably lower than our findings of 79%; this again could be at least in part because they did not require that influenza be circulating at the time.

Finally, Mr Hak and colleagues are concerned that our patients were entered within 48 hours of symptom onset and state that this might be responsible for the positive results. Actually, a longer duration after symptom onset would have negatively affected the ability to identify influenza in the laboratory, either by serologic analysis or isolation. More importantly, the 48-hour interval is critical because it is only during this period that the neuraminidase inhibitors are known to be effective. As the value of these drugs becomes better established in different groups, the challenge is to get the drugs to those who need them during this time period.

Arnold S. Monto, MD
Ann Arbor, Mich
Stefan Gravenstein, MD
Norfolk, Va
Michael Elliott, MD
Michael Colopy, PhD
Jo Schweinle, MD
Research Triangle Park, NC

1. Monto AS, Webster A, Keene O. Randomized, placebo-controlled studies of inhaled zanamivir in the treatment of influenza A and B: pooled efficacy analysis. *J Antimicrob Chemother*. 1999;44:23-29.
2. Monto AS, Gravenstein S, Elliott M, Colopy M, Schweinle J. Clinical signs and symptoms predicting influenza infection. *Arch Intern Med*. 2000;160:3243-3247.
3. Treanor JJ, Hayden FG, Vrooman PS, et al. Efficacy and safety of the oral neuraminidase inhibitor oseltamivir in treating acute influenza. *JAMA*. 2000;283:1016-1024.
4. Govaert ThME, Dinant GJ, Aretz K, Knottnerus JA. The predictive value of influenza symptomatology in elderly people. *Fam Pract*. 1998;15:16-22.
5. Boivin G, Hardy I, Tellier G, Maziade J. Predicting influenza infections during epidemics with use of a clinical case definition. *Clin Infect Dis*. 2000;31:1166-1169.

## Physicians' Attitudes About Prescribing and Knowledge of the Costs of Common Medications

I read with interest the article by Reichert et al.[1] The article is relevant and timely. In India, it is much more important as our people are poor and they have to pay a large sum of their salary and/or savings for even a single episode of sickness.

It is really a matter of concern to know that 80% of physicians are unaware of the cost of the drugs.

In a study conducted in our hospital,[2] we surveyed doctors and nurses regarding the cost of 15 commonly used items (drugs [ranitidine, diclofenac, nifedipine, etc], disposables, and investigations [electrocardiogram, x-ray examination, blood glucose estimation, etc]). Cost estimates that fell within 20% of the correct prices were considered acceptable; 41% of the responses were incorrect (24% were overestimated and 17% were underestimated). The doctors underestimated costs more frequently than the nurses.

Both underestimates and overestimates affect health care service. The chances of waste increase if the costs of drugs are underestimated. When charges are overestimated, drugs may be underused.

Saroj K. Mishra, MD
Rourkela, India
Radhanath Satpathy, MD
Rourkela

1. Reichert S, Simon T, Halm EA. Physicians' attitudes about prescribing and knowledge of the costs of common medications. *Arch Intern Med*. 2000;160:2799-2803.
2. Mishra SK, Satpathy S. Hospital staff do not know how much drugs cost [letter]. *West J Med*. 1999;171:225.

### In reply

We thank Drs Mishra and Satpathy for their comments. Studies of different health systems on several continents now show that physicians' knowledge of medication costs is often inadequate. Unfortunately, very little, if any, time in medical school or residency programs in the United States is spent educating physicians-in-training about the basic anatomy and physiology of our health care system. Even less time in the curriculum is allocated to the most practical, consumer-level information about government and private health plans, benefits policies, and costs of drugs and other common expenditures.

In response to our findings,[1] we developed a simple, interactive teaching conference to educate internal medicine residents about the basics of insurance coverage of medications and costs of common drugs in ambulatory care. We also created a pocket guide containing the average wholesale price of a month's supply of the 100 most commonly used drugs in our adult primary care practice. This pocket guide is also accessible from all physician workstations via our institution's intranet Web site. Preliminary analyses of the impact of our educational intervention reveal that we were able to favorably change physicians' attitudes about prescribing and knowledge of medical costs.[2] We are also glad to see that several of the new electronic prescribing guides for handheld computers and Internet-based pharmacies now contain information on drug costs.[3,4] We feel that the availability of drug price information at the point of prescribing will best enable clinicians to consider cost when appropriate.

Because insurance coverage policies and prices are moving targets, we also need to encourage physicians to ask their patients if they have trouble paying for their prescriptions. Inability to pay for medications is an all-too-common cause of poor compliance with therapy. We may be unwittingly

Downloaded from www.archinternmed.com, on February 14, 2006
©2001 American Medical Association. All rights reserved.

*contibuting to this problem when we prescribe drugs without accurately considering their costs.*

*In addition, we need to empower patients to talk to their doctors about the real cost of drugs to them, since for most conditions, there are usually lower-cost alternatives. We were struck by the number of individuals who wrote to us seeking advice on more affordable drug choices after reading a newspaper account of our article, rather than ask their own doctor for help.*

*Finally, after an election season that saw broad political support for enhancing access to affordable medications, we hope that policymakers are finally able to make real progress in this area. The health of our patients and country deserves no less.*

Ethan A. Halm, MD, MPH
Todd Simon, MD
New York, NY
Steven Reichert, MD
Englewood, NJ

1. Reichert S, Simon T, Halm EA. Physicians' attitudes about prescribing and knowledge of the cost of common medications. *Arch Intern Med.* 2000;160: 2799-2803.
2. Korn LM, Reichert S, Simon T, Halm EA. Improving residents' and attendings' attitudes and knowledge of medication costs [abstract]. *J Gen Intern Med.* 2000;15(suppl 1):36.
3. qRx, version 4.0. Available at: http://www.epocrates.com/. Accessibility verified January 16, 2001.
4. Tarascon ePharmacopoeia. Available at: http://www.medscape.com/MedscapeMobile/Tarascon/public/learn_tarascon.html. Accessibility verified January 16, 2001.

## Physicians' Attitudes About Involvement in Lethal Injection for Capital Punishment

With regard to the excellent and revealing article by Farber et al,[1] we wish to make the following comments.

To the extent that physicians would justify their participation in executions on the basis that capital punishment has a deterrent effect on murder and thus protects life, they should know the current scientific "bottom line" regarding deterrence. There is now widespread agreement among criminologists that the death penalty is not a more effective deterrent to murder than an alternative sanction, namely, long-term imprisonment.[2]

In the study of Farber et al,[1] the number of physicians who believed that the death penalty has a deterrent effect on murder is striking: 46% believed that the death penalty significantly lowers or somewhat lowers the murder rate. The opposite effect of the death penalty has been called brutalization, the proposition that the murder rate goes up after executions. In one explanation of brutalization, individuals receive the message from the state that lethal revenge is correct and proper, and then feel justified in following the example of the state. Only about 1% of responding physicians expressed a belief in brutalization (ie, that the death penalty somewhat raises or significantly raises the murder rate). Forty percent believed that there is no effect (ie, neither deterrence nor brutalization). Notably, Farber et al found that physicians who believed that capital punishment has a deterrent nor effect approved of more physician participation in capital punishment (actions deemed unethical by medical societies) than physicians who believed that capital punishment has no deterrent effect or has a brutalizing effect.

If physicians understood that capital punishment is not a more effective deterrent to murder than long-term imprisonment and does not protect public health by decreasing societal violence, they might have less appetite for participating in executions or otherwise supporting capital punishment. However, it is possible that the expressed belief in deterrence is a surrogate or rationalization for other motives (for example, vengeance or the desire to make a moral statement regarding the sanctity of human life). In this case, physicians' willingness to participate in capital punishment might be little affected by knowledge of the lack of deterrent effect as compared with long-term imprisonment.

Even when physicians hold widely disparate political or scientific views, they may find some common ground in historical matters, especially the history of medicine. It is in this spirit that the following is offered. The idea of brutalization, that capital punishment might increase the level of societal violence, is not new. Dr Benjamin Rush, a physician and signer of the Declaration of Independence, wrote about the brutalization factor as early as 1787 and used a crude statistical analysis to support his hypothesis.[3,4] Dr Rush compared the level of murder in Pisa, a city without the death penalty for murder, with that in Rome, a retentionist jurisdiction during the period in question. The much higher incidence of murder in Rome led Rush to conclude that "Even murder itself is propagated by the punishment of death for murder. Of this we have a remarkable proof in Italy."[3]

Dr Rush considered the demographics of Pisa (Tuscany) and Rome, and concluded that "It is remarkable, the manners, principles, and religion, of the inhabitants of Tuscany and Rome, are exactly the same. The abolition of death alone, as a punishment for murder, produced this difference in the moral character of the two nations."[3] Interestingly, Rush concluded that long-term imprisonment was an ultimate solution:

> If society can be secured from violence, by confining the murderer, so as to prevent a repetition of his crime, the end of extirpation will be answered. In confinement, he may be reformed— and if this should prove impracticable, he may be restrained for a term of years, that will probably be coeval with his life.[3]

Although a few modern studies have found a brutalization effect,[5-7] when viewed from the perspective of the entire literature, the evidence for brutalization is limited. Criminologists continue to refine their studies by examining more specific subpopulations and circumstances of murder, and additional evidence for brutalization (or deterrence) may emerge. Collectively, however, at the present time it is most prudent scientifically to accept the null hypothesis (ie, no net deterrence or brutalization). Of course, these studies are based on statistical analysis of populations. However, there is another perspective on this issue, and physicians are intimately familiar with this perspective. This is the perspective of the individual patient, the "case." At the same time that physicians understand the

Downloaded from www.archinternmed.com , on February 14, 2006
©2001 American Medical Association. All rights reserved.

necessity and desirability of statistical analyses on populations, they understand that statistics do not predict events regarding an individual patient.

The late Dr Louis Jolyon West[8] considered the brutalization effect from the perspective of individual cases. Based on these case studies, he concluded,

> I am convinced that there is an even more specific way in which the death penalty breeds murder. It becomes more than a symbol. It becomes a promise, a contract, a covenant between society and certain (by no means rare) warped mentalities who are moved to kill as part of a self-destructive urge. These murders are discovered by the psychiatric examiner to be, consciously or unconsciously, an attempt to commit suicide by committing homicide. It only works if the perpetrator believes he will be executed for his crime.[8]

Physicians' attitudes about racism, classism, and error in the administration of capital punishment in the United States were not examined in the study by Farber et al. Not only is the death penalty problematic because of the issues of deterrence and brutalization, but very serious concerns have been raised because of race bias, class bias, and errors in its administration. Recent statistics from the Department of Justice[9] are consistent with a significant error rate in capital convictions: in 1998, 285 individuals were sent to death row in the United States, but 93 were removed from death row by judicial order (excluding executions). Despite the safeguards in the current system, the threat of executing individuals who are legally or actually innocent is real. How physicians understand or misunderstand these elements of race bias, class bias, and error might provide clues as to why the majority of physicians view their participation in executions as ethically acceptable.

*Daniel P. Wirt, MD*
*Houston, Tex*
*William C. Bailey, PhD*
*Cleveland, Ohio*
*William J. Bowers, PhD*
*Boston, Mass*

1. Farber N, Davis EB, Weiner J, Jordan J, Boyer EG, Ubel PA. Physicians' attitudes about involvement in lethal injection for capital punishment. *Arch Intern Med*. 2000;160:2912-2916.
2. Bailey WC, Peterson RD. Capital punishment, homicide, and deterrence: an assessment of the evidence and extension to female homicide. In: Smith MD, Zahn MA, eds. *Homicide: A Sourcebook of Social Research*. Thousand Oaks, Calif: Sage Publications; 1999:257-276..
3. Rush B. *An Enquiry Into the Effects of Public Punishments Upon Criminals and Upon Society: Read in the Society for Promoting Political Enquiries, Convened at the House of his Excellency, Benjamin Franklin, Esquire, in Philadelphia, March 9th, 1787*. Philadelphia, Pa: Joseph James; 1787. Available in: *Essays: Literary, Moral and Philosophical*. Schenectady, NY: Union College Press; 1988:79-94.
4. Rush B. *Considerations on the Injustice and Impolicy of Punishing Murder by Death; Extracted From the American Museum; With Additions*. Philadelphia, Pa: Mathew Carey; 1792.
5. Bowers WJ. The effect of executions is brutalization, not deterrence. In: Haas KC, Inciardi JA, eds. *Challenging Capital Punishment: Legal and Social Science Approaches*. Newbury Park, Calif: Sage Publications; 1988:49-89.
6. Cochran JK, Chamlin MB, Seth M. Deterrence or brutalization? an impact assessment of Oklahoma's return to capital punishment. *Criminology*. 1994;32:107-134.
7. Bailey WC. Deterrence, brutalization, and the death penalty: another examination of Oklahoma's return to capital punishment. *Criminology*. 1998;36:711-733.
8. West LJ. Psychiatric reflections on the death penalty. *Am J Orthopsychiatry*. 1975;45:689-700.
9. Snell TL. *Capital Punishment 1998*. Washington, DC: Bureau of Justice Statistics, Dept of Justice; 1999.

## In reply

*We are appreciative of the insightful comments by Wirt et al. They point out the large number of respondents to our survey who believed that the death penalty had a significant deterrent effect on the murder rate.[1] They also indicate that in order to justify their participation in lethal injections, physicians should know the current scientific evidence involving the death penalty and its effect on the murder rate. While such knowledge is important, we believe that those who condone physician involvement in the death penalty will need to provide a cogent ethical argument for why such participation should be allowed. In our view, as Wirt et al point out, there is no evidence that the death penalty negatively affects the murder rate. In addition, even if capital punishment were a deterrent against violent crime, it still would not justify physician involvement in the process.*

*In addition, we believe that there may be multiple factors involved in why these physicians condoned the involvement of their colleagues in the death penalty. Physicians have cited the need for a shared public responsibility in conducting lethal injections,[2] while others[3,4] believe that prisoners suffer less when physicians are involved. It is interesting that Wirt et al raised the issues of racism and classism in attempting to explain why physicians would condone their involvement in lethal injections. We did not investigate the reasoning of physicians in this study. However, in previous work,[5] we found that residents' decisions to breach confidentiality in hypothetical cases of self-reported past crime were not affected by the race of the hypothetical patient. It is possible that such biases come into play regarding physicians' attitudes toward involvement in lethal injections. However, we believe more fundamental concerns, such as whether government can ever be involved in medical processes and technology, and physicians' perceived duty to society vs their obligation to their patients, must be explored.*

*Neil J. Farber, MD*
*Wilmington, Del*
*Elizabeth B. Davis, PhD*
*Washington, DC*
*Joan Weiner, PhD*
*Philadelphia, Pa*
*Janine Jordan, MD*
*Wilmington*
*E. Gil Boyer, EdD*
*Philadelphia*
*Peter A. Ubel, MD*
*Ann Arbor, Mich*

1. Farber NJ, Davis EB, Weiner J, Jordan J, Boyer EG, Ubel PA. Physicians' attitudes about involvement in lethal injection for capital punishment. *Arch Intern Med*. 2000;160:2912-2916.
2. Crowley JP, Ingall MA, Kahr FM, Braden W, Hershkowitz M, Rakatansky H. Capital punishment and the physician: the views of 6 Rhode Island physicians. *R I Med*. 1995;78:215-221.
3. Thorburn KM. Physicians and the death penalty. *West J Med*. 1987;146:638-640.
4. American Medical Association Council on Ethical and Judicial Affairs. Physician participation in capital punishment. *JAMA*. 1993;270:365-368.
5. Farber NJ, Weiner JL, Boyer EG, Robinson EJ. Residents' decisions to breach confidentiality. *J Gen Intern Med*. 1989;4:31-33.

Downloaded from www.archinternmed.com , on February 14, 2006
©2001 American Medical Association. All rights reserved.