**E-filed 2/14/06**

DESIGNATED FOR PUBLICATION

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| Michael Angelo MORALES,<br><br>                    Plaintiff,<br><br>          v.<br><br>Roderick Q. HICKMAN, Secretary of the California Department of Corrections and Rehabilitation; Steven W. Ornoski, Acting Warden of San Quentin State Prison; and Does 1-50,<br><br>                    Defendants. | Case Number C 06 219 JF<br>Case Number C 06 926 JF RS<br><br>DEATH-PENALTY CASE<br><br>ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION<br><br>[Docket No. 12] |

Plaintiff Michael Angelo Morales is a condemned inmate at California's San Quentin State Prison. He is scheduled to be executed at 12:01 a.m. on February 21, 2006. The present action challenges the manner in which California's lethal-injection protocol is administered. In his amended complaint, Plaintiff contends that the way in which the protocol is carried out creates an undue risk of causing him excessive pain as he is being executed, thereby violating the Eighth Amendment's command that "cruel and unusual punishments [not be] inflicted." U.S. Const. amend. VIII.

Plaintiff seeks a preliminary injunction to stay his execution so that the Court may conduct a full evidentiary hearing to consider his claims. Defendants Roderick Q. Hickman, Secretary of the California Department of Corrections and Rehabilitation, and Steven W.

1    Ornoski, Acting Warden of San Quentin State Prison, oppose the motion.  The Court has read the

2    moving and responding papers and has considered the oral arguments of counsel presented on

3    January 26 and February 9, 2006.  The Court also has considered the parties' responses to its

4    request for supplemental briefing dated February 13, 2006.  The Court has jurisdiction pursuant

5    to 42 U.S.C. § 1983 (2006).  *Beardslee v. Woodford*, 395 F.3d 1064, 1069-70 (9th Cir. 2005).

6    For the reasons set forth below, Plaintiff's motion will be denied, subject to certain conditions

7    concerning the manner in which the execution is to be carried out.

8                                                    I

9          The Eighth Amendment prohibits punishments that are "incompatible with the evolving

10   standards of decency that mark the progress of a maturing society."  *Estelle v. Gamble*, 429 U.S.

11   97, 102 (1976) (internal quotation marks and citations omitted).  Executions that "involve the

12   unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976), or that

13   "involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447 (1890), are not

14   permitted.  When analyzing a particular method of execution or the implementation thereof, it is

15   appropriate to focus "on the objective evidence of the pain involved."  *Fierro v. Gomez*, 77 F.3d

16   301, 306 (9th Cir. 1996) (citing *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir. 1994)), *vacated on

17   other grounds*, 519 U.S. 918 (1996).  In this case, the Court must determine whether Plaintiff "is

18   subject to an unnecessary risk of unconstitutional pain or suffering such that his execution by

19   lethal injection under California's protocol must be restrained." *Cooper v. Rimmer*, 379 F.3d

20   1029, 1033 (9th Cir. 2004).

21         In California, unless a condemned inmate affirmatively selects to be executed by lethal

22   gas, executions are performed by lethal injection.  Cal. Penal Code § 3604 (West 2006).

23   Defendants have developed California's lethal-injection protocol[1] to implement this statutory

24   directive.  *See id.* at § 3604(a) (lethal injection to be administered "by standards established

25

26         [1]Defendants have developed two versions of the protocol:  a confidential version labeled "San
     Quentin Institution Procedure No. 770" and a redacted, publicly available version labeled "San Quentin
27   Operational Procedure No. 770."  During the course of this litigation, the Court reviewed the confidential
     version *in camera* and ordered Defendants to make it available to Plaintiff's counsel with certain
28   redactions related to prison security and subject to a protective order.  There are potentially significant
     differences between the two versions.

                                                    2

under the direction of the Department of Corrections").[2]  The protocol calls for the injection of a

sequence of three drugs into the person being executed:  five grams of sodium thiopental, a

barbiturate sedative, to induce unconsciousness; 50 or 100 milligrams of pancuronium bromide, a

neuromuscular blocking agent, to induce paralysis; and 50 or 100 milliequivalents of potassium

chloride, to induce cardiac arrest.[3]  Significantly, each drug is given in a dosage that is lethal in

and of itself.

In his amended complaint, Plaintiff contends that these drugs are administered in such a

way that there is an undue risk that he will be conscious when the pancuronium bromide and the

potassium chloride are injected.  Defendants agree with Plaintiff that a person injected with either

of these two drugs while conscious would experience excruciating pain; however, they assert that

the dosage of sodium thiopental is more than sufficient to insure that Plaintiff will be

unconscious prior to their administration.

A significant number of media reports have described this action as an attack on the

constitutionality of lethal injection.  *See, e.g.*, *Lethal Injection of Murderer-Rapist Could Be*

---

[2]The Department of Corrections was reorganized into the Department of Corrections and
Rehabilitation on July 1, 2005.

[3]The lethal-injection protocol is not entirely clear as to which dosages of pancuronium bromide
and potassium chloride are used.  The protocol provides for the preparation of two syringes of 50
milligrams each of pancuronium bromide (which is also known as Pavulon).  It then instructs:

> The "NS" syringe shall be removed and one of the #2 syringes (Pavulon)
> shall be inserted.  The entire contents shall be injected with slow, even
> pressure on the syringe plunger.
> CAUTION:  If all of the Sodium Pentothal has not been flushed from the
> line, there is a chance of flocculation forming when coming in contact
> with the Pavulon, which will block the flow of fluid through the
> Angiocath.  If this should happen, shift over to the contingency line
> running to the right arm.  When the contents of the first #2 syringe has
> [sic] been injected, repeat with the second #2 syringe.

San Quentin Operational Procedure No. 770 § VI.E.4.d.5)(g)(5) (publicly available version).  Regarding
syringes of 50 milliequivalents of potassium chloride, the protocol directs, "The first #3 syringe (KCl)
shall be inserted and the entire contents shall be injected.  The second #3 syringe shall be repeated or
until death has been pronounced by the physician [sic]."  *Id.* at § VI.E.4.d.5)(g)(7).  Additionally, the
protocol and Defendants' submissions are inconsistent as to whether the volume used to administer
sodium thiopental is 20 or 50 cubic centimeters, *see id.* at § VI.E.4.d.5)(c)(6)(d); this difference would
affect how much sodium thiopental actually gets to an inmate being executed due to the volume of fluid
containing sodium thiopental that is retained in the intravenous line after the flush of 20 cc of saline, as a
percent of the total dose of sodium thiopental that is intended to be administered.

Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)

1   *Blocked*, San Diego Union-Trib., Feb. 10, 2006, at A4 ("A federal judge said yesterday that he

2   might block a murderer and rapist's Feb. [sic] 21 execution to provide enough time to determine

3   whether lethal injection is cruel and unusual punishment."). As is apparent from the foregoing

4   discussion, these reports are in error. Rather, the discrete issues in the present action are whether

5   or not there is a reasonable possibility that Plaintiff will be conscious when he is injected with

6   pancuronium bromide or potassium chloride, and, if so, how the risk of such an occurrence may

7   be avoided.

8                                                    II

9          The United States Court of Appeals for the Ninth Circuit has explained that a condemned

10  inmate seeking a stay of execution is

11              required to demonstrate (1) a strong likelihood of success on the
                merits, (2) the possibility of irreparable injury to the plaintiff if
12              preliminary relief is not granted, (3) a balance of hardships
                favoring the plaintiff, and (4) advancement of the public interest
13              (in certain cases). Alternatively, injunctive relief could be granted
                if he demonstrated either a combination of probable success on the
14              merits and the possibility of irreparable injury or that serious
                questions are raised and the balance of hardships tips sharply in his
15              favor. These two alternatives represent extremes of a single
                continuum, rather than two separate tests. Thus, the greater the
16              relative hardship to the party seeking the preliminary injunction,
                the less probability of success must be established by the party. In
17              cases where the public interest is involved, the district court must
                also examine whether the public interest favors the plaintiff. [¶] In
18              capital cases, the Supreme Court has instructed that equity must
                take into consideration the State's strong interest in proceeding
19              with its judgment.

20  *Beardslee*, 395 F.3d at 1067-68 (internal quotation marks, citations, brackets and emphasis

21  omitted). As the United States Supreme Court has adjured,

22              before granting a stay [of execution], a district court must consider
                not only the likelihood of success on the merits and the relative
23              harm to the parties, but also the extent to which the inmate has
                delayed unnecessarily in bringing the claim. Given the State's
24              significant interest in enforcing its criminal judgments, there is a
                strong equitable presumption against the grant of a stay where a
25              claim could have been brought at such a time as to allow
                consideration of the merits without requiring entry of a stay.
26
27  *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004) (citations omitted).

28

                                                    4

III

Two years ago, condemned inmate Kevin Cooper faced imminent execution at San Quentin. Eight days before he was scheduled to be executed, Cooper filed an action in which he challenged California's lethal-injection protocol on Eighth Amendment grounds. This Court declined to stay the execution, finding that Cooper had delayed unduly in asserting his claims and that he had done no more than raise the possibility that he might suffer unnecessary pain if errors were made in the course of his execution. *Cooper v. Rimmer*, No. C 04 436 JF, 2004 WL 231325 (N.D. Cal. Feb. 6, 2004). The Ninth Circuit affirmed for the same reasons. *Cooper*, 379 F.3d 1029.[4]

Just over one year ago, another inmate under sentence of death, Donald J. Beardslee, filed an action in this Court challenging the lethal-injection protocol shortly after the San Mateo Superior Court set his execution date. Beardslee contended that the protocol violated both his First Amendment right to freedom of speech and his Eighth Amendment right not to be subjected to cruel and unusual punishment. While this Court recognized that Beardslee had been more diligent than Cooper in that he filed his action thirty days before his scheduled execution and had exhausted his administrative remedies prior to filing, it nonetheless concluded that Beardslee also had delayed unduly in asserting his claims. On the merits, the Court concluded, "Based upon the present record, a finding that there is a reasonable possibility that . . . errors will occur [during Beardslee's execution] would not be supported by the evidence. [Beardslee's] action thus is materially indistinguishable from *Cooper*." *Beardslee v. Woodford*, No. C 04 5381 JF, 2005 WL 40073 (N.D. Cal. Jan. 7, 2005).

The Ninth Circuit disagreed with this Court's determination that Beardslee's action was untimely. *Beardslee*, 395 F.3d at 1069-70. The appellate court noted that "the precise execution

---

[4]In a separate habeas corpus proceeding originally brought before the Ninth Circuit, that court granted Cooper a stay of execution to permit him to return to the United States District Court for the Southern District of California to pursue his claim that he is innocent of the crimes of which he was convicted and for which he was sentenced to death. *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir. 2004) (en banc). This Court subsequently dismissed without prejudice Cooper's challenge to the lethal-injection protocol in light of Cooper's failure to exhaust his administrative remedies. *Cooper v. Woodford*, No. C 04 436 JF (N.D. Cal. Oct. 12, 2004).

protocol is subject to alteration until the time of execution" and it found that "by regulation the California Department of Corrections does not permit challenges to anticipated actions."[5]  *Id.* at 1069.  *Beardslee* thus suggests that in California, a condemned inmate's challenge to the lethal-injection protocol may not become ripe for judicial review until the inmate's execution is imminent.  *See id.* at 1069 n.5; *but cf. id.* at 1069-70 n.6 ("we have not resolved the question of when challenges to execution methods are ripe").  At the very least, unlike Cooper, "Beardslee pursued his claims aggressively as soon as he viewed them as ripe." *Id.* at 1069.

Although it concluded that Beardslee's challenge was timely, the Ninth Circuit affirmed this Court's decision on the merits, holding that "we cannot say, given our deferential standard of review, that the district court abused its discretion in denying [a] stay of execution." *Id.* at 1070. In doing so, however, it noted that

> the California execution logs of William Bonin, Keith Williams, Jaturun Siripongs, and Manuel Babbit[t] . . . contain indications that there may have been problems associated with the administration of the chemicals that may have resulted in the prisoners being conscious during portions of the executions.  This evidence, coupled with the opinion tendered by Beardslee's expert, raises extremely troubling questions about the protocol.

*Id.* at 1075.

In the present action, Plaintiff has been even more diligent than Beardslee:  he filed his challenge to the lethal-injection protocol shortly before the Ventura Superior Court scheduled his execution—thirty-nine days before the execution date that court ultimately set.[6]  Because in light of *Beardslee*, Plaintiff is not guilty of undue delay in bringing his claim, there is no presumption against the grant of a stay due to delay, much less the "strong equitable presumption" identified by the Supreme Court in *Nelson*, 541 U.S. at 650.[7]

---

[5]The regulation reads in relevant part, "An appeal may be rejected for any of the following reasons: . . . (3)  The appeal concerns an anticipated action or decision." Cal. Code Regs. tit. 15, § 3084.3(c) (2006).

[6]It also appears from the face of his amended complaint that Plaintiff has exhausted his administrative remedies.

[7]This conclusion is buttressed by the Supreme Court's recent denial, by a vote of 6-3, of an application to vacate a stay of execution in *Crawford v. Taylor*, 546 U.S. ___ , No. 05A705 (Feb. 1,

Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)

IV

Plaintiff's diligence in filing the present action has made it possible for this Court to proceed in a somewhat more orderly fashion than otherwise would have been possible. At the initial hearing on January 26, 2006, the Court announced that it would construe Plaintiff's application for a temporary restraining order as it would a motion for a preliminary injunction, ordered supplemental briefing on Plaintiff's motion to expedite discovery as well as his motion for a preliminary injunction, and scheduled oral argument on the motion for a preliminary injunction. On February 1, 2006, the Court issued an order granting in part Plaintiff's motion for expedited discovery; the discovery granted was completed the following day.[8] The Court heard argument on the motion for a preliminary injunction on February 9, 2006, and requested additional supplemental briefing by an order dated February 13, 2006.[9] As a result of this procedural history, the record in the present action is substantially more developed than the record in *Cooper* or *Beardslee*.

Through their involvement in the *Cooper* and *Beardslee* cases, both this Court and the

---

2006). Like Plaintiff, Taylor filed an action pursuant to § 1983 in which he challenged his state's lethal-injection protocol when his execution was imminent but an execution date had not yet been set. During the course of the litigation, the United States District Court for the Western District of Missouri scheduled an evidentiary hearing for February 2006. The Missouri Supreme Court subsequently selected February 1, 2006, for Taylor's execution date, and the district court issued a stay of execution. A panel of the Eighth Circuit vacated the stay, 2-1, and remanded with instructions for the action to be reassigned and for the new judge to hold an expedited evidentiary hearing. Following an abbreviated telephonic hearing, the district court denied Taylor relief. The Eighth Circuit panel affirmed, again 2-1, but the en banc court granted Taylor a stay by a vote of 9-1. As noted, the Supreme Court declined to vacate the stay. For the same reasons that the present action is analogous to *Taylor*, it is distinguishable from other recent cases in which the Supreme Court has allowed executions to go forward. *See, e.g.*, *Neville v. Livingston*, 546 U.S. ___ , No. 05-9136 (Feb. 8, 2006); *Elizalde v. Livingston*, 546 U.S. ___, No. 05A696 (Jan. 31, 2006).

[8]The discovery granted was concerned primarily with the three executions that Defendants have conducted since *Beardslee*—those of Beardslee himself on January 19, 2005; Stanley Tookie Williams on December 13, 2005; and Clarence Ray Allen on January 17, 2006. In addition, as noted, much of the confidential version of California's lethal-injection protocol was disclosed. Although not required to do so by the discovery order, Defendants also voluntarily produced additional execution logs that previously had not been made available.

[9]The additional briefing addresses whether it would be feasible for Plaintiff's execution to proceed using only sodium thiopental or utilizing an independent means to insure that Plaintiff will be unconscious before pancuronium bromide and potassium chloride are injected.

7

1   Ninth Circuit have acquired substantial familiarity with the legal and factual issues surrounding

2   lethal injection in California. In addition, many other courts have reviewed lethal-injection

3   protocols similar to California's. To date, no court has found either lethal injection in general or

4   a specific lethal-injection protocol in particular to be unconstitutional. *See, e.g.*, *Bieghler v.*

5   *State*, 839 N.E. 691, 694-96 (Ind. Dec. 28, 2005); *Boyd v. Beck*, ___ F. Supp. 2d ___, No. 5:05-

6   CT-774-D, 2005 WL 3289333 (E.D.N.C. Nov. 29, 2005); *Abdur'Rahman v. Bredesen*, ___

7   S.W.3d ___, No. M2003-01767-SC-R11-CV, 2005 WL 2615801 (Tenn. Oct. 17, 2005); *Aldrich*

8   *v. Johnson*, 388 F.3d 159 (5th Cir. 2004) (lethal injection in Texas); *Reid v. Johnson*, 333 F.

9   Supp. 2d 543 (E.D. Va. 2004); *Harris v. Johnson*, 376 F.3d 414 (5th Cir. 2004) (lethal injection

10  in Texas); *People v. Snow*, 65 P.3d 749, 800-01 (Cal. 2003); *Sims v. State*, 754 So.2d 657 (Fla.

11  2000); *State v. Webb*, 750 A.2d 448, 453-57 (Conn. 2000); *LaGrand v. Stewart*, 133 F.3d 1253,

12  1265 (9th Cir. 1998) (lethal injection in Arizona); *but cf. Rutherford v. Crosby*, 546 U.S. ___,

13  No. 05-8795 (Jan. 31, 2006) (granting stay of execution pending disposition of cert. pet.); *Hill v.*

14  *Crosby*, 546 U.S. ___, No. 05-8794 (Jan. 25, 2006) (granting stay of execution & granting cert.);

15  *Anderson v. Evans*, No. CIV-05-0825-F, 2006 WL 83093, at *3-*4 (W.D. Okla. Jan. 11, 2006)

16  (denying mot. to dismiss 8th amend. challenge to lethal-injection protocol). At the same time, it

17  should be noted that the record now before this Court, which includes both additional expert

18  declarations and detailed logs from multiple executions in California, contains evidence of a kind

19  that was not presented in these earlier cases. *See, e.g.*, *Reid*, 333 F. Supp. 2d at 548-49 (limiting

20  scope of review to "issues pertaining to the particular chemical combination . . . and their [sic]

21  probable affect [sic] on Reid" and excluding other evidence); *Webb*, 750 A.2d at 453-57

22  (resolving challenge in state where no lethal injections had been performed); *Bieghler*, 839

23  N.E.2d at 696; *Boyd*, 2005 WL 3289333, at *3.; *cf. Anderson*, 2006 WL 83093, at *3-*4

24  (discussing evidence proffered in complaint).

25      This Court and others have found persuasive the declarations of Defendants' medical

26  expert, Dr. Mark Dershwitz, to the effect that "over 99.999999999999% of the population would

27  be unconscious within sixty seconds from the start of the administration of [five grams of]

28  thiopental sodium" and that "this dose will cause virtually all persons to stop breathing within a

8

1   minute of drug administration.  Therefore . . . virtually every person given five grams of

2   thiopental sodium will have stopped breathing prior to" the administration of the pancuronium

3   bromide.  *Cooper*, 379 F.3d at 1032; *see also, e.g.*, *Reid*, 333 F. Supp. 2d at 547 (discussing two

4   grams of sodium thiopental used in Virginia).  In most if not all of the legal challenges to lethal

5   injection, condemned inmates have suggested various errors that could occur during the

6   administration of sodium thiopental, thereby rendering an inmate conscious when the

7   pancuronium bromide and potassium chloride are administered.  However, "the risk of accident

8   cannot and need not be eliminated from the execution process in order to survive constitutional

9   review," *Campbell*, 18 F.3d at 687, and the courts that have considered the issue to date have

10  found that "the likelihood of such an error occurring 'is so remote as to be nonexistent,'"

11  *Beardslee*, 2005 WL 40073, at *3 (quoting *Reid*, 333 F. Supp.2d at 551).

12          Plaintiff does not dispute Dr. Dershwitz's conclusions at the theoretical level, agreeing

13  that a person's breathing and consciousness should cease within one minute of the beginning of

14  the administration of sodium thiopental.  Instead, he contends that in actual practice in

15  California, for whatever reason, the sodium thiopental has not had its intended effect.  He cites,

16  *inter alia*, the following evidence from the execution logs:

17          Jaturun Siripongs, executed February 9, 1999:  The administration of sodium thiopental

18          began at 12:04 a.m. and the administration of pancuronium bromide began at 12:08 a.m.,

19          yet respirations[10] did not cease until 12:09 a.m., four minutes after the administration of

20          sodium thiopental began and one minute after the administration of pancuronium bromide

21          began.

22          Manuel Babbitt, executed May 4, 1999:  The administration of sodium thiopental began

23          at 12:28 a.m. and the administration of pancuronium bromide began at 12:31 a.m., yet

24          respirations did not cease until 12:33 a.m., five minutes after the administration of

25          sodium thiopental began and two minutes after the administration of pancuronium

26          bromide began.  In addition, brief spasmodic movements were observed in the upper

27

28          [10]"Respirations" is the term used by the employees of the Department of Corrections and
        Rehabilitation who witnessed the executions and made entries in the execution logs.

1    chest at 12:32 a.m.[11]

2         Darrell Keith Rich, executed March 15, 2000:  The administration of sodium thiopental

3    began at 12:06 a.m. and the administration of pancuronium bromide began at 12:08 a.m.,

4    yet respirations did not cease until 12:08 a.m., when pancuronium bromide was injected,

5    two minutes after the administration of sodium thiopental began.  Chest movements were

6    observed from 12:09 a.m. to 12:10 a.m.[12]

7         Stephen Wayne Anderson, executed January 29, 2002:  The administration of sodium

8    thiopental began at 12:17 a.m. and the administration of pancuronium bromide began at

9    12:19 a.m., yet respirations did not cease until 12:22 a.m., five minutes after the

10    administration of sodium thiopental began and three minutes after the administration of

11    pancuronium bromide began.

12         Stanley Tookie Williams, executed December 13, 2005:  The administration of sodium

13    thiopental began at 12:22 a.m., the administration of pancuronium bromide began at

14    12:28 a.m., and the administration of potassium chloride began at 12:32 a.m. or 12:34

15    a.m., yet respirations did not cease until either 12:28 a.m. or 12:34 a.m.—that is, either

16    six or twelve minutes after the administration of sodium thiopental began, either when or

17    six minutes after the administration of pancuronium bromide began, and either four

18    minutes before or when the administration of potassium chloride began.[13]

19

20    [11]Plaintiff's medical expert, Dr. Mark Heath, notes that Babbitt maintained a steady heart rate of
21    95 or 96 beats per minute for seven minutes after he was injected with sodium thiopental.  Dr. Heath
      states that this fact raises concerns about whether Babbitt was properly sedated.

22    [12]According to Dr. Heath, this evidence is consistent with a conscious attempt to fight the
23    paralytic effect of the pancuronium bromide rather than with unconsciousness due to the successful
      administration of the sodium thiopental, particularly in light of Rich's apparently iatrogenic rapid heart
24    rate of 110 beats per minute as the chest movements were occurring.  Rich's heart rate was 130 beats per
25    minute when the administration of potassium chloride began.

26    [13]Defendants' records are inconsistent in this regard:  the formal execution log suggests that
27    Williams stopped breathing at 12:28 a.m. and indicates that potassium chloride was injected at 12:32 a.m.
      whereas the execution team's log states that Williams stopped breathing at 12:34 a.m when the potassium
      chloride was injected.  It appears that the formal log has been altered without any indication as to who
28    made the alteration.  Similarly to Rich, Williams apparently experienced an iatrogenic rapid heart rate of
      115 beats per minute when he was injected with pancuronium bromide.

10

1    Clarence Ray Allen, executed January 17, 2006:  The administration of sodium thiopental

2         began at 12:18 a.m., yet respirations did not cease until 12:27 a.m., when pancuronium

3         bromide was injected, nine minutes after the administration of sodium thiopental began.

4         In a new declaration filed in the present action on February 6, 2006, Dr. Dershwitz opines

5    that the "respirations" reported in the execution logs may be not be respirations at all,

6    hypothesizing that they are no more than "chest wall movements."  However, he proposes this

7    hypothesis with considerably less certainty than was evident in his discussion of the

8    pharmacokinetics and pharmacodynamics of sodium thiopental, which are his principal areas of

9    expertise.  *Cf. Beardslee*, 395 F.3d at 1075.  While Dr. Dershwitz's explanation may be correct,

10   evidence from eyewitnesses tending to show that many inmates continue to breathe long after

11   they should have ceased to do so cannot simply be disregarded on its face.  In rejecting the

12   plaintiffs' claims on the merits in *Cooper* and *Beardslee*, this Court relied on Dr. Dershwitz's

13   opinion that the amount of sodium thiopental used in California's lethal-injection protocol should

14   both stop breathing and cause unconsciousness within a minute after administration begins.

15   While there is no direct evidence that any condemned inmate actually was conscious when

16   pancuronium bromide was injected, evidence from Defendants' own execution logs that the

17   inmates' breathing may not have ceased as expected in at least six out of thirteen executions by

18   lethal injection in California raises at least some doubt as to whether the protocol actually is

19   functioning as intended, and because of the paralytic effect of pancuronium bromide, evidence

20   that an inmate was conscious at some point after that drug was injected would be imperceptible

21   to anyone other than a person with training and experience in anesthesia.[14]

22        Other evidence in the present record raises additional concerns as to the manner in which

23   the drugs used in the lethal-injection protocol are administered.  For example, it is unclear why

24   some inmates— including Clarence Ray Allen, who had a long history of coronary artery disease

25   and suffered a heart attack less than five months before he was executed, *see Allen v. Hickman*,

26   ___ F. Supp. 2d ___, No. C 05 5051 JSW, 2005 WL 3610666 (N.D. Cal. Dec. 15, 2005)—have

27

28        [14]*See* Dr. Heath's declaration in response to the February 13 request for supplemental briefing, at
     p. 9.

11

1   required second doses of potassium chloride to stop promptly the beating of their hearts.[15]  The

2   Court need not list all such anomalies here.  It is sufficient for purposes of resolving the present

3   motion to note that Plaintiff has raised more substantial questions than his counterparts in

4   *Cooper* and *Beardslee*.

5                                                                  V

6          The fact that Plaintiff has raised such questions does not mean that he must be granted a

7   stay of execution.  The State's "strong interest in proceeding with its judgment," *Gomez v. U.S.*

8   *Dist. Ct. N.D. Cal.*, 503 U.S. 653, 654 (1992), is no less important here than it was in *Cooper* and

9   *Beardslee*.  It has been nearly twenty-five years since Plaintiff committed the crimes for which he

10  now faces the death penalty.  Even if the Court were to hold an evidentiary hearing and Plaintiff

11  were to prevail, Plaintiff would remain under a sentence of death.  Neither the death penalty nor

12  lethal injection as a means of execution would be abolished.  At best, Plaintiff would be entitled

13  to injunctive relief requiring the State to modify its lethal-injection protocol to correct the flaws

14  Plaintiff has alleged.  Presumably, at some point, Plaintiff would be executed.

15         Having given the matter much thought, the Court concludes that it is within its equitable

16  powers to fashion a remedy—set forth below as the order of the Court—that preserves both the

17  State's interest in proceeding with Plaintiff's execution and Plaintiff's constitutional right not to

18  be subject to an undue risk of extreme pain.  Should Defendants decline to implement this

19  remedy, the Court will stay the execution and hold an evidentiary hearing within ninety days in

20  order to resolve the questions raised by the execution logs.

21         Whether or not Defendants implement the remedy and thus proceed to execute Plaintiff as

22  scheduled, the Court respectfully suggests that Defendants conduct a thorough review of the

23  lethal-injection protocol, including, *inter alia*, the manner in which the drugs are injected, the

24  means used to determine when the person being executed has lost consciousness, and the quality

25

26         [15]At a press conference immediately following Allen's execution, Warden Ornoski stated that a
27  second dose of potassium chloride was required because "this guy's heart has been beating for 76 years,
    and it took awhile for it to stop."  Kevin Fagan, *Reporter's Eyewitness Account of Allen's Execution*, S.F.
28  Chron., Jan. 17, 2006, *available at* http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/01/17/
    MNG37GOHD715.DTL.

Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)

1   of contemporaneous records of executions, such as execution logs and electrocardiograms.

2   Given the number of condemned inmates on California's Death Row, the issues presented by this

3   case are likely to recur with considerable frequency.  Because California's next execution is

4   unlikely to occur until the latter part of this year, the State presently is in a particularly good

5   position to address these issues and put them to rest.  It is hoped that the remedy ordered by this

6   Federal Court in this case will be a one-time event; under the doctrines of comity and separation

7   of powers, the particulars of California's lethal-injection protocol are and should remain the

8   province of the State's executive branch.  A proactive approach by Defendants would go a long

9   way toward maintaining judicial and public confidence in the integrity and effectiveness of the

10  protocol.

11                                                            VI

12          As noted at the outset, the present action concerns the narrow question of whether the

13  evidence before the Court demonstrates that Defendants' administration of California's lethal-

14  injection protocol creates an undue risk that Plaintiff will suffer excessive pain when he is

15  executed.  While the Court finds that Plaintiff has raised substantial questions in this regard, it

16  also concludes that those questions may be addressed effectively by means other than a stay of

17  execution, and that these alternative means would place a substantially lesser burden on the

18  State's strong interest in proceeding with its judgment.

19          Accordingly, and good cause therefor appearing, Plaintiff's motion for a preliminary

20  injunction is conditionally DENIED.  Defendants may proceed with the execution scheduled for

21  February 21, 2006, provided that they do one of the following:

22          1) Certify in writing, by the close of business on Thursday, February 16, 2006, that they

23  will use only sodium thiopental or another barbiturate or combination of barbiturates in

24  Plaintiff's execution.[16]

25

26          [16]In their response to the February 13 request for supplemental briefing, Defendants assert that
27  while sodium thiopental alone would be effective to cause Plaintiff's death, its use without the other two
    drugs would cause the execution to be unduly prolonged.  Plaintiff correctly points out that there is no
28  evidence in the record to support Defendants' claim that the execution could last as long as forty-five
    minutes.  The execution logs show that several executions pursuant to the current protocol took

                                                            13
Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)

1    2) Agree to independent verification, through direct observation and examination by a

2    qualified individual or individuals, in a manner comparable to that normally used in medical

3    settings where a combination of sedative and paralytic medications is administered, that Plaintiff

4    in fact is unconscious before either pancuronium bromide or potassium chloride is injected.

5    Because Plaintiff has raised a substantial question as to whether a person rendered unconscious

6    by sodium thiopental might regain consciousness during the administration of pancuronium

7    bromide or potassium chloride,[17] the presence of such person(s) shall be continuous until Plaintiff

8    is pronounced dead.  With respect to this alternative:

9            (a)  A "qualified individual" shall be a person with formal training and experience

10           in the field of general anesthesia.  The nature and extent of such training and experience

11           shall be set forth in a declaration submitted to the Court on or before the close of business

12           on Wednesday, February 15, 2006.  Plaintiff may file any comments he may have with

13           respect to the qualifications of such person(s) not later than 12:00 noon on Thursday,

14           February 16, 2006.  The Court will advise the parties as to whether it finds the person(s)

15           to be qualified by the close of business on Thursday, February 16, 2006.

16           (b)  The person(s) may be employees of the Department of Corrections and

17    Rehabilitation.[18]

18           (c)  If Defendants wish to keep the identity of such person(s) confidential, they

19

20    considerably longer than anticipated.  While the Court has no wish to burden the participants in and
21    witnesses to Plaintiff's execution with additional stress in what obviously is a very difficult situation, it
      concludes that the questions surrounding the protocol justify an exception to the standard procedure in
22    this one instance, particularly in lieu of a stay of execution.  The Court's purpose in permitting
      Defendants to use other barbiturates or a combination of barbiturates is to give Defendants flexibility
23    with respect to the length of the execution; such an approach appears to be fully consistent both with the
      law—"the precise execution protocol is subject to alteration until the time of execution," *Beardslee*, 395
24    F.3d at 1069—and with the opinions of Plaintiff's medical expert, Dr. Heath.

25           [17]*See*, *inter alia*, the excerpts from the execution logs summarized above and Dr. Heath's
26    declaration filed in response to the February 13 request for supplemental briefing, at p. 9.

27           [18]Defendants have indicated through declarations and in their offer of proof regarding lethal-
      injection procedures that medical doctors, registered nurses, and licensed vocational nurses employed by
28    the Department have rôles at executions.  At this time, the Court has no information as to the specific
      training and experience of these individuals.

Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)

1   may submit their declaration setting forth the qualifications of such person(s) with

2   personal identifiers redacted, except that the redacted information shall be provided to the

3   Court for *in camera* review by e-mail to g_o_kolombatovich@cand.uscourts.gov.

4           (d)  During the execution, the person(s) may wear appropriate clothing to protect

5   their anonymity.

6           If Defendants reject both of the alternatives described above, a stay of execution will

7   issue without the necessity of further proceedings.  In that event, the Court will hold an

8   evidentiary hearing on the merits of Plaintiff's claims on Tuesday, May 2, 2006, and Wednesday,

9   May 3, 2006.  The Court will issue a briefing schedule and orders with respect to discovery

10  should that become necessary.

11          The Court will retain jurisdiction with respect to Defendants' implementation of the

12  remedy provided for herein.  This order otherwise is intended to be final for purposes of appellate

13  review.

14          IT IS SO ORDERED.

15

16  DATED:  February 14, 2006

17                                              _____
                                                JEREMY FOGEL
                                                United States District Judge

18

19

20

21

22

23

24

25

26

27

28

15

Case No. C 06 219 JF & C 06 926 JF RS
ORDER DENYING CONDITIONALLY PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(DPSAGOK)