David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA  90067
Phone:  (310) 552-5300
Fax:  (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA  94103
Phone :  (415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
Jenner & Block LLP
One IBM Plaza
Chicago, IL  60611-7603
Phone :  (312) 923-2938
Fax:  (312) 840-7338
rsteinken@jenner.com

Attorneys For Plaintiff MICHAEL ANGELO MORALES

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MICHAEL ANGELO MORALES,<br><br><br>Plaintiff,<br><br><br>v.<br><br>James E. TILTON, Acting Secretary of the California Department of Corrections and Rehabilitation, Robert L. AYERS, Acting Warden, San Quentin State Prison, San Quentin, CA; and DOES 1-50,<br>Defendants. | Case No.    C 06 0219 (JF) (RS)<br>             C 06 926 (JF) (RS)<br><br>**PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY**<br><br>**REDACTED**<br><br>**Date:  September 13, 2004**<br>**Time: 2:30 pm**<br>**Court: courtroom 4** |

NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Plaintiff Michael Morales will move this Court on the above date and time for an order compelling Defendants to produce discovery, to produce for deposition, and to answer interrogatories, and will request an order compelling third parties to produce documents. Plaintiff will rely upon the attached Memorandum of Points and Authorities, the Declaration of John R Grele, and the papers and pleadings on file in this matter.

The basis for this Motion is that Defendants and third parties have not properly responded under the Federal Rues of Civil Procedure; that they have not properly asserted their privilege objections and the objections are, therefore, waived; that the privileges asserted are inapplicable, particularly given the protective orders in place; and, that assertions of relevancy objections are incorrect under the law.

Respectfully submitted,

Dated: September 5, 2006

_____

John R, Grele

David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA 94103
Phone: (415) 348-9300
Fax: (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603
Phone: (312) 923-2938
Fax: (312) 840-7338
rsteinken@jenner.com

Attorneys For Plaintiff MICHAEL ANGELO MORALES

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL ANGELO MORALES, | Case No. C 06 0219 (JF) (RS) |
| | C 06 926 (JF) (RS) |
| | |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND MOTION TO COMPEL DISCOVERY FROM DEFENDANTS; MOTION TO COMPEL FROM THIRD-PARTIES** |
| | |
| v. | **REDACTED** |
| | |
| James E. TIPTON, Acting Secretary of the California Department of Corrections and Rehabilitation, Robert L. AYERS, Acting Warden, San Quentin State Prison, San Quentin, CA; and DOES 1-50, | **Date: September 13, 2006** |
| | **Time: 9 am** |
| | **Court: courtroom 4** |
| Defendants. | |

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES .............................................................. 1

    I.      **INTRODUCTION** ................................................................ 1

    II.     **RELIEF REQUESTED** ...................................................... 4

    III.    **ARGUMENT** ....................................................................... 4

    IV.    **DISCOVERY REQUESTS FROM DEFENDANT** .................................. 9

          A.    **Depositions** ........................................................... 9

          B.    **First Set of Interrogatories**............................... 12

          B.    **Plaintiff's Second Set of Interrogatories**...................... 16

          C.    **Plaintiff's First Document Request.** ...................... 20

          D.    **Second Set of Document Requests**.................... 26

          E.    **Third Set of Document Requests** .................... 31

    V.     **THIRD PARTY OFFICE OF THE GOVERNOR** .................................. 40

    VI.    **THIRD PARTY INSPECTOR GENERAL**.............................. 49

    VII.   **CONCLUSION** .......................................................... 53

# TABLE OF AUTHORITIES

## CASES

Admiral Insurance Co. v. U.S. District Court for the District of Ariz., 881 F.2d 1486 (9th Cir. 1988) ...............................................................................................................6

Burlington N. & Santa Fe Railway Co. v. U.S. District Court for the District of Mont., 408 F.3d 1142 (9th Cir. 2005)..........................................................................................7

Gomez v. Vernon, 255 F.3d 1118 (9th Cir. 2001)...............................................................5

In re Grand Jury Subpoena, 357 F.3d 900 (9th Cir. 2004) ...............................................6

Larson v. Harrington, 11 F. Supp. 2d 1198 (E.D. Cal. 1998)...........................................5

National Wildlife Federation v. United States Forest Serv., 861 F.2d 1114 (9th Cir. 1988) ..........5

North Pacifica, LLC v. City of Pacifica, 274 F. Supp. 2d 1118 (N.D. Cal. 2003) ..........5

U.S. v. ChevronTexaco Corp., 241 F. Supp. 2d 1065 (N.D. Cal. 2002) .........................6

United States v. Fernandez, 231 F.3d 1240 (9th Cir. 2000) .............................................5

## STATUTES

Cal Gov. Code § 6254......................................................................................................50-52

Cal Civ. Code § 1798.......................................................................................................50-52

Cal Evid. Code §§ 1043 ...................................................................................................50-52

Cal Pen. Code § 1543.......................................................................................................50-52

Cal Pen. Code § 6125................................................................................................39, 50-52

Cal. Penal Code section 6125 .............................................................................................39

Cal. Gov. Code § 3300.....................................................................................................50-52

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to Federal Rules of Civil Procedure 26, 33, 34, 37 and Local Rules 7 and 37, Plaintiff moves the Court for an order compelling discovery.

## I.
## INTRODUCTION

This matter was well-pled during the first motion to compel.  The Court granted that motion, in relevant part, and, in a subsequent order dated June 9, 2006, ordered production of documents and answers to interrogatories by June 29, 2006.

As described in more detail in the Declaration of John R Grele, submitted herewith, Defendants did produce some documents and answered some interrogatories.  However, the pattern that has emerged is that defendants will only produce documents that plaintiffs specifically identify and insist be turned over.  For instance, plaintiff has long requested all documents pertaining to the three drugs in question (request to produce #24).  However, only after plaintiff insisted several times upon production of the pharmacy logs were they produced, and only recently.  Even then, those logs are woefully incomplete and the production only includes the past three years.

In their interrogatory responses, Defendants have never answered the question of who was involved in each execution and their specific role.  This question is critical for any identification of persons to be deposed or to be witnesses at the hearing.  Defendants' most recent response was to say that Plaintiff does not want all the identities of the individuals involved.  That is only partially true: Plaintiff has no desire to investigate or depose all the team members who escorted inmates in and did not remain.  However, Plaintiff does need some indication, by witness #, of each person's role in each execution.  Some of that has been obtained

in the most inefficient and time-consuming manner possible – by way of deposition.[1]   But, memories being what they are, and with the restrictions on identification at deposition, there is still no indication of who was involved in the executions and how.   The question remains unanswered seven months later.

As for document requests, once a new protocol was announced (assuming it is in fact the protocol)[2], Plaintiff requested all the documents relating to the revisions on March 14, 2006 in a series of requests.   First, Defendants issued their boilerplate objections that were rejected by the Court.   Then Defendants provided some responses, but no documents, in April.   This included a claim that no documents concerning training and pharmacy records existed.   In June, Defendants, once ordered to respond and produce, stated that no records existed.   Depositions, however, revealed a number of documents, including computer records and training records.   As a result, Plaintiff was forced to request the specific documents contained in the depositions in yet a third request.   Yet, the new documents, finally disclosed on August 8, 2006, contain nothing about any of the revisions to the protocol.[3]     Even after our meet and confer, according to Defendants there was not a single email, draft, memo or notation concerning any revisions of Procedure 770.

---

[1]  For instance, witnesses who were escorts and remained in the chamber were witnesses to whether the veins were properly accessed, or whether there was trouble doing so.

[2]  The March 6, 2006 protocol has not been approved by the Warden.

[3]  In this way, Defendants were forced to acknowledge and produce some documents such as training records and pharmacy logs, nearly six (6) months after they were requested.  Defendants' tactic of misleading Plaintiff into believing the records don't exist, then admitting they do and producing them subsequently has meant that relevant questions raised by the documents could not be asked in depositions and that Plaintiff decided to take certain depositions because others did not appear fruitful.

Now, once the witnesses in deposition disclosed such documents, Defendants represent that they have been lost or destroyed, or privileged.[4]

Depositions have also hit a stumbling block.  Defendants' counsel refused to allow the deposition of an anesthesiologist who assisted in the drafting of the new procedure for five weeks, then disclosed he is no longer a CDCR employee (he is a full-time consultant with the same job title and responsibilities), requiring a deposition by subpoena, which finally took place August 17, 2006.  Defendants have refused to identify who will be the new team leader now that Witness #1 has left San Quentin and is no longer going to be in that role.  As a result, plaintiff has no idea who is going to run the process and how, as much of what occurs is not contained in Procedure 770.  Plaintiff knows nothing about that person's training, experience, biases, previous difficulties, etc.

Defendants have delayed producing former team members for deposition, the ones Plaintiff is aware of from the depositions.   They should produce them, even at this late date.

As for Third Parties, they are state agencies that took part in meetings to discuss revisions of Procedure 770, or are assigned to observe executions.  They were subpoenaed to produce documents, and have not turned over anything except copies of pleadings produced in this litigation.  The original agreement with Defendant's counsel was that he would accept a request to produce documents, but those entities would raise their own objections.   However, Defendant's counsel waited until August 8, 2006 to inform Plaintiff that he would not be honoring that agreement and that Plaintiff could directly subpoena the agencies.  Plaintiff did just that.

---

[4]  As will be seen, Third Parties have responded that there are additional documents from Defendants that Defendants did not disclose here.  Third Parties are claiming privilege as to documents given to them by Defendants.

## II.
## RELIEF REQUESTED

This Motion is fairly lengthy, mostly because of Defendants' failure to answer or produce, and because of the requirements of the local rules that mandate a verbatim rendition of each request and response.  However,  there are certain features of requests and documents that are particularly important:

- The production of the retired lethal injection team members and next team leader for deposition, as well as a response from Warden Ornoski as to what occurred in the devising of the new protocol;

- Interrogatories that request Defendants to identify who participated in which executions, and their respective roles, particularly medical personnel;

- Interrogatories that require Defendants to identify the genesis and development of the new protocol, and who participated in that process;

- Documents that describe the meetings and events surrounding the revisions to the protocol;

- Documents concerning lethal injection team members, personnel files and investigations into misconduct in the units in which they worked.

## III.
## ARGUMENT

There are several categories of discovery that remain.  For Defendants, there are those that were previously ordered produced, which have never been.  Then, there is a new set of document requests, based upon deposition answers and other discovery responses. There are two main areas in dispute.

Both Defendants and Third Parties object to having to turn over documents concerning their meetings and discussions to revise Procedure 770.  Those meeting were

attended by: CDCR officials; CDCR's counsel: Defendants' counsel here; the Inspector

General's Office; the Office of the Governor (legal counsel); and Defendant's testifying

expert in this case.  It appears that CDCR officials and the expert did not take any notes.

However, all the lawyers did.  The Inspector General may have, but cannot locate them.[5]

When an agency decides to enact a procedure or policy, and an attorney is present or

involved, there is no privilege.  Certainly, no attorney-client privilege attaches whenever

non-clients are present, which they were in this case.  *Gomez v. Vernon*, 255 F.3d 1118,

1131 (9th Cir. 2001).  And, the use of attorneys does not insulate Defendants or Third

Parties from disclosure. *See Larson v. Harrington,* 11 F. Supp. 2d 1198 (E.D. Cal. 1998)

(attendance of attorney to render legal advice does not insulate discussions of agency).

Otherwise, every litigant, particularly state agency defendants, could shield itself from

discovery simply by having an attorney present and participating, or, as the case is here,

having policy discussions be handled by attorneys.

The requested discovery is also not protected by the deliberative process privilege.

For the privilege to apply, "a document must be both (1) 'predecisional' or 'antecedent to

the adoption of agency policy' and (2) deliberative, meaning 'it must actually be related to

the process by which policies are formulated.'"  *United States v. Fernandez*, 231 F.3d 1240,

1246 (9th Cir. 2000) (quoting *Nat'l Wildlife Fed'n v. United States Forest Serv*., 861 F.2d

1114, 1117 (9th Cir. 1988).  It does not apply to factual information. *Fernandez,* 231 F.3d at

1247; *see also North Pacifica, LLC v. City of Pacifica,* 274 F. Supp. 2d 1118 (N.D. Cal.

---

5   The Inspector General's presence was testified to by Warden Ornoski, but not disclosed in Defendant's
response to interrogatories.  Warden Ornoski also stated that San Quentin Chief Medical Officer Dr. St.
Clair was there, as well as someone from the federal receiver's office.  Those persons were not identified
in Defendants' responses to interrogatories.

2003).   Again, it would be very difficult to assert such a privilege with the cornucopia of persons and agencies involved, and with Defendants' counsel and expert witness present.

Work product immunity also does not apply.  In order to successfully assert the work-product doctrine, which is a qualified immunity that protects an attorney's mental impressions, a party must show that the documents were: (1) prepared in anticipation of litigation or for trial; and (2) prepared by or for another party or the party's representative. *Admiral Ins. Co. v. U.S. Dist. Court for the Dist. of Ariz.*, 881 F.2d 1486, 1494 (9th Cir. 1988); *In re Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004).  Defendants, however, have failed to demonstrate that the discovery requests that Plaintiff seeks meet either prong of the test.   For instance, the Governor is not a party to any litigation, as Defendants here have pointed out in refusing to honor the request to produce documents. And, Mr. Slavin's role is that of in-house CDCR counsel, whose activities are not necessarily insulated and protected by attorney-client privilege and work product immunity, even as they pertain to the operations of CDCR.  *See U.S. v. ChevronTexaco Corp***.** 241 F.Supp.2d 1065,  1076 (N.D. Cal. 2002).  Seeking to effectuate an execution or to devise a lethal injection protocol are not activities solely related to litigation.

Even if the immunity applies, it is waived as to any materials provided to anyone other than that attorney's client (i.e. anything that Mr. Gillette or Mr. Slavin provided to Governor's counsel or that  Governor's counsel provided to Mr. Gillette or Mr. Slavin). Finally, the immunity is a qualified one and must give way in this circumstance, given that the attorneys were the ones conducting the policy discussions.  This is particularly true if those attorneys noted statements made by Dr. Singler, their expert, or statements by any CDCR official that were recorded by attorneys.  The substantial need for these materials is demonstrated by the complete lack of any clear indication  of how CDCR arrived at its

decision to reduce the amount of thiopental to 1.5 grams, and to add the thiopental drip.  Dr. Singler seems to have forgotten much of the discussion at the meeting, and was not privy to the discussions and exchanges that occurred afterwards when the procedure was determined. Former Warden Ornoski does not recall where the information/directive came from. Witness #1 says it was decided by "people in Sacramento" and he received it from Ornoski, who denies it.  Denise Dull, apparently had some undefined role that no one can discern. [6]

Here, it appears it was the lawyers who were instrumental in devising Procedure 770. According to Warden Ornoski, nearly all of the discussion was undertaken by Governor's counsel and Mr. Gillette.  They may have sought input from the doctors, but the doctor was clear he was not advising them as to the proper procedure.  According to Witness #1, the directive came from them to the Warden to revise Procedure 770 to lessen the dose of sedative to the lowest in the Nation, and to include a sedative drip.

That the lawyers were acting as drafters of defendant's policy is shown by Third Party Governor's counsel's privilege log.  In that log, it appears Mr. Gillette provided notes and papers to all the participants, both before and after the meeting at the Governor's office. The lawyers' notes and drafts, their discussions with others, are all discoverable, as are all the persons they consulted with.  As a result, Defendants must answer the interrogatories properly, and Mr. Gillette, Mr. Slavin and Governor's counsel all must provide information they have as to who they consulted and what was said.

As for Third Party responses, their boilerplate invocations of privilege are unacceptable, and result in waiver.  *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for the Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005).   Governor's counsel has claimed

---

[6]  Ms. Dull's role was not disclosed in the interrogatories, only referenced in the depositions, and none of the documents appear to be from or to her.

privilege to documents sent to and from Mr. Gillette, and several other persons who are not on Governor's counsel staff.  If any attorney-client or work product privilege existed to those documents, they have been waived.  Likewise, no privilege can be asserted as to documents provided to them from others, including Mr. Gillette.  And, there is no privilege applicable to the Governor's office merely because it was using lawyers to effectuate policy.

The privileges invoked by the Inspector General center mainly around documents pertaining to investigations of personnel and events that concern lethal injection team members.  How the Inspector General could assert any privilege objections without viewing a single document is not explained.  The medical privacy objections for the victims of poor [**REDACTED**] care are easily addressed through the use of patient pseudonyms.

Defendants object to having to turn over this material as well, on relevance grounds. The [**REDACTED**]  are responsible for setting the catheters, monitoring the inmates, training and guiding the executioner(s), setting and watching the IV rates, mixing the chemicals, marking the syringes, picking them off the cart in the proper order, and placing them in the stop cocks properly.  Circumstances at San Quentin have called into question the professionalism and competency of  [**REDACTED**] .  Unnecessary deaths in the very same unit  [**REDACTED**]   include an instance where they claimed they could not find a vein and then destroyed all the paperwork.  There have been six such deaths documented at San Quentin, and any number of maimings and simple negligence.  Admittedly, it is not known if these particular individuals were involved or to what extent.  But, that is the purpose of the discovery.

Defendants have portrayed these individuals as qualified and competent.  The records may disclose another, less attractive side of their work with inmates, one that has been the focus of attention both internally and through the receivership proceedings.  It

makes no sense to allow individuals with problematic **[REDACTED]** histories on an execution team. The only question is whether these persons have been involved, and to what extent. The fact that they practice in the very same unit that has been the focus of attention is sufficient to pursue the matter further.

**IV.**
**DISCOVERY REQUESTS FROM DEFENDANT**

**A.    Depositions**

Yet again, Defendants have obstructed discovery by instructing Warden Ornoski not to reveal the discussions at the meeting at which Procedure 770 was discussed and, apparently, determined. This Court previously overruled Defendants' earlier objections to this line of questioning and ordered the Warden to answer the questions. When the deposition was reconvened, Defendants' counsel instructed the Warden not to answer questions regarding statements made by counsel at this meeting, even though counsel's statements were directed to a group of people, many of whom he does not represent.    The Warden should be ordered to answer these questions.

Witness #s 6, 7, 8 and 9 are or were execution team members. For some of them, Witness 6 and 7, plaintiff has been requesting those depositions for some time, only to get no where with Defendant's counsel. Witness #8's existence was revealed recently as **[REDACTED]** involved, although the extent of involvement is not known. Witness #9 has never been identified and defendants refuse to produce him/her.

The **[REDACTED]** depositions were always significant given the deposition testimony of the **[REDACTED]** and Witness #1. They possess information surrounding the use of the equipment, its design and functioning, the mixing of the sedative and the executions themselves. All of this is important to any determination of whether Mr. Morales will be sufficiently sedated.

However, they became even more critical after the August 14, 2006 deposition of Witness #5, the team leader for the past 8 executions.  Witness #5 stated that the **[REDACTED]**  were responsible for determining important features of the execution.  Witness #5 denied knowledge of most of the procedures, including such topics as the names of the drugs used during an execution, the quantity of syringes prepared for each drug, the names of inmates executed – including his most recent execution this year, how many injections there were, what concentrations were used, the rates of administration, the length of line, etc.  Whether or not the team leader for 8 executions was being truthful or deceptive in his claimed ignorance, is irrelevant for these purposes, but does require more depositions than were originally thought were necessary.  Plaintiff's hope that Witness #5 could obviate the need to depose more **[REDACTED]** staff was defeated by Witness #5's real or feigned ignorance.[7]

As for Witness # 6, the **[redacted]** for the several of the past executions, defendants' representation is that he/she is overseas and unavailable.  Defendants made the same representation for Witness #5, but they were lying.  On June 7, 2006, Warden Ayers swore that Witness #5 was traveling overseas.  In deposition, Witness #5 disclosed that he/she was residing locally from mid-April until the end of June.   Apparently, Defendants were emailing with Witness #5 about the case, and Witness #5 was setting up school class tours of San Quentin with the Warden during this time.  Given this deception, defendants should be ordered to produce all records concerning Witness #6's residence, location at which he/she is receiving retirement benefits, email addresses, and any information indicating whereabouts for the past year.  It must be turned over within two days.

---

[7] It is not insignificant that there were several emails between Witness #1 and #5 describing the litigation process and Witness #5 was provided with the deposition testimonies of Witness #3 and #4, which he claims he never read.

Witness #7's deposition was substantially delayed by Defendants, until Plaintiff's investigator was forced to subpoena him/her, a situation that neither side desired.

Likewise, Witness #8 is an **[redacted]** who was on the execution team. For some reason, defendants refuse to produce him/her.[8] Defendants refuse to provide his/her name to the investigator despite repeated requests.

Witness #9 is the team leader in training. Now that Witness #1 is no longer part of the procedure, the question arises as to how the procedure will be effectuated. There are several critical features of the new protocol that are not in Procedure 770, and so are left to the discretion of the team leader. Foremost is who is going to be assigned to what tasks. Second, the operation and characteristics of some of the equipment that will determine whether Mr. Morales is sufficiently unconscious at the time of the administration of the potassium chloride. And, third, who is going to administer the drugs and how. As recently as the dates of the depositions of team leaders Witness #1 and Witness #5, there are no execution team members who have been trained or who are qualified to administer the lethal drugs, and the only persons who provided such training in the past retired in January 2006. These facts are critically important now that California has the lowest sedative dose of any state. In fact, plaintiff questions the utility of a hearing without a team leader designation and defendants appear to have settled on a strategy to not designate or disclose in order to avoid scrutiny.[9]

Be that as it may, plaintiff requested a numerical witness designation for the team leader in training the night of the Morales execution so that he/she could be deposed. The pattern is

---

[8]  If Witness #6 is truly unavailable, then witnesses 7 and 8 become even more important.

[9]  Witness #1's history was uncovered in deposition and discussed in the prior motion to compel.

that this person is the one to take over as team leader, although plaintiff understands it is the Warden's decision.  Defendants refused to allow deposition.  They should be ordered to do so.

As will be seen below, the difficulty with depositions could have been alleviated if Defendants had answered the interrogatory concerning who had what role in the executions, as ordered by the Court.  In fact, if that interrogatory had been answered, plaintiff could better discern which of these witnesses are important for which events.   It would have greatly shortened the discovery effort, and the questioning at the depositions.

**B.**     **First Set of Interrogatories**

**Interrogatory No. 2**

**Identification of the persons, whether curre nt employees or not, who were responsible for or contributed to the proposing, devising and/or modifying the qualifications, experience, and training of lethal injection personnel**.

Response:  Defendants object to this interrogatory as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

Supp. Response:  Defendants reassert their earlier objection on grounds of institutional security and official information privilege to the disclosure of the names of any person who has ever served on an execution team.  To the extent the interrogatory seeks the names of any person who has ever served on an execution team, it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving defendants' objections, the training of the execution team is as described in the testimony of Witness #1 in the proceeding at San Quentin on March 30,

2006, and in his deposition on April 11, and in the testimony of Witness #3 in his deposition on April 13, 2006.

Reasons: Plaintiff asserted that the supplemental interrogatory was non-responsive, and the Court ruled defendants must answer it. They have not. Obviously, the training is not the question; it is who was or is responsible for devising and modifying the qualifications, experience, and training.

**Interrogatory No. 4**

**Identification of the persons, whether current employees or not, who were responsible for or contributed to the creating, proposing, and devising of Procedure 770 (and revisions).**

Response: Defendants object to this interrogatory as overbroad and unduly burdensome. It is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

Supp. Response: Defendants reassert their earlier objections that the interrogatory is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Defendants reassert their earlier objection on grounds of institutional security and official information privilege to the disclosure of the names of any past or present members of the execution team.

Without waiving defendants' objections, former San Quentin Warden Daniel Vasquez was involved in development of the original O.P. 770. subsequent changes have been at the direction of the warden based on changes in equipment, packaging of drugs, or actual practice.

<u>Reason to Compel</u>: Defendants' grounds of privilege were resolved against them. They have not answered the question, particularly as to the new protocol. In fact, merely because Warden Vasquez was one person involved, does not mean others were not, particularly since 770 has been changed several times (many changes were never included in any version of 770) by many persons, including the team leaders.

**<u>Interrogatory No. 5</u>**

**Identification of the persons, whether current employees or not, who ha[ve] conducted or contributed to a medical, ethical, or other expert evaluation of the chemicals used, qualifications and training or personnel involved, and the procedures employed in Procedure 770 (and revisions).**

<u>Response</u>: Defendants object to this interrogatory as overbroad and unduly burdensome. It is not reasonably calculated to lead to the discovery of admissible evidence. To the extent plaintiff seeks the names of experts to be called at the evidentiary hearing in May that information will be provided within the time frame set by the Court on March 3, 2006.

<u>Supp. Response</u>: See response to Interrogatory number 4. To the extent Plaintiff seeks the names of experts to be called at the evidentiary hearing that information will be provided within the time frame set by the Court on March 3, 2006, as amended by subsequent agreement of counsel.

<u>Reason to Compel</u>: The Court ruled that Plaintiff is entitled to this discovery. Defendants must provide it -- merely to say that names of experts won't be given is not to answer the question as to who has contributed to the effort. There has been consultation with at least two medical professionals of which Plaintiff is aware: Singler and Rosko. Noticeably, Rosko was not included in this response, showing how Defendants' answer was deceptive. There has been some indication by Witness #1 that others may have been involved as well, including Dr. Dershwitz.

**Interrogatory No. 7:**

**The name, qualification, training and description of tasks for the person(s) who determine when to deviate from Procedure 770, and how, including the person who authorized 2nd does of potassium chloride during Allen's execution and pancuronium bromide during Bonin.**

Supp. Response:  Defendants reassert their earlier objections that the interrogatory is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Defendants reassert their earlier objection on the grounds of institutional security and official information privilege to the disclosure of the names of past or present members of the execution team.

Without waiving defendants' objections, the warden has ultimate responsibility for conducting an execution.  Warden Ornoski authorized the second dose of potassium chloride during the Allen execution.  Defendants are still investigating the Bonin issue.

Reasons:  Plaintiff raised this as non-responsive in the first Motion to compel and defendant was ordered to answer.   The question did not ask who has "ultimate authority", but who determines when and how to deviate from Procedure 770 during an execution.   The deposition testimony appears at odds with the answer as well.

**Interrogatory No. 8**

**Names of all medical persons present at all prior lethal injection executions and their respective roles in the process.**

Response:  Defendants object to this interrogatory as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

Supp. Response: Defendants reassert their earlier objection on grounds of institutional security and official information privilege to the disclosure of the names of any past or present members of the execution team.

Without waiving defendants' objections, to the extent known the names of the doctors who have participated in executions have already been disclosed during the testimony of witness #1 in the proceeding at San Quentin on March 30, 2006, and in his deposition on April 11, and in the testimony of Witness #3 in his deposition on April 13, 2006. The doctor's role is to fill out the execution log, monitor the EKG, and pronounce death. The other    **[REDACTED]**                        on the execution team. Their roles are described in the above testimony.

Reasons: The court ordered this discovery. This is a critical interrogatory and Defendants' continued failure to respond has greatly hindered Plaintiff. Merely stating that their roles are as described in previous testimony is insufficient, particularly when that testimony is devoid of details and contradictory. What is important is who did what and when. That question remains unanswered. Plaintiff has already agreed to designation by witness numbering.

**B.    Plaintiff's Second Set of Interrogatories**

**Interrogatory No. 2**

**Identify each person, including but not limited to medical personnel, who participated in or was consulted regarding the assessment and attempted implementation of the proposed alternative execution procedures set forth by the Court in its February 14, 2006 Order.**

Supp. Response: Defendants reassert their earlier objections based on work-product, attorney-client and deliberative process privileges. Defendants reassert their earlier objections that the interrogatory is overbroad and unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Further, the names of the

anesthesiologists involved are covered by the protective order issued by the Court when it ordered the alternative procedure.

Further Supp. Response: Without waiving any applicable objections or privileges, Dr. Robert C. Singler, MD, participated in preparations for implementation of the first procedure authorized by the Court's order.   Anesthesiologist #2 also participated in preparations for that procedure,  As explained in the deposition of Witness #1, members of the execution (sic) participated in practice sessions related to that procedure, as did former Warden Ornoski, and Assistant Secretary Darc Keller.

Reasons to Compel: All objections and privileges were ruled upon by the Court. The answer is non-responsive and incomplete.  Dr. Rosko was consulted as well.  It is believed others were involved as well.  Ms. Dull from the prison, Mr. Gillette and Mr. Slavin have all been described as being involved in these consultations.  Witness #1 believed Dr. Dershwitz was as well.  Further, Defendants have asserted to the press that they could not find anyone to undertake the second alternative procedure.   The names of those consulated with for that procedure, if any, remain unknown.

**Interrogatory No. 3**

**Identify each person who participated in the executions of Jaturun Siripongs, Manuel Babbitt, Darrell Keith Rich, Stephen Wayne Anderson, Donald Beardslee, Stanley Williams or Clarence Ray Allen.**

Response: Defendants object to this interrogatory as overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and that the names of personnel on the execution team are protected by the federal official information privilege.  As previously disclosed, the witness who will testify at the March 30, 2006 hearing at San Quentin participated in each of the above executions.  In some cases the

names of the doctors who were present to pronounce death are included on the execution logs previously provided to counsel for plaintiff.

Supp. Response:   Defendants reassert their earlier objection on grounds of institutional security and official information privilege to disclosure of the names of any past or present members of the execution team. To the extent the interrogatory seeks the names of any person who served on the execution team it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving defendants' objections, the warden of San Quentin and the doctors whose names have previously been disclosed participated in the above executions

Further Supp. Response: Without waiving any applicable objections or privileges, Defendants have previously identified, and Plaintiff has deposed, three members of the execution team, designated as Witnesses # 1, # 3, and # 4. The former team leader, Witness # 5, retired after the Williams execution and is currently traveling outside the United States. A **[REDACTED]**who participated in more than one execution, Witness # 6, retired after the Williams execution and is currently traveling outside the United States.

**[REDACTED]**  who participated in some executions, Witness # 7, retired in 2003. A **[REDACTED]** who participated in some executions, Witness # 8, transferred to another institution in 2000. Defendants understand from prior discussions with counsel that Plaintiff does not intend to depose or otherwise investigate other members of the execution team. To the extent that such investigation is deemed relevant Defendants will assign numbers to the team members.

Reasons:  The Court ordered Defendants to respond.  There are at least ten persons on each execution team.  It should also be noted that at the time of the further supplemental response, Witness #5 was in the United States.

**Interrogatory No. 4**

**Identify each person who was present as part of the execution team for the execution of Mr. Morales, that was scheduled to take place at 12:01 a.m. on February 21, 2006 and then at 7:30 p.m. on February 21, 2006**.

Response:  Defendants object to this interrogatory as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence. Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and that the names of personnel on the execution team are protected by the federal official information privilege.  As previously disclosed, the witness who will testify at the March 30, 2006 hearing at San Quentin participated in the Morales execution.

Supp Response:   Defendants reassert their earlier objection on grounds of institutional security and official information privilege to the disclosure of the names of any past or present members of the execution team.

Without waiving defendants' objections, Plaintiff has already deposed two members of the execution team who were scheduled to participate in the Morales execution.

Further Supp. Response :   As Plaintiff is already aware, Witnesses # 1, # 3, and # 4 were assigned to participate in the Morales execution. Defendants understand from prior discussions with counsel that Plaintiff does not intend to depose or otherwise investigate other members of the execution team. To the extent that such investigation is deemed relevant Defendants will assign numbers to the team members.

Reasons :  The court ordered this answered.  Plaintiff cannot discern who to depose or interview.  Of particular interest is the team leader in training as there appears no one in charge of executions presently at San Quentin.

**C.**             **Plaintiff's First Document Request.**

**Request no. 4**

**All documents relating to the creation or provenance of Operational Procedure no. 770, including other states' protocols**

      <u>Supp. Response</u>:  Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to discovery of admissible evidence.  Without waiving their objections, to the extent such documents exist they are at San Quentin State Prison and defendants will make them available for inspection by Plaintiff.   Unredacted version of IP 770 are being withheld pursuant to previous orders of the Court.

      <u>Reasons to Compel</u>: The materials provided did not contain any of the emails and computer files testified to in deposition.  This includes the information in emails to and from Witness #1, Witness #3 and Witness #4, Denise Dull, Warden Ornoski, and Mr. Slavin, or information contained on their computers, as well as Dr. Rosko's.  It did not include the emails from and to Witness #5 that he testified to.  It did not include the information provided by Mr. Gillette to the participants at the meetings that are described in the PNS litigation.

**Request No. 6**

**All documents relating to the administration of lethal injection which describes any revisions or changes in the process from its inception to the present**.

      <u>Response</u>: Modification of OP 770 are reflected in the amended version of the protocol, a redacted version of which will be provided to plaintiff.  Defendants otherwise object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.

      <u>Supp. Response</u>:  Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to discovery of admissible evidence.  Without waiving

their objections, to the extent such documents exist they are at San Quentin State Prison and defendants will make them available for inspection by Plaintiff.  Unredacted version of IP 770 are being withheld pursuant to previous orders of the Court.

Reasons:   Again, the documents provided did not include any of the emails and computer files described above, nor did it include the information provided by Mr. Gillette to Defendants and others about lethal injection..

**Request No. 7a**

**All correspondence by the California Department of Corrections regarding the use of lethal injection.**

Response: Defendants object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.

Supp. Response:  Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to discovery of admissible evidence.  Without waiving their objections, to the extent such documents exist they are at San Quentin State Prison and defendants will make them available for inspection by Plaintiff.  Unredacted version of IP 770 are being withheld pursuant to previous orders of the Court.

Reasons:    Again, the documents provided did not include any of the emails and computer files described above, nor did it include the information provided by Mr. Gillette to Defendants and others about lethal injection.  All of these were revealed in depositions and in privilege logs submitted by the Governor's counsel.

**Request No. 8**:

**All documents relating to the assessment of the competency of the lethal injections team assigned to plaintiff's execution and to previous executions carried out in California.**

Response:  There are no such documents.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Supp. Response</u>:  Defendants objection to this request as overbroad and unduly burdensome.   It is not reasonably related to the discovery of admissible evidence. Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

<u>Reasons</u>:  The competence of execution team members is highly relevant, and with witness number designations, will not compromise security.  Defendants merely seek to hide from disclosure inconvenient facts about team members.

**Request No. 11**

**All documents relating to the decision to implement lethal injection in California as it is currently practiced**.

Supplemental Response to Request No. 11

Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiving their objections, to the extent such documents exist they are at San Quentin State Prison and defendants will make them available for inspection by Plaintiff. Unredacted versions IP 770 are being withheld pursuant to previous orders of the Court .

<u>Reasons</u>:   There were no such documents made available at San Quentin.

**Request No. 17**

**All documents relating to the Execution Team who will execute plaintiff, including but not limited to the identities of the team members and the Lieutenant in Charge of the Chamber; the role that each member is to play in plaintiff's execution; the training that each member has received for his or her intended role; each member's employment history, including discipline and complaints; any medical training the members have received at any time; any history of drug use; any criminal records, whether or not resulting in conviction; and any background checks performed on the team members.**

<u>Response</u>: Defendants object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

<u>Supplemental Response to Request No. 17</u>

Defendants reassert their earlier objection on grounds of institutional security and official information privilege to the disclosure of the names of any past or present members of the execution team. The request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving any privileges, **[REDACTED]**   are required to be licensed as provided in the original response to Request No. 30.

<u>Further Supplemental Response to Request No. 17</u>

As authorized by the Court's order of May 2, 2006, and without waiving any applicable objections or privileges, Witnesses # 1, # 3, and # 4, all of whom have been deposed by Plaintiff, were scheduled to participate in the Morales execution. Should the Court so direct copies of their personnel files will be made available for in camera review. Defendants understand from prior discussions with counsel that Plaintiff does not intend to depose or otherwise investigate other members of the execution team. To the extent that such investigation is deemed relevant Defendants will assign numbers to the team members and, if so directed, make their personnel files available to the Court for in camera review

<u>Reasons</u>: the Court has ordered this be responded to and it has not been.  The personnel files were never turned over to Plaintiff or the Court.

**Request No. 18**

**All documents related to each one of the following tasks in the execution process of Mr. Morales, including but not limited to any descriptions or procedures for the task; the identities of persons in charge of the task; the training that each person has received for his or her intended role; each person's employment history, including discipline and complaints; any medical training that they have received at any time; any history of drug use; any criminal records, whether or not resulting in conviction; and any background checks performed on the team members:**

> a.   **Pre-execution examination of plaintiff's physical health, including assessment of plaintiff's venous integrity and ability to achieve peripheral IV access;**
> b.   **Drug mixing;**
> c.   **Syringe preparation;**
> d.   **IV line set-up;**
> e.   **Patency of catheters/IV lines;**
> f.   **Inmate removal from cell and strap down;**
> g.   **Catheter insertion;**
> h.   **Drug administration;**
> i.   **Assessment of plane anesthesia;**
> j.   **EKG monitoring;**
> k.   **Pronouncement of death.**

Response: Defendants object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object that disclosure of the information could compromise the institutional security of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

Supplemental Resp.: Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving their objections, to the extent such documents exist they are at San Quentin State Prison and defendants will make them available for inspection by Plaintiff. Unredacted versions IP 770 are being withheld pursuant to previous orders of the Court.

Further Supplemental Response to Request No. 18

Pursuant to the Court's order of May 2, 2006, and without waiving any applicable objections or privileges, descriptions of tasks to be performed are set forth in OP 770. The

licensing requirements for **[REDACTED]**   who inserts the catheters is set forth in documents provided in the original response to Request No. 30. The roles of Witnesses # 1, # 3, and # 4 have been set forth in their depositions. Should the Court so direct copies of their personnel files will be made available for in camera review. Defendants understand from prior discussions with counsel that Plaintiff does not intend to depose or otherwise investigate other members of the execution team. To the extent that such investigation is deemed relevant Defendants will assign numbers to the team members and, if so directed, make their personnel files available to the Court for in camera review.

The EKG is monitored by a physician who also pronounces death. Although Dr. St. Clair, whom Plaintiff has deposed, was scheduled to participate in the Morales execution, he is no longer employed at San Quentin and until another execution date is set Defendants are unable to identify what physician will undertake those responsibilities

Reasons:   The Court already ordered this material turned over.   None of the documents provided responded to this request.  The employment histories and records have not been turned over, either to Plaintiff or the Court (as far as Plaintiff knows).  And, the request is not an interrogatory – it seeks production of documents, regardless of the testimonies at deposition (which are contradictory).

**Request No. 24**

**All documents related to the 'injection team,' as referred to on p. 32 of the June 13, 2003 revision of Procedure No. 770, including but not limited to the qualifications required to serve on the injection team; identities of the team members; employment history, including discipline and complaints; medical training; any history of drug use; criminal history, whether or not resulting in conviction; and background checks performed on the team members.**

Response: Defendants object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object that disclosure of the information could compromise the institutional security

of San Quentin and, to the extent it seeks the names of personnel on the execution team, the information is protected by the federal official information privilege.

Reasons: Defendants were ordered to respond and they never did.

**D.**        <u>**Second Set of Document Requests**</u>

<u>**Request No. 1**</u>

**All documents and communications relating to the modifications of Procedure No. 770 reflected in the new protocol from the version that existed on February 20, 2006.**

<u>Supplemental Response to Request No. 1</u>: Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence and that the requested information is protected by work product, attorney-client, and deliberative process privileges.

Without waiving any privileges, the modifications of IP 770 are reflected in the redacted version previously provided to Plaintiff. Additional information was provided during the deposition of Witness # 1.

<u>Reasons</u>:  Defendants have not responded to this request, despite being ordered to do so.  Witness #1 testified to a series of written exchanges between himself and Ms. Dull, none of which have been turned over.  Dr. Rosko testified to a writing he gave Witness #1 and others, which has not been provided.  Dr. Singler and Dr. Etkins have not turned over all the materials they were sent and reviewed, including emails.  None of the emails testified to by Witness #5 have been turned over.  None of Ms. Dull's communications have been turned over, nor has anything that was in the possession of Warden Ornoski, or the wardens who have followed him.

<u>**Request No. 2**</u>

**All documents, including documents filed in connection with other litigation, relating to suggestions by "court experts" that the CDCR adopt any of the changes to Procedure No. 770 that are now reflected in the new protocol.**

<u>Supp. Resp.</u>:   Defendants reassert their previously objections that the request is ambiguous, overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and that the requested information is protected by the work product, attorney-client, and deliberative process privileges.

Without waiving any privileges, and to the extent Defendants are not aware of any suggestions by any "court expert" that CDCR adopt any of the changes to Procedure No. 770 that are not reflected in the new protocol." The changes made are reflected in the protocol.

<u>Reasons</u>: Procedure 770 was revised in less than a day.  Dr. Singler stated he was consulted both at the time of Plaintiff's scheduled execution and afterwards.  He was certainly such an expert.  To the extent Defendant's have received any other suggestions, favorable or unfavorable, from experts who have been disclosed, such as Dr. Dershwitz, they are discoverable.

**Request No. 3**

**All documents and communications relating to the CDCR's consideration, assessment, preparations for, planned implementation of and efforts to employ either or both of the two alternative execution procedures proposed by the Court on February 14, 2006.**

<u>Further Supp. Resp.</u>: There are no such documents other than those filed with the Court during the litigation.

<u>Reasons</u>: It is simply unbelievable that there are no documents pertaining to either of the alternatives adopted by Defendants to execute Mr. Morales.  Ostensibly, this request would cover all the court filings and orders that are in CDCR's possession and which discuss these alternatives.  Mr. Keller's documents have never been provided, despite his central role.

**Request No. 4**

**All documents and communications relating to the CDCR's decision to continue to use the three-drug cocktail in the new protocol**.

<u>Further Response</u>: There are no such documents.

<u>Reasons</u>: Defendants and Governor's counsel, in their privilege logs, now indicate there are such materials.  And, Dr. Singler testified as to communications concerning the new protocol, as did Dr. Etkins.  Witness #1 and Dr., Rosko testified to such materials. Nothing from Mr. Keller or Ms. Dull have been turned over.

## Request No. 5

**All documents and communications relating to the CDCR's decision not to use sodium thiopental alone in the new protocol.**

<u>Further Response</u>: There are no such documents.

<u>Reasons</u>: Defendants and Governor's counsel, in their privilege logs, now indicate there are such materials.  And, Dr. Singler testified as to communications concerning the new protocol, as did Dr. Etkins.  Witness #1 and Dr., Rosko testified to such materials. Nothing from Mr. Keller or Ms. Dull have been turned over.

## Request No. 7

**All documents and communications relating to the decision to alter the initial dose of sodium thiopental to 1.5 grams, including but not limited to all documents concerning analysis, testing or facts on which that decision was based.**

<u>Further Response</u>: There are no such documents.

<u>Reasons</u>: Defendants and Governor's counsel, in their privilege logs, now indicate there are such materials.  And, Dr. Singler testified as to communications concerning the new protocol, as did Dr. Etkins.  Witness #1 and Dr., Rosko testified to such materials. Nothing from Mr. Keller or Ms. Dull have been turned over.

## Request No. 8

**All documents and communications relating to the CDCR's decision to reduce the dose of pancuronium from 100 mg to 40 mg, including but not limited to all documents concerning analysis, testing or facts on which that decision was based.**

<u>Further Response</u>: There are no such documents.

<u>Reasons</u>: Defendants and Governor's counsel, in their privilege logs, now indicate there are such materials.  And, Dr. Singler testified as to communications concerning the new protocol, as did Dr. Etkins.  Witness #1 and Dr., Rosko testified to such materials. Nothing from Mr. Keller or Ms. Dull have been turned over.

## Request No. 9

**All documents and communications relating to the CDCR's decision to increase the dose of potassium from 100 mEq to 240 mEq, including but not limited to all documents concerning analysis, testing or facts on which that decision was based.**

<u>Further Response</u>: There are no such documents.

<u>Reasons</u>: Defendants and Governor's counsel, in their privilege logs, now indicate there are such materials.  And, Dr. Singler testified as to communications concerning the new protocol, as did Dr. Etkins.  Witness #1 and Dr., Rosko testified to such materials. Nothing from Mr. Keller or Ms. Dull have been turned over.

## Request No. 17

**All documents relating to the CDCR's decision to include pancuronium in the protocol, including, but not limited to, any documents that relate to the purpose to be served by its inclusion in the protocol, as well as any evidence that seizures or writhing would occur in the absence of pancuronium.**

<u>Supp. Resp.</u>: Defendants reassert their objection that the request is overbroad and not reasonably calculated to lead to the discovery of admissible evidence and that the requested information is protected by work product, attorney-client, and deliberative process privileges.  Without waiving any privileges, to the extent that such documents exist they are at San Quentin State Prison and Defendants will make them available for inspection by Plaintiff.

Reasons: There was nothing in the documents at San Quentin that was responsive to this request.

**Request No. 23**

**All documents relating to work orders, contracts, purchasing agreements, consultant fees, architectural drawings or similar documents in any way related to modifications of the execution chamber or the room adjacent to the chamber, and the installation of or modification to any equipment used in the lethal injection process.**

Supp. Resp: Defendants reassert their previous objections that the request is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving their objections, to the extent such documents exist they are at San Quentin State Prison and Defendants will make them available for inspection by Plaintiff.

Reasons: Defendants were ordered to turn this material over, and they have not done so. No such documents were made available for inspection despite the testimony from Witness #1 that they do exist.

**Request No. 24**

**All documents relating to sodium thiopental, pancuronium bromide, potassium chloride, or any other drug used by the CDCR in lethal injections, including but not limited to prescriptions, purchase orders, instructions, and inventory lists.**

Response: Defendants object to this request as overbroad and unduly burdensome. It is not reasonably calculated to lead to the discovery of admissible evidence.

Supp. Resp.: Pharmacy records are retained for three years. Attached are extant documents.

Further Supp. Resp.: Additional documents responsive to the request are attached.

Further Supp. Resp.: Additional documents responsive to the request are attached.

Reasons: Defendants have turned over some records, finally. But, the logs they have turned over are only part of the logs for the execution team concerning what drugs are actually taken from the pharmacy.

**Request No. 25**

**All documents received from, sent to, reviewed by or exchanged with any anesthesiologist or other medical personnel regarding the execution of Michael Morales that was scheduled for February 21, 2006, including correspondence, billing records or invoices.**

Response: Defendants object to this request as overbroad and unduly burdensome.  It is not reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object that the requested information is protected by work product, attorney-client, and deliberative process privileges.

Reasons:  Defendants were ordered to respond to this request.  They have not done so..

**E.      Third Set of Document Requests**

Many of these requests were covered by previous requests.  They were requested again with citations to the depositions wherein witnesses testified to their existence.  The following are in dispute:

**Request no. 1**

**Any and all documents, notes, communications, or records generated by Andrea Hoch, Tami Bogart, Dan Maguire or any Governor's Office employee, representative, or agent either at a meeting or regarding a meeting scheduled by the Governor's Office in or about February or March 2006 that was attended by, inter alia, then San Quentin State Prison Acting Warden Steven Ornoski, Dane Gillette, Andrea Hoch, Tami Bogart, and Dan Maguire.**

Response:  The Office of the Governor and the State of California is a separate and independent state agency and is not a party to this action.  None of the Defendants have control or custody over any documents from the Governor's Office.  Accordingly, Plaintiff may not seek discovery of the requested documents from Defendants.

Reason:  This is the request that Plaintiff thought Defendants would agree to accept, but Defendants apparently change their mind.  In any event, the request still requires Defendants and their counsel to turn over anything provided to them by Governor's counsel.

**Request No. 2**

**Any and all documents, notes, communications, or records generated by Andrea Hoch, Tami Bogart, Dan Maguire or any Governor's Office employee, representative, or agent regarding Procedure 770, i.e., the procedure used by the State of California to execute an inmate.**

Response: See response to request no. 1 above.

Reasons:  Again, these were materials Plaintiff thought Defendants would agreed to a request to produce as they are essentially a state agency involved in the fashioning of the protocol.  In any event, the request still requires Defendants and their counsel to turn over anything provided to them by Governor's counsel.

**Request No. 3**

**All documents or notes generated by any CDCR employee, representative, or agent at the meeting called by the Governor's legal affairs secretary that is referred to in Warden Ornoski's Deposition at 146.**

Response:  The only documents responsive to this request are protected by the work product and attorney-client privileges as set forth in the attached privilege log.

Privilege log:  work product and attorney-client are asserted for Mr. Gillette's notes and Mr. Slavin's notes.

Reason:  As discussed above, there is no attorney-client privilege or work-product immunity that applies.  This was a meeting called by the Governor's office and with persons from several different agencies along with private officials attending, not an internal CDCR discussion with their counsel about litigation.  Any notes reflecting that discussion are discoverable.

**Request No. 5**

**Any and all documents or notes generated by any CDCR employee, representative, agent, or Robert Singler, M.D. that refer to the process concluded upon at the meeting called by the Governor's legal affairs secretary that is referred to in Warden Ornoski's Deposition at 146.**

Response:  The only documents arguably responsive to this request are protected by the work product and attorney-client privileges as set forth in the attached privilege log.

Privilege log:  work product and attorney-client are asserted for Mr. Gillette's notes and Mr. Slavin's notes.

Reason:  As discussed above, there is no attorney-client privilege or work-product immunity that applies.  This was a meeting called by the Governor's office and with persons from several different agencies along with private officials attending, not an internal CDCR discussion with their counsel about litigation. Any notes reflecting that discussion are discoverable.  Further, the procedure is one that was devised by counsel.  The Defendants cannot insulate their decisions and the reasons for them by having the lawyers decide how to revise Procedure 770.

**Request No. 7**

**All pay sheets for people on the execution team that who attended execution training sessions in 2004 as referred to in the deposition of Witness # 1 at page 123.**

Response: Defendants object to this request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. To the extent Plaintiff is seeking documentation relating to training by the execution team, see the documents provided in response to requests 11 through 14.

Reasons :  The pay sheets reflect the number, length and location of training sessions. Plaintiff understands from the meet and confer that the only record of these sheets is located in a warehouse and they are not catalogued.  An affidavit to this effect, and that there is no other potential source such as duty rosters for individuals, or that he individuals don't have access to this information themselves, will suffice.

**Request No. 8**

**All pay sheets for people on the execution team that who attended execution training sessions in 2005 as referred to in the deposition of Witness # 1 at page 123.**

Response: See response to request No. 7.

Reasons :  The pay sheets reflect the number, length and location of training sessions. Plaintiff understands from the meet and confer that the only record of these sheets is located in a warehouse and they are not catalogued.  An affidavit to this effect, and that there is no other potential source such as duty rosters for individuals, or that he individuals don't have access to this information themselves, will suffice.

**Request No. 9**

**All pay sheets for people on the execution team that who attended execution training sessions in 2006 as referred to in the deposition of Witness # 1 at page 123.**

Response: See response to request No. 7.

Reasons :  The pay sheets reflect the number, length and location of training sessions. Plaintiff understands from the meet and confer that the only record of these sheets is located in a warehouse and they are not catalogued.  An affidavit to this effect, and that there is no other potential source such as duty rosters for individuals, or that he individuals don't have access to this information themselves, will suffice.

**Request No. 10**

**All pay sheets for people on the execution team that who attended execution training sessions in 1997-20034 as referred to in the deposition of Witness # 1 at page 123.**

Response: See response to request No. 7.

Reasons :  The pay sheets reflect the number, length and location of training sessions. Plaintiff understands from the meet and confer that the only record of these sheets is located in a warehouse and they are not catalogued.  An affidavit to this effect, and that there is no other potential source such as duty rosters for individuals, or that he individuals don't have access to this information themselves, will suffice.

**Request nos. 11-14**

**All training documents to show a person was at training that day in [1997-2006] as referred to in the deposition of Witness #1 at page 123.**

Response[s]:  See accompanying documents responsive to the request and redacted pursuant to the Court's protective order marked as Documents 11-14.

Reasons:  Finally, after months of litigation, the training logs were turned over. However, the redactions make them nearly meaningless.  Instead of completely redacting the names, witness designations need to be placed in them so Plaintiff can discern who is going to the trainings and who is not.

**Request No. 15**

**All sign in sheets that reflect assignments for [REDACTED] execution team members referred to by Witness # 3, in his deposition at 93.**

Response:  As there is no such document referenced at the designated page Defendants are unable to respond.

Reasons:  At the meet and confer, the correct page designation was given to Defendants.  They have not produced the documents.

**Request No. 16**

**All team leader memos to supervisors of execution team members referred  to by Witness #3, in his deposition at 93.**

Response:  As there is no such document referenced at the designated page Defendants are unable to respond.

Reasons:  At the meet and confer, the correct page designation was given to Defendants.  They have not produced the documents.

**Request no. 21**

**The 10 or 12 page documents reviewed by Witness #4 that is referred to in Witness #4's deposition at page 93.**

Response:  The witness was referring to a portion of OP 770 in effect at the time, a copy of which redacted pursuant to the Court's order has already been provided to Plaintiff.

Reasons:  Witness #4 stated he had not reviewed OP 770.  This must be some other document he is referring to.

**Request no. 23**

**Produce the execution protocol of the State of Texas that was provided to Warden Ornoski as referred to in his Deposition at 48.**

Response:  Warden Ornoski testified that eh Texas prison officials would not provide a copy of the execution protocol during the visit.  Accordingly, Defendants have no documentation to produce.  Because no Texas officials are defendants in this action, and none of their documents are in the control or custody of Defendants, Plaintiff may not seek discovery of the requested document from Defendants.

Reason:  Warden Ornoski testified that while he was not given the entire protocol, he was given a shorter document pertaining to the protocol.  Because he testified he relied on the Texas procedure in part, that procedure is relevant.

**Request No. 24**

**All writings generated from Warden Ornoski's direction to visit, and visit the State of Texas to observe an execution, whether created by Warden Ornoski, Eric Messick, or any other CECR employee.**

Response: There are no such written materials. There is a tape recording of conversations with correctional officials and death row inmates in Texas, none of which relater to the method of execution. The recording raises security and privacy issues and is not being produced for that reason as set forth in the attached privilege log. Defendants further object that the requested material is not reasonably calculated to lead to the discovery of admissible evidence.

Privilege Log:  merely repeats that the tape is covered by "privacy and institutional security."

<u>Reasons</u>:  The tape recording must be turned over because Warden Ornoski testified he relied on the information from Texas, in part, in suggesting revisions.  There are no such privileges and the log is insufficient to assert them.

## Request No. 26

**The current version of Procedure 770 that has been fully approved according to the Department Operations Manual and/or any other process by which such procedures are approved.**

<u>Response</u>: The current version of OP 770 as redacted pursuant to the Court's order has already been provided to Plaintiff.

<u>Reasons</u>:  This is a request for the production of the official version, which is required to be approved and signed by the Warden and the Director.  If Defendants are stating that there is no official version, then there is no such document.  If they are stating that the official approved version has been provided, that is another.  Here, they do neither.

## Requests 27-34:

These are a series of requests similar to request #26 that seek the versions of Procedure 770 that have been approved in the past and currently.  For each, Defendants merely stated that the previous and current versions have already been provided.  Again, this is not a response because it does not either state that those version were officially approved or not, and does not provide any documentation.

## Request No. 31

**All versions of Procedure 770 that were ever approved and signed by Warden Ornoski in 2005.**

<u>Response</u>:  The version of OP 770 in effect in 2005 as redacted pursuant to the Court's order has already been provided to Plaintiff.

<u>Reasons</u>:  This is an example of the above.

**Request no. 33**

**All versions of Procedure 770 that were ever approved by any Warden in 2006.**

Response:  The version of OP 770 as amended in 2006 and redacted pursuant to the Court's order has already been provided to Plaintiff.  To date the current warden has not signed that version.

Reasons: Plaintiff is entitled to the approved protocol, whether redacted or not.

**Request No. 34**

**All versions of Procedure 770 that were approved by the Director of CDCR in 2006.**

Response: The version of OP 770 as amended in 2006 and redacted pursuant to the Court's order has already been provided to Plaintiff.

Reasons:  This is another example of the failure to response to the request directly.

**Request No. 48**

**Any and all performance evaluations for** [redacted]**, team leaders or assistant team leaders on the execution team.**

Response:  there are no written evaluations of team members with respect to their work on the execution team.

Reasons:  The request is not limited to evaluations of their work on the execution team.

**Request No. 49**

**Any and all documents reflecting deaths occurring at the [redacted] , or within 48 hours of treatment there, since 1998.**

Response:  Defendants object to this request as not reasonably calculated to lead to the discovery of admissible evidence.

Reasons:  This request seeks the information about execution team members, and the allegations that they have provided inadequate **[redacted]**  to the point those prisoners have died unnecessarily.

**Request No. 50**

**Any and all documents concerning any investigation into deaths that have been attributed to [redacted]  San Quentin by any reviewing entity.**

Response:  Defendants object to this request as not reasonably calculated to lead to the discovery of admissible evidence.

Reasons:  This request seeks the information about execution team members, and the allegations that they have         **[redacted]**         those prisoners have died unnecessarily.

**Request No. 51**

**Any and all documents concerning lethal injection and/or executions generated or received by the Office of the Inspector General**

Response:  the Office of the Inspector General is separate and independent state agency, *see* Penal Code section 6125, and is not a party to this action.  None of the Defendant have control or custody over any documents from the Office of Inspector General.  Accordingly, Plaintiff may not seek discovery of the requested documents from Defendants.

Reasons:  This is another instance in which Plaintiff believed Defendants were to accept the request and any objections to be raised in the context of this litigation.  That turns out not to be the case.  However, Defendant still must turn over any documents, including emails, from that agency.

**V.**

**THIRD PARTY OFFICE OF THE GOVERNOR**

Here, the request was for documents and information gathered as a result of the governor's counsel's involvement in executions and in revising Procedure 770.  That counsel has asserted a host of privileges, all of which don't apply.  This is particularly true of documents provided to and received from other persons and agencies.  As described above, if Governor's counsel obtained information from CDCR or its lawyer, that information is discoverable.

In the PNS litigation, Governor's counsel produced a privilege log that disclosed emails from Ward Campbell, also of Mr. Gillette's office, that concern lethal injection. Those are responsive to this request and no privilege is claimed here.  They should be ordered turned over.

There appears to have been a chart presented to various persons involved in the meeting that was given to them by Mr. Gillette concerning lethal injection procedures.  That meeting was attended by not only governor's counsel, but Dr. Singler, and officials from CDCR.   The chart should have been turned over in response to the discovery requests described above, or at least some privileged invoked.  It was not.  If the attorney notes are the problem, they can be redacted.

**Request no. 2**

**All documents provided by CDCR relating to CDCR's lethal injection procedures.**

Response: Objection. This request is overbroad and therefore seeks documents that are not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence. This request also seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative

process privilege, official information privilege, and self-critical analysis privilege. Without waiving these objections, Respondent responds to this request as follows:

Please see attached documents bates-stamped numbers Morales 50-52 and 59-179.

Please see attached privilege log for documents bates-stamped numbers Morales 1-49, 53-55, and 180-181.

Privilege log: attorney-client and attorney work product are claimed for handwritten notes by Andrea Hoch, Counsel at Office of Legal Affairs that are on the *Morales* pleadings.

Attorney-client is claimed for a facsimile cover sheet and for facsimile transmissions from CDCR to Ms. Hoch

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart authored by Mr. Gillette that appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

Reasons to Produce: the boilerplate objection results in waiver. There is no privilege or immunity that attaches to materials provided by CDCR or its counsel. Governor's counsel is like any other witness to statements by CDCR, and their notes that may reflect any statements made, particularly statements by CDCR, its counsel or Dr. Singler, are discoverable. Merely because one of the counsel have written on it does not allow them to not disclose an entire document generated by CDCR. The documents are relevant exactly because the Governor's counsel chose to become involved in the fashioning of CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of the fashioning.

Further, there appear to be emails from Mr. Gillette that are on the privilege log and that are responsive to this request. No privilege has been claimed as to those with respect to this request.

In the PNS litigation, Governor's counsel produced a privilege log that disclosed emails from Ward Campbell, also of Mr. Gillette's office.  Those are responsive to this request and no privilege is claimed here.

**Request no. 3:**

**All communications with CDCR relating to lethal injection procedures.**

Response:  Objection. This request is generally overbroad, vague, and ambiguous. In addition, as stated above in the general objections, the meaning of "communications" as defined in Schedule A is vague and ambiguous. The definition of "communications" as defined in the subpoena is also contrary to Rule 45 of the Federal Rules of Civil Procedure, which does not allow a party to subpoena oral communications by means of a document subpoena. This request also seeks documents that are not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence. This request also seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative process privilege, official information privilege, and self-critical analysis privilege. Without waiting these objections, Respondent responds to this request as follows:

Please see attached documents bates-stamped numbers Morales 50-52 and 59-179.

Please see attached privilege log for documents bates-stamped numbers Morales 1-49, 53-55, and 180-189.

Privilege Log:

Attorney-client and attorney work product are claimed for handwritten notes by Andrea Hoch, Counsel at Office of Legal Affairs that are on the *Morales* pleadings.

Attorney-client is claimed for a facsimile cover sheet and for facsimile transmissions from CDCR to Ms. Hoch.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart authored by Mr. Gillette that appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for emails from Governor's counsel to various persons, some unknown, and to CDCR

Attorney-client and attorney work product are claimed for emails from unknown persons to Governor's counsel and other unknown persons.

Reasons to Produce:  the boilerplate objection results in waiver.  There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel.  The documents are relevant exactly because the Governor's counsel chose to become involved in the fashioning of CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of the fashioning.

A communication is nothing more than a documents that memorializes or comments upon a discussion.

If the privilege is being invoked merely because of the notes of counsel, those can be redacted.  Emails and attachments, as well as documents to and from CDCR are not privileged.

**Request no. 3[a]:**

**All documents relating to any meetings with CDCR  relating to lethal injection procedures**.

Response: Objection. This request is overbroad in that it seeks documents that are not relevant to this litigation, not reasonably calculated to lead to the discovery of admissible

evidence. This request also seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative process privilege, official information privilege, and self-critical analysis privilege. Without waiting these objections, Respondent responds to this request as follows:

Please see attached privilege log for documents bates-stamped numbers Morales 53-58 and 187.

Privilege log:

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart provided by Mr. Gillette that appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for notes of the meeting by Ms. Bogert.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for emails from Governor's counsel to various persons, some unknown, and to CDCR.

Reasons: The boilerplate objection results in waiver. There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel. The documents are relevant exactly because the Governor's counsel, a third party, chose to become involved in the fashioning of CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of the fashioning.

If the privilege is being invoked merely because of the notes of counsel, those can be redacted. Emails to and from CDCR are not privileged.

**Request no. 4**

**All communications relating to any meetings with CDCR relating to lethal injection procedures**

<u>Response</u>: Objection.  This request is overbroad in that it seeks documents that are not relevant to this litigation, nor reasonably calculated to lead to the discovery of admissible evidence. In addition, as stated above in the general objections, the meaning of "communications" as defined in Schedule A is vague and ambiguous. The definition of "communications" as defined in the subpoena is also contrary to Rule 45 of the Federal Rules of Civil Procedure, which does not allow a party to subpoena oral communications by means of a document subpoena. This request also seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative process privilege, official information privilege, and self-critical analysis privilege. Without waiting these objections, Respondent responds to this request as follows:

Please see attached privilege log for documents bates-stamped numbers Morales 53-58 and 187.

<u>Privilege log</u>:

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart provided by Mr. Gillette that appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for notes of the meeting by Ms. Bogert.

Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for emails from Governor's counsel to various persons, some unknown, and to CDCR.

<u>Reasons</u>:  The boilerplate objection results in waiver.  There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel, or materials provided by that counsel.  A communication is nothing more than a documents that memorializes or comments upon a discussion.  The documents are relevant exactly

1   because the Governor's counsel, a third party, chose to become involved in the fashioning of

2   CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of

3   the fashioning.

4           If the privilege is being invoked merely because of the notes of counsel, those can be

5   redacted.  Emails to and from CDCR are not privileged.

6   **Request no. 5**

7   **All documents and communications relating to any meetings attended by, inter alia,**
    **then San Quentin state prison acting warden Steven Ornoski, Jack St. Clair, M.D.,**

8   **Robert Singler, M.D., Bruce Slavin, Dane Gillette, and/or a representative from the**

9   **inspector general's office  relating to lethal injection procedures.**

10          <u>Response</u> : Objection. As stated above in the general objections, the meaning of

11  "communications" as defined in Schedule A is vague and ambiguous. The definition of

12  "communications" as defined in the subpoena is also contrary to Rule 45 of the Federal

13  Rules of Civil Procedure, which does not allow a party to subpoena oral communications by

14  means of a document subpoena. This request also seeks documents protected from

15  disclosure by the following privileges: attorney-client privilege, attorney work product

16  privilege, deliberative process privilege, official information privilege, and self-critical

17  analysis privilege. Without waiting these objections, Respondent responds to this request as

18  follows:

19          Please see attached privilege log for documents bates-stamped numbers Morales 53-

20  58.

21          <u>Privilege Log</u>: Attorney-client, work product, deliberative process, official

22  information and self-critical analysis are claimed for a chart provided by Mr. Gillette that

23  appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms.

24  Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

25          Attorney-client, work product, deliberative process, official information and self-

26  critical analysis are claimed for notes of the meeting by Ms. Bogert.

27

28

<u>Reasons</u>:  The boilerplate objection results in waiver.  There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel, or materials provided by that counsel.  A communication is nothing more than a documents that memorializes or comments upon a discussion.  The documents are relevant exactly because the Governor's counsel, a third party, chose to become involved in the fashioning of CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of the fashioning.

If the privilege is being invoked merely because of the notes of counsel, those can be redacted

## Request no. 6

**All documents and communications relating to any consultations with any medical doctor relating to lethal injection procedures, including but not limited to Dr. Dershwitz and/or Dr. Singler.**

<u>Response</u>: Objection. As stated above in the general objections, the meaning of "communications" as defined in Schedule A is vague and ambiguous. The definition of "communications" as defined in the subpoena is also contrary to Rule 45 of the Federal Rules of Civil Procedure, which does not allow a party to subpoena oral communications by means of a document subpoena. This request also seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative process privilege, official information privilege, and self-critical analysis privilege. Without waiting these objections, Respondent responds to this request as follows:

Please see attached privilege log for documents bates-stamped numbers Morales 53-58 and 190-191.

<u>Privilege Log</u>: Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart provided by Mr. Gillette that

appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

Attorney-client and work product are claimed for an email from Mr. Costigan, who is not identified, to Ms. Hoch and other, unidentified persons.

Reasons: The boilerplate objection results in waiver. There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel, or materials provided by that counsel. A communication is nothing more than a documents that memorializes or comments upon a discussion. The documents are relevant exactly because the Governor's counsel, a third party, chose to become involved in the fashioning of CDCR procedures and because it appears they and Mr. Gillette were the ones doing much of the fashioning. Emails from unidentified persons to counsel and other, unidentified persons, are not privileged. If the privilege is being invoked merely because of the notes of counsel, those can be redacted

**Request no. 7**

**All documents relating to the procedure used by the state of California to execute an inmate.**

Objection. This request seeks documents protected from disclosure by the following privileges: attorney-client privilege, attorney work product privilege, deliberative process privilege, official information privilege, and self-critical analysis privilege. Without waiting these objections, Respondent responds to this request as follows:

Please see attached privilege log for documents bates-stamped numbers Morales 53-58.

Privilege Log: Attorney-client, work product, deliberative process, official information and self-critical analysis are claimed for a chart provided by Mr. Gillette that appears to have been given to Governor's counsel, with (undated) handwritten notes by Ms. Hoch, Ms. Bogert and Mr. Maguire, all of Counsel at the Office of Legal Affairs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Reasons</u>:  The boilerplate objection results in waiver.  There is no privilege or immunity that attaches to materials reflecting discussions with CDCR or its counsel, or materials provided by that counsel.  If the privilege is being invoked merely because of the notes of counsel, those can be redacted.

## VI.
## THIRD PARTY INSPECTOR GENERAL

For the majority of requests, having to do with witnessing the executions and being involved in discussions as to modifications of Procedure 770, the Inspector General has stated they have no documents.  A suitable declaration describing the search needs to be submitted because the testimony is that they are present as monitors for every execution and that they participated in the discussions concerning Mr. Morales' scheduled execution that night, as well as the modifications of Procedure 770.  In fact, the head of the agency was involved.  It is simply inconceivable that there is not a single email, letter, appointment calendar entry, memo or note about all of their involvement.  If that is the case,  they need to discuss document retention and when the information was deleted from computers.

As to the following disputed requests, we have narrowed the request to merely asking for investigations of conduct by current and former execution team members, which the Inspector General can obtain from Defendants' counsel, and of the units they work in. The Inspector General is still requiring a court order before the information is disclosed.

### Request 11:

**All documents and communications relating to deaths of prisoners at San Quentin state prison from 1996 to and including the present.**

<u>Response</u>: Non-party OIG objects as vague, ambiguous and overbroad as to cause of death and to a particular person or party and, due to the large number of documents that potentially fall within this category, is therefore burdensome and oppressive. The OIG objects

based on relevance of all deaths to the issue of lethal injection. In addition, the OIG objects based on official information privilege, deliberative process privilege, self-critical analysis privilege, the right to privacy, and HIPPA (health Insurance Portability and Accountability Act). Moreover, this category seeks documents that are confidential under California laws governing activities of the Office of the Inspector General (CA Pen. Code § 6125, et. seq.), investigations of peace officers (California Public Safety Officers' Procedural Bill of Rights, CA Gov. Code § 3300, et. seq., CA Penal Code §§ 832.5, 832.7., 832.8, CA Evid. Code §§ 1043 and 1045, CA Gov. Code § 6254, subd.(f)), confidentiality of medical records (Information Practices Act, CA Civ. Code § 1798, et. seq., Confidentiality of Medical Information Act, CA Civ. Code § 56 et. seq., and CA Pen. Code § 1543) and privacy rights (constitutional right to privacy).

Reason to compel: the boilerplate objection constitutes waiver. Relevance has already been discussed above and throughout. California confidentiality laws are not applicable in this Court. Medical privacy issues can be dealt with by inmate number designations. There is no self-critical analysis privilege and if there was, it is inapplicable because they are a different agency than CDCR.

**Request 12:**

      **All documents and communications relating to medical care provided to prisoners at San Quentin state prison from 1996 to and including the present.**

Response: Non-party OIG objects as vague, ambiguous and overbroad as to cause of death and to a particular person or party and, due to the large number of documents that potentially fall within this category, is therefore burdensome and oppressive. The OIG objects based on relevance of all deaths to the issue of lethal injection. In addition, the OIG objects based on official information privilege, deliberative process privilege, self-critical analysis privilege, the right to privacy, and HIPPA (health Insurance Portability and Accountability Act). Moreover, this category seeks documents that are confidential under California laws governing

activities of the Office of the Inspector General (CA Pen. Code § 6125, et. seq.), investigations of peace officers (California Public Safety Officers' Procedural Bill of Rights, CA Gov. Code § 3300, et. seq., CA Penal Code §§ 832.5, 832.7., 832.8, CA Evid. Code §§ 1043 and 1045, CA Gov. Code § 6254, subd.(f)), confidentiality of medical records (Information Practices Act, CA Civ. Code § 1798, et. seq., Confidentiality of Medical Information Act, CA Civ. Code § 56 et. seq., and CA Pen. Code § 1543) and privacy rights (constitutional right to privacy).

Reason to compel: the boilerplate objection constitutes waiver.  Relevance has already been discussed above and throughout.  California confidentiality laws are not applicable in this Court.  Medical privacy issues can be dealt with by inmate number designations.  There is no self-critical analysis privilege and if there was, it is inapplicable because they are a different agency than CDCR.

**Request 13**:

**All documents and communications relating to investigations of [REDACTED] and medical doctors at San Quentin state prison from 1996 to and including the present**.

Response: Non-party OIG objects as vague, ambiguous and overbroad as to cause of death and to a particular person or party and, due to the large number of documents that potentially fall within this category, is therefore burdensome and oppressive. The OIG objects based on relevance of all deaths to the issue of lethal injection. In addition, the OIG objects based on official information privilege, deliberative process privilege, self-critical analysis privilege, the right to privacy, and HIPPA (health Insurance Portability and Accountability Act). Moreover, this category seeks documents that are confidential under California laws governing activities of the Office of the Inspector General (CA Pen. Code § 6125, et. seq.), investigations of peace officers (California Public Safety Officers' Procedural Bill of Rights, CA Gov. Code § 3300, et. seq., CA Penal Code §§ 832.5, 832.7., 832.8, CA Evid. Code §§ 1043 and 1045, CA

Gov. Code § 6254, subd.(f)), confidentiality of medical records (Information Practices Act, CA Civ. Code § 1798, et. seq., Confidentiality of Medical Information Act, CA Civ. Code § 56 et. seq., and CA Pen. Code § 1543) and privacy rights (constitutional right to privacy).

Reason to compel: the boilerplate objection constitutes waiver.  Relevance has already been discussed above and throughout.  California confidentiality laws are not applicable in this Court.  Medical privacy issues can be dealt with by inmate number designations.  There is no self-critical analysis privilege and if there was, it is inapplicable because they are a different agency than CDCR.

**Request 14**:

**All documents and communications relating to any members of the lethal injection team at San Quentin State Prison who served in any capacity on that team from 1996 to and including the present**.

Response: Non-party OIG objects as vague, ambiguous and overbroad as to cause of death and to a particular person or party and, due to the large number of documents that potentially fall within this category, is therefore burdensome and oppressive. The OIG objects based on relevance of all deaths to the issue of lethal injection. In addition, the OIG objects based on official information privilege, deliberative process privilege, self-critical analysis privilege, the right to privacy, and HIPPA (health Insurance Portability and Accountability Act). Moreover, this category seeks documents that are confidential under California laws governing activities of the Office of the Inspector General (CA Pen. Code § 6125, et. seq.), investigations of peace officers (California Public Safety Officers' Procedural Bill of Rights, CA Gov. Code § 3300, et. seq., CA Penal Code §§ 832.5, 832.7., 832.8, CA Evid. Code §§ 1043 and 1045, CA Gov. Code § 6254, subd.(f)), confidentiality of medical records (Information Practices Act, CA Civ. Code § 1798, et. seq., Confidentiality of Medical Information Act, CA Civ. Code § 56 et. seq., and CA Pen. Code § 1543) and privacy rights (constitutional right to privacy).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>Reason to compel</u>: the boilerplate objection constitutes waiver. Relevance has already been discussed above and throughout. California confidentiality laws are not applicable in this Court. Medical privacy issues can be dealt with by inmate number designations. There is no self-critical analysis privilege and if there was, it is inapplicable because they are a different agency than CDCR.

## VII.
## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter an Order compelling Defendants to produce the aforementioned documents and information.

Dated: September 5, 2006

MICHAEL ANGELO MORALES

By:

John R Grele

David A. Senior (# 108759)
McBreen & Senior
1880 Century Park East, Suite 1450
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
703 Market Street, Suite 550
San Francisco, CA 94103
Phone: (415) 348-9300
Fax: (415) 348-0364
jgrele@earthlink.net

1  Richard P. Steinken (admitted *pro hac vice*)
   Janice H. Lam (admitted *pro hac vice*)
2  Stephanie L. Reinhart (admitted *pro hac vice*)
   Jenner & Block LLP
3  One IBM Plaza
   Chicago, IL  60611-7603
4  Phone:  (312) 923-2938
   Fax:  (312) 840-7338
5  rsteinken@jenner.com

6
   Ginger D. Anders (admitted *pro hac vice*)
7  Jenner & Block LLP
   601 Thirteenth Street, NW
8  Suite 1200 South
   Washington DC 20005-3823
9  Phone:  (202) 639-6000
   Fax:  (202) 639-6066
10 ganders@jenner.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28