\*\*E-filed 12/15/06\*\*

DESIGNATED FOR PUBLICATION

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Michael Angelo MORALES,<br><br>  Plaintiff,<br><br>  v.<br><br>James E. TILTON, Secretary of the California Department of Corrections and Rehabilitation, and Robert L. Ayers Jr., Acting Warden of San Quentin State Prison,<br><br>  Defendants. | Case Number C 06 219 JF RS<br>Case Number C 06 926 JF RS<br><br>DEATH-PENALTY CASE<br><br>MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS<br><br>[] |

I

Few issues in American society have generated as much impassioned debate as the death penalty. At one end of the spectrum, abolitionists condemn the intentional taking of human life by the State as barbaric and profoundly immoral. At the other, proponents see death, even a painful death, as the only just punishment for crimes that inflict unimaginable suffering on victims and their surviving loved ones. Even among those with less absolute positions, there are vigorous arguments about the social, penological, and economic costs and benefits of capital punishment.

Any legal proceeding arising in this context thus acts as a powerful magnet, an opportunity for people who care about this divisive issue to express their opinions and vent their

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

frustrations. However, because courts (and particularly trial courts) exist not to resolve broad questions of social policy but to decide specific legal and factual disputes, it is important at the outset for this Court to make very clear what this case is not about.

This case is not about whether the death penalty makes sense morally or as a matter of policy: the former inquiry is a matter not of law but of conscience; the latter is a question not for the judiciary but for the legislature and the voters. Nor is it about whether California's primary method of execution—lethal injection—is constitutional in the abstract: the arguments and evidence presented by the parties address the specific manner in which California has implemented that method and proposes to do so in the future. Nor is it about whether the Constitution requires that executions be painless: binding precedent holds that the Eighth Amendment prohibits only "the unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion), and procedures that create an "unnecessary risk" that such pain will be inflicted, *Cooper v. Rimmer*, 379 F.3d 1029, 1033 (9th Cir. 2004).

Nor, finally, does it somehow involve a comparison of the pain that Plaintiff, a condemned inmate at California's San Quentin State Prison, might suffer when he is executed with the horrific suffering of the young woman he raped and murdered. The Court has considered seriously the constitutional issues raised by this case not because of some imagined personal sympathy for Plaintiff but because it is its fundamental duty to do so. As a practical matter, there is no way for a court to address Eighth Amendment issues in the capital context other than in a case raised by a death-row inmate; by definition, the acts of which such an inmate stands convicted are viewed by the law and a majority of the community as so abhorrent as to warrant the ultimate penalty. Lest there be any doubt, this Court has the most profound sympathy for the family and loved ones of Plaintiff's victim.

In fact, this case presents a very narrow question: does California's lethal-injection protocol—as actually administered in practice—create an undue and unnecessary risk that an inmate will suffer pain so extreme that it offends the Eighth Amendment? Because this question has arisen in the context of previous executions, *see Beardslee v. Woodford*, 395 F.3d 1064 (9th Cir. 2005); *Cooper*, 379 F.3d 1029, and is likely to recur with frequency in the future, the Court

2

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

has undertaken a thorough review of every aspect of the protocol, including the composition and training of the execution team, the equipment and apparatus used in executions, the pharmacology and pharmacokinetics of the drugs involved, and the available documentary and anecdotal evidence concerning every execution in California since lethal injection was adopted as the State's preferred means of execution in 1992, *see* 1992 Cal. Stat. 558.  The Court has reviewed a mountain of documents, including hundreds of pages of legal briefs, expert declarations, and deposition testimony, and it has conducted five days of formal hearings, including a day at San Quentin State Prison that involved a detailed examination of the execution chamber and related facilities.  The Court concludes that absent effective remedial action by Defendants—the nature of which is discussed in Part IV of this memorandum—this exhaustive review will compel it to answer the question presented in the affirmative.  Defendants' implementation of lethal injection is broken, but it can be fixed.

## II

Plaintiff Michael Angelo Morales raped and murdered Terri Winchell.  A jury convicted Plaintiff of murder, found special circumstances, and sentenced him to death.  *See generally Morales v. Woodford*, 388 F.3d 1159, 1163-67 (9th Cir. 2004).

In California, "[i]f a person under sentence of death does not choose either lethal gas or lethal injection within 10 days after the warden's service upon the inmate of an execution warrant [then] the penalty of death shall be imposed by lethal injection." Cal. Penal Code § 3604(b) (West 2006).  More specifically, "[t]he punishment of death shall be inflicted . . . by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections."[1]  *Id.* § 3604(a). Defendants[2] have adopted San Quentin Operational Procedure No. 0-770 ("OP 770") as

---

[1] The Department of Corrections was reorganized into the Department of Corrections and Rehabilitation on July 1, 2005.

[2] At the commencement of the present litigation, the Defendants were Roderick Q. Hickman, who was the Secretary of the California Department of Corrections and Rehabilitation, and Steven W. Ornoski, then the Acting Warden of San Quentin State Prison; they were sued in their official capacities. Both of these positions have experienced multiple changes in personnel since this action was filed; each

California's protocol governing executions by lethal injection. This protocol, like those used by the federal government and most other states, provides for the injection of three drugs into a person being executed: sodium thiopental, a barbiturate sedative, to induce unconsciousness; pancuronium bromide, a neuromuscular blocking agent, to induce paralysis; and potassium chloride, to induce cardiac arrest.

Plaintiff filed the present action on January 13, 2006, contending that OP 770 and the manner in which Defendants implement it would subject him to an unnecessary risk of excessive pain, thus violating the Eighth Amendment's command that "cruel and unusual punishments [not be] inflicted." U.S. Const. amend. VIII. Five days later, the Superior Court of California for the County of Ventura issued a death warrant, setting Plaintiff's execution for February 21, 2006. This Court then ordered briefing and limited discovery and held two hearings on Plaintiff's application for a preliminary injunction to stay his execution so that the Court could conduct a full evidentiary hearing to consider his claims.

On February 14, 2006, the Court issued an order conditionally denying Plaintiff's request for a stay of execution. *Morales v. Hickman*, 415 F. Supp. 2d 1037 (N.D. Cal. 2006). The Court reviewed in detail evidence from execution logs, which indicated that "inmates' breathing may not have ceased as expected in at least six out of thirteen executions by lethal injection in California."[3] *Id.* at 1045. This and other evidence raised concerns that inmates may have been conscious when they were injected with pancuronium bromide and potassium chloride, drugs that the parties agreed would cause an unconstitutional level of pain if injected into a conscious person. Given this evidence, the Court fashioned a remedy that was intended to permit Defendants to proceed with Plaintiff's execution as scheduled by executing him with only barbiturates or by retaining the services of a qualified expert to ensure that Plaintiff would be unconscious when exposed to the painful drugs. *Id.* at 1047. In so holding, the Court stated,

---

time, the proper Defendants automatically were substituted pursuant to Federal Rule of Civil Procedure 25(d)(1). The current Defendants are Secretary James E. Tilton and Acting Warden Robert L. Ayers Jr.

[3] In fact, there have been only eleven executions by lethal injection in California; the first two executions following the reinstatement of the death penalty were by lethal gas.

4

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

> Whether or not Defendants implement the remedy and thus proceed to execute Plaintiff as scheduled, the Court respectfully suggests that Defendants conduct a thorough review of the lethal-injection protocol, including, *inter alia*, the manner in which the drugs are injected, the means used to determine when the person being executed has lost consciousness, and the quality of contemporaneous records of executions, such as execution logs and electrocardiograms. Given the number of condemned inmates on California's Death Row, the issues presented by this case are likely to recur with considerable frequency. Because California's next execution is unlikely to occur until the latter part of this year, the State presently is in a particularly good position to address these issues and put them to rest. It is hoped that the remedy ordered by this Federal Court in this case will be a one-time event; under the doctrines of comity and separation of powers, the particulars of California's lethal-injection protocol are and should remain the province of the State's executive branch. A proactive approach by Defendants would go a long way toward maintaining judicial and public confidence in the integrity and effectiveness of the protocol.

*Id.* at 1046-47.

The day after the Court issued its order, Defendants responded that they had retained the services of two anesthesiologists who would attend Plaintiff's execution pursuant to the terms of the order. Based upon Defendants' written submissions, and over Plaintiff's strenuous objections, the Court stated that it was satisfied that the anesthesiologists would "take all medically appropriate steps to ensure that Plaintiff is and remains unconscious" when injected with pancuronium bromide and potassium chloride. (Final Order Re Defendants' Compliance with Conditions, Doc. No. 67 at 4 n.3.; *id.* at 5 (finding that "the anesthesiologists designated by Defendants are qualified professionals who will use their professional judgment not merely to observe the execution but to *ensure* that Plaintiff is and remains unconscious").)

On February 19, 2006, the United States Court of Appeals for the Ninth Circuit affirmed. 438 F.3d 926 (9th Cir. 2006). The Ninth Circuit construed this Court's order as

> clearly contemplating that [the anesthesiologists] have the authority to take "all medically appropriate steps"—either alone or in conjunction with the injection team—to immediately place or return Morales into an unconscious state or to otherwise alleviate the painful effects of either or both the pancuronium bromide or potassium chloride.

*Id.* at 931.

However, for reasons that remain somewhat unclear, there was a "disconnect between the

5

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS (DPSAGOK)

expectations articulated in the orders of this Court and the Court of Appeals and the expectations of the anesthesiologists" regarding how they would participate in Plaintiff's execution. (Order on Defendants' Motion to Proceed with Execution, Doc. No. 78 at 3.) Defendants apparently had told the anesthesiologists that the anesthesiologists merely would have to observe the execution, while Defendants' counsel represented to the Court that the anesthesiologists would ensure that Plaintiff would remain unconscious after he was injected with sodium thiopental. This disconnect became apparent on the evening of February 20, 2006, approximately three or four hours before Plaintiff's scheduled execution (which Defendants had set for 12:01 a.m. on February 21), when Defendants provided copies of the Ninth Circuit's opinion to the anesthesiologists. Almost immediately, the anesthesiologists stated that they could not proceed for reasons of medical ethics. Several hours of tense discussions (including what Warden Ornoski described as "training" of the anesthesiologists) and telephonic hearings followed, during which Defendants postponed the execution. At approximately 2:45 a.m. on February 21, Defendants stated that they would seek approval from the Court to execute Plaintiff using only sodium thiopental (and without the participation of the anesthesiologists); the execution was rescheduled for 7:30 p.m.

The parties submitted briefing on Defendants' request, and the Court heard approximately one hour of telephonic argument during the morning of February 21. Because Defendants had indicated their desire to proceed using only sodium thiopental only hours earlier, the record contained virtually no evidence as to the details of how such an execution would be carried out, and Plaintiff had no meaningful opportunity for appellate review.[4] Accordingly, shortly before 3:00 p.m., the Court issued an order in which it held that, in light of the unique circumstances then presented,

> due process requires that . . . Defendants' obligations be set forth in a way that leaves no room for reasonable doubt. Accordingly, while Defendants may proceed with the execution this evening using only sodium thiopental, they may do so only if the sodium thiopental is injected in the execution chamber directly into the

---

[4]Obviously, this situation would not have arisen had Defendants elected this option initially pursuant to the Court's order of February 14.

6

>intravenous cannula by a person or persons licensed by the State of California to inject medications intravenously.

(*Id.*) Defendants were unwilling or unable to execute Plaintiff in accordance with these requirements, and a stay of execution to permit an evidentiary hearing issued automatically pursuant to the Court's order of February 14. 415 F. Supp. 2d at 1048.

The Court then set an expedited schedule for an evidentiary hearing to be held in May 2006. Thereafter, at the joint request of the parties, the evidentiary hearing was deferred until September 2006 to enable the parties to complete discovery.

On February 28, 2006, the Governor's Office hosted a meeting lasting approximately an hour and a half at which potential changes to OP 770 were discussed. Although more significant modifications were proposed by some of the participants, the Governor's Legal Affairs Secretary concluded that the only change that would be undertaken at that time was what was described as a "tweak" of the chemical aspects of the protocol. It was decided that the dosages of the three drugs would be adjusted and that a continuous infusion of sodium thiopental during the administration of pancuronium bromide and potassium chloride would be added. There is no indication from the record that the participants in the meeting addressed or considered issues related to the selection and training of the execution team, the administration of the drugs, the monitoring of executions, or the quality of execution logs and other pertinent records. Defendants issued the revised version of OP 770 on March 6, 2006; this version remains current and is the version that Defendants intend to follow in executing Plaintiff.

The Pacific News Service ("PNS") thereafter filed a related lawsuit, *Pacific News Service v. Tilton*, No. C 06 1793 JF RS (N.D. Cal. filed Mar. 8, 2006), challenging Defendants' use of pancuronium bromide during executions. PNS moved to consolidate its action with this one. The Court noted that "despite the fact that not consolidating the actions may leave an unresolved First Amendment challenge to California's lethal-injection protocol pending even after the conclusion of the proceedings in *Morales*, Defendants urge the Court to take a deliberate approach to managing these cases, with *PNS* being addressed after *Morales*." The Court declined to consolidate the cases, stating, "While the Court is committed to resolving all aspects of the

7

present litigation expeditiously, it will defer to the State's expressed concerns." (Order Denying Motion to Consolidate without Prejudice, Doc. No. 110 at 2.) In reaching this conclusion, the Court observed,

> At the hearing, counsel for Morales expressed the concern that an appeal of the Court's judgment in *Morales* might be pending while the *PNS* action was still unresolved. Because of the closely related nature of these actions, as well as the Court's inherent authority to determine the timing of its decisions, the Court considers this scenario unlikely.

(*Id.* at 3 n.1.)

On March 30, 2006, the Court convened at San Quentin State Prison for what the parties agreed would be a preliminary session of the evidentiary hearing. At San Quentin, the Court examined the equipment and facilities used during executions, and it heard partial testimony from the then-leader of Defendants' execution team.

In preparation for the remainder of the evidentiary hearing, the parties filed a joint pre-hearing conference statement containing detailed factual stipulations and also submitted voluminous testimony, including the testimony of experts and present and former execution team members, by means of deposition excerpts. The evidentiary hearing recommenced on September 26 and concluded on September 29, 2006. Following the evidentiary hearing, the parties submitted closing briefs.

III

From the evidence in the record and the parties' extensive briefing, the Court has learned a great deal about executions by lethal injection in general and their implementation in California in particular. The opportunity to make first-hand observations at San Quentin was quite useful, and the oral testimony and written declarations of well-qualified experts on both sides have been very helpful. Yet in many respects, the Court finds itself in virtually the same position today that it was in when it considered Plaintiff's motion for a preliminary injunction in February 2006.

As they did in February, the parties agree that it would be unconstitutional to inject a conscious person with pancuronium bromide and potassium chloride in the amounts

8

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

contemplated by OP 770. Defendants' principal medical expert, Dr. Robert C. Singler,[5] testified that it would be "terrifying" to be awake and injected with the contemplated dosage of pancuronium bromide and that it would be "unconscionable" to inject a conscious person with the contemplated amount of potassium chloride. The parties also agree, as they did in February, that assuming effective anesthesia, the use in executions of pancuronium bromide or potassium chloride as such does not violate the Eighth Amendment. As it has from its inception, the resolution of this case thus turns on a single factual question: whether OP 770, as implemented, provides constitutionally adequate assurance that condemned inmates will be unconscious when they are injected with pancuronium bromide and potassium chloride.

On the surface, this would appear to be a relatively straightforward inquiry. As Defendants have pointed out repeatedly and as this Court itself has found in three separate capital cases, including this one, the amount of sodium thiopental to be given to the condemned person pursuant to OP 770 is sufficient to cause virtually all persons to become unconscious or even to cease breathing within one minute. *Morales*, 415 F. Supp. 2d at 1043-44; *Beardslee v. Woodford*, No. C 04 5381 JF, 2005 WL 40073, at *2 (N.D. Cal. Jan. 7, 2005); *Cooper v. Rimmer*, No. C 04 436 JF, 2004 WL 231325, at *3 (N.D. Cal. Feb. 6, 2004). Accordingly, assuming that the sodium thiopental is delivered properly, there should be virtually no risk that an inmate will suffer an unconstitutional level of pain.[6]

However, the record in this case, particularly as it has been developed through discovery and the evidentiary hearing, is replete with evidence that in actual practice OP 770 does not function as intended. The evidence shows that the protocol and Defendants' implementation of it

---

[5] Dr. Singler also was one of the anesthesiologists retained by Defendants to participate in Plaintiff's scheduled execution, and he attended the meeting at the Governor's Office on February 28, 2006.

[6] Although Plaintiff's expert witnesses raised questions at the evidentiary hearing with respect to the effectiveness of the one-and-one-half-gram bolus dose of sodium thiopental in the current version of the protocol (compared to the five-gram dose in all prior versions), the Court did not find that testimony persuasive. Having reviewed all of the expert testimony, the Court is satisfied that even one and one-half grams of sodium thiopental, *if properly administered,* are sufficient to eliminate any unconstitutional risk that an inmate will be conscious when the pancuronium bromide and potassium chloride are injected.

9

suffer from a number of critical deficiencies, including:

    1. <u>Inconsistent and unreliable screening of execution team members</u>: For example, one former execution team leader, who was responsible for the custody of sodium thiopental (which in smaller doses is a pleasurable and addictive controlled substance), was disciplined for smuggling illegal drugs into San Quentin; another prison guard led the execution team despite the fact that he was diagnosed with and disabled by post-traumatic stress disorder as a result of his experiences in the prison system and he found working on the execution team to be the most stressful responsibility a prison employee ever could have.

    2. <u>A lack of meaningful training, supervision, and oversight of the execution team</u>: Although members of the execution team testified that they perform numerous "walk-throughs" of some aspects of the execution procedure before each scheduled execution,[7] the team members almost uniformly have no knowledge of the nature or properties of the drugs that are used or the risks or potential problems associated with the procedure. One member of the execution team, a registered nurse who was responsible for mixing and preparing the sodium thiopental at many executions, testified that "[w]e don't have training, really." While the team members who set the intravenous catheters are licensed to do so, they are not adequately prepared to deal with any complications that may arise, and in fact the team failed to set an intravenous line during the execution of Stanley "Tookie" Williams on December 13, 2005. Although Defendants' counsel assured the Court at the evidentiary hearing that "Williams was a lesson well learned, one that will never occur again," the record shows that Defendants did not take steps sufficient to ensure that a similar or worse problem would not occur during the execution of Clarence Ray Allen on January 17, 2006, or Plaintiff's scheduled execution the following month.[8]

    3. <u>Inconsistent and unreliable record-keeping</u>: For example, there are no contemporaneous records showing that all of the sodium thiopental in the syringes used for

---

[7]The execution team neither has received any training in nor has it practiced mixing sodium thiopental since at least as far back as 1998.

[8]Indeed, the execution team members' reaction to the problem at the Williams execution was described by one member as nothing more than "shit does happen, so."

10

injections actually was injected, and, in fact, testimony revealed that in at least several executions it was not. A number of the execution logs are incomplete or contain illegible or overwritten entries with respect to critical data such as the inmate's heart rate and the time at which observations were made. Inexplicably, Defendants use blank paper for their electrocardiogram (EKG) tracings instead of the graph paper that typically is used, and provide neither standardization markings nor paper-speed documentation, thereby precluding accurate interpretation of the tracings, even as to heart rate.[9]

      4. <u>Improper mixing, preparation, and administration of sodium thiopental by the execution team</u>: Among other things, team members' admitted failure to follow the simple directions provided by the manufacturer of sodium thiopental further complicates the inquiry as to whether inmates being executed have been sufficiently anesthetized.

      5. <u>Inadequate lighting, overcrowded conditions, and poorly designed facilities in which the execution team must work</u>: The execution chamber was not designed for lethal-injection executions; San Quentin officials simply made slight modifications to the existing gas chamber, such as drilling holes in the chamber wall for intravenous lines and installing a metal hook at the top of the chamber from which the bags containing the lethal drugs are suspended. The bags are too high to permit the execution team to verify whether the equipment is working properly. The lighting is too dim, and execution team members are too far away, to permit effective observation of any unusual or unexpected movements by the condemned inmate, much less to determine whether the inmate is conscious; this is exacerbated by the fact that the chamber door is sealed shut during executions as if lethal gas were being disseminated, rendering it virtually impossible to hear any sound from the chamber. For some executions, the small anteroom from which the execution team injects the lethal drugs has been so crowded with prison officials and other dignitaries that even simple movement has been difficult.

---

[9]There is also an extremely troubling absence of reliable documentation as to the disposition of sodium thiopental taken from the prison pharmacy by execution team members purportedly for training purposes; team members testified that the actual drugs are not used in training, yet it appears that substantial quantities of sodium thiopental—again, an addictive controlled substance—were not returned to the pharmacy. These circumstances may warrant investigation by an appropriate law-enforcement agency.

Defendants observe correctly that Plaintiff's burden of proof at the present stage of the instant proceeding is greater than it was at the preliminary-injunction stage and that there still is no definitive evidence that any inmate has been conscious during his execution. Nonetheless, the evidence is more than adequate to establish a constitutional violation. Given that the State is taking a human life, the pervasive lack of professionalism in the implementation of OP 770 at the very least is deeply disturbing. Coupled with the fact that the use of pancuronium bromide masks any outward signs of consciousness, the systemic flaws in the implementation of the protocol make it impossible to determine with any degree of certainty whether one or more inmates may have been conscious during previous executions or whether there is any reasonable assurance going forward that a given inmate will be adequately anesthetized. The responsibility for this uncertainty falls squarely upon Defendants, and the circumstances clearly implicate the Eighth Amendment.

As this Court noted in its order of February 14, 2006, anomalies in six execution logs raise substantial questions as to whether certain inmates may have been conscious when pancuronium bromide or potassium chloride was injected. 415 F. Supp. 2d at 1044-46. These substantial questions remain unanswered despite the depth and breadth of the evidentiary record and the parties' briefing. If anything, the questions have become even more substantial. One of the executions not discussed by the Court in its order of February 14 was that of Robert Lee Massie, who was executed on March 27, 2001. Massie's execution was explored in detail at the evidentiary hearing. Testifying on behalf of Defendants, Dr. Singler opined that based upon the heart rates reflected in the execution log, Massie well may have been awake when he was injected with potassium chloride. Significantly, Dr. Singler testified that he was unable to give a definitive opinion principally because of the poor quality of the log itself, and in particular an unclear entry in the log as to Massie's heart rate.

Dr. Singler's testimony regarding Massie's execution is merely the most dramatic evidence concerning the risks posed by Defendants' acts and omissions.[10] Dr. Singler also

---

[10] *Cf., e.g., California: Official Admits Execution Was Bungled*, N.Y. Times, Sept. 27, 2006, at A21 ("A state official admitted that prison guards had bungled the execution of the gang leader Stanley

testified to a number of additional concerns, most notably the fact that overcrowding, obstructed sight lines, and poor lighting in the execution chamber and adjoining anteroom make accurate observations of the inmate during an execution extremely problematic. Whatever the merits of the protocol in the abstract, there can be no real doubt that Defendants' implementation of OP 770 has major flaws, many of which are apparent from the *undisputed* facts to which Defendants stipulated in the amended joint pre-hearing conference statement.

The Framers of our Constitution were not far removed from a society in which condemned prisoners were put to death by being beheaded, drawn, and quartered. The Eighth Amendment was adopted in part as a response to such brutality, and it since has been construed by our Supreme Court to require that punishment for crimes comport with "the evolving standards of decency that mark the progress of a maturing society." *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion)). While opponents of the death penalty believe that any means of execution necessarily violates such standards, the Supreme Court repeatedly has held otherwise, *see, e.g.*, *Gregg*, 428 U.S. 153, in large part because the Constitution itself makes explicit reference to capital punishment, U.S. Const. amends. V & XIV § 1. The use of lethal injection in executions represents an evolution from earlier methods such as hanging, electrocution, and lethal gas that now are viewed by most jurisdictions as unduly harsh. Needless to say, when properly administered, lethal injection results in a death that is far kinder than that suffered by the victims of capital crimes.

At the present time, however, Defendants' implementation of California's lethal-injection protocol lacks both reliability and transparency. In light of the substantial questions raised by the records of previous executions, Defendants' actions and failures to act have resulted in an undue

---

Tookie Williams last December . . . at a federal court hearing in San Jose on lethal injection."); Maura Dolan & Henry Weinstein, *The Chaos Behind California Executions: Trial Testimony Paints Lethal Injection Methods as Haphazard, with Little Medical Oversight*, L.A. Times, Oct. 2, 2006, at A1. Even Kent Scheidegger, the legal director of the Criminal Justice Legal Foundation and one of the strongest advocates of the death penalty in California, has recognized that California "is legitimately criticized for not doing enough homework on the protocol." *Quoted in* Henry Weinstein, *State Will Help Shape Fate of Lethal Injection: The* Morales *Case Gives California a Key Role in a National Debate Over the Method's Humaneness*, L.A. Times, Feb. 23, 2006, at A1.

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

and unnecessary risk of an Eighth Amendment violation. This is intolerable under the Constitution. *See Beardslee*, 395 F.3d at 1070-71; *Cooper*, 379 F.3d at 1033; *Taylor v. Crawford*, No. 05-4173-CV-C-FJG, 2006 WL 1779035 (W.D. Mo. June 26, 2006) (holding that Missouri's lethal-injection protocol violates Eighth Amendment).

IV

As this Court previously has noted, "under the doctrines of comity and separation of powers, the particulars of California's lethal-injection protocol are and should remain the province of the State's executive branch." 415 F. Supp. 2d at 1046. Moreover, despite its critical assessment of Defendants' performance to date, this Court has no intention of interfering with or delaying California's implementation of a constitutional execution protocol. California's voters and legislature repeatedly have expressed their support for capital punishment. This case thus presents an important opportunity for executive leadership.

The Court is prepared to issue formal findings of fact and conclusions of law with respect to the deficiencies in the administration of California's current lethal-injection protocol that have been brought to light in this case. However, it will require additional time to do so, in part because Defendants still have not fulfilled their discovery obligations.[11] In addition, while the Court has deferred consideration of the issues raised in the *PNS* matter until after it issues a formal decision in this case, it still must resolve *PNS* in order to facilitate speedy and complete appellate review of all of the current challenges to OP 770. (*See* Doc. No. 110 at 2-3.) Finally, while it is a virtual certainty that any judgment in this case will be appealed by one party or the other, it seems fair to suggest that a judgment adverse to Defendants grounded in the extensive factual record present here is far more likely to delay the resumption of executions in California than is one favorable to Defendants. Because the Court is prepared to find that the sequence of three drugs described in OP 770 when properly administered will provide for a constitutionally adequate level of anesthesia, and given that the deficiencies in the implementation of the protocol

---

[11]Relatedly, the Court has deferred ruling on the objections of the Governor's Office to certain discovery orders issued by the assigned magistrate judge. *See Morales v. Tilton*, No. C 06 219 JF RS, 2006 WL 2724152, at *3 (N.D. Cal. Sept. 22, 2006).

appear to be correctable,[12] a thorough, effective response to the issues raised in this memorandum likely will enable the Court to enter such a favorable judgment.[13]

Accordingly, and respectfully, the Court urges the Governor's Office to take this opportunity to address seriously now, rather than later, the significant problems with OP 770 and its implementation. In light of the well-documented management issues in California's prison system generally, *see, e.g.*, *Plata v. Schwarzenegger*, No. C 01 1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005), the Court believes that the Governor's Office is in the best position to insist on an appropriate degree of care and professionalism in carrying out what Defendants properly characterize as the "solemn" task of executions.[14]

Toward that end, acknowledging its own limited role and with deference to the role of the State's executive branch, and informed by what it has learned in the course of the present litigation, the Court offers the following observations:

First, given past experience, it seems unlikely that a single, brief meeting primarily of lawyers, the result of which is to "tweak" OP 770, will be sufficient to address the problems

---

[12] While there have been numerous legal challenges to lethal-injection protocols across the country, it is by no means clear that every jurisdiction has problems similar in either nature or extent to California's. For example, Virginia has executed sixty-six inmates pursuant to its lethal-injection protocol, which appears to provide for training, physical facilities, and oversight far superior to that provided by California's. *See Walker v. Johnson*, 448 F. Supp. 2d 719 (E.D. Va. 2006).

[13] Following the conclusion of the evidentiary hearing, the Court propounded a series of written questions that provided the parties with an opportunity to discuss potential remedies for the deficiencies in the administration of OP 770. (Request for Briefing, Doc. No. 256.) For different reasons, the parties largely declined to do so. Plaintiff argued that since Defendants are obligated by statute to design and implement an execution protocol, he should not be asked to do Defendants' work. Defendants contended that while the evidence indeed suggests a need for improvement in the implementation of the protocol, the situation does not rise to the level of a constitutional violation. Plaintiff's position is somewhat understandable, since Plaintiff's primary interest in the present litigation is not improving California's lethal-injection protocol but rather delaying or avoiding his own execution. However, if Defendants' goal is to resume executions as soon as possible, the Court respectfully suggests that their unwillingness to see the situation for what it is and to be proactive is self-defeating.

[14] Part of the problem may be that the prison officials responsible for implementation of the protocol see their legal obligations too narrowly. Warden Ornoski testified that he believes that a "successful execution" is simply one where "the inmate ends up dead at the end of the process." When asked whether he considered a successful execution to mean anything else, he responded, "I'm thinking not."

15
Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

identified in this case. Rather, as contemplated by the Court in its order of February 14, 2006, "a thorough review of the lethal-injection protocol, including, *inter alia*, the manner in which the drugs are injected, the means used to determine when the person being executed has lost consciousness, and the quality of contemporaneous records of executions, such as execution logs and electrocardiograms," 415 F. Supp. 2d at 1046, likely will be necessary. To be meaningful, such a review may require consultation with independent experts and with other jurisdictions, and it must be undertaken with an openness to the idea of making significant improvements in the "infrastructure" of executions.

Second, given that because of the paralytic effect of pancuronium bromide, a determination of an inmate's anesthetic depth after being injected with that drug is extremely difficult for anyone without substantial training and experience in anesthesia, the protocol must ensure that a sufficient dose of sodium thiopental or other anesthetic actually reaches the condemned inmate and that there are reliable means of monitoring and recording the inmate's vital signs throughout the execution process. An adequate protocol also must include a means of providing additional anesthetic to the inmate should the need arise. Because an execution is not a medical procedure, and its purpose is not to keep the inmate alive but rather to end the inmate's life, the Court agrees with Defendants that the Constitution does not necessarily require the attendance and participation of a medical professional.[15] However, the need for a person with medical training would appear to be inversely related to the reliability and transparency of the means for ensuring that the inmate is properly anesthetized: the better the delivery system, the less need there is for medical participation.

Third, because the constitutional issues presented by this case stem solely from the effects of pancuronium bromide and potassium chloride on a person who has not been properly anesthetized, removal of these drugs from the lethal-injection protocol, with the execution accomplished solely by an anesthetic, such as sodium pentobarbital, would eliminate any

---

[15] As noted earlier, this Court's order of February 14 giving Defendants the option of having an anesthesiologist ensure Plaintiff's unconsciousness was intended as a one-time solution to permit Plaintiff's execution to proceed as scheduled. It was not meant to suggest or to hold that the participation of medical professionals in lethal-injection executions generally is required by the Constitution.

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)

1  constitutional concerns, subject only to the implementation of adequate, verifiable procedures to
2  ensure that the inmate actually receives a fatal dose of the anesthetic.[16]  Should Defendants wish
3  to retain a three-drug protocol, which it most certainly is their right to do, they must address in a
4  serious way the broader structural problems in implementation outlined in this memorandum.

## V

Accordingly, and good cause therefor appearing, within thirty days Defendants shall advise the Court and Plaintiff of their response to this memorandum, including specifically whether Defendants and the Governor's Office intend to review and revise OP 770 further and, if so, how much additional time, if any, they believe they will need to complete that task.[17] Plaintiff may file a response to Defendants' submission within fifteen days after the submission has been served upon his counsel of record.  The Court will not construe any pleading filed in response to this memorandum as a waiver of any arguments with respect to the constitutionality of the current version of OP 770, its implementation, or any other legal issue or procedural question presented by the instant case.

IT IS SO ORDERED.

DATED:  December 15, 2006

_____
JEREMY FOGEL
United States District Judge

---

[16] Along the same lines,
> it is somewhat significant that at least nineteen states have enacted laws that either mandate the exclusive use of a sedative or expressly prohibit the use of a neuromuscular blocking agent in the euthanasia of animals. It is also of some significance that the leading professional association of veterinarians promulgated guidelines that prohibit the use of a sedative with a muscle-paralyzing drug for purposes of euthanasia. . . .

*Beardslee*, 395 F.3d at 1073 (footnote omitted).  As noted previously, the use of pancuronium bromide also is at issue in the *PNS* litigation.

[17] The Court notes that any proposed time line may need to be altered depending on the outcome of *Morales v. California Department of Corrections and Rehabilitation*, No. CV 061436 (Cal. Super. Ct. County of Marin filed Apr. 5, 2006), which addresses whether Defendants must follow California's Administrative Procedures Act in promulgating a lethal-injection protocol, and which is scheduled to be decided on cross-motions for summary judgment on January 31, 2007.  *Cf. Bowling v. Ky. Dep't of Corr.*, No. 06-CI-00574 (Ky. Franklin Cir. Ct. Nov. 30, 2006) (holding that Kentucky's lethal-injection protocol violates Commonwealth Administrative Procedures Act).

Case Nos. C 06 219 JF RS & C 06 926 JF RS
MEMORANDUM OF INTENDED DECISION; REQUEST FOR RESPONSE FROM DEFENDANTS
(DPSAGOK)