David A. Senior (# 108579)
McBreen & Senior
2029 Century Park East, Third Floor
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
Law Offices of John R. Grele
149 Natoma St., third floor
San Francisco, CA 94105
Phone: (415) 348-9300
Fax: (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
rsteinken@jenner.com

Attorneys for Intervenor
ALBERT G. BROWN

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MICHAEL ANGELO MORALES, | ) Case No. C 06 0219 (JF) |
| | ) C 06 926 (JF) |
| Plaintiff, | ) |
| | ) **REPLY OF PROPOSED** |
| | ) **INTERVENOR BROWN TO** |
| | ) **DEFENDANTS' RESPONSE TO** |
| | ) **COURT'S QUESTIONS** |
| v. | ) |
| MATTHEW CATE, et al. | ) |
| Defendants. | ) |

1

In response to this Court's September 21, 2010 questions, Defendants described the revisions to the Title 15 CCR 3349 et seq. protocol that would be necessary to accomplish Mr. Brown's execution with a single drug – sodium thiopental. Defendants do not say that they <u>can</u> perform and execution with a single drug or that they <u>will</u> do so should the Court issue an order similar to the February 21, 2006 order wherein the Court could proceed with the execution of Mr. Morales only if they employed a single drug procedure and directed "the sodium thiopental [to be] injected in the execution chamber directly into the intravenous cannula by a person or persons licensed by the State of California to inject medications intravenously." Order, Feb. 21, 2006, at 3, Docket 73.

Defendants' response here indicates they would execute Mr. Brown under a single-drug procedure using essentially the same unknown type of remote administration mechanism in a new facility they surreptitiously constructed which has yet to be examined by counsel or the Court (although toured by the media on the day the parties appeared in Court). Defendants know that such a procedure never has been acceptable to this Court. *See id.* at 3. Under the current record, it is not at all clear who would be doing what, i.e. what team members would be responsible for accomplishing the new mixing regimen; who would insert the catheters; who would examine the lines and when; and, who would infuse the chemicals. Yet, despite this uncertainty, Defendants incredibly suggest that they need only three (3) days lead time to ramp up for this new procedure.

A.    **Because the Equities Strongly Favor Brown, the Court Need Not Fashion Orders Designed to Accommodate the State's Interest in Rushing to Execution**

While the Court correctly notes its responsibility to wield its equitable powers to fashion remedies that accommodate the parties' legitimate interests, deference to Defendants' interests is

not appropriate because Defendants deliberately manufactured its interest in the need for haste by setting an execution date knowing that the applicable procedures need court review, a fact they have been reminded about by this Court several times.  A hearing was set on the procedures under OP 770 (May 15, 2007) (which are the same as the new procedures in substance), which was continued because of a state court injunction that remained in effect until September 20, 2010.[1]  The state then agreed to stay proceedings designed to accomplish review in this Court and counsel for the state assured counsel for Mr. Morales that they would not seek execution dates for other inmates until the Morales matter was completed, thereby avoiding the need to seek class action status or move for multiple joinders and/or numerous pleadings and greatly streamlining the process.[2]  The agreed procedure was in all parties' and the Court's best interest.

    Now, Defendants have gone back on their word and have sought execution dates, in the face of stay orders issued by this Court, hiding behind the fiction that this was the doing of the individual District Attorneys.  First of all, Defendants' counsel is the chief law enforcement officer in California, and exercises constitutional supervisory power over the state's district attorneys.  He very easily could have instructed his subordinate District Attorneys that because stays are in place here and in state court, they should not seek dates until review had taken place in the Morales matter.  Second, it is apparent that the Attorney General has orchestrated this entire effort, even appearing at the date setting hearing for Mr. Brown.  RT at 3, Exhibit "A" to Motion to Intervene, Docket 387-1 ("That date is arrived at not arbitrarily, Your Honor.  It was arrived at by the Attorney General's Office in consultation with the many different parties and

---

[1]  The removal of the injunction this past Monday in no manner resolves the multitude of issues that are now being litigated regarding the creation and propriety of the state's new execution protocol.

[2] This fact was presented to the Court at the September 21, 2010 hearing and not disputed by Defendants.  Counsel for Mr. Morales pointed this out to Defendants' counsel earlier, before Brown came to court, and Defendants' counsel did not dispute this fact.

players that need to be orchestrated in order to bring the execution actually to the point of occurring.")  The suggestion by the Attorney General on September 21, 2010 that it took place otherwise was disingenuous at best.  RT 9, Sept. 21, 2010 (MR. QUINN: "Well, the state doesn't seek -- it's the district attorneys that ultimately initiate it.") (emphasis added).[3]

Further, Mr. Brown acted as quickly as he could.  Brown was actively pursuing federal habeas corpus remedies until October 2008.  *See Brown v. Ornoski*, 503 F.3d 1006 (9th Cir. 2007), *cert. denied, Brown v. Ayers*, 129 S.Ct. 63 (2008).  After rejecting Brown's facial challenge to lethal-injection, the Ninth Circuit's explained that "Brown is free, however, to challenge the particular protocol used by the State of California in a 1983 action, as did the petitioner in *Morales*."  *Brown v. Ornoski*, 503 F.3d at 1017 n.5.  At the completion of Brown's federal court proceedings, the State's "particular protocol" was the subject of state-court-ordered revision under California's Administrative Procedures Act.  There was no procedure in effect at that time.

The procedures were adopted on July 29, 2010, and went into effect on August 29, 2010. His execution setting hearing took place on August 30, 2010.  At the public hearing, the Attorney General and the local District Attorney insisted on a 30-day execution date – for September 29, 2010 – rather than a 60-day date permitted by statute, even though Brown objected that the shorter date would prevent orderly review here and in state court of the lethal-injection procedures.  Defendants point to the fact that the Governor's office sent an earlier letter warning that dates could be set and requesting clemency papers.  The Governor, however, did not specify any likely dates or purport to give notice of when they would be set.  Moreover, for the Governor

---

[3] Defendants' counsel refused to provide information pertaining to their role in this process, the information as to how this came about, and the documents related thereto, which are the subject of California Public Records Act proceedings.

4
INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

to contend that the contrived urgency here is not of his own making is disingenuous. The Governor is a defendant here, resulting from his direct, official and personal involvement in perpetuating the unreliable protocol and ordering retention of the three-drug protocol. While the Governor contends that the sending of a vague letter notice to Mr. Brown somehow justifies a rush to execution advocated here, the letter in fact only demonstrates a calculated attempt by Defendants and their counsel to avoid the commitments previously made and the orders for review of the lethal injection procedures that were set in place by the Court, and whose stay was agreed to by Defendants.[4]

Until very recently, Mr. Brown was under the ambit of a state court permanent injunction, issued in 2007, which prevented his execution and which, by agreement of the parties here, stayed the proceedings before this Court. On August 31, 2010, the *day after* his execution was set, the state trial court clarified that the injunction remained in effect despite the fact that the state had undertaken purported administrative review.[5] On September 20, 2010, the trial court was ordered by the state appellate court to rescind its August 31 order. The *very next day*, Mr. Brown appeared before this Court. Thus, at the time Brown filed his request to appear in this Court on September 21, 2010 and seek leave to intervene, he still was the beneficiary of the state court injunction. Brown sought the September 21, 2010 court date here to be sure his arrival was as timely as possible, should the injunction be successfully challenged (as it was on September 20, 2010).

---

[4] It should be noted that defendants, and each of them plus the District Attorneys' office, employed the very same procedures against Mr. Morales despite a stay of execution order issued by this Court.

[5] The state's position is that Brown was not entitled to rely on the state court's order. This appears to be an argument that injunctions are nullities when ordered against the state.

5
INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Brown also was confined by the requirement that he exhaust his administrative remedies, which he promptly did on September 2, 1010, three days after the regulation went into effect. One week later, September 9, 2010, Brown received notice that the appeal had been sent to prison staff for a first level response, with an indicated response date of September 15, 2010. The denial was not provided *until September 21, 2010.*

Thus, the equities here strongly favor Mr. Brown. The state has sought to pressure this Court and the state courts and thereby evade orderly review of its procedures, which was clearly contemplated by two courts and to which they agreed in this Court. Nothing has changed here with respect to defendants' conduct to date; to wit, the "implementation of California's lethal-injection protocol lacks both reliability and transparency." *Morales v. Tilton*, 465 F. Supp. 2d 972, 981 (N.D. Cal. 2006). By contrast, Mr. Brown has done all he could when he could. The state is precluded from asserting an exigency interest here given its previous conduct and agreements before this Court.

The State's conduct frustrates orderly appellate review. If the State is unreasonably permitted to accelerate the review process, Mr. Brown will likely be unable to get the Morales record before the appellate court, the appellate court will not be able to review it in a timely fashion, and the State will seek to proceed with an execution without adequate judicial and appellate consideration of the relevant facts.

**B.     The State Should Not Be Permitted to Administer an Untested Procedure and/or Allow the Procedure to be Carried Out by Poorly Trained personnel When the Record Demonstrates their Pervasive and All-Encompassing Ineptitude**

When the Court was contemplating whether to permit the execution of Mr. Morales to proceed on February 21, 2006, Mr. Morales raised a number of objections to the possibility of an

6
INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

execution using only one drug with the OP 770 protocol.  Mr. Brown incorporates those here.  Mr. Morales' concerns related to the nature of the delivery system, the fact that even the minimal record evidence known as of that date demonstrated that inmates were breathing long after expiration would have been expected, and that executions were taking an inordinately long time.  The Court made accommodation for these concerns by ordering direct administration by a person trained and licensed to inject medications intravenously.

Now, however, the record is more developed and the concerns more well-documented.  The record of misadventure and incompetence in the Morales case is astonishing and unparalleled, and Mr. Brown has requested the Court examine that record when evaluating his current application for a stay.[6]  Many of the questions raised by the record remain and need to be addressed directly as they are not resolved in the new protocol.  This was the entire reason for the Court directing a hearing after the May 15, 2007 revision.  These unresolved questions include:

1. Is the infusion procedure still conducted in the dark?

2. Does the antechamber offer sufficient viewing of the chamber such that those administering the drugs can see what is taking place in the chamber?  Limited photographs of the new facility available via the internet show a small window with a counter in the antechamber that appears to prevent viewing as the site lines to the inmates' arms are obscured.  An examination of the new facility will be necessary to clear this up.

3. Should the State be permitted to proceed with executions despite eliminating the one recording mechanism that documented inadequate executions – a doctor chart measuring respirations?

---

[6] There is very little argument that would prohibit intervention as all the elements are present and Defendants do not seriously dispute them.

7
INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

4. Should the state be permitted to proceed with executions after eliminating the record of what personnel actually attend training?

5. Can the State proceed with executions under a procedure that calls for having LVNs inserting catheters, when this is prohibited by state law?

6. Who is responsible for viewing the IV lines and checking the inmate to guard against leaking and blown veins? This responsibility rested with witnesses #3 and #4, who exhibited a remarkably inept understanding of how to perform the requisite examination.

7. What is the backup plan if one of the IV lines fails? Is it the three-drugs protocol as contained in the new regulations? What is the procedure if both lines are inoperable? Is there a cut-down procedure or central line being set? Who is responsible for making this determination and who will perform that procedure?

8. Who is responsible for IV insertion? The LVNs who established IV access in past executions demonstrated ineptitude in several executions. (*see* Williams, Beardsley and Thompson)

9. Who is responsible for infusion and what type of training do they have? The previous record was replete with evidence execution personnel describing the process of infusion in a way that reflected no understanding of infusion or how to accomplish it and no appreciation for the fact that inadequate rates of infusion can cause serious difficulties with thiopental because it is an effervescent drug that quickly wears off. Moreover, team members did not understand that improper infusion can blow a vein, particularly with remote administration.

10. Who mixes the chemicals and how is it done? The stipulated findings show that it was not done properly in past executions. First, no execution personnel, including witnesses #3

8
INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

and #4, knew what properly mixed thiopental looked like.  Second, because the dosages varied from the packaging applications, no one mixed the drugs properly.

11.     Can the state proceed with an execution without someone checking the expiration date of the thiopental as displayed by the manufacturer?   One of the "improvements" in the "new" procedure is the elimination of this requirement.  At the very least, the Court should insist that the Defendants disclose how much thiopental they currently possess and its expiration date.

12.     How have Defendants obtained their thiopental?  The record demonstrates a consistent lack of a proper chain of custody, although the previous protocol as well as state and federal law require it.  There appear to be no prescription requirements for the drugs.  Upon information and belief there have been efforts by states to bypass the regular process by which controlled substances are obtained for executions, including transferring thiopental between state departments of corrections and Mr. Brown is rightly concerned that the drug has not been obtained from a properly registered pharmacy according to state and federal laws regulating drug distribution.  This presents potentially serious concerns about the provenience and vintage of thiopental recently coming into the defendants' possession.

13.     What is the delivery mechanism?  The record has exposed the previous mechanism as consisting of a spaghetti ball of twisting lines and devices that could not be explained by the state's own expert, let alone those entrusted with administering it.

14.     What are the dangers of improper administration of thiopental?   Would an improper administration result in the inmate being left in a vegetative state, alive but unconscious? Order, Feb. 21, 2006, at 2, Docket 73 ("An insufficient dose, however, has the potential to cause irreversible brain damage while not causing death.")  Can the state then

execute a *Ford*-incompetent person who they have rendered incompetent by their own misadventure?

15. Can the state credibly argue that it requires only 3 days to train on a new procedure when their own new protocols require 8-hour trainings on a "monthly" basis? It appears that state is merely advancing this argument so it can execute Mr. Brown expeditiously when, after years of review, it has determined that executions require substantially more time to familiarize execution team members with the procedures required to safely and effectively execute a human being. If it says anything, the McAuliffe declaration evidences the defendants' admission that any protocol requires months of training to ensure it is adhered to under conditions of an actual execution.

16. Do the records from Washington and Ohio need to be considered here? The anecdotal information is that the single drug procedure used to execute 9 people rendered the inmates deceased very quickly and safely. To Mr. Brown, this is only confirms that what was taking place in California over the past many years was pure incompetence. How can anyone be assured without proper review that this institutional incompetence is not continuing without the state actually establishing that fact?

C. ***Baze* does not Alter the Requirements of the Court to Undertake Remedial Review**

Defendants rely on the *Baze* case and the requirements therein to justify abbreviated consideration of the new protocol and proceeding to execution. *Baze v. Rees*, 535 U.S. 35 (2008). In fact, the only arguable effect on this litigation is that *Baze* articulated the requirement that a plaintiff establish a substantial risk of serious harm.[7] Given the record here, however, that

---

[7] This standard garnered only 3 votes. Arguably, 3 justices endorsed the "untoward readily avoidable risk of inflicting sever and unnecessary pain" standard. 535 U.S. at 107-108, 123. Justice Stevens was silent on the standard he would adopt, merely adopting the plurality's for

standard was plainly satisfied.  In nearly one-half the executions in California, the protocol did not appear to work as intended; the record shows why: the state was completely and utterly incompetent in the administration of the process, from the mixing of chemicals to the setting of IV's, to infusion through to monitoring inmate vital signs.  Brown's ability to establish a likelihood of success on the merits is clear with this record.

Defendants' bald assertion that a new procedure is in place is insufficient to overcome the current showing.  Instead, the state must come before this Court and affirmatively address the issues raised by the Court's Memorandum and the Plaintiff's closing brief.  This case stands in a different posture from *Baze* or the subsequent circuit cases.  The matter has progressed to a remedial stage of review, far beyond the initial stage of needing to plead or prove risk of harm.  Risk of harm already has been established, and established sufficiently under any standard.

Further, as the Court noted, the landscape has changed significantly since *Baze*.  Both the plurality and the dissent reflected on the absence of alternatives that have been tested, and the dissent would have explicitly adopted a standard that reflected avoidability.  *Baze v. Rees*, 553 U.S. at 57 (ruling that the "comparative efficacy of a one-drug method of execution is not so well established that Kentucky's failure to adopt it constitutes a violation of the Eighth Amendment"); *id*. at 61 (ruling that an Eighth Amendment violation exists where the "risk is substantial when compared to the known and available alternatives").  Since then, two states have used a single-drug protocol apparently without mishap.  Neither of them did so within three (3) days of promulgating the protocol; instead, having given it the administrative consideration and review it required, as well as time for judicial review.  As counsel understands it, Washington announced the single drug protocol on March 8, 2010 while litigation was ongoing.  It is not known what

---

sake of argument in dissent. *Id.*, at 87.  It matters not for this case as the record before the Court is sufficient under any standard.

11

INTERVENOR'S REPLY TO DEFENDANTS' RESPONSE
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

preparations were put into place before that announcement. Washington executed Cal Brown on September 10, 2010 using the new protocol. Ohio announced on November 13, 2009 that it would adopt a single drug process. Again, it is not known what preparations were put into place or reviews undertaken before that announcement. The formal protocol was then released and went into effect on November 30, 2009 and was first used on December 8, 2009. By taking only three (3) days, California once again puts itself in a position of an extreme outlier among the states, all in an effort to execute Mr. Brown on a very suspect timetable.

Brown, Morales, all condemned inmates and the public are entitled to the review he requests, and that has been required by the Court. It should be done quickly, which it will be, and thoroughly, which it can be. To skirt that review based on a process that reeks of manipulation and political expediency reflects everything that is wrong with the administration of the death penalty rather than the orderly and proper judicial review enshrined for over 200 years in our Constitution.

DATED: September 23, 2010                    By:        /s/

                                            David A. Senior
                                            McBREEN &SENIOR

                                            Richard P. Steinken
                                            JENNER & BLOCK

                                            John R. Grele
                                            LAW OFFICE OF JOHN R. GRELE

                                            *Attorneys for Intervenor*
                                            ALBERT GREENWOOD BROWN