KEKER & VAN NEST, LLP
JON B. STREETER - #101970
WENDY J. THURM - #163558
AJAY S. KRISHNAN - #222476
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188
E-mail: jstreeter@kvn.com

ACLU FOUNDATION OF NORTHERN CALIFORNIA
ALAN SCHLOSSER - #49957
MICHAEL RISHER - #191627
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478
E-mail: aschlosser@aclunc.org

Attorneys for Plaintiffs
PACIFIC NEWS SERVICE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PACIFIC NEWS SERVICE,<br><br>                      Plaintiff,<br><br>   v.<br><br>MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation; et al.,<br><br>                      Defendants. | Case No. 5:06-cv-01793-JF<br><br>**DEATH PENALTY CASE**<br><br>**STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT COURT OF APPEALS**<br><br>Dept:    Courtroom 3, 5th Floor<br>Judge:  Hon. Jeremy Fogel |
| MICHAEL ANGELO MORALES,<br><br>                      Plaintiff,<br><br>   v.<br><br>MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation; et al.,<br><br>                      Defendants. | Case No. 5:06-cv-00219-JF-HRL<br>Case No. 5:06-cv-00926-JF-HRL |

STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM THE NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. FACTS ....................................................................................................................................2

III. ARGUMENT ..........................................................................................................................5

    A. The use of pancuronium bromide in California's lethal injection protocol—both under the current regulations and under O.P. 770—is unconstitutional because it suppresses First Amendment-protected information for no legitimate penalogical purpose. ................................................5

        1. *CFAC II* has already decided as a matter of law that the First Amendment access right attaches to executions. ..........................................6

        2. Defendants' use of pancuronium bromide to conceal important information from the public cannot survive the First Amendment balancing test. ...............................................................................7

    B. *Baze v. Rees* does not preclude PNS's claim. ..........................................................10

    C. Given the Ninth Circuit's guidance and the procedural posture of this case, a limited stay is appropriate here. ..................................................................11

IV. CONCLUSION......................................................................................................................12

i
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

## I.     INTRODUCTION

Plaintiff Pacific News Service ("PNS") submits this statement in response to the Court's Order Directing Briefing Following Remand ("Order Directing Briefing"), which was issued this morning, September 28, 2010, and which requested briefing within six hours of its posting. The Order Directing Briefing, which follows the Ninth Circuit Order ("Remand Order") remanding the case to this Court, requests briefing on:

- The legality of California's lethal injection protocol, and the material differences between California's current protocol, enacted by California Code of Regulations Title 15, sections 3349 *et seq.*, and the prior protocol, O.P. 770;
- The effect of the Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35 (2008);
- The standards for a stay as articulated in *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004); and
- Any other issues raised in the Remand Order.

California's current lethal injection protocol, like its predecessor O.P. 770, violates the First Amendment right of the press and the public to meaningfully witness executions. California's use of pancuronium bromide—a drug that has no legitimate penological purpose in the execution protocol, such as hastening death or reducing pain—is a chemical curtain that serves only to suppress information that the press and the public is entitled to view at an execution. The Ninth Circuit's decision in *California First Amendment Coalition v. Woodford*, 299 F.3d 868 (9th Cir. 2002) ("*CFAC II*"), *modifying in part*, 150 F.3d 976 (9th Cir. 1998) ("*CFAC I*") (collectively, "*CFAC*"), compels this result. Indeed, California's recent filings with this Court, admitting its ability to proceed with a "one-drug" execution that omits pancuronium bromide, further proves that that drug is unnecessary, and serves only to suppress First Amendment-protected information gathering. The Supreme Court's decision in *Baze* does not alter this conclusion, because *Baze* is an Eighth Amendment, not a First Amendment, case.

On the issues regarding a stay, a limited stay is necessary here to ensure appropriate consideration of the serious legal issues. As the Ninth Circuit stated in its Remand Order, and as this Court highlighted in its Order Directing Briefing: "the result in this case should not be driven

1

STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

by compromise nor by the State's deadlines superimposed on the district court's already pending review of the new execution protocol." The First Amendment issues raised by PNS are serious ones, and the Ninth Circuit has previously affirmed the preliminary injunction of an execution on the basis of similar First Amendment concerns. *See* Krishnan Declaration,[1] Ex. A (Order of District Court, Hon. Vaugh R. Walker, issuing preliminary injunction in *CFAC*); *CFAC II*, 299 F.3d at 871-872 (noting affirmance of Judge Walker's preliminary injunction). Moreover, PNS submits with this pleading evidence that strongly supports its First Amendment claim, given the preliminary and highly expedited nature of this proceeding. A stay of execution is necessary to ensure that an unconstitutional execution does not go forward while the Court and the parties complete the factual record and necessary legal analysis.

## II.   FACTS

Executions by lethal injection are currently governed by the California Department of Corrections and Rehabilitation ("CDCR") regulations found at California Code of Regulations Title 15, sections 3349 *et seq.*. These regulations provide for execution by injection of three drugs, in order: sodium pentothal, pancuronium bromide, and potassium chloride. 15 C.C.R. §3349.4.5(g)(5). Under O.P. 770, the predecessor to the current protocol, the same three drugs were administered in the same order. Krishnan Decl., Ex. B (Initial Statement of Reasons) at 1.

When issuing the new regulations, CDCR's only stated justifications for continuing to use the "three-drug cocktail" were made in reference to O.P. 770. Krishnan Decl., Ex. B (Initial Statement of Reasons) at 1 (identifying the reasons for using sodium pentothal under the prior protocol, O.P. 770) & 2 (failing to give any other reasons for use of the three-drug protocol). The stated purpose for using sodium pentothal is to "induce unconsciousness." *Id.* at 1. The stated purpose for using pancuronium bromide is to "induce paralysis and cause breathing to cease." *Id.* And the stated purpose for using potassium chloride is "to induce cardiac arrest." *Id.*

But as this Court learned during the evidentiary hearing in *Morales*, neuromuscular

---

[1] "Krishnan Declaration" or "Krishnan Decl." refers to the Declaration of Ajay S. Krishnan in Support of Statement of Pacific News Service in Response to Court's Order Directing Briefing, filed herewith.

2
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

1  blocking agents like pancuronium "block the activity of voluntary muscles."  Krishnan Decl., Ex.
2  C (Concannon testimony) at 262-63.   In the animal euthanasia context, "you run the risk of a
3  veterinary patient who is aware, yet when you look at them, they don't appear to be conscious."
4  *Id.*  In the context of a three-drug execution protocol, there is the risk that the inmate will suffer
5  from an "intense excruciating burning sensation" after the administration of potassium chloride,
6  but would not be able to scream out in pain, because he would be paralyzed.  Krishnan Decl., Ex.
7  C (Heath testimony) at 452-53.

8  The Court also learned during proceedings in *Morales* that pancuronium bromide is
9  unnecessary when used with the other two drugs for either causing death or hastening death.
10 *First*, pancuronium has no anesthetic properties, and it is the fast-acting potassium chloride that,
11 as a practical matter, causes death.  *Id.* at 446-47 (Heath testimony).  *Second*, pancuronium is
12 simply not necessary because sodium pentothal can be delivered in a sufficiently high dose to
13 cause death.  *Id.* at 461-62.  The Court is familiar with the one-drug execution protocols in
14 Washington and Ohio and with news accounts that executions carried out under those protocols
15 proceeded quickly and safely.  Indeed, the State has essentially conceded that pancuronium is
16 unnecessary by agreeing in the last week to proceed with an execution of Mr. Brown using only
17 sodium thiopental.

18 Not only did the State fail to justify the inclusion of pancuronium bromide in the new
19 regulations, but it purposefully omitted its true motivations for continuing to employ the three-
20 drug protocol: to make the death process appear more peaceful.  When officials from CDCR, the
21 Attorney General's office, and the Governor's office met in March 2006 to discuss amending
22 O.P. 770, they discussed the "cosmetic" purpose of pancuronium bromide.  Krishnan Decl., Ex.
23 F (Singler testimony) at 1074-76.   Specifically, Dr. Singler, the state's expert, testified in
24 *Morales* that, at that meeting, there was a discussion of the "death rattle" that occurs during
25 executions, and that pancuronium bromide could eliminate that "visibly disturbing
26 phenomenon."  *Id.* at 1077.  Singler also testified in *Morales* that during the "ugly" event of
27 hypoxia—which occurs when breathing stops—patients start "gurgling" and "sputtering," and
28 ultimately, there is an "agonal gasp or an occasional—an involuntary effort as some part of the

3
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

body or the brain stem tries to—tries to rescue itself." *Id.*, Ex. E at 1016-18. Preventing the public and the press from witnessing the "death rattle" was one of the State's true, non-public reasons for using pancuronium bromide.[2]

CDCR seeks refuge in the Supreme Court's decision in *Baze* to justify its three-drug protocol. CDCR stated:

> in developing this proposed regulation, the CDCR was guided by the United States Supreme Court's decision in *Baze v. Rees* (2008) _U.S._, 128 S.Ct. 1520, which held that the State of Kentucky's lethal injection process, and the administration of the three-chemicals, did not constitute cruel and unusual punishment under the Eighth Amendment.

Krishnan Decl., Ex. B at 2. Indeed, when specifically pressed by public comments on the use of pancuronium bromide as a "chemical curtain" to shield the press and the public from the unvarnished death process, CDCR stated: "The United States Supreme Court in *Baze v. Rees* (2008) 553 U.S. 35 upheld the use of the three chemicals, including pancuronium bromide, identified in these regulations." *Id.*, Ex. G at 42. But *Baze* did not involve a First Amendment challenge. The Supreme Court's decision, therefore, provides no justification for the use of pancuronium bromide in the face of a First Amendment challenge.

Ultimately, the press and the public, who view executions under the new protocol, simply will not be able to meaningfully watch and understand what is taking place, because pancuronium bromide suppresses this information. Accordingly, in the context of both O.P. 770 and the current regulations, pancuronium bromide is a chemical curtain. It prevents execution witnesses from seeing what is really happening during an execution. Pancuronium bromide serves no legitimate functional or penological purpose during an execution, such as anesthetizing the inmate or hastening his death. Defendants know this, but nonetheless continue to use pancuronium bromide. Therefore, Defendants *intentionally* use pancuronium bromide to conceal

---

[2] In the new regulations and in the new execution chamber, CDCR took additional steps to hinder the press and the public's right to meaningfully witness executions: (1) the new regulations state that the microphone in the execution chamber will be turned off after the inmate makes his final statement, such that any sounds that accompany the execution process will not be heard, *see* C.C.R. § 3349.4.5(f)(5); and (2) the viewing rooms constructed as part of the new chamber have sight lines that will make it virtually impossible for the press to view the family witnesses as the execution is taking place.

4
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

socially important information from the press and the public.

### III. ARGUMENT

**A. The use of pancuronium bromide in California's lethal injection protocol—both under the current regulations and under O.P. 770—is unconstitutional because it suppresses First Amendment-protected information for no legitimate penalogical purpose.**

This case involves the application of the First Amendment right to attend and witness important public proceedings in the context of an execution. That right was established in *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980). This presumptive right of access to government proceedings now attaches to virtually every phase of the criminal and civil justice process, to executive proceedings, and to executions inside prisons. The primary purpose of this First Amendment access right is "[t]o ensure that [the] constitutionally protected 'discussion of government affairs' is an informed one." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605 (1982).

Courts employ a two-step analysis to determine whether a restriction on access to a particular government proceeding violates the First Amendment. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9-10 (1986) ("*Press-Enterprise II*"). *First*, the First Amendment right of access must attach to the proceeding. *Id. Second*, if the First Amendment access right does attach, the restriction must survive a First Amendment balancing test: the legitimate governmental interests it serves must outweigh the loss of First Amendment values. *Id.*

To demonstrate a violation of the First Amendment right of access, PNS must show (1) that the First Amendment right of access attaches to executions, and (2) that the state's practice of paralyzing death row inmates fails the appropriate First Amendment balancing test. PNS satisfies both prongs of this test. The first prong is directly controlled and established by *CFAC II*, a decision that binds this Court. The second prong is clearly satisfied, given the evidence that that pancuronium bromide serves no legitimate purpose during an execution and that the state intentionally paralyzes inmates in order to conceal socially important information from the public and press.

5
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

### 1. *CFAC II* has already decided as a matter of law that the First Amendment access right attaches to executions.

*CFAC II* held that the press and the public have a right to meaningfully observe executions "from the moment the condemned enters the execution camber through, to and including, the time the condemned is declared dead." *CFAC II*, 299 F.3d at 885-86 (citations omitted). This holding, on its face, satisfies the first step of the two-step analysis performed in First Amendment right-of-access cases.

Importantly, *CFAC II*'s reasons for extending the First Amendment right of access to executions are particularly relevant in the context of PNS's claim. *CFAC II*'s holding rested on three considerations:

> 1. the developing body of case law recognizing the First Amendment right of access to most aspects of the criminal justice system, including trials, pre- and post-trial proceedings, and prisons;
>
> 2. the historical tradition of public access to executions, from Twelfth century England to the modern American practice; and
>
> 3. the functional importance of public access to executions, namely its contribution to public dialogue on the humaneness of the death penalty and the appearance of fairness that public access fosters.

*CFAC II*, 299 F.3d at 874-77.

The primary type of information to which PNS seeks access is the indicia of pain that an inmate manifests during the killing process (not merely indicia of pain during the "initial procedures," which were at issue in *CFAC*). This is precisely the type of information in which there is historical and functional interest. As the District Court stated in *CFAC*:

> Courts evaluating the constitutionality of methods of execution rely in part on eyewitness testimony. *See, e.g.*, *Jones v. Butterworth*, 695 So. 2d 679 (Fla. 1997); *Sims v. Florida*, 2000 WL 193226 at *7-8 (Fla. 2000); *Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994). This eyewitness testimony is crucial to the review of execution protocols which the courts frequently undertake. While courts rarely invalidate a state's execution procedure, ongoing challenges and threats of challenge motivate states to modify their procedures. For example, lethal gas and electrocution have been vigorously challenged in recent years. In response to these challenges, most states have either moved to the use of lethal injection or make it available as an alternative to gas, electrocution or hanging. *See, e.g.*, *Bryan v. Moore*, 120 S. Ct. 1003 (2000) (certiorari to determine constitutionality of electrocution dismissed as improvident after state modified statute to permit execution by lethal injection); *Rupe v. Wood*, 93 F.3d 1434 (9th Cir. 1996) (constitutionality of hanging a 400-pound man rendered moot after state modified statute to permit lethal injection).

6
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

CFAC, 2000 WL 33173913 at *9 (N.D. Cal. 2000), aff'd, 299 F.3d 868 (9th Cir. 2002).

PNS seeks access to precisely the type of important information that motivated the *CFAC* court to recognize the right of access to executions in the first place: information about pain that the inmate may experience as a result of the execution process. Thus, the importance of the type of information PNS seeks is a key consideration.

### 2. Defendants' use of pancuronium bromide to conceal important information from the public cannot survive the First Amendment balancing test.

Given that the First Amendment access right attaches to executions, the only remaining question is whether the particular challenged restriction survives First Amendment scrutiny. The restriction at issue here is CDCR's use of pancuronium bromide to paralyze the inmate's body so as to conceal from the public possible manifestations of pain or other important information.

In the prison context, courts typically use the four-factor balancing test of *Turner v. Safley*, 482 U.S. 78 (1987), to evaluate whether an asserted constitutional right outweighs the legitimate penological interests of the prison. *See CFAC II*, 299 F.3d at 877-79 ; *Walker v. Sumner*, 917 F.2d 382, 385-86 (9th Cir. 1990); *Whitmire v. Arizona*, 298 F.3d 1134, 1136 (9th Cir. 2002). Courts use the *Turner* test because it is deferential to prison officials, who face "complex and intractable" problems of prison administration that are not easily resolved by judicial decree. *CFAC II*, 299 F.3d at 877-78 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)). The Turner test itself lays out those "legitimate policies and goals of the corrections system" that fall within the special province or expertise of prison officials: "deterrence of future crime, protection of society by quarantining criminal offenders, rehabilitation of those offenders and preservation of internal security." *Id.* at 878 (citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974)).

With those "legitimate penological objectives" defined, the *Turner* test states: "in reviewing a challenge to a prison regulation that burdens fundamental rights, [courts] are directed to ask whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns." *Id.* (internal quotations omitted) (quoting *Turner*, 482 U.S. at 87). More specifically:

7

STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

> In determining whether a restriction on the exercise of rights is reasonable or exaggerated in light of those penological interests, four factors are relevant: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact accommodation of the asserted constitutional rights will have on guards and other inmates, and on the allocation of prison resources generally and (4) whether there exist ready alternatives that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Id.* (internal quotations omitted) (quoting *Turner*, 482 U.S. at 89-91).

Two important observations should be made about the first prong of the *Turner v. Safley* test. *First*, if the government has an illegitimate purpose of concealing information from the public, it automatically fails the balancing test. *CFAC II*, 299 F.3d at 880. Second, if there is no "legitimate governmental interest" that justifies the restriction on fundamental rights, there is no need for further analysis because there is nothing against which to weigh the infringement of the plaintiff's rights. *Id.* at 883 ("the first factor is arguably dispositive."); *see also Walker*, 917 F.2d at 385 ("The first of these factors constitutes a sine qua non.").

Defendants' practice of paralyzing inmates during executions clearly fails this test for three reasons. *First*, Defendants have not asserted any legitimate basis for using pancuronium bromide, and as such, the First Amendment interests outweigh any potential penological interest. *Second*, there is substantial evidence in the record that the government's *purpose* in using pancuronium bromide is to suppress information, which is an independent basis for invalidating the protocol. *Third*, there are readily available alternatives to the three-drug protocol that come at a de minimis cost to any state interest, and as such, California's protocol fails the fourth prong of the *Turner* test.

*First*, the reasons that CDCR submits for using pancuronium lack any evidentiary basis. The first justification that CDCR asserts for its use of pancuronium is to "induce paralysis and cause breathing to cease." Krishnan Decl., Ex. B at 1 (Initial Statement of Reasons). Of course, inducing paralysis, in and of itself, is not a legitimate purpose in an execution. CDCR must therefore be focused on the cessation of breathing. But there is ample evidence that pancuronium bromide does not do that, and at the least, is not needed to do that. Dr. Heath has testified, based on his analysis of past California execution logs, that it is the potassium chloride

8
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

1    that causes death "in the great majority" of cases. *Id.*, Ex. C at 446-47. And the state would be
2    hard-pressed to point to *any* California execution for which it could reliably say that
3    pancuronium bromide actually caused death. Indeed, if the State executed an inmate by using
4    pancuronium bromide, the death would have been caused by suffocation, which would likely be
5    unconstitutional on Eighth Amendment grounds. *Id.*, Ex. D at 552-53.
6         Of course, to the extent that California uses pancuronium because the Supreme Court
7    affirmed the use of a three-drug protocol in *Baze*, Defendants effectively admit that there is no
8    state interest justifying the use of the drug. To suggest that California can suppress First
9    Amendment information because the Supreme Court held that Kentucky's protocol does not
10   violate the Eighth Amendment simply defies logic. *Baze* did not even purport to address any
11   First Amendment concerns. Moreover, the fundamental focus in *Baze* was on whether sodium
12   pentothal was administered properly—as the plaintiff there had conceded that if sodium
13   pentothal were properly administered, there would be no Eighth Amendment violation. 553 U.S.
14   at 49. As such, the *Baze* Court had no reason to evaluate the effect of pancuronium bromide, let
15   alone Kentucky's reasons for using it. Finally, there is no case law suggesting that a valid
16   penological justification for suppressing speech is that other states have similar policies.
17        Thus, there is simply no valid penological basis for using pancuronium. For this reason
18   alone, California's current lethal injection protocol is unconstitutional.
19        *Second*, on this record, there is substantial evidence that California intentionally uses
20   pancuronium to suppress information, which is an improper purpose that renders the protocol
21   unconstitutional. If the government has an illegitimate purpose of concealing information from
22   the public, it automatically fails the balancing test. *CFAC II*, 299 F.3d at 880. CDCR admits—
23   even in its public statement of reasons—that one purpose of pancuronium is to paralyze the
24   inmate. And there is evidence that while developing the protocol, Defendants chose to retain
25   pancuronium bromide in the protocol because it eliminated the "death rattle" that would be
26   perceived by witnesses as "visibly disturbing." Finally, given California's continued insistence
27   on using pancuronium bromide despite the availability of a one-drug protocol, the only
28   conclusion to draw is that California intentionally uses pancuronium bromide to suppress First

9
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

1  Amendment-protected information gathering. This is an independent basis for finding the
2  protocol unconstitutional.
3        *Third*, California's lethal injection protocol fails the fourth prong of the *Turner* test
4  because there are readily available alternatives that accommodate the First Amendment right at a
5  *de minimis* cost to the state's interests. There is substantial evidence that the state can execute
6  inmates without pancuronium bromide. *See* Krishnan Decl., Ex. C (Heath testimony) at 461-62.
7  Other states, namely Washington and Ohio perform executions without pancuronium bromide,
8  and the State has not pointed to any concerns with those executions. And finally, the State has
9  submitted multiple pleadings to this Court in the last week stating that if Albert Brown elected a
10  one-drug protocol, the State would be able to fashion an appropriate procedure. Thus, there is no
11  evidence that pancuronium bromide is needed to cause death—particularly when the state has
12  admitted that both of the other drugs in the protocol are independently lethal.
13        For these reasons, California's use of pancuronium bromide in its lethal injection
14  protocol violates the First Amendment right to meaningfully witness executions.[3]
15  **B.**    ***Baze v. Rees* does not preclude PNS's claim.**
16        The question in *Baze* was whether Kentucky's lethal-injection protocol violated the
17  Eighth Amendment's ban on cruel and unusual punishment; none of the five opinions even
18  mentions the First Amendment, much less analyzes whether or not the state's protocol might
19  violate the public's right to observe the execution. Cases are not authority for issues not
20  presented. *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1199 n. 3 (9th Cir.2008);
21  *see Central Virginia Community College v. Katz*, 546 U.S. 356, 363 (2006) (citing *Cohens v.*
22  *Virginia*, 6 Wheat. 264, 5 L.Ed. 257 (1821)). And the standards for evaluating a protocol under
23  the two amendments are not the same: Under the Eighth Amendment, the burden is on the
24  prisoner to establish that the protocol "creates a demonstrated risk of severe pain." 553 U.S. at

---

[3] To be clear, PNS takes no position on what an appropriate lethal injection protocol would or should look like, nor does PNS take any position on whether simply removing pancuronium bromide from the protocol would result in an otherwise valid method of execution. PNS's only argument is that on the record, the use of pancuronium in the context of California's current protocol is unconstitutional.

10
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

61. As discussed above, a First Amendment challenge involves determining whether there are substantial and legitimate penological interests that outweigh the First Amendment interest in access to information, and determining whether there are ready alternatives that accomodate the right to information at *de minimis* cost to valid penological interests.

Although the *Baze* plurality does refer to the government's "interest in preserving the dignity of the procedure, especially where convulsions or seizures could be misperceived as sign of consciousness or distress," the factual record developed in the Kentucky trial court suggested that pancuronium served two purposes: to prevent "involuntary physical movements during unconsciousness that may accompany the injection of potassium chloride" and to "hasten[] death." 553 U.S. at 58-59 (citing to record). Here, the factual record strongly suggests that pancuronium bromide does not cause or hasten death but is used instead to sanitize the realities that arise from a state-sanctioned execution. A stay is warranted to prevent the State from carrying out an execution in a manner inconsistent with the First Amendment.

**C.   Given the Ninth Circuit's guidance and the procedural posture of this case, a limited stay is appropriate here.**

*Nelson v. Campbell* discusses two procedural aspects relating to stays of execution: whether certain claims should be raised in habeas petitions rather than civil actions under § 1983, and the impact of delay. 541 U.S. at 648-50. The first of these is irrelevant to this suit, because PNS is not a prisoner. As to the second, PNS has not engaged in *any* delay, much less the decade-long "abusive delay" and "last-minute attempts to manipulate the judicial process" at issue in *Nelson*.

During the four years that this suit has been pending, this Court has consistently made it clear that, given the grave issues and consequences involved in Mr. Morales's Eighth Amendment claims, that case would be resolved first, with PNS soon to follow. Until the end of last month, California had no execution protocol in place, and until less than two weeks ago a state court had enjoined the government from implementing its new protocol until the court had examined it for compliance with the state Administrative Procedures Act. Until the state insisted on setting an execution date for Mr. Brown—and setting it for the earliest possible date under

11
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01

state law—PNS, like this Court, had understood that the government would not resume executions until this Court had had an opportunity to review Mr. Morales's, and then PNS's, claims. PNS is now ready to move forward according to the schedule outlined by the Court at last Tuesday's status conference, a schedule that will allow this Court to reach the merits of the First Amendment claim before, it now appears, the state will even be in a position to proceed with another execution.

*Nelson* invokes equitable principles, and those principles apply equally to both sides. Nelson had failed to act "at such a time as to allow consideration of the merits [of the case] without requiring entry of a stay," and the Court held that against him. Here, it is the government that, in its haste to execute somebody before its drugs expire, has made it impossible for this Court to consider the First Amendment problems with its execution protocol, as well as the extent to which the CDCR has addressed the problems with that protocol that this Court discussed in its 2006 opinion. *Nelson's* "strong equitable presumption" thus runs against government. Moreover, it is well established that the violation of the First Amendment right to meaningfully witness an execution would constitute irreparable harm to PNS and would be against the public interest. *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (2009).

### IV. CONCLUSION

For the foregoing reasons, PNS respectfully requests that the Court stay the execution of Albert Greenwood Brown.

Dated: September 28, 2010

ACLU FOUNDATION OF
NORTHERN CALIFORNIA

KEKER & VAN NEST, LLP

By: */s/ Ajay S. Krishnan*
AJAY S. KRISHNAN
Attorneys for Plaintiff
PACIFIC NEWS SERVICE

12
STATEMENT OF PACIFIC NEWS SERVICE IN RESPONSE TO COURT'S ORDER DIRECTING BRIEFING
FOLLOWING REMAND FROM NINTH CIRCUIT COURT OF APPEALS
CASE NO. C 06 1793 JF RS

513880.01