David A. Senior (#108579)
McBreen & Senior
2029 Century Park East, Third Floor
Los Angeles, CA  90067
Phone:  (310) 552-5300
Fax:  (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (#167080)
Law Offices of John R. Grele
149 Natoma St., Third floor
San Francisco, CA  94105
Phone:  (415) 348-9300
Fax:  (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
rsteinken@jenner.com

Attorneys for Plaintiff ALBERT G. BROWN

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL ANGELO MORALES,  ALBERT G. BROWN, | Case No. C 06 0219 (JF) |
| | C 06 926 (JF) |
| Plaintiffs, | **PLAINTIFF BROWN'S BRIEFING** |
| | **FOLLOWING REMAND FROM** |
| | **THE NINTH CIRCUIT** |
| v. | |
| MATTHEW CATE, et al. | |
| Defendants. | |

**INTRODUCTION**

The Ninth Circuit has remanded this matter and instructed the Court to take the time necessary to analyze the complicated and difficult question of whether the record in this case is sufficient to warrant a stay of execution under *Baze v. Rees*, 535 U.S. 35 (2008).  *See* Remand Order at 2.  As the Court noted previously, that question was hard enough on September 21, 2010; it is even more difficult now.  Order, Sept. 24, 2010, Doc. 401 at 8 ("there is no way that the Court can engage in a thorough analysis of the relevant factual and legal issues in the days remaining before Brown's execution date.")  The Court has requested we respond to the issue raised by the Ninth Circuit's remand within six (6) hours.  Brown understands the Court wishes to get this matter resolved as quickly as it can before the execution, now scheduled for September 30, 2010.  But, the answer to that question cannot be resolved in such a compressed time frame.  Therefore, Mr. Brown requests the Court either extend the time necessary to make full inquiry by granting a stay of execution, or at least give the parties additional time.

Recognizing the exigencies here, all brought on by the State, Brown will, nonetheless, provide a synopsis in response to the Court's inquiry within the very short amount of time allotted, which in no way should be considered as something akin to the Court's "strong" preference "to address any constitutional issues with respect to the regulations in a more orderly fashion." *Id*.

Initially, the Court should be aware of some of the "facts on the ground."  The state is unable to execute Brown until after the close of business on September 30, 2010, at the earliest, under state law concerning the remittitur necessary for the superior court to vacate its injunction. The Governor granted a one-day reprieve to accomplish this.  However, on October 1, 2010, the drugs expire and are unusable.  In papers filed in the state supreme court, the state has requested that court order the Court of Appeal to act by 6:00 p.m. and the Superior Court act by 7:00 p.m., should a petition for review not be filed or one that is filed is denied.  Thus, the entire battle is over a 5-hour window to execute that has a Cinderella quality to it.  So much for the solemn

1

dignity and thoughtful consideration deserved by Mr. Brown and his family, the victim's family and the courts.

As will be discussed below, this entire fiasco is brought about by Defendants' counsel here, who sought execution dates precipitously just to get some, or at least one, execution done quickly.   It appears they were so desperate to execute that they were seeking dates of execution even when they knew they wouldn't have the drugs to perform them, or were unaware of this.  It is hard to figure out which is worse.[1]  They did this, Brown submits, just to see if one of the dates would "stick."

There is an obvious Due Process problem here.  Mr. Morales has a right, recognized by the Court and Defendants, to have the Court explore the record and determine if the new regulations solve the previous problems and result in a constitutionally adequate execution.  Mr. Brown, Defendants argue, is not entitled to such an inquiry merely and solely because they sought and obtained an execution date.  Not only does this violate Due Process, they should be estopped from taking such inconsistent positions.

That being said, Brown will, in the sort time allotted, attempt to address both the Ninth Circuit's concerns and those of this Court.

## I.    THE ASSERTED DIFFERENCES BETWEEN OP 770 AND THE NEW REGULATIONS

Both the Ninth Circuit and this Court have requested information as to the alleged differences and similarities between OP 770 and Title 15 Cal. Code Reg. 3349, et seq. (hereafter "Regs.")  As the Court noted, the press of time has not permitted the thorough integration and comparison of the provisions of all versions of OP 770 and the regulations with the hearing

---

[1]     This is the second occasion (the first is set forth clearly in the parties' Stipulated Facts) where the State has made efforts to execute plaintiff Michael Morales without the use of thiopental.  This second time, Defendants made coordinated efforts to set his execution date on September 14, 2010, which would have required an execution to take place after October 1, 2010 when they had no thiopental.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

record and discovery that are relevant here, nor has it permitted a complete submission of additional record material.

The first difficulty is determining what version of OP 770 is being discussed, or should be. As this Court is well aware, the most critical inquiry in how California's lethal injection protocol operates in practice. The Supreme Court necessarily relied upon the facial elements of the protocol in *Baze*, mainly because of the lack of any record before it about how executions took place in Kentucky. This theoretical approach, however, cannot and should not substitute for an examination of how California implements its protocol in practice. This Court, because of what it learned, focused very little of its attention on the actual provisions of OP 770. *Morales v. Tilton,* 465 F.Supp.2d 972 (N.D.Cal., 2006). Thus, the as-applied nature of the inquiry in this Court is much different from what was done in *Baze* and what was done elsewhere. That is why Brown insisted that the Court examine the entire record, and permit him the same right as granted to Mr. Morales to submit additional materials for consideration. It is also why he requested a review of the questions he submitted in his Reply Of Proposed Intervenor Brown To Defendants' Response To Court's Questions, Doc. 399, at 7-10. All of those are questions raised in the Court's Memorandum and the factual record already before the Court.

Another difficulty is the "moving target" nature of this litigation. This Court may be on its fifth or sixth version of execution procedures. The record is replete with various additions and amendments over the years. In this case, we are on our fourth version. OP 770 when Morales came to court, is different from OP 770 submitted in March 2006, which is different from OP 770 submitted in May 2007. So, when a court asks whether the new regulations are different from OP 770, the question is which version? In fact, for most purposes OP 770 March 2006 is the only one with substantially different drug amounts and delivery systems. All of the executions, about which there is significant evidence, were done using the remote administration of the three-drug method employed by OP 770 May 15, 2007 and employed by the Regulations.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Brown submits that the relevant OP 770 is the May 15, 2007 version because that is the one the Court last granted a hearing on for Mr. Morales and which was stayed by consent of the parties. There is little question that the Regulation and that version are substantially similar. It is almost a rubber-stamp. The following are the same: (1) the administration of three drugs, with some slight variation in amounts, except that both use 3 grams of thiopental[2]; (2) remote administration of the drugs by some undetermined rate of infusion[3]; (3) a consciousness check by a member of the infusion team prior to the administration of pancuronium; (4) a member of the team and the Warden remain with the inmate; (5) provisions that permit team member selection of medical personnel who can perform duties they do not regularly engage in, such as LVNs setting catheters and LVNs and nurses monitoring consciousness.

In examining differences, two very important ones leap to mind. The first, germane because of recent events, is that the Regulation does not include a provision for checking the expiration dates on the drugs, whereas previous versions of OP 770 did, in some fashion or another. Perhaps this is how they lost track recently of what they can accomplish. This does not portend well for the new Regulations.

The second one is that they no longer have doctors or trained medical personnel observing the inmate and recording respiration observations. This observation, so important to this case, was removed in OP 770 (5/15/07) as well. Indeed, it appears that the new chamber would not facilitate this, the window between the infusion room and the injection room being even smaller than the one used previously.[4]

Still other provisions add new difficulties. As we learned at the hearing, there used to be a record of in-service training to show who attended what sessions. There was minimal training, particularly of the medical staff, according to those records, directly contradicting the testimony

---

[2]     This was also the case during the executions.

[3]     Again, this was the case during the executions.

[4]     This is based on photographs of the chamber on the internet. Once an examination is done, it may be that the configuration is different from what appears in those photographs.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

of Witness #1, the team leader.  The Regulation eliminates this requirement.  In fact, recent disclosures by CDCR pursuant to a Public Record Acts request show that during the training over the past year, no one was mixing thiopental.  (Appended).  While these records show someone injecting the first two syringes (into what, it is not known), it wasn't thiopental that was actually being used, apparently.  The disclosure is only up to August 13, 2010, so it is not known if they did some training in mixing thiopental since then.

There are provisions in both OP 770 (5/15/07) and the Regulations pertaining to selection and training that were not previously in OP 770.  It is important to note that it was represented to the Court by Witness #1 that this training was occurring during the years he was on the team, 1998 to 2006, but it was not, at least not for non-security personnel.  Under the Regulations, the training of core medical staff (the ones mixing, setting IVs and undertaking a consciousness check) is to the effect that they train once prior to the setting of an execution date, and three times thereafter.  Neither the previous incantations of OP 770 nor the Regulations describe training on how to infuse drugs using a remote administration, something we learned at the hearing was poorly understood, inconsistently applied and can have consequences for the proper administration of thiopental.

Some of the provisions for training appear to have been included simply to say CDCR trains.  For instance, there is training on the consciousness check.  How that can be done without experience with unconscious persons in a clinical setting (which is not required), is not explained or imaginable.

Some training is not included in either.  OP 770 (5/15/07) references approved lesson plans that had to be used.  The Regulations do not.  There appears no specific training in insertion of IV lines, even though both protocols permit those without professional experience to participate.[5]  This is how witness#3 and witness #4 could be on the team and inserting IV lines

---

[5]     The provisions in this area are very carefully worded (distinguishing between setting up lines and inserting IVs, and requiring only a "demonstrated" ability to insert IVs, which could mean they have done it in previous executions) and it remains to be seen how they are construed.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

when, apparently (according to the doctor in charge), their job assignments did not permit it. The training on mixing and inserting IV lines is unclear as to whether it includes actually mixing and inserting, or just reading about it.

It is also important to note that the selection of team members is slightly different as between OP 770 (5/15/10) and the Regulations, including the qualifications sections. This means, of course, that the "team" Mr. McAuliffe has been training for the past two years is not the "team" that the regulations require, unless the same persons manage to get on the team as has always been the case. In fact, despite several incantations of the selection provisions, CDCR always ends up with the same core personnel, who were so problematic at the hearing.

One new feature Defendants point to is the consciousness check. This was contained in OP 770 (5/15/07) and is in the Regulations. The provisions are identical and differ only slightly from the "Warden's poke", adding an eyelash brush. Both halt the consciousness check before administration of pancuronium, which is problematic. More importantly, as with all previous versions of OP 770, the personnel assigned to this task need not have any experience in or medical training in how to measure consciousness. Their only relevant requirement is a general knowledge of the drugs. At the hearing, it was agreed that a surgical plane of anesthetic depth was required, and that this is not the same as simply being unresponsive. Morales raised the concern that a seemingly unconscious person could awaken sufficiently to feel pain if administration of thiopental was too slow or irregular (from improper mixing), and the court previously required monitoring of consciousness throughout the execution.

## II.  THE FINDINGS BY THE COURT

The short answer to this question is that we do not know. Much of what the Court focused on remains unexplored in the context of the regulations that are less than a month old. None of the findings regarding the actual practices of the team need to be changed as there is no evidence to the contrary before this Court.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Further, the Court's timeframe does not permit Brown's counsel to fully address each of the many findings it made. We have simply run out of time.

### III. DEFENDANTS HAVE MADE FEW SUBSTANTIVE CHANGES TO OP 770 IN FORMULATING THE STATE'S EXECUTION REGULATIONS

On December 15, 2006, this Court respectfully requested the state undertake a "meaningful" review of its processes, which "*must be undertaken* with an openness to the idea of making significant improvements in the 'infrastructure' of executions." *Morales v. Tilton*, 465 F. Supp. 2d 972, 983 (N.D. Cal. 2006) (emphasis added). In response to the Court's clear guidance in this regard, Governor Schwarzenegger announced via a press release on December 18, 2006, that he was "committed to doing whatever it takes . . . to ensure that the lethal injection process is constitutional . . . ." Response by the Governor's Office to the Court's Memorandum of Intended Decision Dated December 15, 2006, Docket 291, Ex. A. The Governor added that his "administration will take immediate action to resolve [the] court['s] concerns . . . ." *Id.*

To this end, in late December 2006, Kingston "Bud" Prunty, Undersecretary of CDCR, was appointed "to be the lead person to see that the Department addressed the Court's concerns." Prunty Depo. at 10. Prunty revised OP 770 which was published on May 15, 2007, and then facially was turned into the current execution protocol regulations. *Compare* Cal. Code Regs. tit. 15, § 3349, et seq. *with* OP 770, May 15, 2007, Docket No. 318.[6] Mr. Brown provides as "much detail as possible as to the substantive similarities in and differences between O.P. 770 and Cal. Code Regs. tit. 15 § 3349 et seq." Order, Sept.28, 2010, at 2.

#### 1. OP 770 Revision "Work Group."

In order to address the State's execution implementation shortcomings, Bud Prunty created a "work group" to undertake the review of OP 770. Prunty Depo. at 10, 12.[7] He believes that using a panel to interview and screen "work group" or committee candidates is beneficial

---

[6] "OP 770" hereafter refers to this iteration of the execution protocol.

[7] All deposition transcript excerpts cited herein will be filed herewith.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

"[t]o make sure there is some consistency in screening, make sure we meet our expectations for selection," and "[t]o make sure that there's more than the input of one person." *Id.* at 55-56. Prunty disregarded his own principles here, and instead, personally handpicked the work group charged with reviewing the protocol (*id.* at 57, 10) – to wit, a homogenous group of five CDCR employees. In doing so, Prunty never considered including "any people who were not CDCR employees or retirees." *Id.* at 94. As a result, the execution protocol review exercise mimicked the inadequate self-evaluations previously conducted by CDCR's execution team regarding its own *bona fides*. *See Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006).

Prunty's protocol review cadre consisted of Darc Keller, Steve Cambra, Carl Larson, John McAuliffe, and Tony Newland. Prunty Depo. at 10-11, 200. Keller, the Assistant Secretary for Health Care Services, was fired by CDCR for fraud shortly after Prunty tapped him as "work group" material. Keller's termination occurred after "the receiver had raised issues that there were some contracts for medical services that were not properly let . . ." and other conflicts of interest. *Id.* at 202. CDCR Secretary James Tilton personally requested Keller to submit his resignation. *Id.* at 201. Thereafter, and while under oath, Tilton concealed from plaintiff Morales that Keller had been a member of the OP 770 revision work group. Responses by Defendants Tilton and Ayers to Plaintiff's Initial Post-hearing Interrogatories, No. 5.

Tilton and Warden Robert Ayers verified under oath that John McAuliffe was selected to be on the protocol review team "because of his medical background," and therefore he "was responsible for reviewing the drug mixtures used by other states, and developing the drug mixture set forth in the revised version of O.P. 770." Responses by Defendants Tilton and Ayers to Plaintiff's Initial Post-hearing Interrogatories, No. 5. By contrast, Prunty – who unilaterally selected McAuliffe to be on the protocol revision team, testified that McAuliffe has "never done any [medical] research" for OP 770 and that he doesn't think the revision team was "qualified to do that." Prunty Depo. at 142-43.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Prunty was largely unsupervised in revising OP 770: he reported to Tilton and Andrea Hoch, the Governor's Legal Affairs Advisor (Prunty Depo. at 13), but he "didn't consult [Tilton for] permission to do anything" (*id*. at 14) and doesn't "recall asking [Hoch] for permission to do anything . . . ." *Id*. at 15. In an effort to avoid reliability and transparency, Prunty made no record of his revision activities, thoughts, considerations, and/or recollections. While he estimates that he attended over 50 meetings regarding the revision of OP 770, he "never took a note on a single instance." *Id*. at 85.

Prunty's work group was uninformed and similarly unsupervised. Team members were kept in the dark as to the chain of command, and/or who was on the team. It was "never explained" to McAuliffe who Prunty reported to on this project, and McAuliffe erroneously believed that Denise Dull, Max Lemon, and John McNitt were also on the protocol review team. McAuliffe Depo. at 88-89. Prunty does not "recall giving specific assignments" to anyone in the work group. Prunty Depo. at 88. Indeed, McAuliffe reported to multiple individuals and "just did it" on his own since nobody told him to whom he should report. McAuliffe Depo. at 87. McAuliffe reported his findings to either Cambra, Larson, or Prunty (*id*. at 86-87), and stated that others providing input in the revision process, including John McNitt, reported to "any one of" the other seven members on the team. *Id*. at 89.

2.    **Revision Schedule for OP 770.**

The initial action plan to revise OP 770 was scheduled with "dates as best [as they] could have estimated at that time," and listed the date of completion for June 30 or July 1, 2007. Prunty Depo. at 157-58. Notwithstanding this best estimate of Prunty, a May 15 completion date was set instead, eliminating 20 percent of the estimated time necessary to complete the project. Prunty Depo. at 158. Prunty claims he did not know who selected the May 15 date or why it was selected. *Id*. at 158. Thereafter, the Governor rebuffed Prunty's request for "a little bit longer time to do that." Cal. Senate Pub. Safety Comm. Hearing, May 8, 2007. As a result, when the deadline was set, Prunty and his work group simply "set about making sure [he] met it" (Prunty

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Depo. at 154), irrespective of the time required to undertake a review and revision of the protocol consistent with this Court's directions.

The arbitrary selection of a completion date resulted in a substandard review of OP 770, performed without order or context, and rendered much of it meaningless. For example, CDCR Undersecretary and OP 770 revision leader Prunty thought it was "important in [his] preparation of OP 770 to witness an execution." Prunty Depo. at 124. However, Prunty did not attend his first execution until August 2007 – months after the protocol was reviewed, analyzed, redrafted, and published. *Id*. at 236. Similarly, McAuliffe also had never witnessed the performance of an execution before OP 770 was finalized on May 15. McAuliffe Depo. at 241.

In this regard, the combined execution experience of Prunty and McAuliffe when revising OP 770 was nil. To this day, neither Prunty nor McAuliffe have ever "observed the administration of the lethal chemicals by the execution team members." Prunty Depo. at 136; McAuliffe Depo. at 102. When they observed the August 2007 execution in Oklahoma, Prunty and McAuliffe were in "the witness area" (McAuliffe Depo. at 102), and the execution team was "in a room behind the gurney that the condemned is confined on. They are not visible." Prunty Depo. at 136. They were limited to observing only the inmate, who was tethered to a Gurney (*id.*), and their observations were made through a window from an adjacent room. *Id*. at 137. This is the same observation vantage point that witnesses were afforded in California –  which allowed California to conceal its Constitutional infirmities for many years. *See Morales v. Tilton*, 465 F. Supp. 2d 972, 978-80 (N.D. Cal. 2006). Even Prunty's Oklahoma execution window peeping was substandard – he "didn't get to see all the events of that execution" (Prunty Depo. at 136) from his limited vantage point because his "attention was directed intermittently to the condemned's [brother], who was on the floor" nearby after becoming ill from watching the spectacle. *Id*. at 137.

Former San Quentin Warden Vasquez believes that "[m]aking a execution seem humane and dignified is up to the people that carry it out. You can't legislate it or write it down." ER

---

10

244, Stipulated Fact ("SF") 263.  McAuliffe agrees in that he would "have to be there to see the entire procedure" to judge whether an execution was humane.  McAuliffe Depo. at 203.  In this regard, the utility of California's new OP 770 is no better than the written protocols employed by California in the past, and Prunty's expedited protocol drafting exercise was largely meaningless.

### 3.        Review of Other Execution Venues.

Neither Prunty nor McAuliffe made any contemporaneous notes while present at the execution facilities in Virginia, Oklahoma, Indiana, and the federal Board of Prisons in Indiana.  *See* Prunty Depo. at 232-33.  In fact, Prunty never recorded any of his recollections regarding these visits.  *Id.*  There was "[n]othing in particular" that made an impression on Prunty during his visits to either Virginia or Oklahoma.  *Id.* at 234-35.  Prunty neither inquired nor learned whether Indiana, Virginia, or Oklahoma "ever sought medical expert opinions in designing [their] lethal injection protocol" (*id.* at 229-30); he has no knowledge whether Oklahoma, Indiana, or Virginia have ever had an unsuccessful execution procedure (*id.* at 230-31); and he never learned of any emergency procedures to be employed in any of these states in the event of a mishap during an execution.  *Id.* at 231.  (Prunty is aware of an emergency procedure to be utilized in Oklahoma in the event a stay is issued; however, he did not include this or any similar procedure in OP 770.  *Id.*)

Prunty does not know what type of execution training takes place in Oklahoma.  Prunty Depo. at 229.  He has no information regarding the difficulties encountered in Oklahoma during its executions, the reasons for the difficulties, or its attempted solutions to the problems – he simply does not "recall the specifics . . ."  *Id.* at 137.  While Oklahoma's executioners believe "that the most difficult part of the execution process is always ensuring that there is proper IV access" (*id.* at 137-38), Prunty is not sure whether he attended that discussion.  *Id.*

In summary, after Prunty and McAuliffe visited execution facilities in Virginia, Oklahoma, Indiana, and at the federal Board of Prisons in Indiana, California did not "adopt any particular practice from any of those four places into OP 770."  *Id.* at 235-36.

---

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

### 4.   New California Execution Chamber.

Prunty appointed George Sifuentes, the Director of the Office of Facilities Management, "to evaluate the existing chamber, and . . . to evaluate possibilities of modifying another building to meet that need." Prunty Depo. at 37. Sifuentes did not visit execution sites in other states (McAuliffe Depo. at 237-38), nor attend the work group's site check of the San Quentin facilities. *Id.* at 210.

Sifuentes was "involved in overseeing the costs of the new execution chamber." Prunty Depo. at 33. Prunty supervised Sifuentes. *Id.* at 27. Sifuentes fraudulently advised that a new chamber "could be done as a minor capital outlay project for under $400,000." *Id.* at 28. This was done to avoid legislative oversight and to allow CDCR to "do it quietly" – "low profile." Prunty Depo., Ex. 214, pg. 2. After the Prunty-Sifuentes bid team was replaced by legislative oversight, $800,000 (Prunty Depo. at 26) was found to be a more "reliable and transparent" (*Morales*, 465 F. Supp. 2d at 981) cost for the new chamber. Sifuentes ultimately was disciplined by CDCR for "a pattern" of fraudulent government building cost estimates; i.e., it was "the way he had done business for a while." Prunty Depo. at 33. Prunty, however, took no disciplinary action against Sifuentes or anyone else in the Office of Facilities Management. *Id.* at 30.

### 5.   Documentation Generated During Revision Process.

Prunty's work group was told "early on in the process" to maintain all documentation for discovery. Prunty Depo. at 190. The entire work group reported to Prunty. *Id.* at 13. Correctional Captain John McNitt, a "[d]uly sworn peace officer" who was "sworn to uphold the law" (*id.* at 188), was a representative from the Office of Facilities Management who worked with Prunty's work group. *Id.* at 187. McNitt reported to Cambra, Larson, and McAuliffe that he intended to destroy documents gathered in the course of reviewing OP 770. Prunty Depo., Ex. 215. Neither Cambra, Larson, nor McAuliffe reported this to Prunty (*id.* at 189), and Prunty never took corrective or disciplinary action against McAuliffe, Cambra, Larson, or McNitt. *Id.* at 23.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

6.      **Use of a Three-Drug Protocol in California.**

While McAuliffe was the point man for the State of California to undertake its review of the drug mixtures used by other states, and to develop the drug mixture set forth in the revised version of OP 770 (Responses by Defendants Tilton and Ayers to Plaintiff's Initial Post-hearing Interrogatories, No. 5; McAuliffe Depo. at 200), he is wholly unqualified to perform this function.  The first time he ever studied or researched thiopental was not until December 2006.  McAuliffe Depo. at 158.  McAuliffe blithely explained his lack of knowledge about the effects of protocol drugs, saying, "I just started this in December."  *Id.* at 198.  McAuliffe testified that "1.5 grams [of thiopental] is the optimal dosage for lethal injection based on your expert witnesses, so I took their advice."  *Id.* at 198.  McAuliffe *actually* prescribed three grams total of sodium thiopental for the protocol, "1.5 grams in each syringe, two syringes."  *Id.* at 256.  McAuliffe said that he picked three grams because he "was looking for a mean" of the other states' data, a method he chose because of "basic scientific study."  *Id.* at 257.

McAuliffe had completed his home schooling in execution pharmacology in 90 days or less when he issued "a recommendation" to Cambra, Larson, and Prunty in around March of 2007 that "a single drug be used [for the execution protocol] and it be thiopental"  *Id.* at 200.  Prunty does not remember McAuliffe recommending a one-drug protocol to him.  Prunty Depo. at 160.  Prunty testified that, McAuliffe has "never done any [medical] research" for OP 770 and that he doesn't think the revision team was "qualified to do that."  Prunty Depo. at 142-43.

McAuliffe says he was informed by Prunty that they would be using a "three-drug protocol in the execution protocol" on May 14th, just one day before OP 770 was published.  *Id.* at 189-90.  By contrast, Prunty claims this decision was made by Governor Schwarzenegger (Prunty Depo. at 163), despite the fact that Prunty had only "talked to Governor Schwarzenegger about OP 770" twice.  *Id.* at 95.  Prunty claims he was informed of this decision "sometime in late April, early May."  Prunty Depo. at 162.  Neither story is true, but instead is consistent with past CDCR double talk.  On January 31, 2007, Denise Dull made contemporaneously prepared notes wherein she reported that the Governor, as early as a few weeks after the Court's

13

December 15 order (and well before McAuliffe perhaps started, and certainly completed, his self-taught 90-day crash course in pharmacology), had instructed Prunty that the "1 drug protocol is now off the table, stick w 3 drugs."  Prunty Depo., Ex. 213.

In this regard, California *never* undertook a "meaningful" review of the drugs used or delivered "with an openness to the idea of making significant improvements in the 'infrastructure' of executions."  *Morales v. Tilton*, 465 F. Supp. 2d 972, 983 (N.D. Cal. 2006).

**7.    Selection of California Lethal Injection Team Members.**

In creating a selection process for the execution team, the goal was to correct the deficiencies of the previous process which was not formalized and "all verbal or word of mouth." Larson Depo. at 28.  Nothing, however, has changed.  CDCR has "notified some of the employees" about the opportunity to apply for membership on the execution team, but even Prunty is "not sure exactly how the notice was made to them."  Prunty Depo. at 47.

Carl Larson was the team member responsible for drafting the portion of OP 770 dealing with "selection, recruitment, and retention" of the execution team.  Larson Depo. at 22.  OP 770 states that the lethal injection team members can come from San Quentin or from other departmental locations.  However, Larson stated that "as long as the warden at San Quentin could get a team that meets that criteria, they're going to use San Quentin people," even if there were people "who were better and brighter and cleaner outside of San Quentin."  Larson Depo. at 40.  In this regard, CDCR has every intention of drawing from the same San Quentin "old boy" network as before, regardless of the quality of the candidate pool.

While OP 770 states that team members can have "[n]o prior stress claims," it does not require any psychological tests or evaluations of the team members.  OP 770 at 8.  Employees who have been "assigned to any condemned housing unit either full- or part- time in the past 12 months" (OP 770 at 8) are forbidden from being a part of the lethal injection team, in order to, as Prunty stated, "provide as much insulation between the employee and the condemned inmate as possible" since "they may have some feelings about the condemned and it may -- it may impact

---

14

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

their ability to do the job that they're selected to do." Prunty Depo. at 70. However, just as before, an employee who has worked regular full shifts of overtime in the condemned unit can still be a lethal injection team member, because overtime is "not an assignment." *Id.* at 71.

As part of the lethal injection selection panel, Prunty did not specifically check if any of the execution team applicants had substantial work experience in the condemned housing unit, and no other members of the committee advised Prunty that they had checked either. *Id.* at 72-73. CDCR has no intention of changing its broken selection process for the execution team. Multiple members of past execution teams worked significant schedules – overtime or otherwise – with the condemned population. *See* ER 189, Stipulated Facts 21-23, 25 at 5-6. Many of these same team members now have been selected again to be on the new execution team and hold critical positions, including Witness #9 as Team Leader, Witness #4 as an Infusion Team member, and Witness #3 as an Intravenous Team member. Ex. Redacted, Execution Team Members at 1, 2. Both Witness #3 and Witness #4 are LVNs who work in [redact] (ER 203, SF 58-59 at 20), and "sometimes work in the [redact] area of San Quentin." ER 189, SF 25 at 6. As recently as September 2006, the new execution Team Leader, Witness #9, still "work[ed] overtime in the [redact] areas as the shift Lieutenant," and he "was assigned to work in the [redact] area of the prison for at least four years." ER 229, SF 160 at 45. He was even recognizable and greeted by name by Michael Morales when Morales was brought to the execution chamber on the night of his scheduled February 21, 2006 execution. ER 229, SF 161 at 45. Under the regulations employees who have served in the condemned housing unit still are permitted to be on lethal injection teams. *See* Cal. Code Regs. tit 15, § 3349.1.2(e)(8).

The lethal injection team selection procedure outlined in OP 770 was disregarded by CDCR Undersecretary Prunty. OP 770 says that "[t]he Associate Director, Reception Centers and the Lethal Injection Team Leader will participate as panel members" to "review qualifications, interview prospective candidates, and select Lethal Injection Team Members." OP 770 at 6; Cal. Code Regs. tit 15, § 3349.1.2(a)(4)(A). Since "there was not a team leader

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

formally selected at that time," the team leader did not participate in the interviews and selection process of team members which were taking place in July and September 2007.  Prunty Depo. at 116, 117.  Prunty took the place of the team leader on the panel to interview prospective execution team members (Prunty Depo. at 113, 116), and Witness #9, the team leader who will direct, supervise, discipline, and work with the team (Ex. Redacted, Execution Team Members at 2), had no role on this panel.

The execution team selection panel also was tasked by OP 770/Title 15 of the California Code of Regulations with "[r]eview of all the available candidate's performance evaluations," "[r]eview of the candidate's Personnel, Supervisory, and Training files," and "[r]eview of the candidates [sic] current CI&I Report from the California Department of Justice."  OP 770 at 8; Cal. Code Regs. tit 15, § 3349.1.2(b).  Although Prunty believes that a panel is important to "make sure we meet our expectations for selection," he and the rest of the selection panel disregarded these principles and the screening process of the protocol.  Prunty Depo. at 55-56.  While Prunty claims to have reviewed performance evaluations and CI&I reports, he admittedly failed to review supervisory files, training files, and personnel files.  *Id.* at 62-63, 66.  Again, the CDCR Undersecretary disregarded the very written protocol that he prepared to purportedly eradicate CDCR's failures, almost before the ink was dry.

CDCR's failure to follow the revised procedures in the protocol's execution team member selection process was best explained by the testimony of McAuliffe, who stated that the team members would be chosen by "Warden Ayers."  McAulifffe Depo. at 251.  Prunty testified that after Witness #9 was interviewed, he was included on the selection panel because "[i]t was the warden's intention to have Witness No. 9 be finally selected as the team leader."  Prunty Depo. at 119.  In this regard, nothing has changed from the past deficient selection process wherein Wardens Calderon, Woodford, Brown, and Ornoski merely continued to use those previously on the team, and occasionally selected others whom the team was comfortable with.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

*See Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006); ER 186-87, 223-24 SF at 3-4, 39-40.

### 8.    Development and Content of Training Lesson Plans.

Along with OP 770, the work group produced lesson plans that are to be used for training the lethal injection team.  The "instructional designers" of these lesson plans were Captain Robert Fox and John McAuliffe.  McAuliffe, who has no medical experience, wrote both the intravenous and infusion training manuals, which train the team members to, among other things, insert a catheter and prepare and deliver the lethal chemicals.  However, McAuliffe has never set a catheter.  McAuliffe Depo. at 157.  Similarly, he has never had "any training in administering IV medication." *Id.*

CDCR's execution "team members almost uniformly have no knowledge of the nature or properties of the drugs that are used or the risks or potential problems associated with the procedure." *Morales v. Tilton*, 465 F. Supp. 2d 972, 979 (N.D. Cal. 2006).  Now CDCR has enlisted a person to draft lesson plans to train execution team members on these subjects who has no knowledge, experience, education, or training on these topics.  McAuliffe blithely testified that he is "not a pharmacist" when asked about the "pharmacological effects of thiopental." McAuliffe Depo. at 196-97.  He similarly does not "know the interaction between the use of a benzodiazepine and thiopental" (McAuliffe Depo. at 196) – two drugs that he has authorized for administration to the inmate during an execution.  OP 770 at 43, 44, 92; Cal. Code Regs. tit. 15, §§ 3349.1.1, 3349.4.3, 3349.4.4(a)(2)(B) & 3349.4.5.  McAuliffe's testimony in this regard is in stark contrast to the sworn contentions of CDCR Secretary Tilton and Warden Ayers who claimed that McAuliffe "was responsible for . . . developing the drug mixture set forth in the revised version of O.P. 770" due to "his medical background."  Responses by Defendants Tilton and Ayers to Plaintiff's Initial Post-hearing Interrogatories, No. 5.

The instruction given in OP 770 and the regulations to prepare the sodium thiopental is simply to "[f]ollow the manufacturer's directions as stated on the kit to prepare the chemical

---

17

properly." OP 770, Ex. A, at 43; Cal. Code Regs. tit. 15, § 3349.1.3(c)(3) ("The Infusion Sub-Team shall . . . Mix the Lethal Injection Chemicals in accordance with the manufacturer's instructions . . ."). This is, of course, is what they said they did, but the evidence shows they were unable to do. *See Morales v. Tilton*, 465 F. Supp. 2d 972, 979 & n.7 (N.D. Cal. 2006) ("One member of the execution team, a registered nurse who was responsible for mixing and preparing the sodium thiopental at many executions, testified that '[w]e don't have training, really.'") Directing unqualified and untrained execution team members to simply follow manufacturer's instructions – without more – resulted in the dangerous execution team practices and failures of the past. The package states, "Use reconstituted solution only if it is clear, free from precipitate and is not discolored." ER 197, SF 34a at 14. Witness #4 claimed that he prepared the drugs "by following the instructions" (ER 197,SF 34b at 14), yet obtained a mixed Pentothal solution that was a "yellowish, brownish tan color." ER 197, SF 34 at 14. Witness #6 said she "mixes the thiopental to be clear, not yellow or brown" (ER 236, SF 218 at 52), and Witness #5 said that "[t]o the best of [his] recollection, all the chemicals are clear, are a clear substance." ER 210, SF 87c at 27. At a minimum, professional knowledge and training is required in order to understand and follow the manufacturer's directions, and to train others as to how to do so. Even then, professionals can have differences of opinion and make errors which must be sorted out and corrected. For example, the State's expert pharmacist and anesthesiologist testified that correctly prepared thiopental should be "basically clear" (Doc. 259, Transcript of Proceedings, Sept. 28, 2006, Vol. 4, RT 889), and that it should be "a very pale green" (Doc. 260, Transcript of Proceedings, Sept. 29, 2006, Vol. 5, RT 1121), respectively. The lesson plans provide no such illumination, and are clearly lacking in this regard.

The training of lethal injection team members will be conducted by people who are untrained themselves and therefore unqualified to instruct others. All training sessions are to be conducted by the team leader, in conjunction with the associate warden in the case of the intravenous team, and with the warden or administrative staff for the general lethal injection

team training.   However, there are no specific requirements that the team leader has ever participated in an execution or has mastered any specific task such as how to insert catheter, or prepare or infuse the chemicals.  *See* OP 770 at 8; Cal. Code Regs. tit 15, § 3349.1.2(f)(1).

Remarkably, there are no specific training or lesson plans for the team leader.  *See* Prunty Depo. at 91.  As in the past (*see* ER 223-24, SF 129 at 39-40), the team leader will still be hand-selected by the Warden under the new protocol (*see* Prunty Depo. at 119), and does not require prior team membership, execution training or experience (*see* OP 770 at 8). With untrained instructors and vague and ambiguous lesson plans, the training of the lethal injection team will result in team members who are similarly as unqualified as those of the past.

CDCR's entire post-December 15, 2006 "'review of the lethal-injection protocol . . .'" (*Morales v. Tilton*, 465 F. Supp. 2d 972, 983 (N.D. Cal. 2006) (quoting *Morales v. Hickman*, 415 F. Supp. 2d 1037, 1046 (N.D. Cal. 2006))) was a ruse, conducted grudgingly and in the shadows of fraud, incompetence, and deceit.  The decisions made throughout the process of writing of the May 15, 2007 rendition of OP 770 (which is now its regulations) which gave birth to their regulations were made by an unqualified team who failed to communicate with each other or the Governor's office and failed to do the necessary research.  The Governor's attitude in revising OP 770 perhaps was best stated by his counsel upon return to this Court on June 1, 2007: the State's "perspective is basically, we want to speed along the case."  Joint Status Conference, Docket No. 322, RT 9, June 1, 2007.

## IV.  THIS COURT CORRECTLY FOUND THAT MR. BROWN TIMELY MOVED TO INTERVENE AND FOR A STAY

In considering whether to grant a stay of execution "a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claims."  *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).  The facts and record in this case, as well as the Ninth

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Circuit's guidance in applying Nelson, demonstrates that this Court was correct in concluding, sua sponte, that Mr. Brown's motions to intervene and for a stay of execution were timely made.

Perhaps most significantly, "Defendants themselves did not contend in their briefing that Brown has not been diligent in seeking federal relief." Order at 7 [ER-13]. Similarly, Defendants did not contend in their Opposition to Motion for Stay of Execution and Appellee's Brief or in the Alternative Opposition to Petition for Writ of Mandamus ("Opposition"), filed in the Ninth Circuit that Mr. Brown had been untimely. Indeed, Defendants explicitly "[p]ut[] aside the" discussion of any "reasons for Brown's" purportedly "belated attempt to join the Morales litigation." Opposition at 5. In light of Defendants' failure to petition for rehearing of the panel's order, the determination that Mr. Brown was timely is thus law of the case. *See Williamsburg Wax Museum v. Historic Figures*, 810 F.2d 243, 250 (D.C. Cir. 1987) (under law of the case doctrine, a legal decision made at one stage of the litigation, not challenged in a subsequent appeal when the opportunity existed becomes law of the case for future stages of the same litigation). *See also United States v. Escabar-Urrego*, 110 F.3d 1556 (11th Cir.1997) (district court's determination regarding quantity of drugs possessed became law of the case when appellant failed to seek review of decision).

The Ninth Circuit's Order likewise noted the facts explicitly considered by this Court, which supported the conclusion that Mr. Brown acted in a timely fashion. "After a four-year moratorium on executions in California," and state court proceedings regarding the administrative legality of the revised protocol, "a new lethal injection protocol became effective August 29, 2010." Order at 2, 4. "On August 30, 2010, the State had already scheduled the first execution in four years – Albert Greenwood Brown – for September 29, 2010." Order at 4. Mr. Brown's efforts to protect his constitutional rights, which proceeded simultaneously in both state and federal court, were therefore timely undertaken. *See Beardslee v. Woodford*, 395 F.3d 1064, 1069 (9th Cir. 2005) (petitioner "correctly point[ed] out that the precise execution protocol is subject to alteration until the time of execution"). See also Crowe v. Donald, 528 F.3d 1290,

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

1292 (11th Cir. 2008) (method of execution claim accrues on later of date on which state review is complete or date on which capital litigant becomes subject to new or substantially changed execution protocol).

This Court also found, and Defendants did not dispute, that in contrast to the timely fashion in which Mr. Brown proceeded, it was "'Defendants' choice of an execution date that prevents meaningful review.'" Order at 5. Defendants have only recently revealed that the creation of such time constraints was motivated by their desire to execute an inmate before the State's available supply of sodium thiopental expired. Thus, the Circuit Court noted that while the Defendants may have a significant interest in enforcing criminal judgments, "it is incredible to think that the deliberative process might be driven by the expiration date of the execution drug." Order at 2.

Weighing the relative harm to be suffered by the parties therefore strongly favors Mr. Brown. This Court can thoroughly review the issues in this case within the next three months. If Defendants' new regulations have in fact "succeeded in remedying" the significant flaws in earlier protocols, Defendants will have the drugs available to resume lawful executions. Order at 2. By contrast, executing Mr. Brown with a protocol that in practice subjects him to the risk of extreme pain constitutes irreparable injury, that cannot be corrected by further litigation. *See Sell v. U.S.*, 539 U.S. 166, 176 (2003) (notwithstanding government's interest in enforcement of law and punishment, involuntary administration of drugs to render defendant competent to stand trial threatened irreparable warranting pre-trial review as collateral order).

## CONCLUSION

Based on the foregoing, and Mr. Brown's demonstration of likely success on the merits, as discussed above, he is entitled to a stay to permit the orderly consideration of the claims he shares with Mr. Morales.

BRIEFING FOLLOWING REMAND FROM THE NINTH CIRCUIT
C 06-0129 (JF)(RS) &C 06-926 (JF)(RS)

Dated: September 28, 2010                    Respectfully submitted,

                                     By:      /s/ David S. Senior

                              David A. Senior
                              McBREEN &SENIOR

                              Richard P. Steinken
                              JENNER & BLOCK

                              John R. Grele
                              LAW OFFICE OF JOHN R. GRELE

                              *Attorneys for Plaintiff*
                              ALBERT GREENWOOD BROWN

22