David A. Senior (# 108579)
MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
LAW OFFICES OF JOHN R. GRELE
149 Natoma Street, Third Floor
San Francisco, CA 94105
Phone: (415) 348-9300
Fax:      (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
rsteinken@jenner.com

Attorneys for Plaintiffs
MICHAEL A. MORALES and
ALBERT G. BROWN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MICHAEL ANGELO MORALES, ALBERT G. BROWN, <br><br> Plaintiffs, <br><br> v. <br><br> Matthew CATE, Secretary of the California Department of Corrections and Rehabilitation, et al., <br> _____ | ) CASE NO. C 06 0219 (JF) (RS) <br> )              C 06-0926 (JF) (RS) <br> ) <br> ) <br> ) FOURTH AMENDED COMPLAINT FOR <br> ) EQUITABLE AND INJUNCTIVE RELIEF <br> ) [42 U.S.C. § 1983] <br> ) <br> ) <br> ) <br> ) |

## NATURE OF ACTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened

violations of the rights of Plaintiffs to be free from cruel and unusual punishment under the

Eighth and Fourteenth Amendments of the United States Constitution and for violations and threatened violations of Plaintiffs' rights to be free from arbitrary and capricious protocols and procedures under the Fifth and Fourteenth Amendments to the United States Constitution..

2.      Plaintiffs contend that lethal injection, as performed in California, will subject them to present demonstrated substantial risks of inflicting tortuous pain and suffering under the Eighth Amendment.

3.      Plaintiffs additionally contend that Defendants, as a result of their deliberate failure to use medically-approved procedures and properly-trained personnel, have inflicted pain and torture on over 60% of the inmates who they have executed in the past, making it certain that a presently existing demonstrated risk exists that they will suffer the same fate unless Defendants adopt and employ a humane and safe execution protocol.

4.      Plaintiffs further contend that the continued use of the three-drug procedure after already having been found to employ similar, if not identical, procedures in violation of the Eighth Amendment is an intentional and willful disregard of a known and substantial risk of inflicting severe pain and suffering.

5.      Plaintiffs additionally contend that Defendants' continued use of their three-drug procedure when tested, available alternatives exist establishes that the demonstrated risk of severe pain by Defendants' process is substantial when compared to the known and available alternatives.  Defendants have refused to adopt such alternatives in the face of these documented advantages, without any legitimate penological justification for their continued retention of the three-drug protocol.

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

6.       Plaintiffs further contend that the use of pancuronium bromide, a paralytic agent that acts as a chemical veil over the lethal injection process, disguises the excruciating pain and suffering to which they will be subjected.  Plaintiffs also contend that the use of potassium chloride, as administered by the Defendants in the lethal injection process, will subject them to excruciating pain and suffering.

7.       Plaintiffs seek temporary, preliminary, and permanent injunctive relief to prevent the Defendants from executing Plaintiffs by means of lethal injection, as that method of execution is currently preformed in California under the current protocol or any similar protocol.  Plaintiffs request that Defendants be restrained from carrying out any executions, and from any preparatory measures to effectuate executions, until such time as this Court has ruled that they have eliminated the substantial risk of serious pain and suffering under the Constitution.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (further relief).  This action arises under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

9.       Venue is proper pursuant to 28 U.S.C. § 1391(b) in that Plaintiffs are currently incarcerated at San Quentin State Prison ("San Quentin") in San Quentin, California, located in this District.  All executions conducted by the State of California ("State") occur at San Quentin.  The events giving rise to this complaint will occur in this District.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**3**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

**THE PARTIES**

10.     Plaintiffs Albert Brown and Michael Morales are United States citizens and residents of the State.  They currently are death-sentenced prisoners under the supervision of the California Department of Corrections and Rehabilitation (CDCR).  They are held at San Quentin State Prison, San Quentin, California, 94974.

11.     Defendant Matthew Cade is the Secretary of the CDCR.

12.     Defendant Vincent Cullen is the Warden of San Quentin State Prison, where the Plaintiffs are incarcerated and where the Plaintiffs' executions will occur.

13.     Defendant Arnold Schwarzenegger is the Governor of the State of California.

14.     Plaintiffs do not know the true names of Does 1-50 but allege that they have or will participate in Plaintiffs' executions by virtue of their roles in designing, implementing, and/or carrying out the lethal injection process.  When Plaintiffs discover the Doe Defendants' true identities, they will amend this complaint accordingly.

**GENERAL ALLEGATIONS**

15.     All prior allegations set forth above are re-alleged as if set forth entirely herein.

16.     On January 6, 2006, the clerk of the Superior Court of Ventura County issued a Notice of Public Session in the case of People v. Morales, No. CR 17960, scheduling a public session on January 18, 2006 for the purpose of the setting of the date of execution of judgment of death of February 21, 2006.  On September 2, 2010, the clerk of the Superior Court of Ventura County issued a Notice of Public Session in the case of People v. Morales, No. CR 17960, scheduling a public session on September 14, 2010 for the purpose of the setting of the date of execution of judgment of death.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**4**

17.     On August 30, 2010, the Superior Court of Riverside County held a Public Session in the case of <u>People v. Brown</u>, No. CR 18104, for the purpose of the setting of the date of execution of judgment of death on September 29, 2010.

18.     Without conceding that the provisions for exhaustion of administrative remedies are applicable to their claims, Plaintiffs have effectively exhausted all administrative remedies for the issues contained in this Complaint to the extent that they were available and have satisfied the Prison Litigation Reform Act's exhaustion requirements pursuant to 42 U.S.C. § 1997e(a).

19.     Plaintiffs are not required to exhaust administrative remedies before bringing this claim because resolution of the grievance seeking modification of Regs./OP 770 is not possible through the appeal process and exhaustion is futile.  *See also Beardslee v. Woodford*, 395 F.3d 1064, 1069 (9th Cir. 2005).

20.     Both Plaintiffs' executions have been stayed pending resolution of this matter.

21.     Plaintiffs are death row inmates and the Defendants intend to carry out their execution by means of lethal injection.  Under California law, death sentences shall be carried out by "administration of a lethal gas or by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections."  Cal. Penal Code § 3604(a).  The statute prescribes no specific drugs, dosages, drug combinations, or the manner of intravenous line access to be used in the execution process; nor does the statute prescribe any certification, training, or licensure required of those who participate in the execution process.  All of the details of the execution process are to be determined by the CDCR.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**5**

22.     The CDCR has decided to execute Plaintiffs by poisoning them with a lethal combination of three chemical substances: sodium thiopental, an ultra short-acting barbiturate; pancuronium bromide, an excruciatingly painful and tortuous chemical which paralyzes all muscles; and potassium chloride, an excruciatingly painful chemical which activates the nerve fibers lining the prisoner's veins and interferes with the heart's contractions, causing cardiac arrest.

23.     In performing Plaintiffs' executions by lethal injection, the CDCR contends it will follow the protocol established in California Code of Regulations title 15, sections 3349 et seq. (2010), which is nearly identical to San Quentin Operational Procedure No. 770, May 15, 2007, ("Regs./OP 770"), as well as certain practices not delineated in the protocol.  The protocol and actual practice by which lethal injection executions will be performed under Regs./OP 770 violate constitutional and statutory provisions enacted to prevent cruelty, pain, and torture.  It creates a substantial risk that condemned inmates will experience severe pain and suffering during executions.

24.     The remote administration of the chemical substances, the absence of standardized procedures for administration of the chemicals, the lack of adequate training, screening and qualifications of the personnel involved in the process, and the combination and amounts of the three particular chemicals used in Regs./OP 770 create a present, grave, substantial and demonstrated risk that Plaintiffs will not be adequately unconscious during the execution process and, as a result, will experience an excruciatingly painful and protracted death.  Use of similar procedures has resulted in such suffering in over 60 % of the lethal injection executions carried out in California to date.

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

25.     Regs./OP 770 lacks medically necessary safeguards, thus making it a present certainty that Plaintiffs will suffer a demonstrated risk of unconstitutional pain during the lethal injection process. The protocol identifies no procedures for ensuring that the anesthetic agent is properly flowing into the prisoner after either pancuronium bromide or potassium chloride are administered to avoid the excruciatingly painful effects of either drug in the event Plaintiffs regain consciousness, a safeguard required by the Eighth Amendment that is already required in any medical or veterinary procedure after administration of a sedative and before the administration of an excruciatingly painful overdose of a neuromuscular blocking agent, such as pancuronium bromide, or the administration of an excruciatingly painful potassium chloride overdose.

26.     The protocol established in Regs./OP 770 does not require the minimum expertise of the execution team personnel that would be necessary to ensure their proper performance of the tasks in the lethal injection procedure. There are no guidelines or customary procedures upon which these personnel can rely if they are required to exercise their discretion during the process. There is no plan in place if the Plaintiffs require medical assistance during the execution. And, in the event that the procedure described in Regs./OP 770 becomes difficult or impossible to accomplish, there is no alternative procedure, personnel or equipment available for obtaining access to Plaintiffs' veins, a problem that has occurred in several recent executions.

27.     Two of the substances used in previous executions and continued in Regs./OP 770, pancuronium bromide and potassium chloride, will cause excruciating pain or suffering if administered to a condemned inmate who is not sufficiently anesthetized.

**7**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

28. The proposed anesthetic agent, sodium thiopental ("thiopental") was invented in the early 1930s, and is an ultra short-acting barbiturate currently used only infrequently in clinical settings and in typical surgical doses produces only transient anesthesia. Historically, it was administered only during the preliminary phase of anesthesia administration, and never administered remotely in the manner proposed. In the lethal injection process, thiopental is intended to anesthetize the condemned inmate, but if it is not successfully delivered into the condemned inmate's blood stream, thiopental will not provide a sufficient sedative effect for the duration of the execution process. Failure to deliver the entire dose of thiopental is a foreseeable occurrence given the inadequacy of the procedures, selection and training as contained in Regs/OP 700 and as demonstrated in practice by Defendants. And, as a result of a failed delivery, the condemned inmate will remain conscious or regain consciousness and experience both conscious paralysis and asphyxiation induced by pancuronium bromide and the excruciatingly painful burning induced by potassium chloride as it courses through the prisoner's veins, ultimately leading to cardiac arrest.

29. Thiopental is sold in powder form and must be mixed into a solution to be injectable. It must be mixed and administered by a qualified individual. To deliver a five-gram dose of thiopental into an inmate's vein successfully, the Defendants must prepare a solution that will deliver the dose in the proper concentration, a process that requires mixing multiple vials of thiopental powder with the correct quantity of diluent, combining multiple vials into two larger syringes, and ensuring that the entire amount of properly mixed powder is drawn into the syringes. If this process is not performed accurately, as it has not been in past executions, it will result in an incorrect concentration of thiopental,

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

which will prevent delivery of a reliable dose of anesthetic.   Regs./OP 770 as written and in practice does not reasonably assure that the personnel who will mix the thiopental, prepare the syringes, and deliver the drugs have adequate and appropriate training and experience to perform the tasks properly.  On information and belief, other states use licensed pharmacists or physicians to mix the drugs, including thiopental, for lethal injections.  Defendants have ignored the advice of their expert to engage such qualified personnel in this mixing process and have continued the use of unqualified personnel despite repeated inability by such personnel to mix thiopental properly.

30.      Thiopental is an effervescent drug that, if improperly administered, will not achieve or maintain adequate sedation over time.  Regs./OP 770, as written and in practice, contains no provision for the proper rate of infusion so as to achieve or maintain adequate anesthetic depth during an execution.  As written and in practice, it contains inadequate qualifications, selection, and training for the individuals involved in the infusion.

31.      There is a present substantial risk that sodium thiopental will be ineffectively delivered, given the inadequacy of the administration procedures and the personnel involved, and as a result will not provide a sufficient sedative effect for the duration of the execution process.  This has actually occurred in over 60% of California's lethal injections executions, as well as in executions in other states.  With this inadequate sedation, Plaintiffs will experience the conscious asphyxiation caused by pancuronium bromide and the excruciatingly painful internal burning sensation and cardiac arrest caused by a potassium chloride overdose.

32.      The American Veterinary Medical Association (AVMA) states that when potassium chloride is used for euthanasia, it is extremely important that the personnel who

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**9**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

perform euthanasia are trained and knowledgeable in anesthetic techniques and competent in assessing the anesthetic depth appropriate for potassium chloride administration, a depth at which animals are in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli. California law requires non-veterinary personnel who perform animal euthanasia to undergo strict training by a veterinarian and/or a registered veterinary technician who specializes in anesthesia. California law does not permit non-veterinary personnel to perform euthanasia using potassium chloride or neuromuscular blockers; rather, such personnel are limited to using a lethal overdose of barbiturates such as pentobarbital. Regs./OP 770 does not include comparable protections or require comparable training, and thus a procedure under that protocol would be illegal if performed on animals.

33.     The AVMA also employs a longer-lasting and more stable barbiturate, sodium pentobarbital, for animal euthanasia. The CDCR's use of sodium thiopental under Regs./OP 770 knowingly exacerbates the substantial demonstrated present risk of error created by its deficient protocol because sodium thiopental is extremely volatile, short-acting, and sensitive to human error, and because CDCR makes no determination of a suitable level for any particular inmate, despite this being a required procedure for administration of a sedative to all humans and animals for any purpose.

34.     Pancuronium bromide, the second chemical administered in the lethal injection process, paralyzes muscles, including the diaphragm, but it does not affect consciousness or the perception of pain. A similar paralytic agent has been used by CDCR in the past to torture prisoners as part of its behavioral modification programs. Pancuronium bromide, administered by itself as a "lethal dose," would not result in a quick death; instead, it would

**10**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

cause someone to suffocate to death while still conscious in an agonizing and tortuous death.

35.    The use of pancuronium bromide as administered under Regs./OP 770 in combination with the initial dose of sodium thiopental, creates a present demonstrated risk of substantial pain because  Plaintiffs will become paralyzed while still aware of  pain and suffering death from suffocation induced by pancuronium bromide and the burning veins and heart failure caused by the administration of the potassium chloride.  Pancuronium bromide creates a present significant, present and  demonstrated risk that a prisoner will be paralyzed during the injection of an extremely painful drug, aware of this pain, yet be entirely unable to inform the attendants of his condition.  Without the use of pancuronium bromide, a prisoner would be able to indicate that he was still conscious or had regained consciousness or awareness prior to the administration of potassium chloride.  Properly trained and qualified personnel would be able to assess unconsciousness, which CDCR personnel at present cannot and do not do and thus are unable to determine whether an inmate is aware of or feeling pain at the time the pancuronium bromide or the potassium chloride is administered, or if the administration causes the prisoner to become able enough to sense the excruciating pain from pancuronium bromide and, then, potassium chloride.

36.    When pancuronium bromide is administered after an initial dose of thiopental, as is called for in the protocol for executions by lethal injection and as has been applied in past executions, it creates a substantial and unacceptable risk of serious harm.  As such, the combination of thiopental and pancuronium bromide creates the unconscionable possibility that a condemned inmate will be placed in a state of "chemical entombment" while he consciously experiences the agony of suffocation, the intense burning from potassium

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

chloride as the chemical courses through his veins, and the substantial pain of having a cardiac arrest.

37.     Because Regs./OP 770 calls for the potassium chloride to be administered in a lethal dose, the use of pancuronium bromide will serve no purpose in the execution process.  It is completely unnecessary in the lethal injection process and will only serve to mask any pain or suffering that the Plaintiffs may experience.  Rather, the chemical is used to prevent the executioners and witnesses from knowing whether the condemned inmate is inadequately anesthetized.  In cases where the thiopental is not successfully delivered to the inmate's circulation and/or the condemned inmate is not adequately anesthetized, pancuronium bromide will create the appearance of a serene death while masking the fact that the inmate is experiencing conscious paralysis, suffocation, and the agony of cardiac arrest from the administration of potassium chloride.  The use of pancuronium bromide is unnecessary to bring about the inmate's death.  Absent the use of pancuronium bromide, an inmate undergoing execution would be able to indicate that he was still conscious or had regained consciousness prior to the excruciatingly painful lethal dose of potassium chloride.

38.     Pancuronium bromide could not lawfully be used alone as the fatal agent because causing death by suffocation violates the Eighth Amendment's prohibition against cruel and unusual punishment.

39.     The third and final chemical Defendants intend to administer to Plaintiffs during the lethal injection process is potassium chloride, an extremely painful chemical which causes the inmate's death by disrupting the heart's contractions, ultimately leading to cardiac arrest.  It is indisputable and undisputed that an inadequately anesthetized inmate

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

injected with potassium chloride will experience torturous pain.  As potassium chloride travels through the bloodstream from the site of injection towards the heart, the chemical activates sensory nerve fibers inside the veins, causing a prolonged and intense burning sensation.  In the foreseeable event that the condemned inmate is not adequately anesthetized throughout the execution procedure, the potassium chloride will cause the inmate to consciously experience the agonizing pain of this excruciatingly painful chemical coursing through his veins and of cardiac arrest, while being incapable of expressing his suffering due to the paralytic effects of the pancuronium bromide.

40.     Death by potassium chloride poisoning is viewed as being so inhumane that the AVMA prohibits its use as the sole agent for animal euthanasia.  If potassium chloride is to be used at all, the AVMA requires the practitioner administering the potassium chloride to have the proper training and knowledge to ensure that the euthanized animal has reached a surgical plane of anesthesia.  The appropriate anesthetic depth for the use of a potassium chloride execution is "characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli."  Conversely, the Reg./OP 770 as written and applied lacks even the most basic protections or training regimen—safeguards that California requires for non-veterinary personnel who perform animal euthanasia.  Accordingly, the lethal injection procedures intended to be employed on Plaintiffs would be illegal if performed on household pets.

## THE DEVELOPMENT OF REGS./OP 770

41.     The version of Procedure No. 770, under which Defendants originally intended to execute Plaintiff Morales, and which is contained substantially verbatim in the Regulations, was adopted without any medical research or review to ensure that a prisoner would not

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

13

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

suffer a painful death.  No member of the medical community was involved in its adoption.

The procedure was adopted by the former Warden of San Quentin, Daniel Vasquez, after

observing two executions in Texas, without any further input from or consultation with

medical personnel.  The procedure was not subsequently subjected to any review by

medical professionals or other qualified persons to assess if it was an appropriate procedure

or if it was being administered in a manner that either caused or prevented unnecessary

infliction of pain and suffering.  In fact, evidence collected from executions conducted

under Procedure No. 770 demonstrated that the protocol as administered was not properly

sedating executed inmates, as a result of which they were aware of and suffering from pain.

Defendants knew this, yet undertook no appropriate review or revisions of their procedures.

This continued use of the same failed procedures without any adequate safeguards to

ensure those failings are not addressed and rectified both as written and in practice itself

creates a present substantial risk of severe and unnecessary pain and tortuous death.

42.     On February 14, 2006, the District Court for the Northern District of California

found that Plaintiff had raised "substantial questions" that the 2003 protocol "creates an

undue risk that Plaintiff will suffer excessive pain when he is executed."  *Morales v.*

*Hickman*, 415 F.Supp.2d 1037, 1047 (N.D.Cal. 2006) (Order Denying Conditionally

Plaintiff's Motion for Preliminary Injunction).  The District Court therefore suggested that

Defendants "conduct a thorough review of the lethal-injection protocol, including, *inter*

*alia*, the manner in which the drugs are injected, the means used to determine when the

person being executed has lost consciousness, and the quality of contemporaneous records

of executions, such as execution logs and electrocardiograms. . . . A proactive approach by

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

1    Defendants would go a long way towards maintaining judicial and public confidence in the

2    integrity and effectiveness of the protocol." *Id.* at 1046-47.

3    43.      In light of the substantial possibility that Plaintiff Morales would suffer

4    excruciating pain as he was executed, the District Court held that Defendants could proceed

5    to execute him only if they implemented one of two proposed modifications of the

6    execution procedure. *Id.* at 1046-48. Defendants could either certify that they would

7    execute Plaintiff Morales using only sodium thiopental or another barbiturate; or procure

8    the assistance of "qualified individual or individuals" to provide "independent verification"

9    that he was in fact unconscious prior to the administration of the pancuronium bromide and

10   potassium chloride. *Id.*

11

12   44.      Defendants determined in February, 2006 that satisfactorily "qualified

13   individuals" would in fact be medical doctors, and in particular board certified

14   anesthesiologists, to allow Defendants to "ensure that [Plaintiff] [was] unconscious at all

15   times following the administration of sodium thiopental." Nonetheless, Defendants did not

16   go forward with the scheduled 12:01 a.m. execution on February 21, 2006.

17

18   45.      Later that day, Defendants returned to the District Court and advised that they

19   then believed that the most suitable manner to execute Plaintiff was by administering only

20   a single lethal dose of sodium thiopental or other barbiturate, and they sought permission to

21   perform the execution at 7:30 p.m. on February 21, 2006 in this manner. The District

22   Court issued an order allowing the execution to proceed so long as "sodium thiopental

23   [was] injected in the execution chamber directly into the intravenous cannula by a person

24   or persons licensed by the State of California to inject medications intravenously." Order

25   on Defendants' Motion to Proceed with Execution, at 3 (Feb. 21, 2006). Defendants

**15**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

initially agreed but then declined to comply with the District Court's order, and the execution did not go forward.

46. Because Defendants did not comply with the District Court's Orders, by the terms of the February 14, 2006 Order, a stay of execution automatically was entered on February 21, 2006. *See* 415 F. Supp. 2d at 1049.

47. Following the events of February 21, 2006, Defendants modified the execution protocol, and these modifications were incorporated in a new version of Procedure No. 770, dated March 6, 2006. According to Defendants, the changes to the protocol were made after consultation with unidentified "court experts," and in part reflected deviations from the 2003 version of the protocol that had been sanctioned by Defendants but had not previously been formally adopted as revisions to the protocol, or recorded in the contemporaneous records of executions. Defendants, however, rejected their own expert's recommendation to use a single barbiturate as the sole lethal agent, relying on two blatantly invalid considerations: no other state uses a barbiturate as the sole lethal agent; and the use of pancuronium prevents the ability to determine whether an inmate is inadequately anesthetized. Instead, Defendants followed the direction of Defendant Schwarzenegger that CDCR merely "tweak" the previous versions of OP 770 and provide for less sedative.

48. The March 6, 2006 version of Procedure No. 770, as well as Defendants' stated intention to follow the new version, was substantially similar to the 2003 version in all material respects relating to the manner in which the chemicals are administered. The March 6, 2006 version employed the same three chemicals, injected in the same sequence, and using the same remote administration, but Defendants – after purported consultation with "experts" – determined to use a lower initial dose of sodium thiopental, a lower dose

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**16**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

of pancuronium bromide, and a higher dose of potassium chloride.  The only material difference between the 2003 version of the protocol and the March 6, 2006 version is that, in addition to an initial bolus dose of 1.5 grams of sodium thiopental, the March 6 version provided that a continuous drip of five grams of sodium thiopental would be started in a second IV line after the initial dose of sodium thiopental is administered.  Shortly after the drip is started, a saline flush was to be sent through the first IV line and the pancuronium and potassium were to be injected.

49.     The March 6, 2006 version of Procedure No. 770 utterly failed to address the "substantial questions" raised by Plaintiff, and recognized by the District Court, regarding the significant risk that Plaintiff will suffer excruciating pain during the execution.  Among other things, the March 6, 2006 version of Procedure No. 770, like the 2003 version, failed to provide any procedure for ensuring that the inmate is in an appropriate surgical plane of anesthesia prior to the administration of the pancuronium bromide and throughout an execution; failed to provide for any training to be given to the injection personnel; failed to require any level of experience or other qualifications for such personnel; failed to ensure that an adequate dose of anesthesia is able to reach the prisoner; and failed to provide procedures for obtaining IV access should the inmate have unusable peripheral veins.  Moreover, because the design of the execution chamber remained the same, and the March 6, 2006 version of the protocol made no material changes in the equipment used to administer the drugs, it did not alleviate the need to use multiple IV extensions and other conditions that have caused the drug administration problems that plagued the previous executions.

**17**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

50.     The decision to lower the dose of anesthetic was based on the belief of Defendants and their selected expert that the previously used five-gram dose of sodium thiopental rendered inmates "too unconscious" for the potassium chloride to cause death as quickly as it would otherwise.  Moreover, by their own admission, Defendants deliberately increased the risk of excessive suffering in order to ensure that executions are carried out as quickly as possible.

51.     Defendants' failure to address the substantial questions regarding the significant risk of excruciating pain created by the original version of Procedure No. 770, even after the experience of recent executions wherein inadequate sedation was present, and even after the District Court recognized the seriousness and substantial nature of the risk, amounted to conscious disregard of Plaintiffs' constitutional right to be free from cruel and unusual punishment.  Indeed, on March 6, 2006, after obtaining the advice of, inter alia, Robert Singler, M.D. and at the direction of Andrea Hoch, Legal Affairs Secretary of Governor Arnold Schwarzenegger, Defendants purposefully rendered the execution procedure more dangerous without any rational reason for doing so.

52.     Defendants' creation of the March 6, 2006 version of Procedure No. 770 in the space of a mere thirteen days, without consultation with any members of the medical community or other experts – besides the unnamed "court experts" and/or Robert Singler, M.D. – further evidenced Defendants' deliberate disregard of Plaintiff's Eighth Amendment rights.

53.     Defendants flagrantly ignored the District Court's suggestion that they conduct a "thorough" review of the execution procedures and instead advanced a marginally different version of Procedure No. 770 that simply perpetuated the deficiencies in the previous

**18**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

version and exacerbated the already-significant risk of inadequate anesthesia.  Thereafter, the District Court undertook a comprehensive review of the execution protocol, including the composition and training of the execution team, the equipment and apparatus used in executions, the pharmacology and pharmacokinetics of the drugs involved, and the available documentary and anecdotal evidence concerning executions in California, and concluded that Defendants' Procedure 770 as actually administered in practice violated the Eighth Amendment.  *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006).

54.     The District Court based its finding on the entire record; on the largely undisputed evidence presented at the hearing; on Defendants' stipulation that injection of the second and third drugs in the three-drug protocol (pancuronium bromide and potassium chloride) without adequate anesthesia will cause an unconstitutional level of pain; on the fact that data in Defendants' execution logs indicate that sodium thiopental did not have its expected effect or function as expected in at least 64% of lethal-injection executions; and in particular on the testimony of Defendants' own medical expert, Dr. Singler, that in at least one execution the inmate likely was awake when the second and third drugs were injected, and that the only reason that the anesthesiologist could not render a definitive opinion was the apparent unreliability of Defendants' records.  (The District Court thereafter amended this finding, holding that Procedure 770 as implemented in practice through and including the date of the evidentiary hearing in the 2006 Morales litigation created a "demonstrated risk of severe pain."  Order, Sept. 28, 2010.)

55.     On December 15, 2006, the District Court respectfully requested the state undertake a "meaningful" review of its processes, which "*must be undertaken* with an openness to the idea of making significant improvements in the 'infrastructure' of

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**19**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

executions." *Morales v. Tilton*, 465 F. Supp. 2d at 983 (emphasis added). In response to the District Court's clear directive in this regard, Defendant Governor Schwarzenegger announced via a press release on December 18, 2006, that he was "committed to doing whatever it takes . . . to ensure that the lethal injection process is constitutional . . . ." Response by the Governor's Office to the Court's Memorandum of Intended Decision Dated December 15, 2006, Docket 291, Ex. A. The Governor added that his "administration will take immediate action to resolve [the] court['s] concerns . . . ." *Id.*

56.     To this end, in late December 2006, Kingston "Bud" Prunty, Undersecretary of CDCR, was appointed to be the lead person to see that the Department addressed the Court's concerns. Prunty revised OP 770 which was published on May 15, 2007, and then facially was turned into the current execution protocol regulations. *Compare* Cal. Code Regs. tit. 15, § 3349, et seq. *with* OP 770, May 15, 2007, Docket No. 318.

57.     In order to address the State's execution implementation shortcomings, Bud Prunty created a "work group" to undertake the review of OP 770. Prunty expressed a belief that using a panel to interview and screen "work group" or committee candidates would be beneficial to insure consistency in screening, to make sure Defendants' expectations for selection were met, and to provide the input of more than one person. However, Prunty then disregarded his own principles, and instead, personally handpicked the work group charged with reviewing the protocol – to wit, a homogenous group of five CDCR employees. In doing so, Prunty never considered including any people who were not CDCR employees or retirees. As a result, the execution protocol review exercise mimicked the inadequate self-evaluations previously conducted by CDCR's execution team regarding its own *bona fides*. *See Morales v. Tilton*, 465 F. Supp. 2d at 979.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**20**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

58.      Prunty's protocol review cadre consisted of Darc Keller, Steve Cambra, Carl Larson, John McAuliffe, and Tony Newland.  Keller, the Assistant Secretary for Health Care Services, was fired by CDCR for fraud shortly after Prunty tapped him as "work group" material.  Keller's termination occurred after the receiver had raised issues that there were some contracts for medical services that were not properly let and other conflicts of interest.  CDCR Secretary James Tilton personally requested Keller to submit his resignation.

59.      Tilton and Warden Robert Ayers have verified under oath that John McAuliffe was selected to be on the protocol review team because of his "medical background," and therefore he "was responsible for reviewing the drug mixtures used by other states, and developing the drug mixture set forth in the revised version of O.P. 770.  By contrast, Prunty – who unilaterally selected McAuliffe to be on the protocol revision team, testified that McAuliffe has never done any medical research for OP 770 and that he doesn't think the revision team was qualified to do that.

60.      Prunty maintained he was largely unsupervised in revising OP 770: he reported to Tilton and Andrea Hoch, the Governor's Legal Affairs Advisor, but he didn't consult Tilton for permission to do anything and doesn't recall what he may have asked Hoch for permission to do.  In an effort to avoid reliability and transparency, Prunty made no record of his revision activities, thoughts, considerations, and/or recollections.  While he estimates that he attended over 50 meetings regarding the revision of OP 770, he never took a note on a single instance.

61.      Prunty's work group was uninformed and similarly unsupervised.  Team members were kept in the dark as to the chain of command, and/or who was on the team.  It was

**21**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

never explained to McAuliffe who Prunty reported to on this project, and McAuliffe

erroneously believed that Denise Dull, Max Lemon, and John McNitt were also on the

protocol review team.  Prunty does not recall giving specific assignments to anyone in the

work group.  Indeed, McAuliffe reported to multiple individuals and "just did it" on his

own since nobody told him to whom he should report.

62.     McAuliffe reported his findings to either Cambra, Larson, or Prunty, and stated

that others providing input in the revision process, including John McNitt, reported to "any

one of" the other seven members on the team.

63.     The initial action plan to revise OP 770 was scheduled with dates as best as they

could have estimated at that time, and listed the date of completion for June 30 or July 1,

2007.  Notwithstanding this best estimate of Prunty, ultimately a May 15 completion date

was set instead, eliminating 20 percent of the estimated time necessary to complete the

project.  Prunty claims he does not know who selected the May 15 date or why it was

selected.  Thereafter, Defendant Governor rebuffed Prunty's request for a little bit longer

time to do that.  As a result, when the deadline was set, Prunty and his work group simply

set about making sure he met it, irrespective of the time required to undertake a review and

revision of the protocol consistent with the District Court's directions.

64.     The arbitrary selection of a completion date resulted in a substandard review of

OP 770, performed without order or context, and rendered much of it meaningless.  CDCR

Undersecretary and OP 770 revision leader Prunty thought it was important in his

preparation of OP 770 to witness an execution.  However, Prunty did not attend his first

execution until August 2007 – months after the protocol was reviewed, analyzed, redrafted,

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

and published.  Similarly, McAuliffe also had never witnessed the performance of an

execution before OP 770 was finalized on May 15.

65.     The combined execution experience of Prunty and McAuliffe when revising OP

770 was nil.  To this day, neither Prunty nor McAuliffe has ever observed the

administration of the lethal chemicals by the execution team members.  When they

observed the August 2007 execution in Oklahoma, Prunty and McAuliffe were in the

witness area, with no ability to see the execution team in a room behind the gurney on

which the condemned was confined.  They were limited to observing only the inmate

tethered to a gurney, and their observations were made through a window from an adjacent

room.  This is the same observation vantage point that witnesses were afforded in

California – which allowed California to conceal its Constitutional infirmities for many

years. *See Morales v. Tilton*, 465 F. Supp. 2d at 978-80.  Even Prunty's Oklahoma

execution window peeping was substandard – he didn't get to see all the events of that

execution from his limited vantage point because his attention was directed intermittently

to the condemned's brother, who was on the floor nearby after becoming ill from watching

the spectacle.

66.     Former San Quentin Warden Vasquez believes that "[m]aking a execution seem

humane and dignified is up to the people that carry it out.  You can't legislate it or write it

down."  Stipulated Fact ("SF") 263.  McAuliffe agrees in that he would have to be there to

see the entire procedure to judge whether an execution was humane.  In this regard, the

utility of California's Regs./OP 770 is no better than the written protocols employed by

California in the past, and Prunty's expedited protocol drafting exercise was largely

meaningless.

**23**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

67.     Neither Prunty nor McAuliffe made any contemporaneous notes while present at the execution facilities in Virginia, Oklahoma, Indiana, and the federal Board of Prisons in Indiana.  In fact, Prunty never recorded any of his recollections regarding these visits. There was "[n]othing in particular" that made an impression on Prunty during his visits to either Virginia or Oklahoma.  Prunty neither inquired nor learned whether Indiana, Virginia, or Oklahoma ever sought medical expert opinions in designing their lethal injection protocol; he has no knowledge whether Oklahoma, Indiana, or Virginia have ever had an unsuccessful execution procedure; and he never learned of any emergency procedures to be employed in any of these states in the event of a mishap during an execution.  Prunty is aware of an emergency procedure to be utilized in Oklahoma in the event a stay is issued; however, he did not include this or any similar procedure in Regs./OP 770.

68.     Prunty does not know what type of execution training takes place in Oklahoma. He has no information regarding the difficulties encountered in Oklahoma during its executions, the reasons for the difficulties, or its attempted solutions to the problems – he simply does not "recall the specifics . . ."  While Prunty is aware that Oklahoma's executioners believe that the most difficult part of the execution process is always ensuring that there is proper IV access, Prunty is not sure whether he attended that discussion.

69.     After Prunty and McAuliffe visited execution facilities in Virginia, Oklahoma, Indiana, and at the federal Board of Prisons in Indiana, California did not adopt any particular practice from any of those four places into Regs./OP 770.

70.     Prunty appointed George Sifuentes, the Director of the Office of Facilities Management, to evaluate the existing chamber, and to evaluate possibilities of modifying

**24**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

another building to meet that need.  Sifuentes did not visit execution sites in other states, nor attend the work group's site check of the San Quentin facilities.

71.     Sifuentes was involved in overseeing the costs of the new execution chamber. Prunty supervised Sifuentes.  Sifuentes fraudulently advised that a new chamber "could be done as a minor capital outlay project for under $400,000."  This was done to avoid legislative oversight and to allow CDCR to "do it quietly" – "low profile."  After the Prunty-Sifuentes bid team was replaced by legislative oversight, $800,000 was found to be a more "reliable and transparent" (*Morales*, 465 F. Supp. 2d at 981) cost for the new chamber.  Sifuentes ultimately was disciplined by CDCR for "a pattern"of fraudulent government building cost estimates; i.e., it was "the way he had done business for a while." Prunty, however, took no disciplinary action against Sifuentes or anyone else in the Office of Facilities Management.

72.     Prunty's work group was told early on in the process to maintain all documentation for discovery.  The entire work group reported to Prunty.  Correctional Captain John McNitt, a duly sworn peace officer who was sworn to uphold the law, was a representative from the Office of Facilities Management who worked with Prunty's work group.  McNitt reported to Cambra, Larson, and McAuliffe that he intended to destroy documents gathered in the course of reviewing OP 770.  Neither Cambra, Larson, nor McAuliffe reported this to Prunty, and Prunty never took corrective or disciplinary action against McAuliffe, Cambra, Larson, or McNitt.

73.     While McAuliffe was the point man for the Defendants to undertake its review of the drug mixtures used by other states, and to develop the drug mixture set forth in the revised version of Regs./OP 770, he is wholly unqualified to perform this function.  The

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**25**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

first time he ever studied or researched thiopental was not until December 2006.

McAuliffe blithely explains his lack of knowledge about the effects of protocol drugs,

saying, "I just started this in December."  McAuliffe testified that "1.5 grams [of

thiopental] is the optimal dosage for lethal injection based on your expert witnesses, so I

took their advice."  McAuliffe *actually* prescribed three grams total of sodium thiopental

for the protocol, "1.5 grams in each syringe, two syringes."  McAuliffe said that he picked

three grams because he "was looking for a mean" of the other states' data, a method he

chose because of "basic scientific study."

74.     McAuliffe had completed his home schooling in execution pharmacology in 90

days or less when he issued "a recommendation" to Cambra, Larson, and Prunty in around

March of 2007 that "a single drug be used [for the execution protocol] and it be thiopental."

Prunty does not remember McAuliffe recommending a one-drug protocol to him.  Prunty

testified that, McAuliffe has "never done any [medical] research" for OP 770 and that he

doesn't think the revision team was "qualified to do that."

75.     McAuliffe says he was informed by Prunty that they would be using a "three-drug

protocol in the execution protocol" on May 14th, just one day before OP 770 was

published.  By contrast, Prunty claims this decision was made by Defendant Governor

Schwarzenegger, despite the fact that Prunty had only "talked to Governor Schwarzenegger

about OP 770" twice.  Prunty claims he was informed of this decision "sometime in late

April, early May."  Neither story is true, but instead is consistent with past CDCR double

talk.  On January 31, 2007, Denise Dull made contemporaneously prepared notes wherein

she reported that the Governor, as early as a few weeks after the Court's December 15

order (and well before McAuliffe perhaps started, and certainly completed, his self-taught

**26**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

90-day crash course in pharmacology), had instructed Prunty that the "1 drug protocol is now off the table, stick with 3 drugs."

76.    In this regard, California *never* undertook a "meaningful" review of the drugs used or delivered "with an openness to the idea of making significant improvements in the 'infrastructure' of executions." *Morales v. Tilton*, 465 F. Supp. 2d at 983.

77.    In creating a selection process for the execution team, the goal was to correct the deficiencies of the previous process which was not formalized and "all verbal or word of mouth." Nothing, however, has changed. CDCR has "notified some of the employees" about the opportunity to apply for membership on the execution team, but even Prunty is "not sure exactly how the notice was made to them."

78.    Carl Larson was the team member responsible for drafting the protocol that addresses "selection, recruitment, and retention" of the execution team. Regs./OP 770 states that the lethal injection team members can come from San Quentin or from other departmental locations. However, Larson testified that "as long as the warden at San Quentin could get a team that meets that criteria, they're going to use San Quentin people," even if there were people "who were better and brighter and cleaner outside of San Quentin." In this regard, Defendant CDCR has every intention of drawing from the same San Quentin "old boy" network as before, regardless of the quality of the candidate pool.

79.    While Regs./OP 770 states that team members can have no prior stress claims (Cal. Code Regs. tit. 15, § 3349.1.2(e)(3)), it does not require any psychological tests or evaluations of the team members. It does not require screening for any psychiatric diagnosis or review of files that may disclose such a disability.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

80.      Prunty acknowledges that employees who have been assigned to any condemned housing unit should be prohibited from being a part of the lethal injection team, in order to provide as much insulation between the employee and the condemned inmate as possible since they may have some feelings about the condemned and it may -- it may impact their ability to do the job that they're selected to do.  Under the Regs./OP 770, employees who have served in the condemned housing unit still are permitted to be on lethal injection teams.  *See* Cal. Code Regs. tit 15, § 3349.1.2(e)(8).

81.      The execution team selection panel was tasked by Regs./OP 770 with "[r]eview of all the available candidate's performance evaluations," "[r]eview of the candidate's Personnel, Supervisory, and Training files," and "[r]eview of the candidates [sic] current CI&I Report from the California Department of Justice."  OP 770 at 8; Cal. Code Regs. tit 15, § 3349.1.2(b).  Although Prunty believes that a panel is important to "make sure we meet our expectations for selection," he and the rest of the selection panel disregarded these principles and the screening process of the protocol.  While Prunty claims to have reviewed performance evaluations and CI&I reports, he testified that he failed to review supervisory files, training files, and personnel files.

82.      CDCR's failure to follow the revised procedures in the protocol's execution team member selection process was best explained by the testimony of McAuliffe, who stated that the team members would be chosen by "Warden Ayers."

83.      CDCR's execution "team members almost uniformly have no knowledge of the nature or properties of the drugs that are used or the risks or potential problems associated with the procedure." *Morales v. Tilton*, 465 F. Supp. 2d at 979.  Now CDCR has enlisted a person to train execution team members on these subjects who has no knowledge,

**28**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

experience, education, or training on these topics. McAuliffe blithely testified that he is "not a pharmacist" when asked about the "pharmacological effects of thiopental." He similarly does not "know the interaction between the use of a benzodiazepine and thiopental" – two drugs that he has authorized for administration to the inmate during an execution. OP 770 at 43, 44, 92; Cal. Code Regs. tit. 15, §§ 3349.1.1, 3349.4.3, 3349.4.4(a)(2)(B) & 3349.4.5.

84.     McAuliffe's testimony in this regard is in stark contrast to the sworn contentions of Defendants who claimed that McAuliffe "was responsible for . . . developing the drug mixture set forth in the revised version of O.P. 770" due to "his medical background."

85.     The instruction given in Regs./OP 770 to prepare the sodium thiopental is simply to "[f]ollow the manufacturer's directions as stated on the kit to prepare the chemical properly." OP 770, Ex. A, at 43; Cal. Code Regs. tit. 15, § 3349.1.3(c)(3) ("The Infusion Sub-Team shall . . . Mix the Lethal Injection Chemicals in accordance with the manufacturer's instructions . . ."). This is, of course, is what they said they used to do, but the evidence shows they were unable to do. *See Morales v. Tilton*, 465 F. Supp. 2d 972, 979 & n.7 (N.D. Cal. 2006) ("One member of the execution team, a registered nurse who was responsible for mixing and preparing the sodium thiopental at many executions, testified that '[w]e don't have training, really.'") Directing unqualified and untrained execution team members to simply follow manufacturer's instructions – without more – resulted in the substantial risks from the execution team practices and failures of the past. The package states, "Use reconstituted solution only if it is clear, free from precipitate and is not discolored." SF 34a at 14. Witness #4, who was in Defendants last published version of the infusion team designated with mixing thiopental, claimed that he prepared

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**29**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

the drugs "by following the instructions" (SF 34b at 14), yet obtained a mixed Thiopental

solution that was a "yellowish, brownish tan color." SF 34 at 14. At a minimum,

professional knowledge and training is required in order to understand and follow the

manufacturer's directions, and to train others as to how to do so. Even then, professionals

can have differences of opinion and make errors which must be sorted out and corrected.

For example, the State's expert pharmacist and anesthesiologist testified that correctly

prepared thiopental should be "basically clear" (Doc. 259, Transcript of Proceedings, Sept.

28, 2006, Vol. 4, RT 889), and that it should be "a very pale green" (Doc. 260, Transcript

of Proceedings, Sept. 29, 2006, Vol. 5, RT 1121), respectively. The training provides no

such illumination, and are clearly lacking in this regard.

86.     The training of lethal injection team members will be conducted by people who

are untrained themselves and therefore unqualified to instruct others. All training sessions

are to be conducted by the team leader, in conjunction with the associate warden in the case

of the intravenous team, and with the warden or administrative staff for the general lethal

injection team training. However, there are no specific requirements that the team leader

has ever participated in an execution or has mastered any specific task such as how to insert

catheter, or prepare or infuse the chemicals. *See* OP 770 at 8; Cal. Code Regs. tit 15, §

3349.1.2(f)(1).

87.     Remarkably, there are no specific training or lesson plans for the team leader. As

in the past (*see* SF 129 at 39-40), the team leader position does not require prior team

membership, execution training or experience (*see* OP 770 at 8; Cal. Code Regs. tit 15, §

3349.1.2(a)). With untrained instructors and vague and ambiguous lesson plans, the

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

training of the lethal injection team will result in team members who are similarly as unqualified as those of the past.

88.     CDCR's entire post-December 15, 2006 "'review of the lethal-injection protocol . . .'" (*Morales v. Tilton*, 465 F. Supp. 2d 972, 983 (N.D. Cal. 2006) (quoting *Morales v. Hickman*, 415 F. Supp. 2d 1037, 1046 (N.D. Cal. 2006))) was a ruse, conducted grudgingly and in the shadows of fraud, incompetence, and deceit. The decisions made throughout the process of writing of the Regs./OP 770 were made by an unqualified team who failed to communicate with each other or the Defendant Governor and failed to do the necessary research.

89.     While on February 16, 2006, Defendants unilaterally determined that the most "qualified individuals" to "ensure that [Plaintiff] [was] unconscious at all times following the administration of sodium thiopental" would in fact be medical doctors, and in particular board certified anesthesiologists, and in the space of two days did obtain two such medical professionals to attend an execution, Defendants now have reversed field and eliminated physician participation from executions. Defendants' Regs./OP 770 do not provide for qualified medical doctors to perform the complex task of assessing unconsciousness, or to perform or monitor any other tasks associated with planning for or conducting executions. The Regs./OP 770 sets forth a demonstrated present unconstitutional risk by requiring that the consciousness assessment be conducted not by someone with relevant medical experience, but rather by a person certified to insert intravenous catheters into peripheral veins and to place electrocardiogram leads. Cal. Code Regs. tit. 15, 3349.1.2(f)(4). An assessment conducted under these conditions does not constitute effective monitoring of anesthetic depth, and presently is insufficient to ascertain whether the inmate is placed into,

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

and remains in, a surgical plane of anesthesia.  Regs./OP 770 mandate no rank requirement, no relevant experience requirement, no germane consciousness assessment training, and/or no other safeguards which will modify its 64% rate of performing executions with a present demonstrated risk of severe pain.

90.     Defendants' Regs./OP 770 have no provisions for a doctor to perform a central line catheterization if necessary, despite Defendants' knowledge that some inmates will require a central line to avoid unsuccessful drug administration, and that central line placement requires extensive medical training.

91.     On February 21, 2006, Defendants unilaterally determined that, because Procedure 770 prevented them from ensuring that inmates will be unconscious at all times following the administration of sodium thiopental, a preferred method of execution would be to use only sodium thiopental during Plaintiff's execution.  *Morales v. Tilton*, 465 F. Supp. 2d at 976.   During Plaintiff Brown's pending execution, Defendants represented that they were able to and could effectively execute him with a single-drug option, and were prepared to do so.

92.     Subsequent to February 21, 2006, Dr. Mark Dershwitz, one of the medical experts retained by Defendants to defend their protocol in this action and in previous lethal-injection challenges, has advised several states, including those with which Defendants have exchanged execution-related information, and, on information and belief, Defendants as well, that using a single barbiturate as the sole lethal agent would be an easier, less complex, and less dangerous means of accomplishing executions.  Despite their knowledge of this advice, and despite Defendants' endorsement on February 21, 2006, of the single-drug protocol,  Defendants failed to give serious consideration to the use of a single-drug

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

---

**32**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

protocol, even though they still have no reliable method to ensure that Plaintiff will be unconscious at all times following the administration of sodium thiopental.  Instead, Defendants' Regs./OP 770 intends to continue to make use of the same complicated three drug protocol involving the use of two drugs which indisputably cause excruciatingly pain when improper sedation occurs.

93.     Before reviewing, evaluating, and/or revising its March 6, 2006 execution Procedure, Defendants decided in January 2007 to build a new execution facility.  The design and construction of the new facility was derived from the March 6, 2006 execution Procedure, in that the subsequently announced May 15, 2007 version of OP 770 had not yet been created, reviewed, evaluated, and/or revised.  While certain CDCR executives were tasked with examining other states' execution chambers for enlightenment to purportedly improve CDCR's execution facility and/or its use thereof, they did so only after Defendants designed and began construction of CDCR's new execution facility.  CDCRs' review of other execution facilities was a ruse, simply undertaken to provide the District Court with the appearance that Defendants conducted the "thorough review" of the matter that was respectfully suggested by the Court.

94.     Defendants' new execution facility was designed and built without any assessment or evaluation of: the design of other facilities; problems encountered during executions in California and in other states; and/or the particulars of the protocol or execution procedures to be employed, including the public's input via the Administrative Procedures Act proceedings.

95.     Defendants fraudulently claimed that the execution chamber could be designed and constructed from discretionary budgeting, that a new execution chamber had been

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

ordered to be built by the District Court, and that the District Court ordered that construction be completed by May 15, 2007. Defendants' tactics were an effort to avoid transparency and mandatory state legislative oversight and to obtain a permanent lethal injection facility so as to justify a multi-million dollar expansion of death row at San Quentin. The then CDCR Secretary later claimed he was not advised of this decision to build a new chamber, or of the commencement of the construction of this facility.

96.     On April 13, 2007, when Defendants' fraudulent budgeting activities came to light, Defendants backdated a budgeting request to January, 2007, and submitted the same for legislative consideration. On or about April 21, 2007, Defendant Schwarzenegger ordered that the construction be stopped.

97.     The Regs./OP 770 are substantially similar to the 2003 version in all material respects regarding the manner in which the chemicals are administered. The Regs./OP 770 employs the same three chemicals, injected in the same sequence, but Defendants determined to use a greater initial dose of sodium thiopental than the March 6, 2006 Procedure, but a smaller dose than was used in the 2003 version, a greater dose of pancuronium bromide, and a lower dose of potassium chloride.

98.     Regs./OP 770 utterly fails to even examine the many "substantial questions" raised by Plaintiff Morales, and recognized by the District Court, regarding the significant risk that Plaintiffs will suffer excruciating pain during the execution. Among other things, Regs./OP 770, like its predecessor March 6, 2006 and 2003 versions, fails to provide any adequate procedure and personnel for ensuring that the inmate is in an appropriate surgical plane of anesthesia prior to the administration of the pancuronium bromide and remains in a surgical plane of anesthesia for the duration of the execution; fails to provide for any

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

meaningful training to be given to the personnel involved; fails to require any level of relevant experience or other relevant qualifications for such personnel; fails to provide for any mechanism to ensure that an adequate dose of anesthesia is able to reach the prisoner; fails to provide guidelines for detecting and remedying the foreseeable problems that could occur and that have recently caused botched executions in several other states, or to ensure that personnel are sufficiently trained and qualified to exercise their judgment in such situations; fails to ensure an appropriate delivery mechanism for any of the three chemicals, and fails to provide procedures for obtaining IV access should the inmate have unusable peripheral veins.

99.    Indeed, the Regs./OP 770 is even more ill-conceived and deficient than the older versions.  The additional deficiencies include, but are not limited to, the fact that Defendants determined that much less sodium thiopental should be administered to the inmate than that which was supposed to have been administered to inmates in all past executions, even assuming proper administration by the execution team resulting in the full dose of thiopental reaching the prisoner.  This significantly decreased dose of sodium thiopental drastically lowers the margin for error in administering the anesthesia and increases the probability that the inmate will not be placed in an appropriate surgical plane of anesthesia.

100.    Defendants – in conjunction with the advice of their selected experts – deliberately chose to lower the dose of anesthetic in the belief that the previously used five-gram dose of sodium thiopental rendered inmates "too unconscious" for the potassium chloride to cause death as quickly as it would otherwise.  Defendants were aware that such a theory was ill-conceived, medically unsound and unsupported by the records in previous

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

executions.  Moreover, by their own admission, Defendants deliberately increased the risk of excessive suffering in order to ensure that executions are carried out as quickly as possible.

101.    Defendants' failure to address the substantial questions regarding the significant risk of excruciating pain created by the original version of Procedure No. 770, even after Defendants' execution logs indicate that sodium thiopental did not have its expected effect or function as expected in 64% of lethal-injection executions pursuant to the protocol , and even after the District Court recognized the seriousness and substantial nature of the risk, amounts to a present substantial risk of a violation of Plaintiffs' constitutional right to be free from cruel and unusual punishment.  Defendants have flagrantly disregarded their prior representations to the District Court that they intended to conduct a careful review, revision, and implementation of their execution procedures.  As a result, Defendants substituted a different version of Procedure No. 770 – Regs./OP 770 – that simply perpetuated the deficiencies in the previous version and exacerbates the already present and substantial risk of inadequate anesthesia.

102.    Defendants have taken no actions to improve any aspect of their lethal injection protocol other than their minimal efforts to address the five examples of deficiencies that were articulated by the District Court in its December 15, 2006 order.  However, Defendants have given far too narrow a reading to the District Court's order, and far too favorable an assessment of the adequacy of their entire execution protocol and performance.  The Order makes plain that far broader and meaningful remedial efforts by Defendants were necessary before their proposed execution protocol could pass constitutional muster.

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

103.    The District Court stated that "[t]he evidence shows that the protocol and Defendants' implementation of it suffer *from a number of critical deficiencies, including . . . ." Morales v. Tilton*, 465 F. Supp. 2d at 979 (emphasis added).  The District Court did not state that there were only *five* deficiencies, or suggest in any way that the examples given were an exhaustive list of Defendants' failures.  Defendants' failure to read this guidance correctly, or at all, before commencing their review of their protocol gravely undermines their claims that a "thoughtful" or "meaningful" review of its processes was "*undertaken with an openness to the idea of making significant improvements in the 'infrastructure' of executions*" (*Morales*, 465 F. Supp. 2d at 983(emphasis added)), or that they were in fact "committed to doing whatever it takes . . . to ensure that the lethal injection process is constitutional . . . ."  Response by the Governor's Office to the Court's Memorandum of Intended Decision Dated December 15, 2006, Docket 291, Ex. A.

104.    Indeed, the record since the District Court gave clear notice that "Defendants' implementation of California's lethal-injection protocol lacks both reliability and transparency" (*Morales*, 465 F. Supp. 2d at 981) is that Defendants have not even read the order.  *See, e.g.*, Order, Sept. 28, 2010 at 4 n.3 ("The person then serving as the warden at San Quentin, who later admitted that he had not read the Court's memorandum in *Morales v. Tilton*, apparently believed that such an order had been made. *Findings of S. Public Safety Comm. Informational Hr'g on San Quentin Death Chamber*, 2007–08 Sess. (Cal. 2007).")

## DEFICIENCIES IN THE PROCEDURES CREATE A CONTINUED SUBSTANTIAL RISK OF CONSCIOUS AND AGONIZING SUFFERING

105.    Central features of the Defendants' lethal injection procedures create a substantial risk of serious harm in violation of the Eighth Amendment.  Defendants

**37**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

have not improved upon or effectuated any meaningful changes identified as necessary by the District Court.  In fact, they have made their procedures worse in many ways.  In addition, there is an unconstitutional and present substantial risk that the protocol will not be administered as written.  Such deviations create a present substantial risk of severe pain due to, for example, improper placement of the IV and/or inadequately administered anesthesia, inadequate mixing of the drugs, insufficient administration of the chemicals, and insufficient monitoring of the inmate.  This failure to include adequate safeguards, failure to address the known deficiencies in the procedures and the failure to remedy the procedures that has produced unconstitutional executions creates a substantial and present risk of severe pain and suffering.  The deficiencies include but are not limited to:

a.      The failure to employ trained medical professionals with a sufficient degree of relevant experience to ensure that intravenous lines are properly placed; that inadequate lines can be identified promptly; that Plaintiffs are adequately anesthetized initially and throughout the procedure; and, to monitor vital signs.

b.      The continued use of remote administration, which increases the risk of failed delivery, already having occurred in past executions, and despite the advice of their own expert that during routine administration of anesthesia, the anesthesiologist stands at the bedside while administering anesthesia and remains attending throughout the procedure.  This includes the use of intravenous lines in a manner for which they are not designed or used in any clinical practice.

**38**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

c.      The absence of specified medical equipment, employed in other states, to monitor vital signs that would ensure unconsciousness and the absence of qualified personnel, who could use, operate and make findings from this equipment.  Previously, Defendants were willing to and able to provide trained anesthesiologists with a variety of monitoring equipment available to them that is not specific or required in the procedures.

d.      The absence of a procedure to revive an inmate should one or more chemicals be administered before a last-minute stay.

e.      The failure to consider or effectuate a change in the chemicals used when the state of the science is that the chemicals designated in the procedures are out-dated, irregularly utilized and that safer, well-tested and studied, and more effective chemicals exist to induce and maintain anesthesia, and to rapidly stop the heart.

f.      The failure to consider any one-drug alternative other than to immediately reject the notion of using one drug.

g.      The failure to articulate, prepare for, or train under any contingency plan should both intravenous lines fail.

h.      The failure to articulate sufficiently what venous access will be used.  Although the Regs./OP 770 refers to the ability to access peripheral veins, the actual access is not so clearly limited.  Rather, it is to an "appropriate vein", which may include such veins.  Thus, it is not clear whether additional venous access is contemplated, such as a percutaneous central line placement which

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

requires highly trained and experienced medical personnel, or the barbaric cutdown procedure done by unqualified and untrained personnel.

i.      The failure to provide any requirement for intravenous team members to have any  requisite length of experience in inserting intravenous catheters, or to have any actual experience inserting intravenous catheters for inmates or any other population, one of the "most significant" safeguards identified by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).  Regs./OP 770  only requires experience in "setting up intravenous lines", which is distinguished from actually inserting catheters.  The Supreme Court noted that Kentucky had personnel whose daily assignment was inserting intravenous lines in inmates.

j.      The failure to specify the categories of personnel certification deemed qualified to insert intravenous catheters during an execution, another "significant" safeguard identified by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).

k.      The failure to require the use of medical personnel who are qualified to insert intravenous catheters under current CDCR rules and regulations, and state law, and the failure to ensure the use of methods of insertion of intravenous catheters required by CDCR rules and regulation, and state law.  The procedures permit Defendants to use persons who are not permitted to engage in the insertion of intravenous lines at CDCR without additional safeguards not present here.  The prohibited persons include Licensed Vocational Nurses and some categories of Registered Nurses.

**40**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

l.      The failure to require the approval of and the assignment by the court-appointed receiver, who has sole authority to determine medical personnel assignments, mandated as a remedial measure for decades of medical malpractice in California prisons.

m.      The failure to ensure that CDCR medical personnel are not on the team in any fashion is itself a violation of the Eighth Amendment as CDCR medical care delivery has been found to be in violation of the Eighth Amendment because of unnecessary deaths, maimings, and severe medical mistreatment of inmates.

n.      The failure to include any persons with sufficient experience, expertise, or medical competency on the selection panel so as to evaluate the qualifications of medical personnel assigned to the team.

o.      The failure to provide for any persons with qualifications, training and experience necessary to identify and remedy training errors to oversee the training of team members.

p.      The exclusion of medical personnel from the regular training of team members.  Another "significant" safeguard identified by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), was the 10 session a year requirement for medical personnel in Kentucky.  There is no such requirement in Defendants' procedures.

q.      The removal of a recordation requirement that documents who is attending training sessions, which was present for the previous alleged

**41**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

training, and which established a high rate of absenteeism from training sessions, particularly by the medical personnel.

r. The failure to provide evaluation of team member performance during training. The procedure fails to specify the type of training that the selected personnel must undergo and the proficiency level that the personnel must reach though that training.

s. The failure to provide oversight of training and selection of team members and the failure to provide for anyone with adequate medical training or expertise, or qualifications, to perform, oversee or review the training.

t. The failure to provide training that includes the setting of intravenous lines on volunteers or otherwise practice setting intravenous lines on a live subject, another "significant" safeguard identified by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).

u. The removal of the Warden, over his objection, from the infusion location where he or she can observe, monitor and direct the lethal injection process, confer with the medical personnel who are monitoring the infusion, and take appropriate action, including ordering use of a backup or halting the execution because of infusion errors, as is required.

v. The removal of a provision requiring the inspection of the expiration dates on the drugs to ensure that outdated drugs are not used. This has resulted in the attempt to set execution dates, including that of Plaintiff Morales, that would have required the use of expired drugs.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**42**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

w.     The failure to provide that the drugs obtained comply with the requirements of the Food and Drug Administration prohibitions on illegal and unapproved substitutes manufactured in foreign locations.

x.     The failure to provide that the drugs obtained comply with use restrictions contained in federal and state laws.

y.     The Regs./OP 770 permit the same unqualified and incompetent persons to continue mixing thiopental.  The execution protocol fails to set forth sufficient details regarding the credentials, certification, licensure, experience, or proficiency of the personnel entrusted to prepare the drugs despite their own expert's advice that "[h]opefully, a pharmacist oversees them to make sure it was done properly."  Preparation of drugs, particularly for intravenous use, is a technical undertaking which requires training in pharmaceutical methods and calculations and which previously supposedly "qualified" persons were unable to effectuate.  The protocol's failure to require that the execution personnel possess such certification, licensure, or experience, as well as its failure to require and effectuate such training, greatly exacerbates the substantial risk that drugs will be improperly administered and condemned inmates will consciously experience excruciating pain during the lethal injection process.

z.     The failure to ensure that the infusion process does not occur in the dark, as it did previously.

aa.     The failure to follow their own procedures on selection of team members, and for complete transparency in the process.

**43**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

bb.     The failure to follow their own procedures on training of team members, and for complete transparency in the process.  This includes the failure to actually train on procedures such as mixing the drugs and putting the correct quantities and concentrations in the syringes.

cc.     The failure to ensure proper infusion of the chemicals.

dd.     The failure to ensure the adequate selection and training regarding infusion, and ignoring their own expert advice that while "[s]omeone non-medically could do it [inject the drugs]," it "would . . . certainly be ideal to at least have a nurse do that," because "[t]hey are trained.  It's common.  They are used to what it feels like to push an IV through a small tube.  They are familiar with it."

ee.     Use of a chamber that was designed and built prior to the adoption of any revised procedures and that contains continued remote administration and inadequate sight lines from the infusion room to the execution chamber itself.

ff.     Elimination of the trained medical observations and documentations of inmates, including respirations, that have existed in all other California protocols.  These records were eliminated solely for the purpose of disguising any present substantial risks and/or continued errors.

gg.     The reduction in performance evaluations reviewed in order to qualify as a team member to only the most recent evaluation.  A CDCR employee with an extensive history of poor performance evaluations could nevertheless be selected for the lethal injection team if he or she garners just one satisfactory

**44**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

evaluation.  Similarly, a brand new employee who had received just one

performance evaluation could be selected for the lethal injection team, provided that

the evaluation met expectations.

        hh.    The lack of any experience and stated qualifications in

monitoring intravenous lines for intravenous team members.

        ii.    The failure to provide that the personnel charged with

performing the consciousness check are qualified and trained to do so.  The

procedure makes no provision for qualified personnel to monitor the anesthetic

depth of the condemned inmate during the execution.  Typically, anesthetic care is

performed by individuals who have received advanced training in the medical

subspecialty of anesthesiology, such as physicians who have already completed their

residency in the specialty of anesthesiology or nurses who have trained to become

Certified Registered Nurse Anesthetists.  Yet there is no provision that such persons,

or persons even remotely similarly qualified, will be either selected or trained to

monitor anesthetic depth, undermining any effort to reasonably ensure that the

Plaintiffs are fully anesthetized prior to the administration of the pancuronium

bromide and potassium chloride.

        jj.    There are no appropriate procedures for assessing whether, or

ensuring that, the prisoner is properly and adequately anesthetized prior to the

administration of the pancuronium bromide and potassium chloride, as would be

required in any medical or veterinary procedure after administration of a sedative

and before the administration of a neuromuscular blocking agent or a painful

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**45**

potassium chloride overdose.  There is no requirement that the personnel ensure

unconsciousness throughout the procedure until the inmate is dead.  This is in

violation of previous court orders.

kk.     The failure to include a proper and effective mechanism for

chain of custody over the chemicals, and for complete transparency in the process.

No procedures exist for recording the lot numbers of the drugs not used in

executions, rendering them susceptible to diversion by team members.

ll.     The failure to establish procedures for ensuring that the IV

lines are flowing throughout the execution.  The only procedure identified is a saline

drip, which is turned off prior to the beginning of the administration of the

chemicals.  In the past executions, that mechanism has not been sufficient and has

not been adequately monitored by qualified and trained personnel.

mm.    The procedure also does not adequately ensure appropriate

monitoring of either the lethal injection apparatuses or the condemned inmate by

qualified and properly trained personnel.  It does not make appropriate provision for

what the team member inside the chamber will be monitoring.  Because of the lack

of sufficient qualifications, inadequate training and insufficient direction, the

procedure to be employed is exactly like that previously employed, with the same

unqualified persons permitted to undertake this effort who demonstrated a complete

inability to properly discern or describe any difficulties that may arise with regards

to the delivery of the chemicals.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**46**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

## FAILURE TO CONSIDER AND ADOPT VIABLE ALTERNATIVES

106.     Defendants have repeatedly and deliberately ignored much more viable, safe and effective alternatives to the three-drug lethal injection procedure that have been "tried and tested."  The demonstrated risk of severe pain created by Defendants' process is substantial when compared to the known and available alternatives.  Veternarians have eliminated the use of pancuronium and potassium chloride in euthanasia of animals, and have substituted painless chemicals.  Other and more stable barbiturates and drug combinations that do not utilize either a paralytic or a pain-inducing chemical to stop heart activity are available and are regularly used to euthanize animals by veterinarians and their trained assistants.  Many states have adopted procedures that in fact employ physicians and/or highly qualified personnel in critical steps in the process such as securing intravenous access, mixing and administering the drugs, and monitoring the inmate.  The Regs./OP 770 fail to mandate these current best practices, despite the fact that Defendants previously were able to secure physician services on very short notice whom they could not use solely because of their own misconduct.  Moreover, Ohio and Washington employ a method that uses solely thiopental, thereby avoiding the dangerous and tortuous paralytic pancuronium, and excruciatingly painful potassium chloride.  Defendants themselves have twice represented they are able to and can effectively execute using physicians and/or a single drug method.

107.     Defendants have ignored their own experts' advice in retaining the three-drug procedure.  Dr. Singler advised them that it would be equally viable to use a single-drug procedure and at one time referred to the application of other drugs as the "cosmetic" portion of the process.  Dr. Dershwitz has advocated this procedure.  The analyst employed

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

by Defendant CDCR to research and revise the procedure in light of the Court's 2006 Memorandum of Intended Decision recommended a thiopental-only procedure.

108.     The three-drug procedure without trained physicians was retained pursuant to a directive from Defendant Schwarzenegger, before any assessment could be done – *or was done* – by the other Defendants.  It was retained because the Defendants' lengthy history of mishaps in the lethal injection process required application of a paralytic so that such mishaps were not easily discernable, and potassium chloride to ensure death because thiopental was being insufficiently administered.  Its retention by Defendants with a long history of inability and unwillingness to properly administer their lethal injection procedures, and continued failure to address known deficiencies, creates a present substantial risk that condemned inmates will experience severe pain and suffering during executions.

109.     The proffered alternatives effectively mollify the substantial risk of serious harm contained in the procedures that California seeks to employ.  They are feasible, readily implemented and they significantly reduce the substantial risk of severe pain.  The comparative efficacy of a one-drug method of execution is well established such that Defendants' failure to adopt it constitutes a violation of the Eighth Amendment. Defendants have refused to adopt such alternatives in the face of these documented advantages, without any legitimate penological justification for their continued retention of the three-drug protocol.  Their refusal to change their method, particularly in light of the established Eighth Amendment violation, is cruel and unusual under the Eighth Amendment.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**48**

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

## COUNT I

### VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND TO BE FREE FROM ARBITRARY AND CAPRICIOUS PROCESSES PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

110.      Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 109.

111.      Defendants are acting under color of California law in subjecting Plaintiffs to an arbitrary and capricious method of execution causing to be administered to Plaintiffs chemicals that will cause a wanton exposure to objectively intolerable, present, and substantial risk of inflicting unconstitutional severe, excruciating, and prolonged pain in the execution of a sentence of death, and by designing and continuing to administer a process under which they will inject Plaintiffs with chemicals in amounts, combinations, and by a procedure that will cause a wanton exposure to objectively intolerable, present, and substantial risk of conscious suffering and extreme pain in the execution of a sentence of death, thereby depriving Plaintiffs of their rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution to be free from cruel and unusual punishment and to be free from arbitrary and capricious procedures, in violation of 42 U.S.C. § 1983.

112.      Regs./OP 770, which specifies the State's lethal injection protocol, and the Defendants' actual practice of implementing the protocol violates Plaintiffs' rights under the cruel and unusual punishment clause of the Eighth Amendment because (a) the protocol creates a present and substantial risk of excruciating physical and psychological pain; (b)

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

**49**

the protocol does not comport with contemporary norms and standards of society; and (c)

the protocol offends the dignity of the person and society.

113.    Regs./OP 770 requires utilization of three dangerous chemicals but does not

ensure that the personnel entrusted with the lethal injection procedure possess the proper

and necessary training, experience, or expertise to administer those drugs.  Moreover, the

protocol fails to provide specific guidelines for the administration of the three separate

chemicals, which is an essential requirement for their proper administration.

114.    Regs./OP 770 contains little or no description of the training, credentials,

certifications, experience, or proficiency required of any personnel involved in the

administration of the lethal injection procedure, notwithstanding the fact that it is a

complex medical procedure requiring a great deal of expertise in order to be performed

correctly.   Regs./OP 770 does not require at the execution the presence of any personnel

who possess sufficient expertise to insert an intravenous line properly in all situations,

determine if there is a blockage in the intravenous line, or evaluate whether a prisoner is

properly sedated before and after proceeding with the unconstitutionally painful parts of the

execution process.  Nor is it Defendants' actual practice to require the participation of such

personnel.

115.    The absence of such trained personnel creates a present and substantial risk that a

prisoner would not receive the necessary amount of anesthetic prior to being paralyzed by

the pancuronium bromide and then experience the severe unconstitutional pain of the

potassium chloride.  The execution logs of California prisoners, and the recent experiences

in other states which utilize similar protocols, establish that many executed prisoners did

not receive enough sedative prior to the administration of pancuronium bromide.

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

Moreover, toxicology reports from prisoners executed by other states suggest that some prisoners likely remained conscious during the administration of lethal drugs, which could have occurred because of improper insertion of the intravenous line, an unrecognized blockage in the line, or various other reasons.  The factors contributing to the likelihood that prisoners in other states were executed while conscious are present in Regs./OP770 and the actual practice of CDCR in implementing it.

116.     Inducing and maintaining a sufficient level of unconsciousness by correctly administering sodium thiopental is indispensable to preventing the wanton infliction of severe pain when the potassium chloride overdose is administered.  Regs./OP 770, however, does nothing to ensure such a level of unconsciousness.  Nor does the protocol provide guidelines for ensuring that an inmate is deeply anesthetized prior to injecting the second two drugs, or establish procedures for determining if or when an additional dose of sodium thiopental should be administered, and/or what to do in the event an inmate becomes conscious during the administration of the second or third drugs.

117.     Defendants' decision to reject their own experts' opinion that a single sedative should be employed, and their decision to maintain the remote administration of the three drugs without anesthetic monitoring despite evidence that such administration was not effectively sedating inmates, and Defendants' blind adherence to a procedure that lacks necessary medical safeguards and personnel, despite evidence that such a process has resulted in a substantial and unnecessary risk of undue pain and suffering in past executions and in the executions undertaken by other jurisdictions, constitutes a deliberate decision to disregard the present and substantial risk of undue pain and suffering in the procedure as outlined and as employed.

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

118.    The CDCR's lethal injection protocol and practices fail to address any reasonably foreseeable complications with any appropriate medical response, such as difficulty obtaining access to a peripheral vein, or damage to such veins as a result of repeated failed attempts to insert the catheter.  Moreover, the protocol and practices include no safeguards that would protect the prisoner in the event a stay of execution is entered or a reprieve granted immediately before or after the lethal injection process has begun.  Thus, the protocol and actual practices fail to provide any protections to prevent a prisoner from being wrongly executed should a reprieve or stay be granted after the process has begun but before death has occurred.

119.    At any time before the potassium chloride is administered, the prisoner could be readily resuscitated if trained personnel and routine resuscitation medication and equipment were present at the execution site.  Even after the potassium chloride is administered, resuscitation would still be possible, although admittedly it would be more challenging.  Any resuscitation, however, would require the close proximity of the necessary equipment, medication, and properly trained personnel.  The omission of such personnel and equipment under the protocol set forth in the Regs./OP 770 further undermines the constitutionality of the procedure.

120.    Although it is possible to conduct executions in a constitutionally compliant manner, the Defendants have deliberately chosen not to do so.  The CDCR could choose to use different chemicals that do not cause excruciating pain and therefore do not carry extraordinarily grave and present consequences to a condemned inmate if not properly administered, as all veterinary euthanasia does.  Instead, the CDCR has knowingly and recklessly chosen to use chemicals that will subject the inmate to excruciating pain in the

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

likely event of administration error.  Moreover, it has not taken precautions to ensure that the personnel who are involved in the process, including the preparation and administration of the lethal injection chemicals, possess the training, experience, and expertise needed to administer those chemicals properly.  Thus, while it is possible for the CDCR to choose different lethal injection chemicals and/or retain qualified personnel to administer its chosen chemicals in order to ensure the constitutionality of its lethal injection procedure, the CDCR purposefully has not done so.

121.    Feasible, readily implemented alternative procedures exist that would significantlyreduce the substantial risk of excruciating pain created by the ADC's deficient protocol. These alternative procedures include, but are not limited to, a protocol that remedies the deficiencies set forth herein.

122.    These numerous deficiencies in the CDCR's lethal injection protocol are the direct result of Defendants' conscious disregard of the present substantial risk that the execution procedure will result in the wanton and unnecessary infliction of extreme pain. The failure of the Defendants to take sufficient measures to minimize the risk of substantial, extreme and excruciating pain and mutilation, when such risk could readily be prevented by adopting an alternative procedure to remove the risks in their procedures violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

123.    The use of pancuronium bromide under the protocol established in Regs./OP 770 to paralyze Plaintiffs creates a present substantial risk that an inadequately sedated prisoner will be subjected to a severely painful and protracted death.  Moreover, it serves no legitimate penological purpose.

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

124.     Pancuronium bromide does not play a legitimate role in killing the condemned person.  The administration of pancuronium bromide cannot be justified on the grounds that the drug paralyzes the breathing muscles because death by asphyxiation is itself a form of cruel and unusual punishment under the Eighth Amendment.

125.     Enjoining the administration of pancuronium bromide will have no appreciable impact on California correctional institution procedures.  If anything, it will simplify the execution process by eliminating one step in the process.

126.     The question of whether there exist readily available alternatives to pancuronium bromide is not an issue in this case because paralyzing a condemned inmate in the execution process is not a legitimate penological goal.

127.     The Ninth Circuit and this Court have previously held that Defendants and their predecessors, in order to forestall discussion and criticism of California's lethal injection procedure, have implemented restrictions on the execution process in order to prevent witnesses from being aware of complications experienced during the procedure.

128.     The CDCR's failure to require sufficient training, credentials, certification, experience, or proficiency of the personnel involved in the administration of the lethal injection procedure greatly increases the present and substantial risk that a prisoner will experience excruciating pain as a result of the suffocation caused by the pancuronium bromide and the severely painful internal burn and cardiac arrest caused by a potassium chloride overdose.  Employing untrained personnel to perform executions exacerbates the present and substantial risks created by the deficiencies in the protocol and the methods and circumstances of drug administration, because untrained personnel will be unable to react to and remedy problems that arise during an execution.  Allowing untrained personnel to

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

develop deviations from the protocol that become customary practices also increases the risk of inhumane executions due to the lack of vetting by qualified experts and the danger that execution team turnover will lead to confusion as to how to perform the execution.

129.     Allowing personnel who lack sufficient training, credentials, certification, experience, or proficiency to conduct the lethal injection procedure violates the rights of the condemned person.  Suffocation while inadequately sedated or otherwise aware, as caused by the administration of pancuronium bromide, violates the Eighth Amendment because death by asphyxiation is itself a form of cruel and unusual punishment.  Similarly, internal burning and cardiac arrest while insufficiently sedated or otherwise aware, as caused by a potassium chloride overdose, constitute unnecessary severe physical and psychological pain in violation of the Eighth Amendment.

130.     If Plaintiffs suffer unnecessary pain, they will have no alternative "reasonable and effective means of communication" to communicate the fact that they were not properly anesthetized because they will be unable to do so and the pancuronium bromide will paralyze them and they will be dead at the conclusion of the procedure.

131.     Enjoining the administration of the lethal injection procedure by personnel who lack sufficient training, credentials, certification, experience, or proficiency will have no appreciable impact on the correctional institution.

132.     The question of whether there exist readily available alternatives to requiring personnel who possess sufficient training, credentials, certification, experience, or proficiency to conduct the lethal injection procedure is not an issue in this case because causing a prisoner who has not been properly anaesthetized as a result of administration error to experience excruciating pain from the conscious suffocation caused by

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

pancuronium bromide and the painful internal burn and cardiac arrest caused by a potassium chloride overdose is not a legitimate penological goal.

133.     CDCR's continued use of remote administration of three-drugs without sufficient means of ensuring adequate sedation throughout the procedure greatly increases the risk that a prisoner will experience excruciating pain as a result of the suffocation caused by the pancuronium bromide and the painful internal burn and cardiac arrest caused by a potassium chloride overdose.  Enjoining the use of remote administration of the three-drugs without sufficient safeguards will have no appreciable impact on the correctional institution.  The question of whether there exist readily-available alternatives to employing remote administration of the three-drugs without sufficient safeguards because needlessly exposing inmates to an unreasonable risk of excruciating pain is not a legitimate penological goal.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Albert G. Brown and Michael A. Morales pray for:

1.     Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiffs by lethal injection using Regs./OP 770, or any similar practices or protocol;

2.     In the event that Regs./OP 770, or any similar protocol, is not enjoined in its entirety as violating the Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering unnecessary drugs that cause excruciating and prolonged pain during the execution process;

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

3.      In the event that Regs./OP 770, or any similar protocol, is not enjoined in its entirety as violating the Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from allowing personnel who lack sufficient training, credentials, certification, experience, or proficiency to conduct the lethal injection procedure;

4.      That the Court conduct appropriate and necessary evidentiary hearings and discovery to permit Plaintiffs to prove their constitutional claims;

5.      Reasonable attorneys' fees pursuant to 42 U.S.C. § 1983 and the laws of the United States;

6.      Costs of suit; and

7.      Any such other relief as the Court deems just and proper.

DATED: October 8, 2010                    By: _____/s/_____

David A. Senior
McBREEN &SENIOR

Richard P. Steinken
JENNER & BLOCK

John R. Grele
LAW OFFICE OF JOHN R. GRELE
*Attorneys for Plaintiffs*
ALBERT G. BROWN
MICHAEL A. MORALES

MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FOURTH AMENDED COMPLAINT
Case Nos. C 06 219 JF RS, C 06 926 JF RS