1   EDMUND G. BROWN JR.
    Attorney General of California
2   THOMAS S. PATTERSON
    Supervising Deputy Attorney General
3   MICHAEL J. QUINN
    Deputy Attorney General
4   State Bar No. 209542
    JAY M. GOLDMAN
5   Deputy Attorney General
    State Bar No. 168141
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-5846
     Fax:  (415) 703-5843
8    E-mail:  Jay.Goldman@doj.ca.gov
    *Attorneys for Defendants*
9   *Schwarzenegger, Cate, and Cullen*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14

15  **MICHAEL ANGELO MORALES,**      C 06-0219 JF
    **ALBERT G. BROWN,**
16                                   **DEFENDANTS' NOTICE OF MOTION**
                          Plaintiffs, **AND MOTION TO DISMISS FOR**
17                                   **FAILURE TO STATE A CLAIM**
         v.
                                     Date:      December 2, 2010
18                                   Time:      1:30 PM
    **MATTHEW CATE, et al.,**         Dept:      Ct. Rm. 3, 5th Fl.
19                                   Judge      The Honorable Jeremy Fogel
                          Defendants. Trial Date None
20                                   Action Filed:  1/5/2006

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

Memorandum of Points and Authorities ................................................................... 1

Introduction ............................................................................................................... 1

Statement of Issues .................................................................................................... 2

Statement of the Case ................................................................................................ 3

Statement of Facts ..................................................................................................... 4

I.      California's New Lethal-Injection Regulations. ........................................ 4

        A.      Team Selection and Required Qualifications ................................ 4

        B.      Team Training. ............................................................................... 5

        C.      The Execution. ............................................................................... 6

                1.      Selection of Veins. ............................................................ 6

                2.      Mixing and Custody of Chemicals. .................................. 6

                3.      Preparation of Chemicals and Syringes. .......................... 6

                4.      Inserting IV Catheters and Execution-Room Monitoring of Inmate. ............................................................................ 7

                5.      Administering Chemicals, Consciousness Checks, and When to Use the Alternate IV Catheter. ......................... 7

                6.      Physician Monitoring. ....................................................... 8

                7.      Documented Post-Execution Critique for Compliance with Regulations. ........................................................................ 8

Argument .................................................................................................................... 8

I.      Plaintiffs Fail to State a Claim Against the Regulations as Written or for an Alternative Protocol to the New Regulations. ........................................ 8

        A.      The Standard for a Rule 12(b)(6) Motion to Dismiss. ................. 8

        B.      *Baze v. Rees* Establishes that California's Lethal-Injection Regulations are Facially Constitutional as a Matter of Law. ........ 9

                1.      Plaintiffs Fail to Allege a Facial Claim that the Regulations Lack Sufficient Requirements for the Minimum Qualifications and Experience Required for Intravenous Sub-Team Members. ........................................................ 13

                2.      The Training Required by California Exceeds What Was Noted with Approval in *Baze*. ........................................ 14

                3.      California's Requirements for Mixing Sodium Thiopental and Training in This Regard Comport With *Baze*. ......... 15

                4.      California's Regulations Regarding a Check for Inmate Consciousness Exceed the Kentucky Protocol Approved In *Baze*. ............................................................................... 16

                5.      California's Required Dosage of Sodium Thiopental Is Identical to Kentucky's—Three Grams. ........................... 17

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

        6.      Additional Inaccurate and Implausible Attacks on the
                Regulations as Written Fail to State a Facial Challenge. .............. 17

4

    C.   Plaintiffs Have Failed to State a Claim that an Alternative to
         California's Regulations Will Eliminate a Substantial Risk of

5

         Severe Pain ............................................................................................. 18

6

Conclusion ....................................................................................................................... 20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*
    129 S.Ct. 1937 (2009) ........................................................................................ 9

*Balistreri v. Pacifica Police Dep.'t*
    901 F.2d 696, 699 (9th Cir. 1990) ..................................................................... 8

*Baze v. Rees*
    553 U.S. 35 (2008) .................................................................................... passim

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ...................................................................................... 8, 9

*Cooey II v. Strickland*
    589 F.3d 210 (6th Cir. 2009) ........................................................................... 15

*Emmett v. Johnson*
    532 F.3d 291 (4th Cir. 2008) ........................................................................... 15

*Farmer v. Brennan*
    511 U.S. 825 (1994) ............................................................................. 9, 10, 19

*Gregg v. Georgia*
    428 U.S. 153 (1976) ......................................................................................... 9

*Hamilton v. Jones*
    472 F.3d 814 (10th Cir. 2007) ......................................................................... 15

*Harrison v. Little*
    571 F.3d 531 (6th Cir. 2009) ........................................................................... 15

*Helling v. McKinney*
    509 U.S. 25 (1993) ...................................................................................... 9, 10

*Hill v. McDonough*
    547 U.S. 573 (2006) ......................................................................................... 9

*In re Kemmler*
    136 U.S. 436 (1890) ......................................................................................... 9

*Morales v. Cate*
    2010 WL 3835655 (N.D. Cal.) ......................................................................... 3

1
2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3
4
*Morales v. Tilton*
   465 F.Supp.2d 972 (N.D. Cal. 2006) ................................................................. 3

5
*Navarro v. Block*
   250 F.3d 729 (9th Cir. 2001)............................................................................... 8

6
7
*Sprewell v. Golden State Warriors*
   266 F.3d 979 (9th Cir. 2001)............................................................................... 9

8
9
*Thompson v. Davis*
   295 F.3d 890 (9th Cir. 2002)............................................................................... 8

10
**STATUTES**

11
United States Code, Title 42
   § 1983 ............................................................................................................ 1, 3, 9

12
13
**CONSTITUTIONAL PROVISIONS**

Eighth Amendment .................................................................................... passim

14
**COURT RULES**

15
16
Federal Rule of Civil Procedure 12(b)(6) .................................................. 1, 3, 8, 20

17
**OTHER AUTHORITIES**

18
California Business & Professions Code
   § 2860.5........................................................................................................... 5

19
20
California Code of Regulations, Title 15
   § 3349.1.2(4)................................................................................................... 13
   § 3349.1.1(p)............................................................................................. passim

21
   § 3349.1.3(c)(2)........................................................................................ passim

22
   § 3349.1.4(c) .............................................................................................. 14, 15
   § 3349.1.4(e)(1)............................................................................................. 14

23
   § 3349.2.2(e)(1)............................................................................................. 14
   § 3349.3(c)(3) & (4)....................................................................................... 18

24
   § 3349.4.3(b)................................................................................................. 15
   § 3349.4.5(g)(4)(F) & (G)............................................................................. 10

25
   § 3349.4.5(g)(5)(A)................................................................................. 16, 17

26
   § 3349 et seq. ................................................................................................. 3

27
California Code of Regulations, Title 16

28
   § 2542.1.......................................................................................................... 5

iv

Def Defs. Not. Of Mot and Mot. To Dismiss  (C 06-0219 JF)

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

California Code of Regulations, Title 22
    § 100106................................................................................................................5
    § 100145................................................................................................................5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

Def Defs. Not. Of Mot and Mot. To Dismiss  (C 06-0219 JF)

1    TO PLAINTIFFS MICHAEL ANGELO MORALES AND ALBERT G. BROWN AND

2    THEIR ATTORNEYS OF RECORD:

3        PLEASE TAKE NOTICE that on December 2, 2010, at 1:30 p.m. or as soon thereafter as

4    counsel may be heard, in Courtroom Three of the United States Courthouse, located     at 280

5    South First Street, San Jose, California, Defendants Governor Arnold Schwarzenegger, Secretary

6    Matthew Cate, and Warden Vincent Cullen (Defendants) will and hereby do move the Court

7    under Federal Rule of Civil Procedure 12(b)(6) to dismiss two of Plaintiffs' three claims for a

8    failure to state a claim: (1) Plaintiffs' facial challenge to the State of California's written

9    regulations governing the administration of the death penalty by use of lethal injection; and (2)

10   Plaintiffs' attempt to allege a claim that, under the standard for adopting an alternative execution

11   protocol set forth in *Baze v. Rees*, 553 U.S. 35, 61 (2008), there exists a known and available

12   alternative to California's regulations as written which, in comparison to California's regulations,

13   significantly reduces a substantial risk of severe pain.

14       Defendants note that Plaintiffs reiterate throughout their Fourth Amended Complaint that,

15   while they are challenging California's lethal-injection regulations as they are written, they are

16   also alleging a third claim by which they challenge the constitutionality of these same regulations

17   as they are applied.  Defendants are not presently moving by way of this motion to dismiss

18   Plaintiffs' third "as applied" claim.

19       Defendants' motion is based on this notice of motion and motion, the memorandum of

20   points and authorities, the request for judicial notice, as well as the pleadings and records on file

21   in this case.

22                        **MEMORANDUM OF POINTS AND AUTHORITIES**

23                                          **INTRODUCTION**

24       Plaintiffs, California death-row inmates, have filed their Fourth Amended Complaint under

25   42 U.S.C. § 1983, seeking relief for alleged violations of their right to be free from cruel and

26   unusual punishment.  (Am. Compl. ¶ 1.)  Plaintiffs attempt to challenge in two respects the

27   written regulations by which the California Department of Corrections and Rehabilitation

28   (CDCR) is required to execute inmates under a sentence of death by lethal-injection.  First,

                                                    1

Plaintiffs contend that, if an execution is carried out in compliance with California's lethal-injection regulations as they are written, that execution will carry a substantial risk that an inmate will suffer torturous pain.  Second, Plaintiffs attempt to allege a claim that California's lethal-injection regulations, as they are written, carry a substantial risk of harm in comparison to known and feasible alternatives to California's regulations.

However, Plaintiffs failed to state a claim for a facial challenge to California's regulations because the regulations are substantially similar to or exceed the regulations approved by the United States Supreme Court in *Baze*.  Plaintiffs have not alleged facts sufficient to state a claim that, as written, California's regulations will necessarily subject Plaintiffs to a substantial risk of serious harm, where serious harm means severe pain.

Further, Plaintiffs have not articulated a claim that there is a feasible, readily implemented alternate protocol which would, in comparison to California's regulations, significantly reduce a substantial risk of severe pain.  Therefore, they have failed allege facts sufficient to state a claim that, from an Eighth Amendment perspective, an alternate lethal-injection protocol ought to displace California's lethal-injection regulations

Therefore, at this point, Defendants respectfully request that Plaintiffs' facial challenge to California's regulations, and attempt to allege a claim that an alternate protocol exists which under the *Baze* test should displace California's regulations, should each be dismissed.

## STATEMENT OF ISSUES

1.    In *Baze v. Rees*, 553 U.S. 35 (2008), the Supreme Court upheld Kentucky's lethal-injection protocol against a challenge under the Eighth Amendment of the Constitution.  The Court held that "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard."  *Id.* at 61.  Given the similarities between California's regulations and Kentucky's protocol have Plaintiffs' failed to state facts sufficient to allege a facial challenge to California's written regulations?

2.    *Baze* requires a comparison of an alternative protocol to the challenged portions of an existing protocol, to determine whether the challenged terms of an existing protocol present a demonstrated and substantial risk of severe pain in comparison to a specific, available, and

2

1   feasible alternative.  Plaintiffs have not alleged the terms of a known and available alternate

2   protocol that would satisfy the Eighth Amendment.  Have Plaintiffs failed to allege a claim that

3   the challenged terms of California's protocol should be displaced by an alternative protocol?

4                                    **STATEMENT OF THE CASE**

5         On January 5, 2006, Plaintiff Morales, a state prison inmate, filed this civil-rights lawsuit

6   under 42 U.S.C. § 1983.  This Court described Plaintiff Morales' challenge as follows: "This case

7   presents a vary narrow question: does California's lethal-injection protocol—as actually

8   administered in practice—create an undue and unnecessary risk that an inmate will suffer pain so

9   extreme that it offends the Eighth Amendment?"  *Morales v. Tilton*, 465 F.Supp.2d 972, 974

10  (N.D. Cal. 2006).  Thereafter, a state-court judgment required that any lethal-injection protocol

11  must be adopted as regulations through California's Administrative Procedure Act before any

12  executions could take place.  Meanwhile, the U.S. Supreme Court issued its opinion in *Baze*, in

13  which it upheld the constitutionality of Kentucky's lethal-injection protocol, and set forth

14  standards by which an Eighth Amendment challenge to a state's execution protocol must be

15  adjudicated.

16        On July 30, 2010, the State of California's Office of Administrative Law issued its Notice

17  of Approval of California's new lethal-injection regulations, Cal. Code Regs. tit. 15 §§3349 et

18  seq.  (Request For Judicial Notice, Exhibit A.)  These regulations went into effect on August 29,

19  2010.  (*Id.*)  Thereafter, the Court permitted Plaintiff Brown to intervene in this case.  This Court

20  noted that Brown apparently raised substantial questions of fact about whether some of

21  California's former lethal-injection protocol "have been addressed *in actual practice.*"  *Morales*

22  *v. Cate*, 2010 WL 3835655 (N.D. Cal.) (emphasis in original).  On October 8, 2010, Plaintiffs

23  filed their Fourth Amended Complaint in which they attempt to allege both facial and as-applied

24  challenges to California's new lethal-injection regulations, and in addition, attempt to allege a

25  claim that unspecified alternate protocols prevail over California's regulations under the test set

26  forth in *Baze*.  Defendants now move under Rule 12(b)(6) to dismiss Plaintiffs' facial challenge

27  and the claim that there is an alternate protocol to California's regulations which satisfies the

28  *Baze* test.

                                              3

**STATEMENT OF FACTS**

I.   **CALIFORNIA'S NEW LETHAL-INJECTION REGULATIONS.**

California, like the Federal government and more than 30 states, require the infusion of three chemicals to carry out death sentences.  *Baze*, 553 U.S. at 44.

Many, but not all, of Plaintiffs' allegations go to the formation, qualifications, training, and tasks assigned to, an Intravenous Sub-Team and an Infusion Sub-Team.  California's regulations require that the Intravenous Sub-Team insert intravenous catheters, place electronic monitoring sensors on an inmate, check an inmate for consciousness during an execution, monitor intravenous lines, and crimp and uncouple intravenous lines.  Cal. Code Regs. tit. 15 §§ 3349.1.1(p), 3349.1.3(c)(2).  The Infusion Sub-Team will receive the lethal-injection chemicals, mix them according to the manufacturer's instructions, draw them into syringes, label and color code the syringes, and infuse the lethal-injection chemicals.  *Id.* §§ 3349.1.1(o), 3349.1.3(c)(3).

**A.   Team Selection and Required Qualifications.**

The Warden of San Quentin, with assistance, will normally coordinate the recruitment and selection of team members from the employees of San Quentin.  *Id.* § 3349.1.2(a)(1).  If necessary, however, the Warden may contract with other medical personnel to serve as members of the team, or to serve as the physician attending the execution.  *Id.* § 3349.1.2(a)(4)(B).  The Warden may also, if necessary, select team members from other CDCR locations or outside of CDCR.  *Id.* § 3349.1.2(a)(3).  The Warden shall form and head a team-selection panel to review the qualifications, interview prospective team members, and select members of the Lethal Injection Team.  *Id.* 3349.1.2(a)(4)(A).  The selection panel must interview each prospective team member; review all of their available performance evaluations; personnel, supervisory, and training files; and perform a criminal-background check.  *Id.* § 3349.1.2(b).  In addition, Intravenous Sub-Team members are also required to:

"(A) Maintain current certification and license to insert intravenous catheters into peripheral veins.[1]

---

[1] In California, the license held by registered nurses permits them to insert intravenous catheters.  There are other licensed medical professionals who are also allowed to insert

(continued…)

4

(B)  Maintain a current certification and license for placement of the Electrocardiogram (ECG) leads used during the lethal injection process.

(C)  Demonstrate ability to insert an intravenous catheter or catheters into an appropriate vein or veins of an inmate.

(D)  Demonstrate ability to set up intravenous lines and intravenous drip.

(E)  Qualified in the appropriate placement of the ECG leads utilized during this process.

(F)  Regularly set up intravenous lines in the performance of their job duties, unrelated to their duties on the Lethal Injection Team.

(G)  Have a basic understanding of the effects of the three chemicals used in the lethal injection process."

*Id.* § 3349.1.2(4)

**B.    Team Training.**

All CDCR employees who are also lethal-injection team members are required to train monthly, and this training shall include a simulation of an execution by lethal injection.  *Id.* § 3349.1.4(c).  Intravenous Sub-Team members shall also train in the use of electronic monitors for vital signs, setting up intravenous lines and drip, determining the size of catheters to be used, recognizing potential problems and recommendations for avoidance or resolution, checking for consciousness, monitoring intravenous lines to ensure patency, and crimping and uncoupling intravenous lines.  *Id.* § 3349.1.4(c)(3).  Training for Infusion Sub-Team members includes the appropriate mixing of chemicals to be used in the lethal-injection process, the proper level and rate for infusing the chemicals into intravenous lines, proper sequence for infusing the three chemicals and the effects of each chemical, numbering and color coding for syringes of chemicals, handling and accounting for controlled substances, and identifying, avoiding, and resolving potential problems.  *Id.*§ 3349.1.4(c)(4).

---

(…continued)
intravenous catheters if they hold specific medical professional licenses, and complete additional requirements to obtain a special certification.  These professions include licensed vocational nurses, paramedics, and advanced emergency medical technicians (EMTs).  Cal. Bus. & Prof. Code § 2860.5, Cal. Code Regs. tit. 16 § 2542.1, Cal. Code Regs. tit. 22 § 100145, Cal. Code Regs. tit. 22 §100106.

In addition to the monthly training, additional training shall be conducted in the 30 days before a scheduled execution date. *Id.* § 3349.1.4(d)(2). Each training session shall be conducted for a minimum of eight hours. *Id.* at § 3349.1.4(d)(3). No CDCR personnel on the Lethal Injection team may participate in an execution unless they have had at least six prior training sessions. These include at least three sessions in the six months before an execution, and one training session per day for each of the three days immediately before an execution. *Id.* § 3349.1.4(d)(4). Each sub-team leader must maintain a training file that includes a record of all lethal-injection-process training sessions. *Id.* §§ 3349.1.4(e)(1), 3349.2.2(e)(1).

### C. The Execution.

#### 1. Selection of Veins.

When an execution order is received, the inmate shall be referred to the Intravenous Sub-Team for a vein assessment to determine the size, location, and resilience of the veins in the front or inside of the elbow areas. If no suitable vein is found there, alternate sites will be considered, including but not limited to the forearm, wrist, back of hand, top of foot, ankle, lower leg, or other appropriate location, and the results will be reported to the Warden. *Id.* § 3349.3(c)(3) & (4).

#### 2. Mixing And Custody of Chemicals.

The lethal-injection chemicals shall be obtained from a licensed pharmaceutical facility or distributor, and the chemicals to be used shall be recorded in a mandatory chain-of-custody form required by regulation. *Id.* § 3349.4.1(c)(1). The chemicals and saline to be used are to be secured in the Lethal Injection Facility. *Id.* § 3349.4.1(c)(2). Three hours before the execution, the chemicals shall be transferred to the Infusion Sub-Team, and two members shall verify this transfer on a chain-of-custody form. *Id.* § 3349.4.3(a)(3).

#### 3. Preparation of Chemicals and Syringes.

Two identical trays of chemicals and saline shall be prepared in color-coded syringes, and the sodium thiopental shall be mixed according to the manufacturer's instructions. *Id.* § 3349.4.3(b). Each tray shall include two syringes with 1.5 grams of sodium thiopental (a total of 3 grams per tray), followed by a syringe of 50 cc saline flush, then one syringe with 50 milligrams of pancruronium bromide, then a syringe with 50 cc of saline flush, then two syringes

6

1    that shall each contain 100 milliequivalents of potassium chloride (a total of 200 milliequivilents

2    per tray), and a final syringe with 50 cc of saline flush.  *Id.* § 3349.4.3(b)(2).

3                      **4.  Inserting IV Catheters and Execution-Room Monitoring of Inmate.**

4            During the execution the inmate shall be secured, and the Intravenous Sub-Team will insert

5    two intravenous catheters into pre-designated veins that were identified during the prior vein

6    inspection, and designate which will be the primary and back-up intravenous lines.  *Id.* §

7    3349.4.5(e)(3) & (5).  One Intravenous Sub-Team member must remain in the execution room to

8    continuously monitor the intravenous lines, and stand next to the inmate and access the inmate's

9    consciousness throughout the execution.  *Id.* § 3349.4.5((d)(8).  The Warden must also take a

10   position within the execution room and must remain in close proximity to the inmate.  *Id.* §

11   3349.4.5(f).

12                      **5.  Administering Chemicals, Consciousness Checks, and When to Use The**
13                      **Alternate IV Catheter.**

14           The Warden will direct the Infusion Sub-Team to administer the lethal-injection chemicals

15   and saline.  *Id.* § 3349.4.5(f)(6).  If at any time the primary intravenous catheter fails, the Warden

16   shall be notified and will direct the entire lethal-injection sequence to begin again using the back-

17   up intravenous catheter and back-up tray of chemicals.  *Id.* § 3349.4.5(g)(3).

18           The process will begin with the administration of the first 1.5 gram dosage of sodium

19   thiopental, followed by a consciousness assessment of the inmate.  *Id.* at § 3349.4.5(g)(5)(A). The

20   Intravenous Sub-Team member shall brush the back of a hand over the inmate's eyelashes, speak

21   to and gently shake the inmate.  *Id.*  Observations will be documented.  *Id.*  If the inmate is

22   unresponsive, this will demonstrate unconsciousness.  *Id.*  Then a second dosage of 1.5 grams of

23   sodium thiopental shall be administered, and a second consciousness check performed.  *Id.* §

24   3349.4.5(g)(5)(C).  If the inmate is unconscious, the remaining syringes shall be administered.

25   *Id.* § 3349.4.5(g)(5)(C)-(H).

26           However, if after the administration of either the first or second dosages of 1.5 grams of

27   sodium thiopental, the consciousness check shows that the inmate was not rendered unconscious,

28   then the Warden will direct that the back-up intravenous catheter and line be used, and the entire

                                                            7

1  duplicate sequence of chemicals on the back-up chemical tray will be administered in the same

2  order. *Id.* § 3349.4.5(g)(6). That means a dosage of sodium thiopental, followed by a

3  consciousness check, then a second dosage of sodium thiopental, followed by a second

4  consciousness check, and then the remaining chemicals. *Id.*

5  ### 6. Physician Monitoring.

6  The inmate's heart activity shall be monitored by electronic devices, and the devices shall

7  be monitored by an attending physician. *Id.* § 3349.4.5(g)(7) & (8). Death will be determined by

8  the attending physician. *Id.* § 3349.4.5(g)(8).

9  ### 7. Documented Post-Execution Critique For Compliance With Regulations.

10  Within 72 hours after each execution, the Warden must critique the execution. "The

11  purpose of the critique will be to evaluate the execution from all operational perspectives,

12  including compliance with the regulations." *Id.* § 3349.4.6(n)(1). This critique shall be

13  documented and included in a master execution file, which is a permanent record maintained in

14  the Warden's office. *Id.* §§ 3349.4.6(n)(2), 3349.1.1(w).

15  ## ARGUMENT

16  **I.  PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE REGULATIONS AS WRITTEN OR
    FOR AN ALTERNATIVE PROTOCOL TO THE NEW REGULATIONS.**

17

18  **A.  The Standard For A Rule 12(b)(6) Motion To Dismiss.**

19  A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*,

20  250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where the complaint lacks sufficient

21  facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

22  (9th Cir. 1990).

23  To sufficiently state a claim to relief, a pleading "does not need detailed factual allegations"

24  but the "[f]actual allegations must be enough to raise a right to relief above the speculative level."

25  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court must assume the truth of facts

26  presented and construe all inferences from them in the light most favorable to the nonmoving

27  party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). However, "[t]hreadbare recitals of

28  the elements of a cause of action, supported by mere conclusory statements, do not suffice."

8

1    *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at

2    555). A court is not "required to accept as true allegations that are merely conclusory,

3    unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*,

4    266 F.3d 979, 988 (9th Cir. 2001). A complaint is insufficient if it alleges no more than enough

5    to leave open the possibility that a plaintiff might later establish some set of undisclosed facts to

6    support recovery. *Twombly*, 550 U.S. at 561. Instead, a complaint "must contain sufficient

7    factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 129

8    S.Ct. at 1949.

9        **B.**    ***Baze v. Rees* Establishes That California's Lethal-Injection Regulations**

10            **Are Facially Constitutional As a Matter of Law.**

11        In 2008, two years after this action was initially filed, the U.S. Supreme Court clarified the

12    standards for challenging the constitutionality of written execution protocols. As that court noted,

13    the Eighth Amendment does not bar capital punishment. *Baze*, 553 U.S. at 47 (citing *Gregg v.*

14    *Georgia*, 428 U.S. 153, 177 (1976)). Rather, execution procedures only become "cruel when they

15    involve torture or lingering death." *In re Kemmler*, 136 U.S. 436, 447 (1890). There must be

16    "something inhumane and a barbarous, something more than the mere extinguishment of life."

17    *Id.* Before a risk of harm can qualify as cruel and unusual punishment, "the conditions presenting

18    the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise

19    to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 49-50 (quoting *Helling v. McKinney*, 509

20    U.S. 25, 33, 34–35 (1993) (emphasis added in *Baze*)).

21        To prevail on a claim that the risk of harm violates the Eighth Amendment, a plaintiff must

22    demonstrate a "substantial" and "objectively intolerable risk" of harm. *Baze*, 553 U.S. at 50

23    (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 (1994)). The prisoner must demonstrate that

24    the procedure at issue is "cruelly inhumane." *Baze*, 553 U.S. at 52 (quoting *Gregg*, 428 U.S. at

25    175). Challenges to the execution procedures are properly raised by inmates under §1983. *See*

26    *Hill v. McDonough*, 547 U.S. 573, 576 (2006) (holding that challenge to state's lethal-injection

27    protocol is cognizable under § 1983).

28

1    In *Baze v. Rees*, the United States Supreme Court rejected a nearly identical challenge by

2    condemned inmates to Kentucky's lethal-injection protocol, which also used a three-drug

3    combination consisting of 3 grams of sodium thiopental, 50 milligrams of pancuronium bromide,

4    and 240 millequivalents of potassium chloride.[2]  *See Baze*, 553 U.S. at 45.  The *Baze* petitioners

5    claimed there was a significant and unnecessary risk that the sodium thiopental would not be

6    properly administered to achieve its intended effect.  553 U.S. at 49.  They also advocated

7    adoption of a one-drug barbiturate protocol to eliminate any perceived risk.  *Id.* at 51.  The Court

8    rejected the *Baze* petitioners' proposed "unnecessary risk" standard and held instead that

9    condemned inmates must demonstrate "'a substantial risk of serious harm,'" or "an 'objectively

10   intolerable risk of harm that prevents prison officials from pleading that they [are] 'subjectively

11   blameless for purposes of the Eighth Amendment,'"  (*Id.*) (quoting *Farmer v. Brennan*, 511 U.S.

12   825, 846 n.9 (1994)). The Court recognized that "[s]ome risk of pain is inherent in any method of

13   execution—no matter how humane—if only from the prospect of error in following the required

14   procedure." *Id.* at 47. "[A] risk of future harm—not simply actually inflicting pain—can qualify

15   as cruel and unusual punishment," but only if "the conditions presenting the risk [are] '*sure or*

16   *very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent*

17   dangers.'" *Id.* at 49-50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993)).  "Simply

18   because an execution method may result in pain, either by accident or as an inescapable

19   consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that

20   qualifies as cruel and unusual" under the Eighth Amendment.  *Id.* at 50.  Thus, to prevail on an

21   Eighth Amendment challenge to a state's lethal-injection protocol, a condemned prisoner must

22   satisfy the "heavy" burden of proving that the protocol poses a substantial risk of serious harm

23   that is sure or very likely to cause needless suffering. *Id.*

24       In considering Kentucky's protocol, the *Baze* court noted the existence of "important

25   safeguards to ensure that an adequate dose of sodium thiopental [,] . . . [t]he most significant of

26

27       [2] California's dosage requirements only differ from Kentucky's as to the third drug to be
     administered, potassium chloride.  California only requires a total of 200 millequivalents of this
     drug.  Cal. Code. Regs. tit. 15 § 3349.4.5(g)(4)(F) & (G).

28

10

1   [which] is the written protocol's requirement that members of the IV team must have at least one

2   year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or

3   military corpsman . . . [and] participate in at least 10 practice sessions per year." *Baze*, 553 U.S.

4   at 55.  Other safeguards in Kentucky's protocol cited by the Supreme Court include the

5   requirement that the Kentucky IV team establish both primary and backup lines and prepare two

6   sets of the lethal-injection drugs before the execution commences.  *Id.*  "These redundant

7   measures ensure that if an insufficient dose of sodium thiopental is initially administered through

8   the primary line, an additional dose can be given through the backup line before the last two

9   drugs are injected."  *Id.*  The Supreme Court also noted that the presence of a warden and deputy

10  warden in the execution chamber with the prisoner allowed him to watch for signs of IV

11  problems, and was sufficient to monitor consciousness of the inmate during the execution.  *Id.* at

12  56.[3]  And it accepted that the task of mixing sodium thiopental could be accomplished by

13  following the manufacturer's instructions.  *Id.* at 54.

14       In addition to establishing the "substantial risk of serious harm" standard, the *Baze* plurality

15  set the standard for a condemned prisoner to contend that a state's lethal-injection protocol should

16  be modified to satisfy the Eighth Amendment.  An inmate can prevail on his claim only if he

17  demonstrates that: (1) the challenged protocol poses a substantial risk of serious harm, where

18  serious harm means "severe pain" and (2) the alternative procedures proposed are feasible,

19  readily implemented, significantly reduce a substantial risk of severe pain, and do not conflict

20  with the state's legitimate peneological interests.  *Id*. at 52.  The Court emphasized that "an

21  inmate cannot succeed . . . simply by showing one more step the State could take as a failsafe for

22  other, independently adequate measures."  *Id*. at 60-61.  The Court held that an inmate "must

23  show that the risk is substantial when compared to the known and available alternatives.  A State

24  with a lethal injection protocol substantially similar to the protocol we uphold today would not

25  create a risk that meets this standard."  *Id*. at 61

26  _____

27       [3] In her dissent, Justice Ginsberg noted with approval that California's consciousness check, consisting of brushing an inmate's eyelashes, speaking to the inmate and shaking him at both the halfway point and, again, at the completion of the sodium thiopental injection, exceeded Kentucky's means for monitoring consciousness.  *Id.* at 120-21.

28

11

1   The *Baze* petitioners contended that they had identified a significant risk of harm that could

2   be eliminated by adopting a one-drug protocol that dispenses with the use of pancuroniun

3   bromide and potassium chloride. *Id*. at 51. The Court rejected this alternative, stating an inmate

4   may not challenge an execution protocol merely by showing that an alternative is "slightly or

5   marginally safer" and that courts should not be transformed into a board of inquiry charged with

6   determining the "best practices" for executions. *Id.*

7   California's lethal-injection protocol satisfies the standard set forth in *Baze*. The protocol is

8   substantially similar to Kentucky's lethal-injection protocol in that Plaintiffs cannot show a

9   demonstrated risk of severe pain. California's protocol provides safeguards to ensure the

10  adequate delivery of sodium thiopental to place the inmate in a deep state of unconsciousness.

11  Moreover, Plaintiffs have not pleaded facts that, if assumed to be true, demonstrate that the risk of

12  an execution conducted in compliance with California's lethal-injection regulations, as they are

13  written, is substantial when compared to the known and available alternatives. *Baze*, 553 U.S. at

14  52.

15  Instead, Plaintiffs state that an inmate will suffer pain during an execution *if* the first drug in

16  the process is not administered correctly. (Am. Compl. 12:27-13:1 ("It is indisputable and

17  undisputed that an inadequately anesthetized inmate injected with potassium chloride will

18  experience torturous pain."); 33:2-5 ("Instead, Defendants' Regs./Op 770 intends to continue to

19  make use of the same complicated three drug protocol involving the use of two drugs which

20  indisputably cause excruciating pain when improper sedation occurs."); 51:8-10 ("Inducing and

21  maintaining a sufficient level of unconsciousness by correctly administering sodium thiopental is

22  indispensible to preventing the wanton infliction of severe pain when the potassium chloride

23  overdose is administered.").

24  Plaintiffs defective claim attempts to attack aspects of California's lethal-injection

25  regulations which are substantially similar to or exceed comparable aspects of the Kentucky

26  protocol upheld in *Baze*. And they fail to state facts that allege a particular aspect of California's

27  protocol poses a substantial risk of serious harm such as severe pain. Plaintiffs also fail to plead

28  specific alternative procedures that are feasible, readily implemented, and do not plead facts

12

1    showing that there are alternative procedures which will significantly reduce a substantial risk of

2    severe pain when compared to the current California regulations.

3         **1.  Plaintiffs Fail to Allege a Facial Claim That the Regulations Lack**
            **Sufficient Requirements for the Minimum Qualifications and**
4           **Experience Required for Intravenous Sub-Team Members.**

5         Plaintiffs incorrectly allege that California's regulations fail to require adequate screening

6    of members of the Intravenous Sub-Team, and do not require minimum qualifications and

7    experience levels for team members.  (Am. Compl. 6:19-20, 9:14-15, 27:23-26 (alleged lack of

8    psychological criteria), 28:6-8 (no exclusion of individuals who in the past worked in the

9    condemned housing unit), 40:6-11 (failure to require experience with IVs), 40:14-15 (failure to

10   specify the categories of professional certifications required for team membership, which was an

11   aspect of the Kentucky protocol approved in *Baze*), 40:19-21 (failure to require qualified medical

12   personnel), 41:13-15, 44:24-25, 45:5-6 (failure to require experience monitoring IV lines), 50:9-

13   12 (failure to specify qualifications required of IV team members), and 50:14-16 (failure to

14   specify team members must have experience with IV line blockages).

15        In fact, California's regulations are either substantially similar to, or exceed, the Kentucky

16   protocol approved by the Supreme Court in this regard.  As noted above, California requires that

17   its Intravenous Sub-Team members must be licensed medical professionals.  Cal. Code Regs. tit.

18   15 § 3349.1.2(4).  California's written requirement that qualifying professionals are limited to

19   those who maintain current licensure and certification for the setting of IV catheters and lines

20   serves to, like Kentucky's protocol, limit qualifying team members to medical professionals who

21   are required by law to obtain the education and training necessary to perform these services for

22   the general public.  Although California does not, like Kentucky, require that team members have

23   at least one year of prior experience, this is not significant because California has the added

24   requirement that its team members must also concurrently work in positions outside of the

25   execution team where they are required to regularly provide IV services.  *Id.*

26        ///

27        ///

28

13

## 2. The Training Required by California Exceeds What Was Noted With Approval in *Baze.*

Plaintiffs have failed to state a claim that California's regulations regarding training of execution-team members violates the Eighth Amendment.  Although Plaintiffs assert in a conclusory manner that the regulations lack sufficient criteria and requirements for the training of execution-team members, the truth is that California's requirements in this regard exceed the Kentucky training requirements approved in *Baze.*

Plaintiffs allege that California's regulations as written fail to require sufficient training for execution team members, criteria for trainers of the team, and do not require documentation of training.  (*Id.* at  6:19, 9:1-7, 9:14-15, 13:18-19 (regulations as written "lacks even the most basic protection or training regimen"), 30:13-21, 41:17-19, 41:20-21, 41:22-25 (regulations do not require 10 training sessions a year, which was required in the Kentucky protocol approved in *Baze*), 41:27-28 (no requirement for training attendance records), 42:3-4 (failure to provide for an evaluation team to evaluate training sessions), 42:5-7, 42:9-10, 42:13-16 (failure to require training which includes setting of IV catheters on live subjects, as was required by the Kentucky protocol approved in *Baze*), 43:8-11, 50:3-5, and 50:9-12.)

But Plaintiffs again ignore the amount of training required by California's regulations, and fail to note that it exceeds what was required under the Kentucky protocol approved in *Baze*.  California requires 12 full eight-hour training sessions per year.  Cal. Code. Regs. tit. 15 § 3349.1.4(c).  In addition, California requires that team members also participate in daily training sessions for the three days before each execution.  *Id.* § 3349.1.4(d)(4).  By contrast, Kentucky only requires 10 training sessions per year.  *Baze*, 553 U.S. at 55.  And California requires documentation of training sessions by mandating that each sub-team leader must maintain a training file that includes a record of all lethal-injection-process training sessions.  Cal. Code. Regs. tit. 15 §§ 3349.1.4(e)(1), 3349.2.2(e)(1).

California's screening and training requirements are more than sufficient when compared to the requirements noted by the Supreme Court in *Baze*.  Indeed, various circuit courts have upheld execution protocols that have training and team-member-qualification requirements which are

14

1   similar, or less stringent, than those found in California's written regulations.  *See Cooey II v.*

2   *Strickland*, 589 F.3d 210 (6th  Cir. 2009) (regarding Ohio's qualifications, and training

3   requirements, for execution team members); *Harrison v. Little*, 571 F.3d 531, 538 (6th Cir. 2009)

4   (finding that the use of two paramedic technicians to administer the IV and monthly training

5   sessions of the execution team provided sufficient safeguards to assume proper administration of

6   Tennessee's protocol); *Emmett v. Johnson*, 532 F.3d 291, 295 (4th Cir. 2008) (finding sufficient

7   Virginia's requirements that the execution team undergo eight hours of training per month and

8   that at least two team members "have received training as military corpsmen, cardiac emergency

9   technicians, or should receive on-the-job training from a physician in receiving and dispensing

10   medications, to include starting and administering IV fluids"); *Hamilton v. Jones*, 472 F.3d 814,

11   816 (10th Cir. 2007) (rejecting a similar challenge to Oklahoma's protocol, which requires that

12   "an EMT-P or person with similar qualifications and expertise in IV insertion" establish the IV

13   drips).

14        Plaintiffs have failed to allege that the requirements found in California's written

15   regulations for the training, screening, qualifications, and evaluations, of Intravenous Sub-Team

16   members violate the Eighth Amendment, and their claims must be dismissed.

17        **3.  California's Requirements for Mixing Sodium Thiopental and Training
          in This Regard Comport With Baze.**

18

19        Plaintiffs have also failed to state a claim that California's regulations violate the Eighth

20   Amendment because the regulations allegedly do not establish requirements for the knowledge

21   and training team members must have to mix sodium thiopental.  California, like Kentucky,

22   requires that the team mix this drug according to the manufacturer's instructions, and therefore

23   California does not differ from the Kentucky protocol approved by the U.S. Supreme Court in this

24   regard.  Cal. Code Regs. tit. 15 § 3349.4.3(b); *Baze*, 553 U.S. at 54.  Further, California's

25   regulations specify that team members must participate in at least 12 full eight hour training

26   sessions per year in the entire execution procedure.  Cal. Code Regs. tit. 15 § 3349.1.4(c).

27   Therefore, California requires training in, among other parts of the execution process, the mixing

28   of this chemical.  California's regulations exceed those of Kentucky in this regard.  Plaintiffs'

15

attack against California's regulations pertaining to the mixing of sodium thiopental must be

dismissed.

### 4. California's Regulations Regarding a Check for Inmate Consciousness Exceed the Kentucky Protocol Approved In *Baze*.

Plaintiffs have also failed to state a claim that California's regulations, as written, lack

constitutionally sufficient qualification and training requirements for Intravenous Sub-Team

members regarding the need to check for an inmate's unconsciousness during the execution

procedure. Plaintiffs' allegations simply ignore *Baze* and disregard California's written

requirements in this regard.

Plaintiffs assert in a conclusory manner that California's regulations as written violate the

Eighth Amendment because they do not require that a person with unspecified "relevant" medical

experience check for consciousness after administration of sodium thiopental. They further

contend that California's regulations lack specific criteria for training on this subject, or criteria

for screening of potential Intravenous Sub-Team members for expertise in this task. (Am. Compl.

at 31:21-25, 32:1-3, 45:7-8, 50:16-18, 51:14-16, and 51:11.) Plaintiffs also allege that the

regulations lack requirements for equipment, and qualified personnel to use such unspecified

equipment, to ensure unconsciousness. (*Id.* 39:1-5.) And Plaintiffs allege the regulations do not

require team members to check for whether an inmate is unconscious throughout the procedure.

(*Id.* 46:1-2.) Also, Plaintiffs allege that the regulations do not provide for what team members

should do if an inmate becomes conscious during the administration of the second or third drugs.

(*Id.* 51:15-16.)

But the Kentucky protocol approved by the Supreme Court simply required that a warden

and deputy warden observe the inmate for consciousness during an execution, and did not require

any specialized procedures, training or equipment in this regard. *Baze, 553 U.S.* at 58-60. By

contrast, as was noted by Justice Ginsberg in her dissent in *Baze*, California's measures to check

for inmate consciousness go beyond Kentucky's. *See id.* at 553 U.S. 120-21. California requires

two consciousness checks before the second and third drugs are administered. An inmate is given

only half of the sodium thiopental, 1.5 grams, before the first consciousness assessment. Cal.

16

1  Code Regs. tit. 15 § 3349.4.5(g)(5)(A). The Intravenous Sub-Team member located in the

2  execution room is then required to brush the back of a hand over the inmate's eyelashes, speak to

3  and gently shake the inmate. *Id.* Observations must be documented. *Id.* Thereafter, if the inmate

4  is unresponsive, the remaining 1.5 grams of sodium thiopental shall be administered, and a

5  second consciousness check performed. *Id.* § 3349.4.5(g)(5)(C). If the inmate is unconscious,

6  the remaining syringes are administered. *Id.* § 3349.4.5(g)(5)(C)-(H). If he is not unconscious, a

7  full set of chemicals from a second tray will be administered through a backup IV catheter, with

8  two additional consciousness checks performed before the second and third drugs can be

9  administered. *Id.* § 3349.4.5(g)(6).

10       In addition, Plaintiffs attempt to allege that California's regulations bar the Warden from

11  the execution room, and that the inmate will not be closely monitored during an execution. But

12  these allegations, once again, simply ignore California regulations to the contrary. California's

13  regulations require that the Warden, as well as one of the licensed medical professionals on the

14  Intravenous Sub-Team, must be present in the execution room and in close proximity to the

15  inmate during the execution. *Id.* at §§ 3349.4.5(f), 3349.4.5((d)(8).

16       **5. California's Required Dosage of Sodium Thiopental Is Identical to**
           **Kentucky's—Three Grams.**

17

18       Further, Plaintiffs attempt to facially attack California's regulations as written by

19  vaguely alleging that there is something wrong with the dosage level of sodium thiopental

20  required by California's regulations. However, the dosage of this chemical required by California

21  is identical to that required by Kentucky's protocol—three grams. *Id.* § 3349.4.5 (g)(5)(A) and

22  (B); *Baze*, 553 U.S. at 45. Plaintiffs have also failed to state a claim in this regard.

23       **6. Additional Inaccurate and Implausible Attacks on the Regulations As**
           **Written Fail to State a Facial Challenge.**

24

25       Plaintiffs' remaining attacks against California's regulations, as they are written, are simply

26  implausible, or make incorrect assertions about the terms of California's written regulations, and

27  do not rise to the level of an alleged Eighth Amendment violation. For example, Plaintiffs allege

28  that the regulations do not sufficiently govern the selection of the veins to be used for an

17

1   execution.  (Am. Compl. 39:23-40:2.)  But that is false.  Cal. Code  Regs. tit. 15 § 3349.3(c)(3) &

2   (4).  Plaintiffs admit that California constructed a new execution facility, yet implausibly assert

3   that the Eighth Amendment is somehow violated unless California adopts a written prohibition

4   against conducting executions in the dark.  (Am. Compl. 44:24-25 )  Plaintiffs' allege that the

5   Warden of San Quentin is excluded from the execution room, but this is false.  *Id.* § 3349.4.5(f).

6   Plaintiffs allege that the regulations exclude doctors from the execution process, but this is also

7   false.  *Id.* §§ 3349.4.5(g)(7) and (8).  Plaintiffs allege that the use of the three chemicals in

8   question violate FDA recommended uses for these drugs, but this does not state a plausible or

9   coherent Eighth Amendment claim.  Examples of other irrelevant allegations which cannot be

10  considered Eighth Amendment violations include claims that the regulations are defective

11  because they do not require approval of executions by a court appointed receiver overseeing

12  medical care for California inmates (Am. Compl. 41:1-4), an alleged failure to exclude from the

13  execution teams all medical personnel currently employed by CDCR (*id.* at 41:6-11), and the

14  alleged use of IV lines for a procedure for which they were not intended (*id.* at 38:27-28).

15      In summary, although Plaintiffs, in their 57 page complaint, have in a repetitious manner

16  attempted to allege every possible alleged "best practice" and permutation of such practices that

17  they claim are not found in California's regulations, they have not stated facts sufficient to allege

18  a claim that California's execution regulations, as they are written, will result in substantial pain

19  to a condemned inmate in violation of the Eighth Amendment.

20      Plaintiffs have not stated facts sufficient to allege a facial challenge to California's

21  execution regulations as they are written, and as a result their facial challenge must be dismissed.

22      **C.    Plaintiffs Have Failed to State a Claim That an Alternative to California's
            Regulations Will Eliminate a Substantial Risk of Severe Pain.**

23

24      In *Baze,* the Supreme Court noted that a condemned prisoner cannot successfully challenge

25  a State's execution method merely by demonstrating a slightly or marginally safer alternative.

26  According to the Court, "permitting an Eighth Amendment violation to be established on such a

27  showing would threaten to transform courts into boards of inquiry charged with determining 'best

28  practices' for executions, with each ruling supplanted by another round of litigation touting a new

                                    18

and improved methodology." *Baze*, 553 U.S. at 51.  Alternatives proffered by a condemned

prisoner must instead effectively address a "substantial risk of serious harm."  *Id*. at 52 (quoting

*Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  To qualify, the alternative procedure must be

"feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain."

*Id*.

In their fourth amended complaint, Plaintiffs fail to describe such an alternative procedure.

At various points in the complaint, Plaintiffs make vague references to alternatives to Defendants'

three-drug combination.[4]  However, they strain to avoid identifying any particular lethal-injection

method that would satisfy the Eighth Amendment.  While they briefly acknowledge the single-

drug protocols adopted by Ohio and Washington, they never specifically state that those protocols

are constitutional or allege how they meet the *Baze* test by eliminating a substantial risk of severe

pain when compared to California's regulations as written.  Plaintiffs assert that the "three drug

procedure . . . creates a present risk of severe pain and suffering," but fail to specify an alternative

procedure that would effectively address the "substantial risk of serious harm" to an inmate that

would allegedly occur if Defendants conducted an execution with the new regulations.  *Baze*, 553

U.S. at 52.

Plaintiffs' complaint fails to set forth an alternative procedure that is feasible, readily

implemented, and will significantly reduce a substantial risk of severe pain.  Under *Baze*, a

condemned inmate must present such a procedure in challenging a State's method of execution.

Accordingly, because Plaintiffs fail to allege a claim that Defendants' regulations should be

displaced by an alternative protocol, this claim in the complaint should be dismissed.

---

[4] For example, they contend that "Defendants' continued use of their three-drug procedure when tested, available alternatives exist establishes that the demonstrated risk of severe pain by Defendants' process is substantial when compared to the known available alternatives." (Am. Compl. at 2:20-23.)  They note that Ohio and Washington employ a method that uses solely thiopental, thereby avoiding the second and third drugs, pancuronium and potassium chloride.  (*Id*. at 47:18-20.)  Near the end of the complaint, Plaintiffs assert that "feasible, readily implemented alternative procedures exist that would significantly reduce the substantial risk of excruciating pain created by the . . . deficient protocol.  These alternative procedures include, but are not limited to, a protocol that remedies the deficiencies" described in the complaint.  (*Id*. at 59:9-13.)

19

1

2                                    **CONCLUSION**

3         Plaintiffs fail to state a claim consisting of a facial attack against California's regulations.

4  Nor have they stated a claim for the invalidation of California's lethal injection regulations on the

5  basis that there exists an alternative that would significantly reduce a risk of severe pain when

6  compared to California's execution method.  These facial attacks against California's execution

7  regulations claims must be dismissed pursuant to Rule 12(b)(6).

8         Plaintiffs' only claim which ought to remain at this point, simply because it has yet to be

9  challenged by Defendants, is Plaintiffs' dubious claim that, because CDCR allegedly did not

10 comply with a defunct execution protocol four or more years ago, it should be assumed that

11 CDCR is not now in compliance with current regulations that went into effect on August 29,

12 2010.  All other claims should be dismissed.

13

14 Dated:  October 25, 2010                      Respectfully Submitted,

15                                               EDMUND G. BROWN JR.
                                                 Attorney General of California
16                                               THOMAS S. PATTERSON
                                                 Supervising Deputy Attorney General
17

18

19                                               s/ Jay M. Goldman
                                                 JAY M. GOLDMAN
20                                               Deputy Attorney General
                                                 *Attorneys for Defendants*
21                                               *Schwarzenegger, Cate, and Cullen*

22 SF2007200210
   20360111.docx
23

24

25

26

27

28

                                           20

# CERTIFICATE OF SERVICE

Case Name:   **Michael Angelo Morales v. James Tilton, et al.**      No.   **C 06-0219 JF**

I hereby certify that on **October 25, 2010**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

2. **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT'S FACIAL CHALLENGES TO CALIFORNIA'S LETHAL-INJECTION-EXECUTION REGULATIONS, CAL. CODE REGS. TIT. 15 §§ 3349, ET SEQ., UNDER FRCP 12(b)(6) FOR FAILURE TO STATE A CLAIM**

3. **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE (EXHIBIT A)**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  On **October 25, 2010**, I will mail the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

**Habeas Corpus Resource Center**
**303 Second Street, Suite 400 South**
**San Francisco, CA 94107**

**Janice H. Lam**
**Jenner & Block**
**One IBM Plaza**
**Chicago, IL 60611**

**Michael G. Millman**
**California Appellate Project**
**101 Second St., Suite 600**
**San Francisco, CA 94105**

**Office of the Inspector General**
**P.O. Box 348780**
**Sacramento, CA 95834**

**Stephanie L. Reinhart**
**Jenner & Block**
**One IBM Plaza**
**Chicago, IL 60611**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **October 25, 2010**, at San Francisco, California.

|  |  |
|---|---|
| D. Criswell | s/ D. Criswell |
| Declarant | Signature |

20361923.doc