David A. Senior (# 108579)
MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
LAW OFFICES OF JOHN R. GRELE
149 Natoma Street, Third Floor
San Francisco, CA 94105
Phone: (415) 348-9300
Fax: (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
rsteinken@jenner.com

Attorneys for Plaintiffs
MICHAEL A. MORALES and
ALBERT G. BROWN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| MICHAEL ANGELO MORALES, ALBERT G. BROWN, | ) CASE NO. C 06 0219 (JF) (RS) ) C 06-0926 (JF) (RS) ) |
| Plaintiffs, | ) ) ) OPPOSITION OF PLAINTIFFS MICHAEL |
| v. | ) A. MORALES AND ALBERT G. BROWN ) TO DEFENDANTS' MOTION TO DISMISS |
| MATTHEW CATE, Secretary of the California Department of Corrections and Rehabilitation, et al., | ) ) ) |
| Defendants. | ) Date:   December 2, 2010 ) Time:   1:30 pm ) Place:  Courtroom 3 |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 2

    STATEMENT OF THE ISSUES TO BE DECIDED.................................................. 2

    SUCCINCT STATEMENT OF RELEVANT FACTS .............................................. 2

    SUMMARY OF ARGUMENT .................................................................................. 4

    1.    The Fourth Amended Complaint Sets Forth Sufficient Facts to Support a Cognizable Legal Theory That is Plausible on Its Face. .............................. 6

        A.  California's Regulations Do Not Require Experience Inserting Intravenous Catheters. ................................................................................. 9

        B.  California's Consciousness Check Provisions Do Not Cure Any Deficiencies............................................................................................... 11

        C.  Plaintiffs' Claims Are Plausible Based upon California's Record Which Is Starkly Different Than the Record in Kentucky. ........................................ 12

            1.  Intravenous Sub-Team Members Are Inadequately Trained to Place Intravenous Lines and Mix Sodium Thiopental........................................... 13

            2.  The Infusion Sub-Team's Experience and Training Are Deficient. ....... 15

            3.  California's Failure to Employ an Equally Effective Alternative Protocol Creates a Facially Plausible Eighth Amendment Violation. ......... 17

            4.  None of the Allegations are False or Implausible.................................. 19

    2.    Plaintiffs Should be Granted Leave to Amend in the Event There Is a Pleading Deficiency. ................................................................................... 19

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Baze v. Rees*, 553 U.S. 35 (2008)............................................................................ passim

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 6

*Chester v. Beard*, 657 F. Supp. 2d 534 (M.D. Pa. 2009) ........................................... 7

*Cooey v. Strickland*, 610 F. Supp. 2d 853 (S.D. Ohio Apr. 21, 2009) ....................... 8, 10

*Dickens v. Napolitano*, No. 07-1770-PHX-NVW (D. Ariz. Aug. 29, 2008) ..................... 8

*Emmett v. Johnson*, 532 F.3d 291 (4th Cir. 2008) ............................................ 14

*In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762 (N.D. Cal. 2010) ................. 6, 19

*Jackson v. Danberg*, 594 F.3d 210 (3d Cir. 2010)............................................ 10

*Jackson v. Danberg*, No. 06-300-SLR, 2009 WL 612469 (D. Del. Mar. 11, 2009)........... 8

*Lucas v. Dep't of Corrs.*, 66 F.3d 245 (9th Cir. 1995).......................................... 19

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008) ...................... 6

*Morales v. Hickman*, 438 F.3d 926 (9th Cir. 2006) ............................................ 12

*Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006) ............................................ 5, 16

*Nooner v. Norris*, 594 F.3d 592 (8th Cir. 2010) ............................................ 10

*Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010)........................................... 10

*Thorson v. Epps*,  2009 WL 1766806 (N.D. Miss. 2009) ................................... 7

**Statutes**

Fed. R. Civ. P. 8(a)(2)......................................................................................... 4

**Other Authorities**

Cal. Code Regs tit. 15, § 3349.1.3(c)(2) ............................................................. 11

Cal. Code Regs. tit 15, § 3349 et seq. ........................................................... 2, 14

Cal. Code Regs. tit. 15 § 3349.1.2(f)(4)......................................................... 10, 11

Cal. Code Regs. tit. 15, § 3349.1.2(f)(5)........................................................... 16

Cal. Code Regs. tit. 15, § 3349.1.4. ................................................................. 16

Cal. Code Regs. tit. 15, § 3349.4.5(g)(5)............................................................ 11

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

3

## STATEMENT OF THE ISSUES TO BE DECIDED
## [L.R. 7-4(a)(3)]

4

5        1.   Whether plaintiffs' challenges to California's lethal injection protocol in their

6   Fourth Amended Complaint state claims for relief that are plausible on their face, in light

7   of the legal standard set forth in *Baze v. Rees*, 553 U.S. 35 (2008).

8

9        2.   Whether plaintiffs have plausibly alleged that California's continued use of a

10  three-drug lethal injection protocol after a finding of a constitutional violation violates the

11  Fifth, Eighth, and Fourteenth Amendments.

12

13   ## SUCCINCT STATEMENT OF RELEVANT FACTS
     ## [L.R. 7-4(a)(4)]

14

15       On July 30, 2010, the state of California promulgated its Lethal Injection

16  Regulations, effective August 29, 2010.  No. 432; Cal. Code Regs. tit 15, § 3349 et seq.

17  The Lethal Injection Regulations superseded California's previous lethal injection protocol,

18  OP 770, which "as implemented in practice through and including the date of the

19  evidentiary hearing in the 2006 Morales litigation created a 'demonstrated risk of severe

20  pain'" under *Baze v. Rees*, 553 U.S. 35 (2008).  Order Following Remand, Sept. 28, 2010,

21  at 4, No. 424.  Defendants' various versions of OP 770 and the Lethal Injection Regulations

22  "are remarkably similar."  *Id.* at 5.

23

24       On October 8, 2010, plaintiffs Michael A. Morales and Albert G. Brown,

25  condemned inmates in the custody of defendant California Department of Corrections and

26  Rehabilitation ("CDCR"), filed their Fourth Amended Complaint alleging that the Lethal

27  Injection Regulations, on their face and as applied, violate the Fifth, Eighth, and Fourteenth

28

Amendments.[1]  No. 428.  As this Court is aware, the amended complaint, prompted by defendants' repeated requests, merely was "a technical matter" to help the "Court to understand exactly what it is about these regulations that is constitutionally deficient."  RT 23-24, Sept. 21, 2010.  It was not "an amendment that would take a lot of time do."  *Id.* at 24.  It now is clear that the amendment was prompted by defendants as a pretext to make the instant ill-founded motion and to avoid responding to discovery.

Defendants move to dismiss *only* the facial challenge, arguing that the Supreme Court's holding in *Baze v. Rees*, 553 U.S. 35 (2008) ("*Baze*") foreclosed plaintiffs' claims regarding the regulation itself, as if that separation between a regulation that resembles the method of execution for the past 12 years is easily accomplished or appropriate given the record in this case and the stage of the litigation.  Mot. to Dismiss at 1,  No. 430.  Even under defendants' own construct,  they have failed to timely respond to the other allegations in the Fourth Amended Complaint (Scheduling Order, Oct. 5, 2010, at 1, No. 425), and plaintiffs have filed a Request to Enter Default as to these claims.

Defendants appear to have forgotten their own pronouncement when seeking to move forward that "[r]egardless of how the Supreme Court rules in *Baze*, this Court will almost certainly need to consider specific features of the new protocol to determine whether it and the new chamber address the Court's concerns in light of the Supreme Court's ruling.  Because this Court has indicated that it has 'no intention of interfering with or delaying California's implementation of a constitutional execution

---

[1]    Plaintiffs' Fourth Amended Complaint is not the result of any prior pleading deficiencies by plaintiffs, but instead has been brought about by defendants' execution protocol deficiencies which have led defendants to author three remarkably similar versions of the protocol since 2006.  Under such circumstances, the opportunity to amend in response to a motion to dismiss, if required, is more pronounced.

protocol,' and *because an evidentiary showing will be required in any event*, the current schedule should be maintained to create an appropriate and adequate record."  No. 338, at 2 (emphasis added).  As defendants noted then "[t]he questions regarding (1) the screening of execution team members, (2) the training, supervision and oversight of the execution team, (3) the recordkeeping in connection with executions, (4) the mixing, preparation, and administration of the sodium thiopental by the execution team, and (5) the facility in which the execution team must work, will almost certainly remain relevant regardless of how the Supreme Court rules in Baze."  *Id.*  Defendants' position that fact development is necessary because of the record here – regardless of the *Baze* opinion – is as true today as it was then.

## SUMMARY OF ARGUMENT
## [L.R. 7-4(a)(5)]

This Court should deny defendants' motion to dismiss plaintiffs' facial claims. Plaintiffs' complaint sets forth the requisite "short and plain statement" (Fed. R. Civ. P. 8(a)(2)) alleging plausible Fifth, Eighth, and Fourteenth Amendment violations that satisfy their pleading obligations.

Defendants misconstrue and misapply *Baze.*  The test to determine whether a challenge to an execution method is a sufficient claim for relief is not whether the written protocol is itself like the written protocol examined in *Baze.*  In *Baze* itself and nearly every case after it, the courts examined the record of how the protocols work in practice and who is responsible for what.  Nor is the test for pleading alternatives to the method approved in *Baze* one that requires a plaintiff to pronounce a certain method Eighth Amendment challenge proof.  And, it defies logic and reason for a court to examine a written protocol to determine its validity without examining the previous constitutional error in the procedures

1    and whether plaintiffs have sufficiently pled that those errors continue and have not been

2    addressed and rectified by the new protocol.  Given the posture of this case, it is defendants

3    who should bear the burden of establishing that the protocol cures the violations.

4    Examined in this fashion, defendants' motion is really an effort to avoid establishing

5    constitutional viability or having to undertake any fact development in that regard; to wit,

6    to avoid implementing a protocol with both "reliability and transparency."  *Morales v.*

7    *Tilton*, 465 F. Supp. 2d 972, 981 (N.D. Cal. 2006).

8

9            In any event, even if the sole role of the Court in response to a motion to dismiss

10   was to examine whether a plaintiff has pled that a protocol appears dissimilar to

11   Kentucky's as discussed in *Baze,* such that a substantial risk of harm results (or continues),

12   plaintiff has done so here.  California's Lethal Injection Regulations are the same as its

13   predecessor protocol, OP 770, and are not substantially similar to Kentucky's protocol that

14   was reviewed, not on the pleadings, but after "extensive hearings."  *Baze*, 553 U.S. at 40,

15   46 ("After a 7-day bench trial during which the trial court received the testimony of

16   approximately 20 witnesses, including numerous experts . . .").  The one large difference

17   being that unlike Kentucky, California had a very problematic record of executions.

18           The differences between the procedures are core features of the previously-

19   established violations.  For example, unlike in Kentucky, but as was the case under OP 770,

20   the members of California's Intravenous Sub-Team are not required to have any experience

21   setting intravenous catheters, and the Intravenous Sub-Team and the Infusion Sub-Team

22   are inadequately trained.  4th Am. Compl. at 40, 43, No. 428.  Another example is that

23   unlike in Kentucky, the protocol here permits the same persons to undertake the same tasks

24   that they have already proven incapable of accomplishing, permits the same degree of

supervision and training that has already been found deficient, and permits the same

manner of effectuating executions (with one exception, discussed below) already found to

be too unreliable and risk-prone to survive constitutional challenge.

Moreover, defendants have not adopted or even seriously considered a known and

available alternative, the one-drug protocol and/or appropriate physician participation and

monitoring, despite the fact that such methods are used in other states, their use is

supported by defendants' own experts, and defendants themselves have twice represented

when they sought to execute plaintiffs that a single drug protocol is a viable, safe and

reliable method of execution.  4th Am. Compl. at 47, No. 428.  To the extent that

defendants claim such references to alternatives are "vague", that is a matter particularly

susceptible to fact development and/or amendment.

**1.** **The Fourth Amended Complaint Sets Forth Sufficient Facts to Support a Cognizable Legal Theory That is Plausible on Its Face.**

Dismissal under Federal Rule of Civil Procedure 12(b)(6) "is appropriate only

where the complaint lacks a cognizable legal theory or sufficient facts to support a

cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104

(9th Cir. 2008).  "For purposes of a motion to dismiss, the plaintiff's allegations are taken

as true, and the court must construe the complaint in the light most favorable to the

plaintiff."  *In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762, 768 (N.D. Cal. 2010)

(citing *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969)).  To survive a motion to dismiss,

plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995).

The facts and legal theories set forth in the complaint are cognizable and plausible. The best evidence of this is that they were cognizable and plausible, *and provable*, in 2006 as found by this Court on more than one occasion, and continued to be cognizable and plausible in 2010, when the Court again found a constitutional violation under *Baze*. At the least, the issues raised by defendants are questions of fact to be determined, as in *Baze*, after "extensive hearings." *Baze*, 533 U.S. at 40. The three-justice plurality in *Baze*, assuming it announced the operative standard, engaged in fact-specific inquiry concerning a number of features: the experience of IV team members; the fact that practice sessions require 10 sessions per year with a complete walk through, including setting catheters; and, the current personnel qualifications (EMT with daily experience setting catheters). The citations to the record and findings after the hearing in *Baze* appear throughout the plurality opinion. *Id.* at 49, 54-57 and 60. Justices Stevens and Breyer were explicit in their holding that the constitutionality of the procedure depends on the facts. *Id.* at 71; *Id.* at 108. Justices Souter and Ginsberg were of the opinion that further factual development was required in *Baze* itself. *Id.* at 114. Thus, a full seven justices endorsed a fact-specific inquiry, with four of them specifically requiring it.

It is for this reason that other courts have required the very fact development regarding a protocol that is sought here, even in the face of the state's insistence that *Baze* obviates such an inquiry. *See Chester v. Beard*, 657 F. Supp. 2d 534 (M.D. Pa. 2009); *Thorson v. Epps*, 2009 WL 1766806 (N.D. Miss. 2009); *Cooey v. Strickland*, No. 2:04-cv-1156, at *1 (S.D. Ohio Aug. 26, 2008); *Cooey v. Strickland*, 610 F. Supp. 2d 853, 855-918

(S.D. Ohio Apr. 21, 2009); *Jackson v. Danberg*, No. 06-300-SLR, 2009 WL 612469 (D. Del. Mar. 11, 2009); *Dickens v. Napolitano*, No. 07-1770-PHX-NVW (D. Ariz. Aug. 29, 2008) (granting plaintiffs' motion for leave to depose execution personnel after *Baze* was decided).  These cases need to be distinguished from those involving a grant of summary judgment or one in which the protocol has already been found to be constitutional.  And, frequently lost among the discussion of *Baze* is that the substantially similar language by Chief Justice Roberts was on the context of obtaining a stay of execution.  *Id*. at 61.

Perhaps most significant here, Chief Justice Roberts noted the *lack* of any record regarding a single-drug procedure because it was "not proposed to the state courts below. As a result, we are left without any findings on the effectiveness" of such a procedure.  *Id*. at 56.  Thus, the need for such a record is evident according to *Baze* itself.  It is even more evident now that two states have formally adopted the single-drug procedure, as noted in the Complaint (4th Am. Compl. at 47, No. 428), and California has affirmed that it may execute under such a procedure with only three days' training.  And, of all the cases involving lethal injection, this one is perhaps the most developed record on the substantial risks that are established by the continued use of remote administration of the three-drug procedure and using and continuing to permit the use of unqualified and untrained personnel.  It is, therefore, appropriate and required that fact development as to this question occur here.

Notwithstanding the above, and even assuming the defendants' argument regarding the context in which the allegations must be viewed, plaintiffs allege – and the allegations must be taken as true under Rule 12(b)(6) – that California's Lethal Injection Regulations are not "substantially similar" to Kentucky's protocol, nor is the scientific or

factual landscape, and as a result, there is a demonstrated risk of severe pain when compared to known, viable alternatives.  These claims are plausible on their face.

It should also be noted that defendants fail to address much of the Fourth Amended Complaint in their motion, focusing only on qualifications, training, mixing, consciousness checking, and the dosages.  As is evident in a review of the Fourth Amended Complaint, there is much more at issue here, including inadequate selection and failure to provide for back up procedures if venous access is limited or improbable as has occurred in several states and in California.  Plaintiff will address only those issues raised by defendants' motion and simply note that the defective nature of the motion makes relief for failure to state a claim entirely inappropriate at the pleading stage.

### A.    California's Regulations Do Not Require Experience Inserting Intravenous Catheters.

Chief among the complaints based on the evidence before the Court was the defendant CDCR's failure to provide personnel who could adequately insert catheters.  If the Court will recall, the IV personnel had great difficulty accessing veins and blew veins in several executions, and were unaware of the failure to obtain adequate IV access in at least one execution.  The evidence was further that the IV team was not permitted to insert IVs at San Quentin without physician approval and supervision, yet were undertaking the task during executions.  This has continued under the Regulations.

California's Lethal Injection Regulations fail "to provide any requirement for intravenous team members to have any requisite length of experience in inserting intravenous catheters, or to have any actual experience inserting intravenous catheters for inmates or any other population. . . ." 4th Am. Compl. at 40, 50, No. 428.  It is *plausible*

that this protocol deficiency could cause a failure in the setting and inhibit or prevent the

delivery of sodium thiopental to the inmate during the execution as California "execution

logs indicate that sodium thiopental did not have its expected effect or function as expected

in 64% of lethal-injection executions . . ."  Order Following Remand, Sept. 28, 2010, at 4,

No. 424.

In *Baze*, however, the Supreme Court noted that:

> Kentucky has put in place several important safeguards to
> ensure that an adequate dose of sodium thiopental has
> been delivered to the condemned prisoner.  The *most
> significant* of these is the written protocol's requirement
> that members of the IV team must have at least one year
> of professional experience as a certified medical assistant,
> phlebotomist, EMT, paramedic, or military corpsman.

*Baze*, 553 U.S. at 55 (emphasis added).

Defendants concede in their motion that California's Lethal Injection Regulations

do not require that Intravenous Sub-Team members have *any* prior professional experience.

Mot. to Dismiss at 13, No. 430.  Cal. Code Regs. tit. 15 § 3349.1.2(f)(4).  By comparison,

the execution protocols in Arkansas, Delaware, Ohio, and Texas, which have been upheld

by other Courts of Appeals, all require execution team members to have at least one year

professional experience.  *Nooner v. Norris*, 594 F.3d 592, 605 (8th Cir. 2010) (Arkansas -

two years); *Jackson v. Danberg*, 594 F.3d 210, 213 (3d Cir. 2010) (Delaware - one year);

*Cooey v. Strickland*, 589 F.3d 210, 219 (6th Cir. 2009) (Ohio - one year); *Raby v.

Livingston*, 600 F.3d 552, 555 (5th Cir. 2010) (Texas - one year).

Further, the Intravenous Sub-Team only must have current experience "setting up

intravenous lines," "which is distinguished from actually inserting catheters" and need not

have any experience inserting catheters in inmates.  4th Am. Compl. at 40, No. 428.  Cal.

Code Regs., tit. 15, § 3349.1.2(f)(4).  Since the Intravenous Sub-Team must "[i]nsert the intravenous catheters into appropriate veins" and "[m]onitor the intravenous lines to ensure patency of the lines," and the same personnel as previously employed are permitted to do so under the Regulations, it is *plausible* that this lack of experience creates "a substantial and present risk of severe pain and suffering" in violation of the Eighth Amendment.  4th Am. Compl. at 38, No. 428.  Cal. Code Regs tit. 15, § 3349.1.3(c)(2).

Defendants' attempt to obscure this deficiency by claiming the IV team must "regularly provide IV services."  Mot. to Dismiss at 13.  Whatever this means, it is not in the Regulations.  If read carefully, the Regulations do not include any required experience inserting IVs or checking lines for deficiencies.

## B.   California's Consciousness Check Provisions Do Not Cure Any Deficiencies.

California's Lethal Injection Regulations require a member of the Intravenous Sub-Team to assess consciousness of the condemned inmate.  Cal. Code Regs. tit. 15, § 3349.4.5(g)(5).  The Kentucky protocol requires the warden and deputy warden to determine if the inmate is unconscious.  *Baze*, 553 U.S. at 43.

Although the defendants tout this as an "improvement" over the previous procedure and one that is better than Kentucky's, this is not so, at least without any fact development.   As noted in the Complaint, the Intravenous Sub-Team has no experience and inadequate training to assess consciousness.  The deficiency is important because California, unlike Kentucky, has not taken adequate steps "to ensure the proper administration of the first drug" (discussed *infra*).  *Id*. at 60.  In California, the Intravenous Sub-Team is "unable to determine whether an inmate is aware of or feeling pain at the time

the pancuronium bromide or the potassium chloride is administered, or if the administration

causes the prisoner to become able enough to sense the excruciating pain from

pancuronium bromide and, then, potassium chloride."  4th Am. Compl. at 11; No. 428.

This is a *plausible* claim because the California execution team members are not required

to have experience or undertake meaningful training to do so.  *See, e.g.,* No. 281 [Heath

Decl.], at 5, 13-18 (discussing experience and training necessary to assess anesthetic depth

prior to and during administration of all drugs).  Indeed, under the Regulation, Witnesses 3,

4 and 6 would be undertaking this effort.  Further, the Regulation stops the inadequate and

inexperienced assessment after the first drug.  Thus, the question of adequate anesthetic

during the administration of pancuronium bromide and potassium chloride remains

unaddressed.    The plausibility of this allegation and the risk to plaintiffs is underscored by

defendants' decision to retain and use licensed *anesthesiologists* to undertake this task

during plaintiff Morales' February 21, 2006 scheduled execution.  *See Morales v. Hickman*,

438 F.3d 926, 929 (9th Cir. 2006).

> ### C.    Plaintiffs' Claims Are Plausible Based upon California's Record Which Is Starkly Different Than the Record in Kentucky.

The Supreme Court's holding in *Baze* was based in large part on the trial court's

interpretation of the record.  *See, e.g., Baze*, 335 U.S. at 54 ("we cannot say [the trial

court's finding] is clearly erroneous . . . particularly when that finding is substantiated by

expert testimony.").  Here, however, the record is substantially different.  Based upon the

record, defendants' execution practices to date have been declared unconstitutional under

*Baze*.  Order Following Remand, Sept. 28, 2010, at 4, No. 424.  Currently, there exist

"substantial questions of fact as to whether at least some of the deficiencies of [the previous

1    protocol] have been addressed in actual practice."  *Id.* at 7.  As alleged in the Fourth

2    Amended Complaint, the record here provides sufficient facts to show a facially plausible

3    Eighth Amendment violation.

4

5             **1.      Intravenous Sub-Team Members Are Inadequately Trained**

6                      **to Place Intravenous Lines and Mix Sodium Thiopental.**

7             The Fourth Amended Complaint is replete with allegations based on the record

8    and the Regulations themselves that the Intravenous Sub-Team's training is deficient.  The

9    Team Administrator has no qualification or training: "there are no specific requirements

10   that the team leader has ever participated in an execution or has mastered any specific task

11   such as how to insert catheter, or prepare or infuse the chemicals.  . . .  [T]he team leader

12   position does not require prior team membership, execution training or experience."  4th

13   Am. Compl. at 30, No. 428.  The "failure to provide for anyone with adequate medical

14   training or expertise, or qualifications, to perform, oversee or review the training" "creates

15   a present and substantial risk that a prisoner would not receive the necessary amount of

16   anesthetic prior to being paralyzed by the pancuronium bromide and then experience the

17   severe unconstitutional pain of the potassium chloride."  4th Am. Compl. at 42, 50, No.

18   428.  When "the persons charged with administering the drugs and overseeing the process

19   are inadequately trained to do so and, due to this lack of training and the dangers presented

20   by improper administration of the drugs used to ensure death, Plaintiffs face the risk of

21   suffering 'the agony of asphyxiation' and 'tremendous burning in their veins and painful

22   heart attacks,' while being unable to express the pain experienced or convey their suffering

23   because of the paralysis induced by pancuronium bromide."  *Chester v. Beard*, 657 F.

24   Supp. 2d 534, 544 (M.D. Pa. 2009).  Such "allegations are sufficient to state a claim under

25

26

27

28

the Eighth and Fourteenth Amendments, notwithstanding the outcome in *Baze*." *Id.* The

allegations in the Fourth Amended Complaint are almost identical to those in *Chester*.

Moreover, defendants incorrectly contend that other Courts of Appeals have

upheld execution protocols that have training and team-member qualifications requirements

which are similar, if not less stringent, than those found in defendants' regulations. The

Fourth Circuit is the only Court of Appeals that has specifically addressed the

qualifications of the person training the intravenous team. It noted that Virginia's

intravenous team "receives training in the insertion and maintenance of IV lines from a

physician licensed to practice medicine by the Virginia Board of Medicine." *Emmett v.

Johnson*, 532 F.3d 291, 295 (4th Cir. 2008). California's Team Administrator, in contrast,

is the least experienced of all the team members. Cal. Code Regs., tit. 15 §§ 3349.1.2,

3349.1.4(a). "The training of lethal injection team members will be conducted by people

who are untrained themselves and therefore unqualified to instruct others." 4th Am.

Compl. at 30, No. 428.

It should be noted that defendants' records are such that training of core medical

personnel does not occur. This is consistent with the medical personnel non-CDCR

personnel opt-out provision from the training requirements. *See* 4th Am. Compl. at 41, No.

428. It also is contrary to defendants' assertions in their motion.

Even assuming the Regulations require some level of experience in inserting IVs,

another core factual dispute is whether it is true that medical personnel on the IV team at

CDCR are permitted to insert catheters without a doctor's supervision. Mot. to Dismiss at

4 n.1. The record before this Court is to the contrary, as are the allegations. *See* 4th Am.

Compl. at 40, No. 428.

Further, the medical personnel exemption from most of the training assures continued inadequate training as was described under OP 770. 4th Am. Compl. at 41, No. 428. In addition, as defendants note, it is only CDCR personnel who must train. Here, the Warden can employ others, who apparently have no such requirements. And, as noted, the defendants have already failed to follow their own training requirements for executions. 4th Am. Compl. at 43, No. 428.

Defendants argue the training file assures that training will occur. Mot. to Dismiss at 14. But the question is not whether there is a file; it is what is in that file. 4th Am. Compl. at 40-41, No. 428 (eliminating recording requirement as to who actually attends training). Defendants do not and cannot point to a single provision wherein it is noted who attended and what they did. No such Regulation exists. In fact, these records were eliminated specifically because they were used previously to demonstrate the lack of training of core medical personnel, a fact which one medical professional admitted.

## 2.   The Infusion Sub-Team's Experience and Training Are Deficient.

California's Lethal Injection Regulations "permit the same unqualified and incompetent persons to continue mixing sodium thiopental." 4th Am. Compl. at 43, No. 428. The regulations "failure to require [training in mixing sodium thiopental] greatly exacerbates the substantial risk that drugs will be improperly administered and condemned inmates will consciously experience excruciating pain during lethal injection." 4th Am. Compl. at 43, No. 428.

The Infusion Sub-Team, which is responsible for mixing the sodium thiopental, only needs to "(A) Be able to follow the directions provided by the manufacturer in mixing the lethal injection chemicals. (B) Possess the organizational skills necessary to

appropriately label and color code the chemicals used during the lethal injection process."
Cal. Code Regs. tit. 15, § 3349.1.2(f)(5). The Infusion Sub-Team is trained by the Team
Administrator, who does not have any relevant qualifications. Cal. Code Regs. tit. 15, §
3349.1.4.

Based upon the record in *Baze*, the Court upheld the Kentucky trial court's
conclusion that there was a "minimal risk of improper mixing" of sodium thiopental in part
because of expert testimony describing the mixing of sodium thiopental as "not difficult at
all." *Baze*, 553 U.S. at 54. In California, however, the record is quite different. "Among
other things, team members' admitted failure to follow the simple directions provided by
the manufacturer of sodium thiopental further complicates the inquiry as to whether
inmates being executed have been sufficiently anesthetized." *Morales v. Tilton*, 465 F.
Supp. 2d 972, 980 (N. D. Cal. 2006). Defendants' witnesses and experts could not agree
whether sodium thiopental in solution should be a "yellow, brownish tan color," "basically
clear," or "a very pale green." 4th Am. Compl. at 29-30, No. 428. The record reviewed by
Dr. Heath and undisputed by defendants was that Witness No. 6 improperly mixed the
chemicals. No. 281, at 3; 4th Am. Compl. at 29-30, No. 428.

Although defendants assert they now train in mixing the chemicals, the allegation
is that they do not. 4th Am. Compl. at 44, No. 428.[2]

Another allegation, supported by recent events, concerns the use of foreign
thiopental manufactured in an unknown country. 4th Am. Compl. at 43, No. 428.
Defendants do not even respond to this allegation. It is submitted that fact development

_____

[2] Defendants do not contend this is implausible, mainly because it is supported by the
fact that defendants ran out of thiopental some time ago and that their own training logs
contained no notations of any mixing in the forms designated for such notations.

will demonstrate that this is a particularly viable area of inquiry as to substantial risk because it can be demonstrated that different countries use different properties in their drugs, have different requirements as to shelf life, and even have different packaging and mixing instructions.

An improper dose of sodium thiopental would not render the condemned inmate unconscious during the execution, opening the door to the "unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride." *Baze*, 553 U.S. at 53.  It is *plausible* in California, now as before, that the Infusion Sub-Team's complete lack of experience and training is sufficient to create a "substantial and present risk of severe pain and suffering."  4th Am. Compl. at 38, No. 428.

Defendants do not address the allegations concerning the infusion of the drugs themselves and the lack of training for that process.

### 3.   California's Failure to Employ an Equally Effective Alternative Protocol Creates a Facially Plausible Eighth Amendment Violation.

No matter how much defendants argue that plaintiffs have not articulated an alternative under *Baze*, any fair reading of the Fourth Amended Complaint demonstrates that this assertion is simply unfounded. *See* 4th Am. Compl. at 47-48, 51-53, No. 428.

In *Baze*, the plurality noted, "the Commonwealth's continued use of the three-drug protocol cannot be viewed as posing an 'objectively intolerable risk' when no other State has adopted the one-drug method and petitioners proffered no study showing that it is an equally effective manner of imposing a death sentence." *Baze v. Rees*, 553 U.S. 35, 57 (2008).  Since *Baze*, the historical record is now more complete.  Plaintiffs' proposed one-drug protocol is a known and available alternative, which will eliminate the risk of severe

pain.  Other states have adopted the one-drug method.  "Since *Baze* was decided, two

states–Ohio and Washington–have carried out a total of nine successful and problem-free

executions using only sodium thiopental."  Order Granting Motion For Leave to Intervene;

and Denying Conditionally Intervenor's Motion for a Stay of Execution, Sept. 24, 2010, at

5, No. 401; 4th Am. Compl. at 47, No. 428.  Further, defendants' own experts have

indicated that the one-drug protocol is an equally effective manner of imposing the death

sentence:

> Defendants have ignored their own experts' advice in
> retaining the three-drug procedure. Dr. Singler advised
> them that it would be equally viable to use a single-drug
> procedure and at one time referred to the application of
> other drugs as the 'cosmetic portion of the process.'  Dr.
> Dershwitz has advocated this procedure.  The analyst
> employed by Defendant CDCR to research and revise the
> procedure in light of the Court's 2006 Memorandum of
> Intended Decision recommended a thiopental-only
> procedure.

4th Am. Compl. at 47-48, No. 428.

      As noted in the Fourth Amended Complaint, defendants themselves have twice

represented to this Court that a single-drug protocol is equally viable and feasible, and one

that has already been found to alleviate the substantial risk of pain demonstrated by the

record here.  4th Am. Compl. at 47, No. 428.

      Defendants' continued use of the three-drug protocol when an equally effective

alternative exists and is being used by other states creates a facially plausible Eighth

Amendment violation.  *Baze*, at 52 (when a state "refuses to adopt such an alternative in the

face of these documented advantages, without a legitimate penological justification for

adhering to its current method of execution, then a State's refusal to change its method can

be viewed as 'cruel and unusual' under the Eighth Amendment.")

Defendants insist that plaintiffs must allege that any alternative is Eighth Amendment compliant. No such requirement appears in *Baze* or anywhere else.

### 4. None of the Allegations are False or Implausible.

Defendants claim only a few portions of the Fourth Amended Complaint are inaccurate. Mot. to Dismiss at 17-18. For the most part, this results from Defendants inaccurate reading of the Fourth Amended Complaint. For instance, it is not the Warden's absence from the execution room that is in issue; it is his absence from the infusion room. 4th Am. Compl. at 42, No. 428. In other parts, defendants attempt to twist the Regulations into something they are not. For instance, doctors are included in the process, but only to monitor the EEG and declare death. And, the fact that defendants have devised a procedure that does not follow their own regulations and procedures is certainly strong support for allegations that they are ill-equipped to carry out the task at hand.

In any event, for purposes of a motion under Rule 12(b)(6), the allegations are taken as true, and defendants cannot quibble at this stage of the proceedings about whether they are accurate or can be proved by a preponderance of the evidence. *In re Facebook PPC Adver. Litig.*, 709 F. Supp. 2d 762, 768 (N.D. Cal. 2010).

### <u>2.</u> Plaintiffs Should be Granted Leave to Amend in the Event There Is a Pleading Deficiency.

Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrs.*, 66 F.3d 245, 248 (9th Cir. 1995). To the extent that plaintiffs' allegations fail to allege enough facts to state a plausible claim for relief, such a deficiency can be cured by amendment.

//

1

## <u>CONCLUSION</u>

2      For the foregoing reasons, plaintiffs Michael A. Morales and Albert G. Brown

3  request that this Court deny defendants' motion to dismiss, or, in the alternative, grant

4  plaintiffs leave to amend their Fourth Amended Complaint.

5

6  DATED: November 8, 2010          By: _____/s/_____

7                                   David A. Senior
                                     McBREEN &SENIOR
8
                                     Richard P. Steinken
9                                    JENNER & BLOCK

10
                                     John R. Grele
11                                   LAW OFFICE OF JOHN R. GRELE
                                     *Attorneys for Plaintiffs*
12                                   ALBERT G. BROWN
                                      MICHAEL A. MORALES
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28