1   David A. Senior (# 108579)
    MCBREEN & SENIOR
2   2029 Century Park East, Third Floor
    Los Angeles, CA 90067
3   Phone: (310) 552-5300
    Fax: (310) 552-1205
4   dsenior@mcbreensenior.com

5   John R. Grele (# 167080)
    LAW OFFICES OF JOHN R. GRELE
6   149 Natoma Street, Third Floor
    San Francisco, CA 94105
7   Phone: (415) 348-9300
    Fax: (415) 348-0364
8   jgrele@earthlink.net

9   Richard P. Steinken (admitted *pro hac vice*)
    JENNER & BLOCK LLP
10  353 N. Clark Street
    Chicago, IL 60654-3456
11  Phone: 312-222-9350
    Fax: 312-527-0484
12  rsteinken@jenner.com

13  Attorneys for Plaintiffs MICHAEL A. MORALES,
    ALBERT G. BROWN, MITCHELL C. SIMS, and STEVIE L. FIELDS
14
    ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE
15

16              **IN THE UNITED STATES DISTRICT COURT**

17            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18                        **SAN JOSE DIVISION**

19  MICHAEL ANGELO MORALES,            )  **CASE NO. C 06 0219 (JF) (RS)**
    ALBERT G. BROWN, MITCHELL CARLTON  )        **C 06-0926 (JF) (RS)**
20  SIMS, and STEVIE LAMAR FIELDS      )
                                       )
21  Plaintiffs,                        )  **LETTER BRIEF OF PLAINTIFFS**
                                       )  **MICHAEL A. MORALES, ALBERT G.**
22                                     )  **BROWN, MITCHELL C. SIMS AND**
    v.                                 )  **STEVIE L. FIELDS REGARDING**
23                                     )  **IMPACT OF DICKENS V. BREWER**
    MATTHEW CATE, Secretary of the California )
24  Department of Corrections and Rehabilitation, et )  **Date:  March 4, 2011**
    al.,                               )  **Time:  1:30 pm**
25                                     )  **Place:  Courtroom 3, Fifth Floor**
                                       )
26  Defendants.                        )
    _____)
27

28

**INTRODUCTION**

Plaintiffs Michael A. Morales, Albert G. Brown, Mitchell C. Sims, and Stevie L. Fields submit this memorandum in response to the Court's direction at the discovery status conference on February 11, 2011, that the parties submit letter briefs addressing the recent opinion of the United States Court of Appeals for the Ninth Circuit in the case of *Dickens v. Brewer*, No. 09-16539, 2011 WL 420682, 11 Cal. Daily Op. Serv. 1849 (9th Cir. Feb. 09, 2011), and its impact on discovery and the relevance of evidence of past constitutional violations in the present case.  Contrary to the Court's observation that the *Dickens* decision "narrows the scope of what's in play here"  (2/11/11 Tr. at 4), the significant legal and factual distinctions between *Dickens* and the present case render that opinion of limited value in considering the outstanding discovery issues here.

## I.   THE OPINION IN *DICKENS V. BREWER*

In *Dickens v. Brewer*, the Ninth Circuit examined whether Arizona's three-drug lethal injection protocol violated the Eighth Amendment by "creat[ing] an unconstitutional risk that an inmate will be improperly anesthetized and thus experience extreme pain and suffering while dying." 2011 WL 420682, at *1.  Although Arizona had no written protocol during that period of time, the state conducted 21 lethal injection executions between 1992 and 2007 and had never been found in violation of the Eighth Amendment with regard to its implementation of those executions.  After the execution in 2007, Arizona revised its procedures and eventually produced a written protocol dated November 1, 2007.  *Id.*, at *4.

In 2007, Dickens brought an action claiming that the protocol violated the Eighth Amendment because of the risk of improper anesthetization.  After discovery, the district court granted summary judgment in favor of Arizona, holding that the protocol contains sufficient safeguards to protect against improper anesthetization and thus is constitutional under the standard set forth in *Baze v. Rees*, 553 U.S. 35 (2009).  Dickens appealed, but "[o]n appeal, the heart of Dickens's argument is *not* that the safeguards in Arizona's protocol are inadequate."  *Dickens*, 2011 WL 420682, at *2-3. Rather, Dickens' central assertion was that the evidence gathered during discovery raises issues of fact as to whether Arizona will follow the protocol and ensure that the existing safeguards are

implemented.  The Ninth Circuit affirmed, holding that the safeguards were adequate under *Baze* and there was no material issue of fact regarding compliance with the protocol.

### A.   Past Problems with Executions Remain Relevant Under *Dickens*.

This Court has suggested that *Dickens* leaves Plaintiffs with a small "window of opportunity for the kinds of claims that the plaintiffs are making here" and that under that opinion "it's a very difficult showing that the plaintiff has to make."  2/11/11 Tr. at 6-7.  This court further opined that *Dickens* was quite restrictive "about the relevance of past problems with executions and how they bear on the showing that a plaintiff has to make under *Baze*."  2/11/11 Tr. at 5.  In *Dickens*, however, the Ninth Circuit made no rulings or decisions under *Baze* or the Federal Rules of Civil Procedure that would circumscribe the rights of a plaintiff in an as-applied constitutional challenge to conduct relevant discovery; to wit, the right to review materials regarding "any matter that bears on *or that reasonably could lead to* other matter that could bear on any issue that is or may be raised in a case." *Phoenix Solutions, Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 575 (N.D. Cal. 2008) (emphasis added); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

In *Dickens*, the Ninth Circuit noted that the plaintiff argued that the evidence produced in discovery demonstrated a substantial risk of a constitutional violation.  The Ninth Circuit concluded that *Baze* does not foreclose a claim that a protocol was unconstitutional as applied and held that a court must evaluate such a claim based upon the evidence presented.  The Ninth Circuit noted that while the *Baze* plurality "specifically stated that there was no evidence of improper implementation" of Kentucky's lethal injection protocol, in *Dickens* the plaintiff alleged such evidence existed and the court needed to review it.  *See id.*  The court emphasized that looking beyond the protocol's facial constitutionality to consider whether there is a substantial risk that it will be implemented in an unconstitutional manner "is an important inquiry.  If a court could never look beyond the facial constitutionality of an execution protocol when presented with evidence of improper administration, states could simply adopt constitutionally sufficient protocols similar to Kentucky's and then flout them without fear of repercussion."  2010 WL 420682, at *5.  Such is the result a narrow reading of the *Dickens* opinion would produce.

The fact that the Ninth Circuit ultimately concluded that there was no evidence of improper implementation of Arizona's protocol does not diminish the significance of the fact that Dickens had the complete and full opportunity to pursue extensive discovery[1] before defendants successfully made a motion for summary judgment and that the court devoted most of its opinion to an assessment of the factual evidence adduced. Nothing in *Dickens* supports any restriction on the relevant discovery sought by plaintiffs here.

That conclusion is not impacted by the Ninth Circuit's observation that plaintiffs faced "an uphill battle" on their as-applied claim because most of their evidence supporting their claim that Arizona would not follow the protocol came "from events occurring before Arizona adopted the Protocol." *Id.* at *6. Because the protocol had just been implemented after years of Arizona executions accomplished with no written protocol, *Dickens* did not involve a prior (successful) challenge to the Arizona protocol nor could plaintiffs in that case present evidence of a failure to comply with a written protocol. Because Arizona had never violated or failed to properly implement a lethal injection protocol, the court found it "pure speculation" to assume that, because Arizona's execution procedures were insufficient *before* it adopted a protocol, Arizona would disregard the protocol subsequently put into place. *See id.* at *7-8 (finding, for example, that "the fact that Arizona hired unqualified MTMs before the Protocol was in place does not create an issue of fact as to whether Arizona will do the same when operating under the Protocol").

The *Dickens* court conceded that past conduct may be relevant, but disregarded plaintiffs' evidence on the ground that one "isolated failure to follow a procedure does not create an 'objectively intolerable risk of harm.'" *See id.* at *7. On that basis, evidence of multiple failures to follow procedure *could* create an Eighth Amendment violation and, therefore, discovery regarding past violations would be relevant and necessary. Any interpretation of *Dickens* that would foreclose an as-applied challenge to a new or amended lethal injection protocol on the ground that past failures have no bearing on future executions flies in the face of the Ninth Circuit's emphasis on the importance of "look[ing] beyond the facial constitutionality of an execution protocol." *See id.* at *5.

---

[1] No discovery issues under Fed. R. Civ. Pro. 56 (d) (formerly 56 (f)) were appealed by plaintiffs or at issue in *Dickens* because presumably a full opportunity for discovery occurred.

In any event, the analysis in *Dickens* has no effect on the discovery issues before this Court. California has had a written lethal injection protocol, OP 770, for all 11 of its lethal injection executions between 1996 and 2006 and a history of egregious violations of that protocol which resulted in this Court's December 2006 order. This Court has further held that "O.P. 770 as implemented in practice through and including the date of the evidentiary hearing in the 2006 *Morales* litigation created a 'demonstrated risk of severe pain'" in violation of the *Baze* standard. 9/28/10 Order, Dkt. 424 (attached hereto as Ex. 2) at 4. The Court has also observed that OP 770 and the new Regulations are "in most respects . . . remarkably similar" and that there still exist "substantial questions of fact as to whether at least some of the deficiencies of O.P. 770 have been addressed *in actual practice*." *Id*. at 7. Thus, given this record, a finding that future violations are likely is *not* speculative and, therefore, evidence of past violations is entirely relevant.

Moreover, in contrast to *Dickens*, the efficacy of the safeguards in place in the protocol is crucial in this case. As noted, plaintiffs did not argue that the Arizona protocol's safeguards were inadequate. Without a pending challenge as to the efficacy of those safeguards, no discovery was required on the issue, a fact that was a predicate to the Court of Appeals' decision. *Dickens*, 2011 WL 420682, at *3 ("Because the protocol's safeguards are adequate under the *Baze* standard and because there is no material issue of fact regarding compliance with the protocol, we affirm.") By contrast, Plaintiffs here allege that the Lethal-Injection Regulations (Cal. Code Regs. tit. 15, § 3349 et seq.) contain inadequate safeguards *in passim*. Fourth Amended Complaint at ¶¶ 24-26, 41, 79, 80, 85-87, 89, 90, 98, 99, and 105, Dkt. No. 428. Discovery on that issue is critical.

## B.    The Dickens Court Employed a Balancing Test.

In discussing *Dickens*, this Court observed that "on the availability of alternatives, I think the court squarely adopted the position that the state has asserted in this case which is that you don't get to the readily available alternative until you show that there's a substantial risk of an 8th Amendment violation." 2/11/11 Tr. at 5. Plaintiffs respectfully submit that the opinion does not stand for the proposition that only after a showing that there is a substantial risk of an Eighth Amendment violation does a court consider the availability issue of alternatives. More importantly, however, the holding provides no basis for circumscribing discovery here because this Court has already found

that implementation of OP 770 created a "demonstrated risk of severe pain" in violation of the *Baze* standard and that the Regulations that have now replaced that protocol are remarkably similar to it. Order (9/28/10) Dkt. 424 at 4.

The Ninth Circuit's opinion in *Dickens* is not inconsistent with the notion that under the Supreme Court's opinion in *Baze* a balancing test must be employed in assessing a constitutional violation. The *Dickens* court, after reasoning at length about the safeguards in the Arizona protocol and how there was insufficient evidence of risk, addressed the question of the availability of a one-drug protocol in cursory fashion. The court observed that "[w]e cannot embrace the claim that the Protocol is unconstitutional because a one-drug approach is a proven alternative." *Id.* at *9. Rather, under *Baze*, "the failure to adopt an alternative protocol establishes an Eighth Amendment violation only if the current protocol creates a substantial risk of serious harm that the alternative protocol will reduce." *Id.* The next sentence, a quote from *Baze*, reveals that the *Dickens* court did *not* reject the idea that the adequacy of alternatives must be balanced: "A condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative exists." *Id.* (quoting *Baze*, 553 U.S. at 51).

This sentence, read in conjunction with the previous sentence, reveals that the *Dickens* court *did* in fact weigh the risk against the availability of alternatives. In *Dickens* the risk of harm was *so* negligible (on balance versus the court's review of the safeguards), that balancing the risk of harm against the adequacy of available alternatives did not need to be comprehensive. However, if in fact the court did not weigh or balance the alternative protocol *at all*, the court would have had no reason to employ language that emphasizes words like "slightly" or "marginally" when referring to the alternative protocol. Indeed, the court's next statement: "we have determined that the Protocol does not create a substantial risk of serious harm, and thus Arizona cannot be required to adopt a one-drug protocol, even if there is evidence that the protocol is safer and feasible," illustrates that the court *already* weighed the feasibility of an adequate alternative against the negligible risk of harm, and decided the scales tipped in favor of keeping the current protocol. At the very least, this passage cannot be interpreted as *rejecting* a balancing test: at a minimum, the approach the court took is opaque.

This interpretation is supported by the Ninth Circuit's embrace in *Dickens* of the approach adopted by its sister circuits. Although a few of the cases cited stated they were adopting a two-step threshold test, most of these courts actually paid homage to the language in *Baze* that appears to mandate a balancing test, and in fact, these cases often appear to embrace such a balancing test. In any event, they do *not* support the proposition that *Baze* unequivocally required a two-step threshold test. *See, e.g.*, *Jackson v. Danberg*, 594 F.3d 210, 218-23, 28-29 (3d Cir. 2010) (quoting plurality in *Baze* for proposition that Plaintiff must show "the risk is substantial when compared to the known and available alternatives" and discussing adequacy of alternatives); *Cooey v. Strickland*, 589 F.3d 210, 215, 220 (6th Cir. 2009); *Harbison v. Little*, 571 F.3d 531, 535 (6th Cir. 2009); *Emmett v. Johnson*, 532 F.3d 291, 298-99, 308 (4th Cir. 2008); *cf. Morales v. Cate*, 623 F.3d 828, 829 (9th Cir. 2010); *Raby v. Livingston*, 600 F.3d 552, 557 (5th Cir. 2010); *Nooner v. Norris*, 594 F.3d 592, 598-99 (8th Cir. 2010); *Brewer v. Landrigan*, --- U.S. ----, 131 S. Ct. 445 (2010).

Moreover, to the extent *Dickens* endorsed in any way a "threshold" test, the portion of the opinion addressing this issue is dicta and is not instructive. Significantly, the standard was conceded by counsel at the hearing so there is no indication that the court actually analyzed the issue as opposed to simply applying the uncontested standard. Oral Argument, No. 09-16539, at 15:30-18:15 (Dec. 10, 2010). Moreover, because the court emphasized that the issue was *not* whether the safeguards in the protocol are inadequate, but only whether evidence raises issues of fact regarding whether Arizona would follow the protocol and properly implement the existing safeguards, the court did not need to reach the issue of whether to apply a balancing or a threshold test and any discussion of that issue is dicta. *See Parents Involved in Comty. Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 737 (2007) (citing *Cohen v. Virginia,* 6 Wheat. 264, 399-400 (1821) (explaining why dicta is not binding)). Moreover, even if we read the statement to require a two-step test, because the issue was not presented for review, was not given reasoned consideration, and was unnecessary for the decision, it is not binding precedent. *See Sinotes-Cruz v. Gonzales*, 468 F.3d 1190, 1203 (9th 2006).

Here, even if that is the standard, the Court has already found that the procedures in practice do create a substantial harm. The question is whether the state has remedied that finding. In the

remedial context, *Baze* was explicit that the failure to consider and adopt alternatives is itself a constitutional violation.

## II.   DEFENDANTS BEAR THE BURDEN OF PROVING REMEDIATION OF THE ESTABLISHED EIGHTH AMENDMENT VIOLATION.

Regardless of the holding in *Dickens*, Defendants here retain the burden to establish that they have adequately remediated the Eighth Amendment violation found by this Court.  The law is clear that remedial measures taken after conduct has already been held unconstitutional are subject to a heightened standard; the state has the burden of proving, and the court must analyze, the effectiveness of the proposal in remediating the specific constitutional violations.  Given that this Court has already found an Eighth Amendment violation under the *Baze* standard, the Court must specifically review and analyze the effectiveness of the new protocol in *remediating* the constitutional defects already noted in the original protocol.  *See Leeds v. Watson*, 630 F.2d 674, 675 (9th Cir. 1980) (remanding to district court "for further hearing on the adequacy" of a jail's proposed plan to remediate conditions previously found unconstitutional after district court adopted the proposal without a hearing); *see also Green v. County School Bd. of New Kent County, Va.*, 391 U.S. 430, 439 (1968) (in analyzing school board's remedial plans to effectuate desegregation, court must "assess the effectiveness of a proposed plan in achieving desegregation")  Thus, district courts are required to review proposals to determine whether the constitutional violation has been sufficiently remedied.

In school desegregation cases, the states shouldered the burden of proving the effectiveness of their proposed plans in eliminating the constitutional violation: "It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation."  *Green*, 391 U.S. at 439; *see also Evans v. Buchanan*, 512 F. Supp. 839, 858 (D. Del. 1981) (state boards have the "burden of persuading the Court that implementation of the reorganization plan will not imperil desegregation").  The Supreme Court has also recognized that "a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the

Constitution." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15-16 (1971).  And, in fact, "[t]he Supreme Court has indicated that its statements in school desegregation cases as to the appropriate nature and scope of equitable remedies are fully applicable to Eighth Amendment prison litigation." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C. Cir. 1988) (citing cases).

The Prison Litigation Reform Act limits courts' power to fashion prospective relief related to prison conditions that violate federal rights, and under 18 U.S.C. § 3626 any prospective relief "shall be terminable" upon motion of a party or intervener two years after it was granted.  However, no termination shall be granted if the court finds a current/ongoing violation of a federal right.  The Ninth Circuit has held that "[w]hen a party moves to terminate prospective relief under § 3626(b), the burden is on the movant to demonstrate that there are no ongoing constitutional violations, that the relief ordered exceeds what is necessary to correct an ongoing constitutional violation, or both." *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) (citing *Gilmore v. People of the State of Cal.*, 220 F.3d 987, 994 (9th Cir. 2000)); *see also Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992) ("[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree.").  In order to decide a motion to terminate prospective relief, "the court must take evidence on current jail conditions, at least with respect to those remedies Plaintiffs do not concede Defendants are in compliance with constitutional requirements." *Hart v. Agnos*, No. 77-0479, 2008 WL 2008966, at *4 (D. Ariz. Apr. 25, 2008) (citing *Gilmore,* 220 F.3d at 1010) (evidence of "current and ongoing" violations must reflect conditions "as of the time termination is sought").

In the present case, Defendants are not unlike a party moving to terminate prospective relief under the PLRA, and under that same rationale, they too should bear the burden of showing there would be no ongoing constitutional violations under their proposed protocol.  Otherwise, this Court's December 2006 Order, which is basically a form of prospective relief enjoining executions until the state remedies the constitutional infirmities of its protocol, and which Defendants voluntarily accepted, must remain in place.

### III.   BECAUSE THIS COURT HAS FOUND AN EIGHTH AMENDMENT VIOLATION PLAINTIFFS ARE ENTITLED TO EXPANSIVE DISCOVERY TO TEST THE EFFECTIVENESS OF THE PROSPOSED REMEDIATION.

This Court has expressly found that Defendants here are in violation of the Eighth Amendment under *Baze v. Rees* with respect to their implemented practice of conducting executions by lethal injection.  9/28/10 Order, Dkt. 424 at 4.  Defendants' misconduct has been of the *most extreme* nature in order to exceed the formidable standard for unlawfulness set forth in *Baze* – namely, behavior giving rise to a "substantial risk of serious harm" and "sure or very likely to cause" serious pain and suffering.  To date, Defendants have presented no evidence subject to cross-examination – the "greatest legal engine ever invented for the discovery of truth" (*California v. Green*, 399 U.S. 149, 158 (1970)) – that their well-documented unlawful practices have changed.  Plaintiffs are plainly entitled to discovery that will bear on that issue.

Thus, the issue now before this Court is not whether Defendants are violating the Eighth Amendment; it is whether Defendants are not violating the Eighth Amendment.  "Defendants' implementation of lethal injection is broken, but it can be fixed."  *Morales v. Tilton*, 465 F. Supp. 2d 972, 974 (N.D. Cal. 2006).  It now is Defendants' burden to prove that the implementation of the lethal injection protocol has been fixed, and it is Plaintiffs' right to have the full opportunity under the Federal Rules of Civil Procedure to examine defendants' witnesses, records, and actions before Defendants make their proffer.  While the parties here of course are mindful of what the Court of Appeals found persuasive to either prove an Eighth Amendment violation under *Baze*, or as here, to disprove an existing Eighth Amendment violation under *Baze*, the *Dickens* decision is not instructive as to the parties' entitlement to conduct broad discovery in a civil case.

What is instructive with respect to the discovery to take place here is the Court of Appeals' specific guidance to this Court: the issues raised continue to require the open, complete, and transparent production of information and documents to allow the Court to undertake the Court of Appeals' mandate for extensive and complete review of the issues.  *See Morales v. Cate*, *Morales v. Cate*, No. 10-99019, 2010 U.S. App. LEXIS 20012, *9 (9th Cir. Sept. 27, 2010) (noting this Court's need to review the case fully like the extensive hearings and details developed in *Baze*).  This is because "[d]efendants' implementation of California's lethal-injection protocol lacks both reliability

and *transparency*." *Morales v. Tilton*, 465 F. Supp. 2d at 981 (emphasis added).  The Court of Appeals expressly noted the importance of this finding, and did so *after* the Supreme Court's decision in *Baze*.  *Morales v. Cate*, 2010 U.S. App. LEXIS 20012, at *4.  The Court should be focused on the Ninth Circuit's guidance in *Morales*, not *Dickens*, as to the discovery that remains to be completed here.

## IV.   PLAINTIFFS ARE ENTITLED TO THE FULL DISCOVERY PRACTICES USED IN *DICKENS* TO ENSURE TRANSPARENCY IN EXAMINATION OF THE REGULATIONS.

Unlike the plaintiffs in *Dickens*, Plaintiffs here are challenging the purported safeguards in Defendants' Regulations and therefore are entitled to discovery regarding their creation, purposes, and implementation.  The record in this case to date makes such discovery absolutely crucial to understanding the Regulations.  "Whatever the merits of the protocol in the abstract, there can be no real doubt that Defendants' implementation of OP 770 has major flaws, many of which are apparent from the undisputed facts to which Defendants stipulated in the amended joint pre-hearing conference statement." *Morales v. Tilton*, 465 F. Supp. 2d at 981.  The same is true with the Regulations, and evidence of the flaws started to come to light only as discovery was commencing after Defendants attempted to execute Albert Brown, Stevie Fields and Michael Morales in 2010.  The results of that discovery to date reflect behavior that continues to create a substantial risk of harm.

First, it is a stipulated fact that on February 21, 2006, defendants attempted to execute plaintiff Morales without using sodium thiopental.  Dkt. 277, Stip. Fact 26j.  Defendants attempted to do so again in 2010 when they noticed a public hearing to set Morales' execution to take place in October 2010 despite not having any sodium thiopental. *Morales v. Cate*, 2010 U.S. App. LEXIS 20012, *2 (9th Cir. 2010) (defendants did not and would not have sodium thiopental available until the first quarter of 2011).  Defendants' behavior in this regard created a "substantial risk of serious harm" and was "sure or very likely to cause" serious pain and suffering.  *See Dickens*, 2011 WL 420682, at *1-2 ("if the sodium thiopental is not administered correctly, the inmate will be improperly anesthetized during the execution and will experience tremendous pain and suffering from the administration of the pancuronium bromide and potassium chloride.").

Second, the Regulations require execution team members to be trained in "[a]ppropriate mixing of the chemicals used in the lethal injection process."  Cal. Code Regs. tit. 15, § 3349.1.4(c)(4).  Defendants' consultant, John McAuliffe, attested to this Court – on the eve of the Brown execution in order to further facilitate the execution going forward – that the execution team had been training pursuant to the Regulations.  In fact, Defendants' documents show that they had not trained in the mixing of sodium thiopental.  Defendants' behavior and misrepresentations to the Court should be the subject of careful discovery in that they created a "substantial risk of serious harm."  *See Morales*, 465 F. Supp. 2d at 980 ("Among other things, team members' admitted failure to follow the simple directions provided by the manufacturer of sodium thiopental further complicates the inquiry as to whether inmates being executed have been sufficiently anesthetized.").

Third, discovery has uncovered questions regarding the record keeping under the Regulations. Documents exist that purport to set execution team training schedules that clearly could not have taken place.  Full discovery will allow for the development of this evidence under oath to allow the Court to assess this "substantial risk of serious harm."  *See Morales*, 465 F. Supp. 2d at 979 (discussing "[i]nconsistent and unreliable record-keeping.")

Fourth, Defendants' documents reflect their recent efforts to attempt to purchase execution narcotics in Pakistan and from other non-FDA approved sources, including a supplier who operates a driving school in the United Kingdom.  Defendants raise further uncertainties about the quality and nature of their critical execution drug, sodium pentothal, when they concede that a portion of the product they wish to pass off as this critical drug has been sent out for "testing."  In making this cryptic disclosure, Defendants did not reveal any details about the testing protocol, the purposes of the testing, the facility for the testing, and the circumstances – if any – under which they intend to publish the test results.   Dkt. 474.

Fifth, the February 8, 2011 hearing conducted by the Court at Defendants' new execution facility has raised more questions than answers regarding the remedial effects of Defendants' actions. Previously, members of the execution team were "not adequately prepared to deal with any complications that may arise . . . ," "failed to set an intravenous line during [an execution,]" and "fail[ed] to follow the simple directions provided by the manufacturer [for mixing] of sodium

thiopental." *Morales*, 465 F. Supp. 2d at 980.  At the February 8, 2011 hearing, Defendants did nothing to alter the landscape of their existing Eighth Amendment violation under *Baze*.  Defendants showed a lack of knowledge of the systems used during an execution, and/or failed to exhibit the systems for the Court at the hearing and while on the premises, including:

- The type of rigging device that is used to administer the chemicals.  2/8/11 Tr. at 26.

- A presentation of the rigging device for inspection or demonstration.  *Id*. at 26.

- The purpose(s) of one set of ports in the infusion room.  *Id*. at 25-26.

In Defendants' other execution facility (which is still to be used for executions by lethal gas), "[t]he lighting is too dim, and execution team members are too far away, to permit effective observation of any unusual or unexpected movements by the condemned inmate, much less to determine whether the inmate is conscious." *Morales*, 465 F. Supp. 2d at 980.  In addition, "[f]or some executions, the small anteroom from which the execution team injects the lethal drugs has been so crowded with prison officials and other dignitaries that even simple movement has been difficult." *Id.*; *see also id.* at 981 ("overcrowding, obstructed sight lines, and poor lighting in the execution chamber and adjoining anteroom make accurate observations of the inmate during an execution extremely problematic").

At the February 8, 2011 hearing, Defendants' representatives knew little about the lighting of the facilities and/or the placement of execution team members during an execution in their new facility, including:

- Where people would be positioned in the infusion room during an execution.  2/8/11 Tr. at 29.

- What the lighting would be like in the infusion room during an execution.  *Id*. at 30, 51 (without adequate lighting, the writing on the syringes cannot be read.  *Id*. at 50-51.).

Communication issues in the lethal injection facilities exacerbated the overcrowding and lighting problems.  *See Morales*, 465 F. Supp. 2d at 980.  Defendants indicated that the new facility relies primarily on radio communication between team members but refused to present the communication system for inspection or demonstration at the hearing while the Court was on the premises.  2/8/11 Tr. at 43.

"A number of the execution logs are incomplete or contain illegible or overwritten entries with respect to critical data . . . ."  *Morales*, 465 F. Supp. 2d at 979.  Moreover, Defendants' use of blank paper for EKG readings made accurate interpretation of the results extremely difficult.  *Id.*  At the February 8, 2011 hearing, Defendants did not know:

- What area will be used to record logs.  2/8/11 Tr. at 11.

- What information will be logged in a particular log book.  *Id*. at 11.

- And had vague knowledge of what the monitors are used for.  *Id*. at 19 ("I have an idea . . . they are used for assessing the vitals of the inmate. . . .").

There was an "extremely troubling absence of reliable documentation as to the disposition of sodium thiopental taken from the prison pharmacy by execution team members . . . ."  *Morales*, 465 F. Supp. 2d at 979 n.9.  This problem has not been resolved.  At the February 8, 2011 hearing, Defendants could not identify the precise locations where the execution drugs are stored in the infusion room, 2/8/11 Tr. at 10, 18, 20, and did not know whether the execution drugs are processed through the San Quentin pharmacy, or delivered directly to the infusion room.  2/8/11 Tr. at 22.

The Court of Appeals noted that "[i]n *Baze*, the plurality specifically stated that there was no evidence of improper implementation of Kentucky's protocol. (citation omitted)."  *Dickens*, 2011 WL 420682, at *17.  Such is not the case here (*Morales v. Tilton*, 465 F. Supp. 2d at 981) and Plaintiffs – as in *Dickens* – are entitled to conduct discovery as a result.  For example, "*[d]uring discovery*, Dickens . . . learned that Arizona failed to interview and screen" two execution team members.  *Dickens*, 2011 WL 420682, at *19 (emphasis added).  The Ninth Circuit found this evidence unpersuasive to establish a *Baze* violation because there was no protocol to do so when the first member was hired, and the other failure was an isolated error.  *Id.*  Defendants here cannot claim such a safe harbor: in California, there are rules requiring that all team members be screened; and in California, Defendants' errors in this regard are not singular or isolated, but systemic.  Both OP 770 (May 15, 2007) and the Regulations require the California execution team selection panel to "[r]eview [] the candidate's Personnel, Supervisory, and Training files."  OP 770 at 8; Cal. Code Regs. tit. 15, § 3349.1.2 (b)(2)(B).  Bud Prunty, Undersecretary of CDCR, was appointed "to be the lead person to see that the Department addressed the Court's concerns."  Prunty Depo. (attached

hereto as Ex. 1) at 10.  Prunty admittedly failed to review these files in selecting *all team members*. *Id*. at 62-63, 66.

While in *Dickens* the Ninth Circuit held that "[a]bsent any evidence that Arizona failed to adhere to execution procedures in the past, it would be pure speculation to conclude that Arizona might fail to follow the Protocol in the future or even that a material issue of fact has been raised with respect to the effect of past compliance" (*Dickens*, 2011 WL 420682, at *24-25), such is not the case here.  Prior executions in California were performed under a nearly identical protocol to the Regulations and created a substantial risk of harm. 9/28/10 Order, Dkt. 474.   While "*that evidence, alone*, would not establish an issue of fact as to whether such a risk exists under the Protocol" (*Dickens*, 2011 WL 420682, at *25 (emphasis added)), such evidence coupled with other evidence obtained during the discovery process may tell a very different story.  It certainly has before, and to date, there is no presumption that Defendants have remedied their violations.

"Under *Baze*, the failure to adopt an alternative protocol establishes an Eighth Amendment violation only if the current protocol creates a substantial risk of serious harm that the alternative protocol will reduce.  *Baze*, 553 U.S. at 52."  *Dickens*, 2011 WL 420682, at *28.  Unlike in *Dickens* and in *Baze*, plaintiffs here *have established* that the protocol creates a substantial risk of serious harm.  9/28/10 Order, Dkt. 424, at 4.  Indeed, the protocol and the Regulations are "in most respects . . . remarkably similar."  *Id*. at 5.  For Defendants to be able to avoid discovery and *Baze* culpability merely by making minor "tweaks" to their execution protocol would lead to insulation from review by this Court of continued unconstitutional practices.  This is not what *Baze* or *Dickens* stands for, especially not before broad discovery is undertaken to examine whether a substantial risk of harm is present.

Moreover, Defendants' continued attempts under OP 770 *and the Regulations* to execute plaintiff Morales without using sodium thiopental reflects that the current protocol does in fact "create[] a substantial risk of serious harm that the alternative protocol will reduce.  *Baze*, 553 U.S. at 52."  *Dickens*, 2011 WL 420682, at *28.  Defendants have been able to proceed in this unconstitutional manner because "the paralytic effect of pancuronium bromide, [makes] a

1    determination of an inmate's anesthetic depth after being injected with that drug [] extremely difficult

2    for anyone without substantial training and experience in anesthesia . . . ." *Morales*, 465 F. Supp. 2d

3    at 983.  Inasmuch as this Court already has determined that the protocol does create a substantial risk

4    of serious harm, Defendants can be called upon to adopt a one-drug protocol because the evidence is

5    indisputable that such a protocol is safer and feasible.  *See Dickens*, at *28-29.

6    **V.    DEFENDANTS' ATTEMPT TO AVOID DISCOVERY SHOULD BE REJECTED.**

7    Defendants have made one thing quite clear – there will be no discovery in this case without a

8    protracted battle and several court orders.  They are attempting to run out the clock, believing the

9    Court's expressions of a desire to move quickly will prevent orderly litigation and disclosure of the

10   bulk of material needed to litigate the case.  As noted, this was nowhere more apparent than at the

11   recent "tour" of the lethal injection facility, when Defendants cleaned the facility of any IV tubing,

12   rigging for the injections, syringes and medical equipment, and then refused Plaintiffs' requests to

13   view this equipment and to inspect the actual medical carts and cabinets.

14   Defendants have provided almost no paper discovery.  Plaintiffs served discovery

15   requests on October 15 and November 7, 2010, and Defendants provided no answers whatsoever to

16   these requests until January 31, 2011, even though Defendants acknowledged long before that date

17   that at least some of the information Plaintiffs requested was relevant and discoverable.  As set forth

18   below, even then, Defendants provided the same answer for each request.  They rely on the

19   disclosure of only three items: (1) the rulemaking file; (2) training materials for training that occurred

20   post-August 29, 2010; and (3) heavily culled personnel records for current team members.  And those

21   items provide almost no information of value to this litigation.

22   There is little in the rule-making file that is relevant to the majority of Plaintiffs' requests.

23   For example, nothing in the rule-making file pertains to team member qualifications, selection and

24   training.  It contains nothing regarding the preparations Defendants undertook in their effort to pursue

25   the executions of Stevie Fields, Albert Brown, and Michael Morales this past fall.  The only reason

26   Defendants provided the file and refer to it in their responses is that the Court ordered them – by edict

27   of thunder and lightning – to disclose it to Plaintiffs.

28

The training documents also are nearly incomprehensible because Defendants have violated two Court orders and their own agreement regarding redactions.  Team member designations have not been properly provided.  Thus, it is impossible to determine who was present for which trainings, what trainings were actually undertaken, and the qualifications of the persons who participated in the various roles during the training sessions.  When this was brought to the Court's attention after Plaintiffs had twice informally sought the proper redactions, Defendants engaged in further delay by requesting for the first time that Plaintiffs indicate what pages were done improperly. It is difficult to imagine that Defendants were not aware that nearly all of the team member designations were deficient, and that for the vast majority of training materials, there are no bates designations that would permit Plaintiffs to undertake the task of identifying each deficit to Defendants.  Plaintiffs cannot even begin to determine which witnesses to depose without having in hand proper and meaningful team member designations.

Part of the problem lies in the Regulations themselves.  Like OP 770 (May 15, 2007), the Regulations contain several loopholes regarding training that again permit the previously-observed practice of medical staff avoiding screening and regular training.  This time, though, Defendants have covered their tracks by eliminating the forms that were used by Plaintiffs to demonstrate there was no training under the previous versions of OP 770.  Thus, it behooves Defendants not to make the court-ordered team designations on training documents so that Plaintiffs and the Court remain in the dark regarding what training is being undertaken and by whom.  But, not even Defendants can hide the fact that the training documents that have been disclosed indicate Defendants already violated OP 770 and the Regulations by not training in the mixing of thiopental prior to the scheduled executions.

Finally, Defendants have only provided Plaintiffs with training materials for training conducted after August 29, 2010.  However, Defendants filed a declaration by John McAuliffe in this Court seeking to execute Mr. Brown based on trainings that dated back to 2007, which Defendants maintained are the same as those required under the Regulations.  Dkt. 391. This is an enormous concession to the obvious – OP 770 (May 15, 2007) and the Regulations are identical.  Thus, training, selection and qualifications of team members under both procedures are likely to lead to relevant evidence regarding exactly how the provisions work.  It should be noted, for instance, that

1    when the matter was set for hearing in October of 2007, the very same personnel served as the team

2    leader, as well as the personnel mixing chemicals and inserting IVs, as were doing these jobs in 2006

3    (except the team leader was the assistant team leader then).  Thus, to the extent that the protocols in

4    effect, including the Regulations, permit such conduct to reoccur and it has in fact occurred, that is

5    extremely powerful evidence that the Regulations are nothing more than a thin band-aid on a

6    constitutionally defective procedure.

7             OP 770 (May 15, 2007) and the Regulations were in fact designed to permit this continuing

8    conduct, as Defendants have never seriously considered the possibility that their conduct during

9    executions was in any way deficient.  Document requests for the production of materials relating to

10   their decision-making processes are likely to lead to relevant evidence, and have already done so.

11   The Magistrate and this Court have already ruled that such documents are discoverable, yet

12   Defendants continue to refuse to disclose them.  5/2/06 Order, Dkt. 151 at 3-4; 9/13/06 Order, Dkt.

13   209 at 4-5; 9/22/06 Order, Dkt. 242 at 5.   This Court found during the 2006 evidentiary hearing in

14   this case that the records of meetings regarding the design of OP 770 that were conducted at the one-

15   hour meeting with the Governor's staff were illuminating, and found during proceedings related to

16   the attempted Brown execution that documents provided to the Court seemed to indicate that

17   Defendants did not seriously consider alternatives to their course of conduct in designing the

18   provisions that are now contained in the Regulations.  *Morales*, 465 F. Supp. 2d at 977 ("the

19   Governor's Office hosted a meeting lasting approximately an hour and a half at which potential

20   changes to OP 770 were discussed . . . . [T]he Governor's Legal Affairs Secretary concluded that the

21   only change that would be undertaken . . . what was described as a 'tweak' of the chemical aspects of

22   the protocol . . . . There is no indication from the record that the participants in the meeting addressed

23   or considered issues related to the selection and training of the execution team, the administration of

24   the drugs, the monitoring of executions, or the quality of execution logs and other pertinent

25   records.").  *Baze* itself recognized that a state with a flawed procedure such as California's that

26   refuses to consider or implement a feasible alternative is in violation of the constitution.  *Baze*, 553

27   U.S. at 52.

28

## VI.   DEFENDANTS' INDIVIDUAL DISCOVERY RESPONSES ARE DEFICIENT.

In response to this Court's Order that the parties make a comprehensive showing of the outstanding discovery issues in this case, Plaintiffs Michael A. Morales, Albert G. Brown, Mitchell C. Sims, and Stevie L. Fields, are filing with this Letter Brief under seal Exhibit 3, which sets forth Plaintiffs' discovery requests, Defendants' responses to those requests and Plaintiffs' explanations why the responses are inadequate or deficient.  The discovery at issue is Plaintiff Brown's Supplemental Request for Production of Documents and Electronically Stored Information,  Plaintiff Brown's October 15, 2010 Interrogatories, and Plaintiff Brown's Request for Further Production of Documents and Electronically Stored Information.  The information set forth in Exhibit 3 will be the basis of a Motion to Compel, which Plaintiffs will file prior to the next omnibus hearing before the Court currently scheduled for March 4, 2011.

Respectfully submitted,

DATED: February 18, 2010                   By:   _____/s/_____
                                                          Counsel for Plaintiffs

David A. Senior (# 108579)
MCBREEN & SENIOR
2029 Century Park East, Third Floor
Los Angeles, CA 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (# 167080)
LAW OFFICES OF JOHN R. GRELE
149 Natoma Street, Third Floor
San Francisco, CA 94105
Phone: (415) 348-9300
Fax: (415) 348-0364
jgrele@earthlink.net

Richard P. Steinken (admitted *pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654-3456
Phone: 312-222-9350
Fax: 312-527-0484
rsteinken@jenner.com

Kelly M. Morrison (# 255513)
Jean  M. Doherty (# 264308)
Kate T. Spelman (# 269109)
JENNER & BLOCK LLP
633 West Fifth Street
Suite 3500
Los Angeles, CA 90071
Phone: 213-239-5100
Fax: 213-239-5199

Attorneys for Plaintiffs MICHAEL A. MORALES
and ALBERT G. BROWN

Michael Laurence (Bar No. 121854)
Sara Cohbra (Bar No. 193270)
HABEAS CORPUS RESOURCE CENTER
303 Second Street, Suite 400 South
San Francisco, California 94107
Telephone:  (415) 348-3800
Facsimile:  (415) 348-3873
E-mail:       docketing@hcrc.ca.gov

Attorneys for Plaintiffs MITCHELL CARLTON SIMS
 and STEVIE LAMAR FIELDS

LETTER BRIEF OF PLAINTIFFS REGARDING IMPACT OF *DICKENS V. BREWER*