# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---oOo---

```
MICHAEL ANGELO MORALES,         )
                                )
          Plaintiff,            )
                                )
vs.                             )   No. C 06 0219 (JF)
                                )       C 06 926 (JF)
JAMES TILTON, Acting            )
Secretary of the California     )
Department of Corrections;      )
ROBERT L. AYERS, Warden of      )
San Quentin State Prison; and   )
DOES 1-50,                      )
                                )
          Defendants.           )
                                )
                                )
```

Deposition of

KINGSTON W. PRUNTY, JR.

Thursday, September 20, 2007

Reported by:

JEANNETTE M.T.L. DARE, CSR No. 7061        (3-401085)

1
2    A.
3    Q.    Were you appointed to rewrite Operation
4    Procedure 770?
5    A.    I was pointed to oversee the corrections the
6    Department was directed to make by the declaration, the
7    Memorandum of Intended Decision, issued by Judge Fogel.
8    Q.    Who appointed you to do that?
9    A.    James Tilton, the secretary.
10   Q.    What did he say with respect to your
11   appointment?
12   A.    I don't recall the exact words. I was to be
13   the lead person to see that the Department addressed the
14   Court's concerns.
15   Q.    When were you appointed?
16   A.    I'm not sure of the date. Sometime in late
17   December 2006.
18   Q.
19
20   A.
21   Q.
22
23   A.
24   Q.    O
25   A.

1      --                    ?
2
3
4      Q.
5
6
7      A.
8      Q.
9      A.
10   .
11     Q.
12     A.
13     Q.    --
14  t
15     A.
16  l
17     Q.
18     A.
19     Q.
20     A.
21
22
23     Q.    With respect to these 26 people, were their
24  personnel files reviewed?
25     A.    Not by me, but they were reviewed, yes, sir.

1   There's documentation in the file to reflect that they
2   have been.
3       Q.   But you did not review them.
4       A.   I did not.
5       Q.   Was their supervisory files reviewed?
6       A.   I believe the documentation reflects that they
7   were, yes, sir.
8       Q.   Were they reviewed by you?
9       A.   No, sir.
10      Q.   Were their training files reviewed?
11      A.   Not by me.  Let me -- let me clarify.
12           In the documentation, I saw in the files that
13  were prepared there were files for each of those
14  candidates that we interviewed, including their
15  performance and a number of other documents.  Part of
16  the documentation was a list of the training they had
17  attended over the past several years.
18      Q.   Okay.
19      A.   But I didn't review their training file in its
20  entirety.
21      Q.   
22   
23      A.   
24      Q.   
25      A.

1       A.

2

3

4

5

6       Q.

7       A.

8

9       Q.

10

11      A.

12      Q.   These people that are being interviewed, it
13 seems to require that they demonstrate professional job
14 performance and demeanor; is that correct?
15      A.   I'm not sure where you got that.  If I could
16 refresh, I could tell you for sure.
17      Q.   Before looking at it, do you know whether
18 that's required?
19      A.   My belief, it is.  If it's not, it should be.
20      Q.   What does that mean?
21      A.   That if they are competent and they're doing
22 their jobs as they are now, that the performance reports
23 reflect that they are performing their jobs at least to
24 the minimum or standard expectations for that function.
25

# EXHIBIT 2

**E-Filed 9/28/2010**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Michael Angelo MORALES and Albert Greenwood Brown,<br><br>Plaintiffs,<br><br>v.<br><br>Matthew CATE, Secretary of the California Department of Corrections and Rehabilitation, et al.,<br><br>Defendants. | Case Number 5-6-cv-219-JF-HRL<br>Case Number 5-6-cv-926-JF-HRL<br><br>DEATH-PENALTY CASE<br><br>ORDER FOLLOWING REMAND |

## I. INTRODUCTION

This case now is before the Court pursuant to an order of remand filed by the Ninth Circuit Court of Appeals on the evening on September 27, 2010. (Doc. No. 411, *amended by* Doc. No. 420.) The order directs this Court to determine whether, in light of the decision of the United States Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), Plaintiff Albert Greenwood Brown is entitled to a stay of his execution as it would be conducted under California Code of Regulations title 15, sections 3349 et seq. (2010), the lethal-injection execution protocol now in effect in California. In particular, this Court has been asked to address the similarity between the current protocol and San Quentin Operational Procedure 0-770, or O.P. 770, the earlier lethal-injection protocol found constitutionally deficient by the Court following an evidentiary hearing

in 2006, applying the "demonstrated risk" standard articulated in *Baze*, 553 U.S. at 61 (plurality op.), and the standards for stays of execution generally that were announced by the Supreme Court in *Nelson v. Campbell*, 541 U.S. 637 (2004). (Doc. No. 420 at 8.)

The Court has received briefing on these issues from the parties and also has conducted its own review of the record in the limited time available to it given Brown's pending execution date of September 30, 2010.[1] As explained below, pursuant to the guidance provided by the Court of Appeals in its order of remand and new information that has come to light since its own order of September 24, 2010, was entered, the Court concludes that its previous order must be reconsidered and that Brown is entitled to a stay of execution.

## II. DISCUSSION

The extensive history of this litigation is summarized in the Court's order of September 24, 2010, (Doc. No. 401), and will not be repeated here. However, as relevant to the following discussion, three points do bear repeating. *First*, "it is fair to say that there is no case involving an Eighth Amendment challenge to a lethal-injection protocol in which the factual record is as developed as the record here." (*Id.* at 7, *quoted in* Doc. No. 420 at 6.) *Second*, because the instant proceedings with respect to Brown were commenced less than two weeks ago, "there is no way that the Court can engage in a thorough analysis of the relevant factual and legal issues in the days remaining before Brown's execution date." (Doc. No. 401 at 8.) *Third*, notwithstanding this severely constricted time frame, the Court must do its best to apply the tests articulated by the Supreme Court in *Baze* and *Nelson*.

Two other observations are relevant. *First*, the side-by-side comparison of O.P. 770 and the new lethal-injection regulations directed by the Court of Appeals, while obviously highly relevant, was not proffered either by Brown in his original motion for a stay or execution or by Defendants in opposition to that motion. It was Brown's burden as the moving party to show

---

[1] At the time of the Court's earlier order denying conditionally Brown's motion for a stay of execution, the execution was set for September 29, 2010, at 12:01 a.m. On September 27, 2010, apparently because the time within which Brown may seek further appellate review of certain orders in related state-court litigation has yet to run, the Governor granted a reprieve postponing the execution until September 30, 2010, at 9:00 p.m.


that he is likely to succeed on his claim that the new regulations fail to remedy the defects found in O.P. 770 and that as such the regulations subject him to a "demonstrated risk" of an Eighth Amendment violation, *Baze*, 553 U.S. at 61 (plurality op.). Instead, Brown offered only conclusory statements that the two protocols are essentially similar. Brown's failure to meet this burden prior to his briefing on remand was a principal basis of the Court's conclusion that Brown was not entitled to an outright stay of execution. (*See* Doc. No. 401 at 8 ("absent a *presently-existing* 'demonstrated risk' of a constitutional violation, Defendants are entitled to proceed with the execution").)

*Second*, in considering, as it was required to do, California's "strong interest in proceeding with its judgment," *Gomez v. U.S. Dist. Ct. N.D. Cal.*, 503 U.S. 653, 654 (1992), the Court was mindful of the fact that there has been a *de facto* moratorium on executions in the state since its decision in *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal 2006), and it understood that Defendants wished to set other execution dates in the near future. It now appears that Defendants knew, but did not disclose to the Court, that their existing supply of sodium thiopental[2] will expire on October 1, 2010, and that additional quantities of the drug will not be available at least until the first quarter of 2011. (*See* Doc. No. 411 at 2.) At a status conference on September 21, 2010, this Court set an accelerated schedule for resolution of the *Morales* litigation under which a full review of the new regulations will be completed by the end of this year. Under these circumstances, the only execution that would be impacted either directly or indirectly by a stay is Brown's, which as a result of a brief reprieve granted by the Governor is now scheduled only three hours before the expiration date of the sodium thiopental.

**A. Application of *Baze* to the New Regulations**

As discussed in the Court's earlier order, *Baze* created a significantly higher threshold for obtaining a stay of execution in a case challenging lethal-injection protocols substantially similar to the Kentucky protocol upheld there. As noted by Defendants, it appears that the Kentucky

---

[2] Because it is the first drug used in the three-drug lethal injection "cocktail" and is used to induce unconsciousness, sodium thiopental is indispensable to a lawful execution by lethal injection.

3

Case Nos. 5-6-cv-219-JF-HRL & 5-6-cv-926-JF-HRL
ORDER FOLLOWING REMAND
(DPSAGOK)

protocol may have contained fewer safeguards than O.P. 770. *Cf. Baze*, 553 U.S. at 120–21 (Ginsburg, J., dissenting). At the same time, Kentucky had carried out, "with no reported problems," *id.* at 46 (plurality op.), only one execution under its lethal-injection protocol, and the factual record before the Supreme Court was virtually nonexistent.

In its order of September 24, 2010, this Court commented that although it "framed its factual findings and legal conclusions [in the 2006 *Morales* litigation] under the legal standard then applicable in the Ninth Circuit, it likely would have made the same findings and reached the same conclusions under the 'demonstrated risk' standard announced in *Baze*." (Doc. No. 401 at 8 (internal citation omitted).) Although the ultimate disposition in that order did not require an express finding in that regard, such a finding appears to be necessary on remand to inform the Court's comparison of O.P. 770 and the new regulations. Accordingly, the Court hereby finds that O.P. 770 as implemented in practice through and including the date of the evidentiary hearing in the 2006 *Morales* litigation created a "demonstrated risk of severe pain." This finding is based on the entire record, *see Morales*, 465 F. Supp 2d 972; on the largely undisputed evidence presented at the hearing; on Defendants' stipulation that injection of the second and third drugs in the three-drug protocol (pancuronium bromide and potassium chloride) without adequate anesthesia will cause an unconstitutional level of pain; on the fact that data in Defendants' execution logs indicate that sodium thiopental did not have its expected effect or function as expected in 64% of lethal-injection executions pursuant to the protocol; and in particular on the testimony of Defendants' own medical expert, Dr. Singler, that in at least one execution the inmate likely was awake when the second and third drugs were injected, and that the only reason that the anesthesiologist could not render a definitive opinion was the apparent unreliability of Defendants' records, *id.* at 980.

Defendants contend that the deficiencies in O.P. 770 have been remedied by the new regulations and the construction of new execution facilities,[3] and that the Court may determine

---

[3] Though it did cite deficiencies in the facilities used under O.P. 770, the Court did not order that new facilities be constructed. The person then serving as the warden at San Quentin, who later admitted that he had not read the Court's memorandum in *Morales v. Tilton*, apparently believed that such an

4

Case Nos. 5-6-cv-219-JF-HRL & 5-6-cv-926-JF-HRL
ORDER FOLLOWING REMAND
(DPSAGOK)

without discovery, additional briefing or fact-finding that Brown cannot show a "demonstrated risk of severe pain." For his part, Brown claims that the new regulations largely are O.P. 770 by another name, particularly with respect to the selection and training of the execution team and important aspects of the method for delivery of the three drugs involved. Based on the Court's very limited comparison of the two protocols in light of the order of remand and the additional briefing provided by the parties earlier today, it appears that Brown would have difficulty proving that Defendants have not made substantial improvements with respect to the physical conditions in which executions are to take place. However, there is a significant dispute with respect to the remaining issues.

Defendants' position is straightforward. They do not claim that the new regulations are radically different from previous lethal injection protocols; indeed, in most respects the documents are remarkably similar. Instead, they begin with the plurality's observation in *Baze* that "a State with a lethal injection protocol substantially similar to [Kentucky's] would not create a risk that meets [the 'demonstrated risk'] standard." 553 U.S. at 61 (plurality op.). They then cite Justice Ginsburg's approving reference in her dissent to the fact that "[i]n California, a member of the IV team brushes the inmate's eyelashes, speaks to him, and shakes him at the halfway point and, again, at the completion of the sodium thiopental injection." *Id.*, at 120–21 (Ginsburg, J., dissenting).[4] They argue that this "consciousness check" alone is sufficient to render the current regulations constitutionally adequate. They present a side-by-side comparison of key provisions of the regulations and the Kentucky protocol found constitutional in *Baze*, pointing out a number of ways in which the regulations provide greater protection to the inmate than the procedures used in Kentucky. Finally, they assert that subsequent to *Baze*, several courts

---

order had been made. *Findings of S. Public Safety Comm. Informational Hr'g on San Quentin Death Chamber*, 2007–08 Sess. (Cal. 2007).

[4] Justice Ginsburg's comment concerned a revised version of O.P.770 not reviewed in the 2006 *Morales* litigation. O.P. 770 § V(S)(4)(e) (2007). The same procedure is incorporated in the regulations. Cal. Code Regs. tit. 15, § 3349.4.5(g)(5) (2010). The only other significant difference between the version of O.P. 770 considered in the 2006 proceedings and the new regulations is a reduction in the amount of sodium thiopental used in executions from five grams to three grams.

have concluded that evidence of problems under preëxisting, superseded execution protocols is insufficient to show a presently existing "demonstrated risk" of a constitutional violation, citing *Raby v. Livingston,* 600 F.3d 552, 560–62 (5th Cir. 2010); *State v. Jordan,* No. W2007-01272-SC-DDT-DD, 2010 WL 3668513 (Tenn. Sept. 22, 2010); *Jackson v. Danberg,* 594 F. 3d 210, 226–27 (3d Cir. 2010). (*But see, e.g.,* Doc. No. 401 at 7 (distinguishing *Jackson*).)

Although he does not concede that the new regulations are facially adequate under *Baze,* Brown argues principally that the "pervasive lack of professionalism," *Morales,* 465 F. Supp. 2d at 980, and "lack of reliability and transparency," *id.,* at 981, that the Court found in Defendants' actual application of O.P. 770 also has characterized Defendants' subsequent efforts to revise the lethal-injection protocol. He contends that on the present record, unlike other courts that have had to assess the constitutionality of post-*Baze* protocols, this Court cannot simply presume that Defendants' actual application of the new regulations will meet constitutional standards. Citing excerpts from the limited discovery that occurred in the instant case following the 2006 evidentiary hearing (as well as a large volume of exhibits), he argues that Defendants did not come close to conducting the "meaningful review" of the "infrastructure" of executions that the Court concluded was necessary, *id.,* at 983, and that notwithstanding what the regulations say on their face, the deficiencies found by the Court in the selection and training of the execution team, the mixing and delivery of the drugs used in executions, and the adequacy and accuracy of execution records under O.P. 770 in fact have not been addressed and are present under the regulations as well.[5]

In order to obtain a stay of execution under *Baze,* Brown must show that California's lethal-injection protocol "creates a demonstrated risk of severe pain." 553 U.S. at 61 (plurality op.). However, in light of the voluminous record in this case and the fact that the Court has been precluded from proceeding with the *Morales* litigation for more than three years by the pendency of a state-court injunction and the parties' repeated mutual requests that the state-court litigation

---

[5] Defendants' very recent acknowledgment that they have only a very limited supply of sodium thiopental on hand is particularly relevant, as it appears that there is an insufficient quantity of the drug available to permit the pre-execution training and mixing described in the regulations.

6
Case Nos. 5-6-cv-219-JF-HRL & 5-6-cv-926-JF-HRL
ORDER FOLLOWING REMAND
(DPSAGOK)

be resolved first, it is virtually impossible for the Court to assess other than in a very preliminary way prior to Brown's scheduled execution date whether Brown can or will be able to make such a showing. Based solely on that very preliminary assessment, it appears that Brown has raised substantial questions of fact as to whether at least some of the deficiencies of O.P. 770 have been addressed *in actual practice*. Given what is at stake, this Court greatly appreciates the direction of the Court of Appeals that "[t]iming is everything and the district court should take the time necessary to address the State's newly revised protocol in accord with Supreme Court authority." (Doc. No. 420 at 2.) Given an execution date of September 30, 2010, the Court simply cannot comply fully with that directive in time to render a reasoned decision and permit adequate appellate review.

**B. *Nelson v. Campbell***

In *Nelson*, the Supreme Court held that "[g]iven the State's significant interest in enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." 541 U.S. at 650 (internal citations omitted). In this case, as discussed in the Court's order of September 24, 2010, there is no indication, and Defendants did not contend in their opposition to the motions, that Brown's motions were untimely. To the contrary, as this Court found and as the Court of Appeals appears to agree, the equitable presumption appears to cut strongly the other way.

Regardless of whether Defendants' counsel ever expressly represented that they would defer seeking new execution dates until the *Morales* litigation could be concluded, that was Brown's—as well as the Court's—understanding, and it is clear that the urgency of the present situation was created not by Brown but by Defendants' decision to seek an execution date only thirty days after the new regulations became final. Moreover, because the injunction issued by the Marin Superior Court was not vacated until September 20, 2010, it was not apparent that there was anything for this Court to consider until that date.[6] The hearing on Brown's motions to

---

[6] Apparently, the state-court injunction technically will not be vacated until at least September

intervene and to stay his execution heard by this Court on September 21, 2010, actually were appended to a status conference that the Court scheduled *sua sponte* because it was concerned that the developments in the state courts might put it in exactly the position in which it finds itself now. As the Court of Appeals observed, the fact that "[t]he timing of Brown's execution date is apparently dictated in part by the fact that the state's existing inventory of sodium thiopental consists of 7.5 grams, with an expiration date of October 1, 2010," (Doc. No. 420 at 2 (internal quotation marks omitted))—a fact that Defendants did not disclose to this Court—hardly is a reason to forego a proper examination of the merits of Brown's claims.

As noted above, the Court indicated more than three years ago that it wished to proceed expeditiously with such an examination; it has yet to do so only because the parties asked it to wait because of state-court litigation over which it had no control. In other words, much of the review the Court needs to undertake would have been completed by now but for Defendants' own requests. The Court fully intends to undertake that review now, and to do so as quickly as is reasonably possible. The fact that Defendants do not intend to schedule any future executions until at least the first quarter of 2011 (and indeed they cannot because of the unavailability of sodium thiopental) means that such a time line will have minimal effect on Defendants' long-term interests.

### C. Additional Observations

Like the Court of Appeals, this Court will emphasize once again that this case does not involve Brown's guilt, the truly heinous acts Brown committed that resulted in his death sentence, or the wisdom of the death penalty. Particularly in light of the guidance provided by the remand order, the only issue at present is whether *Baze* requires that Brown's execution proceed or whether it permits the Court to complete the review of California's lethal-injection procedures that it began (but because of intervening events was not permitted to complete) more than four years ago.

In offering Brown the option to request that only sodium thiopental be used in his

---

30, 2010, a fact that has prompted the Governor to grant Brown a reprieve until that date.

execution, the Court was seeking a way to reconcile California's "significant interest in enforcing its criminal judgments," *Nelson*, 541 U.S. at 650, with Brown's constitutional right to an execution method that does not expose him to a "demonstrated risk of severe pain."[7] *Baze*, 553 U.S. at 61 (plurality op.). While some understandably find offensive the notion that a condemned inmate may elect a method of execution, such elections are expressly permitted by law in at least thirteen states, including California. However, because the particular election at issue here should not have been presented to Brown unilaterally, the Court recognizes that its effort in this instance was ill-advised and that it should have granted Brown's motion for reconsideration on that basis.

### III. DISPOSITION

Pursuant to the direction of the Court of Appeals, in accordance with the foregoing discussion, and good cause therefor appearing, Brown's motion for a stay of execution is granted. Accordingly, all proceedings related to the execution of Petitioner's sentence of death, including but not limited to preparations for an execution and the setting of an execution date, are hereby stayed. This stay will remain in effect unless and until it is dissolved by this Court, the United States Court of Appeals for the Ninth Circuit, or the Supreme Court of the United States.

IT IS SO ORDERED.

DATED: September 28, 2010

JEREMY FOGEL
United States District Judge

---

[7] As detailed in many of the Court's prior orders, sodium thiopental is painless and, in the amounts at issue here, virtually always fatal. One of Brown's principal criticisms of the new regulations in the state-court litigation is that Defendants did not give adequate consideration to the use of a single-drug alternative. *Sims v. Cal. Dep't of Corr. & Rehab.*, No CIV 1004019 (Cal. Super. Ct. Marin Cnty. compl. filed Aug. 2, 2010).

# EXHIBIT 3

**Document filed under seal.**