David A. Senior (SBN 108759)
MCBREEN & SENIOR
1900 Avenue of the Stars, Eleventh Floor
Los Angeles, California 90067
Phone: (310) 552-5300
Fax: (310) 552-1205
dsenior@mcbreensenior.com

John R. Grele (SBN 167080)
LAW OFFICE OF JOHN R. GRELE
1000 Brannan Street, Suite 400
San Francisco, California 94103
Phone: (415) 655-8776
Fax: (415) 484-7003
jgrele@earthlink.net

Richard P. Steinken (admitted PHV)
JENNER & BLOCK
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 923-2938
Fax: (312) 840-7338
rsteinken@jenner.com

Attorneys for Plaintiffs*

*SEE SIGNATURE PAGE FOR COMPLETE LIST
OF COUNSEL AND PARTIES REPRESENTED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR AYALA, RONALDO AYALA, ALBERT BROWN, RICHARD BOYER, TRACY CAIN, KEVIN COOPER, TIEQUON COX, RAYNARD CUMMINGS, ALBERT CUNNINGHAM, RONALD DEERE, ROBERT FAIRBANK, HARVEY HEISHMAN, DOUGLAS MICKEY, MICHAEL MORALES, WILLIAM PAYTON, SCOTT PINHOLSTER, DAVID RALEY, GUY ROWLAND, RICHARD SAMAYOA, RICARDO SANDERS, MITCHELL SIMS, ANTHONY SULLY, JOHN VISCIOTTI, AND CONRAD ZAPIEN, <br><br> Plaintiffs, | CASE NOS. C-06-0219-RS <br> C-06-0926-RS <br><br><br><br> FIFTH AMENDED COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF <br> [42 U.S.C. § 1983] |

- 1 -

1

2     vs.

3     RONALD DAVIS, Warden of San Quentin
      State Prison, RALPH DIAZ, Acting Secretary
4     of the California Department of Corrections
      and Rehabilitation, GAVIN NEWSOM,
5     Governor of the State of California, and DOES
      1-100,
6
7                          Defendants.

8

9                    **FIFTH AMENDED COMPLAINT**

10
           **DEFENDANT GOVERNOR NEWSOM SHOULD RESPOND**
11            **TO THIS COURT'S INQUIRY**

12           California's execution methods have been broken for more than two decades,

13   during which time the State repeatedly has violated the U.S. Constitution in its execution

14   of condemned inmates.  In September 2006, this Court undertook at a four-day bench

15   trial, "a thorough review of every aspect of the protocol, including the composition and

16
     training of the execution team, the equipment and apparatus used in executions, the
17
     pharmacology and pharmacokinetics of the drugs involved, and the available
18
     documentary and anecdotal evidence concerning every execution in California since
19
     lethal injection was adopted as the State's preferred means of execution in 1992."
20
21   *Morales v. Tilton*, 465 F. Supp. 2d 972, 974 (N.D. Cal. 2006).

22           Upon conclusion of this comprehensive trial, this Court concluded that

23   Defendants' "implementation of lethal injection is broken," that the written protocol
24
     "does not function as intended," that "Defendants' implementation of California's lethal-
25
     injection protocol lacks both reliability and transparency," and that the evidence was
26
     "more than adequate to establish a constitutional violation."  *Id.* at 979, 980.  The Court
27
28   ordered Defendant California Department of Correction and Rehabilitation ("CDCR")

                                    - 2 -

1    and the Governor, who evidence revealed was controlling, directing, and overseeing the

2    unconstitutional behavior of CDCR, to advise the Court whether they intended "to review

3    and revise OP 770 further and, if so, how much additional time, if any, they believe they

4    will need to complete that task." *Id.* at 984.  The Governor responded on December 18,

5    2006 that he and his administration were "committed to fixing the identified deficiencies

6    and intend[ed] to review, evaluate and revise the lethal injection protocol."  ECF No. 291

7    at 2.

8

9        Despite the Court's encouragement that this case "presents an important

10   opportunity for executive leadership," 465 F. Supp. 2d at 982, and Governor

11   Schwarzenegger's commitment to fix the execution protocol and its implementation,

12   lethal injection in California remains broken.  San Quentin Operational Procedure No 0-

13   770 ("OP 770"), California's lethal injection protocol, has been revised several times

14   since 2006, but the problems remain.  Most recently, CDCR published in January 2018

15   the currently-applicable File and Print Execution Regulations ("2018 Regulations") but

16   these not only fail to cure the defects noted by this Court in 2006 but introduce new

17   problems of constitutional dimension.

18

19       Defendant Governor was added to this lawsuit after the 2006 trial; now a third

20   Governor must confront the fact that all Defendants – CDCR and the Governor –

21   continue to violate the Constitution.  Due to the passage of time and change in Executive

22   administrations (*see* ECF No. 708), Defendant Governor should "take this opportunity to

23   address seriously . . . the significant problems with [the execution Regulations] and

24   [their] implementation" (465 F. Supp. 2d at 982), and "advise the Court" whether his

25   office intends "to review and revise" its execution policies and protocols "further and, if

26

27

28

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

so, how much additional time, if any, they believe they will need to complete that task."
*Id.* at 984.

## **NATURE OF ACTION**

1.      Plaintiffs Hector Ayala, Ronaldo Ayala, Albert Brown, Richard Boyer, Tracy Cain, Kevin Cooper, Tiequon Cox, Raynard Cummings, Albert Cunningham, Ronald Deere, Robert Fairbank, Harvey Heishman, Douglas Mickey, Michael Morales, William Payton, Scott Pinholster, David Raley, Guy Rowland, Richard Samayoa, Ricardo Sanders, Mitchell Sims, Anthony Sully, John Visciotti, and Conrad Zapien,[1] are California death-sentenced prisoners held under the supervision of Defendant California Department of Corrections and Rehabilitation (CDCR).  Defendant CDCR's Secretary and Warden operate an agency ("Defendant CDCR") under the direction and control of Defendant Governor.

2.      This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations of the rights of Plaintiffs: (i) to be free from cruel and unusual punishment and to due process under the Eighth and Fourteenth Amendments of the United States Constitution; (ii) to due process and to be free from arbitrary and capricious protocols and procedures under the Fifth and Fourteenth Amendments of the United States Constitution; (iii) to the free exercise of religion, religious liberty, and equal protection under the First, Fifth, and Fourteenth Amendments of the United States Constitution; and (iv) to their rights under state law.

3.      Plaintiffs contend that execution via remote infusion of toxins, as is performed in California, will subject them to a present demonstrated substantial risk of severe pain and

---

[1] All death-sentenced prisoners in California are subject to the same unconstitutional procedures as the Plaintiffs named above.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

suffering, prohibited by the Eighth Amendment, while numerous alternatives exist that are feasible, readily implemented, and significantly reduce a substantial risk of severe pain.

4.      Plaintiffs additionally contend that Defendants, as a result of their deliberate failure to use, *inter alia*, reasonable procedures, properly selected and trained personnel, and properly designed facilities and equipment, have inflicted severe pain and torture on more than 64% of the inmates who they have executed by remote infusion, making it certain that a presently-existing, demonstrated risk exists that Plaintiffs will suffer the same fate unless Defendants implement an alternative execution protocol.

5.      Plaintiffs seek temporary, preliminary, and permanent injunctive relief to prevent Defendants from executing Plaintiffs by means of a remote infusion of an unknown, untested, non-registered, and/or unapproved toxin, as that method of execution currently is to be performed in California under the current protocol.  Plaintiffs request that Defendants be restrained from using the current execution procedures to carry out any executions, and from any preparatory measures to effectuate executions, until such time as this Court has ruled that they have eliminated the substantial risk of severe pain and suffering prohibited by the Constitution.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (further relief). This action arises under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

7.      Without conceding that the provisions for exhaustion of administrative remedies are applicable to their claims, Plaintiffs have effectively exhausted all administrative

- 5 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

remedies for the issues contained in this complaint to the extent that they were available and have satisfied the Prison Litigation Reform Act's exhaustion requirements pursuant to 42 U.S.C. § 1997e(a).

8.      Plaintiffs are not required to exhaust administrative remedies before bringing this claim because resolution of the grievance seeking modification of the regulations is not possible through the administrative appeal process and because exhaustion is futile.  *See also Beardslee v. Woodford*, 395 F.3d 1064, 1069 (9th Cir. 2005).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occur in this District.

## THE PARTIES

10.      Plaintiffs are death-sentenced prisoners under the supervision of Defendant CDCR.  Each has undertaken full state court appellate and initial habeas review and has pursued federal post-conviction habeas proceedings under 28 U.S.C. § 2254 and is subject to the imposition of a date for execution under California law.

11.      Defendant Ralph Diaz is the Secretary of the CDCR.

12.      Defendant Ronald Davis is the Warden of San Quentin State Prison, where the Plaintiffs' executions will occur.

13.      Defendant Gavin Newsom is the Governor of the State of California.

14.      Plaintiffs do not know the true names of Does 1-100 but allege that they have participated or will participate in Plaintiffs' executions by virtue of their roles in designing, implementing, and/or carrying out a process of remote infusion of unknown quantities and qualities of lethal toxins.  When Plaintiffs discover the Doe Defendants' true identities, they will amend this complaint accordingly.

**INTRODUCTION AND BACKGROUND**

15.     This Fifth Amended Complaint does not originate from a "clean slate. Indeed, this Court has recognized that there is no case involving an Eighth Amendment challenge to a lethal-injection protocol in which the factual record is as developed as is the record here." ECF No. 401 at 7. Defendants have a lengthy history of violating the federal Constitution in their execution of condemned inmates. The procedures by which condemned inmates have been killed by the State have subjected those inmates to a demonstrated risk of severe pain – and there is evidence that that risk has been realized in the execution of most inmates. This Court has so concluded. *Morales v. Tilton*, 465 F. Supp. 2d 972, 974, 978-79, 980 (N.D. Cal. 2006) (finding that despite the fact that "assuming that the sodium thiopental is delivered properly, there should be virtually no risk that an inmate will suffer an unconstitutional level of pain, . . . the record in this case . . . is replete with evidence that in actual practice [the execution protocol] does not function as intended"; and that "anomalies in six execution logs raise substantial questions as to whether certain inmates may have been conscious when pancuronium bromide or potassium chloride was injected."); ECF No. 424 at 4 ("the Court hereby finds that O.P. 770 as implemented in practice through and including the date of the evidentiary hearing in the 2006 *Morales* litigation created a 'demonstrated risk of severe pain'" prohibited under *Baze v. Rees*, 553 U.S. 35, 61 (2008); noting that "Defendants' execution logs indicate that sodium thiopental did not have its expected effect or function as expected in 64% of lethal-injection executions pursuant to the protocol.").

16.     Although Defendants have made some changes to execution procedures since this Court's finding of constitutional violations in 2006, this Court has noted that "there is a significant dispute" still remaining whether the changes result in substantial

- 7 -

improvements that eliminate the demonstrated risk of harm and that there are "substantial questions of fact as to whether at least some of the deficiencies of O.P. 770 have been addressed *in actual practice*."  ECF No. 424 at 5, 7.  The Court's conclusion in this respect was reached in September 2010, after Defendants had made changes to the execution procedure and attempted to promulgate them as regulations as required by California law, and was reaffirmed in 2010, when the Court denied Defendants' motion to dismiss.  *Morales v. Cate*, 757 F. Supp. 2d 961 (N.D. Cal. 2010).  Many, if not most, of the changes made are reflected in the currently-applicable File and Print Execution 2018 Regulations published in January 2018; that is, the provisions in the 2010 regulations are the same as those in the (current) 2018 Regulations.

17.     Moreover, the modification of the execution protocol as set forth in the 2018 Regulations to include the purported use of either sodium thiopental or pentobarbital does not, on the record in this case, eliminate the demonstrated risk of severe pain.  "The deficiencies noted by this Court extend far beyond the issue of number and type of drugs used and remain a very real concern for any protocol."  ECF No. 620 at 4; *see also Morales*, 465 F. Supp. 2d at 979 (finding critical deficiencies in the prior protocol that were not related to the number of drugs used).  Furthermore, as this Court found in 2006, an execution with the use of an anesthetic alone would eliminate constitutional concerns *only if* "adequate, verifiable procedures [were implemented] to ensure that the inmate actually receives a fatal dose of the anesthetic."  *Morales*, 465 F. Supp. 2d at 983.  The Court found, based on the record before it, that there was "improper mixing, preparation, and administration of sodium thiopental by the execution team" and that the team members failed "to follow the simple directions provided by the manufacturer of sodium thiopental."  *Id*. at 980.  This Court also determined that "the team members almost

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

uniformly have no knowledge of the nature or properties of the drugs that are used or the risks or potential problems associated with the procedure." *Id.* at 979.  In important respects, executioners failed to comply with the written procedures – and California law. For example, although OP 770 required lethal chemicals to be returned to the prison pharmacy if they were not used, this Court found that sodium thiopental was taken from the pharmacy for training purposes, but was not actually used in the training sessions, and was not returned to the pharmacy. *Id.* at 979 n.9.  Critically, this Court determined that the executions of condemned inmates were permeated with a "pervasive lack of professionalism," and "lack of reliability and transparency," *id.* at 980, 981.  The Court concluded that "Defendants' actions and failures to act have resulted in an undue and unnecessary risk of an Eighth Amendment violation," *id.* at 981, and "created a 'demonstrated risk of severe pain,'"  ECF No. 494 at 4.

18.     Plaintiffs have alleged, and this Court has found, constitutional violations in the conduct of executions by Defendants.  *Morales*, 465 F. Supp. 2d at 975.  This Court also has rejected changes Defendants made to the execution procedure as insufficient to fix the violations, *id.* at 972, and has "urged" Defendants to perform activities to remedy the violations, while prepared to "issue formal findings of fact and conclusions of law with respect to the deficiencies in the administration of California's current lethal-injection protocol," *id.* at 982.  Defendants have since sought pleading guidance from Plaintiffs as to the specifics of their concerns, and thereafter moved to dismiss the amended complaint for failure to state a claim.  This Court denied Defendants' motion because Plaintiffs set forth "detailed factual allegations as to the various ways in which the new regulations allegedly have failed to remedy the deficiencies of OP 770" and because "there is

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

1    substantial evidence that similar prior protocols have been deficient in actual practice."

2    *Morales*, 757 F. Supp. 2d 961, 970, 969 (N.D. Cal. 2010).

3    19.    "When a court attempts to remedy an entrenched constitutional violation through

4    reform of a complex institution . . . it may be necessary in the ordinary course to issue

5    multiple orders directing and adjusting ongoing remedial efforts." *Brown v. Plata*, 563

6    U.S. 493, 516, 513 (2011) (holding that the lower court was "well situated to make the

7    difficult factual judgments necessary to fashion a remedy for [the] complex and

8    intractable constitutional violation" relating to prison conditions).  This Court must

9    determine whether Defendants' remedial efforts, including but not limited to the

10   publishing of a revised execution protocol, have addressed the "complex and intractable

11   constitutional violation[s]" already found by the Court based on the extensive record in

12   this case.  This Court has stated that it will do so, in part by ensuring "the existence of an

13   extensive, well-developed factual record" by "monitor[ing] closely the scope and pace of

14   any additional discovery."  ECF No. 461 at 15.

15

16

17                    **Plaintiff Initiated this Action in January 2006**

18   20.    Plaintiff Morales filed this action on January 13, 2006 against Defendant CDCR's

19   Secretary and Warden, seeking equitable relief from the unconstitutional manner and

20   method by which Defendants intended to execute him on February 21, 2006.  ECF No. 1.

21   When Plaintiff Morales moved for a Temporary Restraining Order on January 26, 2006,

22   the Court set the matter for a Preliminary Injunction hearing on February 9, 2006.  ECF

23   No. 26.  The hearing took place (ECF No. 49) with Plaintiff Morales seeking a stay of

24   execution "so that the Court [could] conduct a full evidentiary hearing to consider his

25   claims."  *Morales v. Hickman*, 415 F. Supp. 2d 1037, 1038 (N.D. Cal. 2006).

26

27

28

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**The Court Placed Conditions on the Morales Execution**

21.     The Court conditionally denied Plaintiff Morales a preliminary injunction on February 14, 2006 (ECF No. 62), stating that it would allow Defendants to execute him using either of two execution procedures fashioned by this Court: 1) use only sodium thiopental or another barbiturate or combination of barbiturates in Plaintiff Morales's execution; or 2) "agree to independent verification, through [continuous] direct observation and examination by a qualified individual or individuals, in a manner comparable to that normally used in medical settings where a combination of sedative and paralytic medications is administered, that Plaintiff in fact is unconscious before either pancuronium bromide or potassium chloride is injected." *Morales*, 415 F. Supp. 2d at 1047.

22.     In response to the evidence presented by Plaintiff Morales at the Preliminary Injunction hearing, this Court also "respectfully suggest[ed] that Defendants conduct a thorough review of the lethal-injection protocol, including, *inter alia,* the manner in which the drugs are injected, the means used to determine when the person being executed has lost consciousness, and the quality of contemporaneous records of executions, such as execution logs and electrocardiograms" because, as the Court correctly anticipated, "the issues presented by this case are likely to recur with considerable frequency." *Morales*, 415 F. Supp. 2d at 1046-47; *Morales v. Tilton*, 465 F. Supp. 2d 972, 975-76 (N.D. Cal. 2006).  To date, Defendants still have failed to conduct the thorough review suggested by this Court, and there now are more than 20 Plaintiffs and proposed Intervenors in this action.

23.     On February 14, 2006, Defendants were advised that if they rejected both execution protocols created by this Court, "a stay of execution [would] issue . . . [and the

- 11 -

Court [would] hold an evidentiary hearing on the merits of Plaintiff's claims . . ."

*Morales*, 415 F. Supp. 2d at 1048.

24.    On February 15, 2006, Defendants verified that they would "comply with the second alternative [created by this Court].  To that end [Defendants] . . . obtained the services of two highly qualified, board certified anesthesiologists to monitor plaintiff throughout the execution."  ECF No. 63 at 2.

25.    On February 16, 2006, this Court again set forth Defendants' obligations under its second alternative with which Defendants stated they would comply: they must present "two board-certified anesthesiologists *who will, as directed in the order*, independent[ly] verif[y], through direct observation and examination . . . that Plaintiff in fact is unconscious before either pancuronium bromide or potassium chloride is injected. Because Plaintiff has raised a substantial question . . . *the presence of [the anesthesiologists] shall be continuous until Plaintiff is pronounced dead*."  ECF No. 67 at 1-2 (emphasis added).

26.    This Court expressly addressed Plaintiff Morales's concern "that Defendants might seek to comply with the order by having the anesthesiologists do nothing more than sit in the antechamber and attempt to view the execution process."  ECF No. 67 at 3. This concern was rejected by this Court because "[i]n fact, [] the relevant terms of the Court's order of February 14, 2006, order are quite specific.  As set forth above, the order directs the anesthesiologists to 'independent[ly] verif[y], through direct observation and examination . . . in a manner comparable to that normally used in medical settings where a combination of sedative and paralytic medications is administered, that Plaintiff in fact is unconscious before either pancuronium bromide or potassium chloride is injected.'" *Id.* at 4.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

27.     Quoting Defendants' sworn declaration, this Court emphasized that Defendant CDCR's personnel had "spoken with both doctors and the warden of San Quentin about the participation of these doctors in the scheduled execution of Michael Morales [and] confirmed that one doctor will be physically present in the execution chamber to monitor the consciousness of Mr. Morales using whatever equipment or other techniques he deems medically appropriate.  The other doctor will be present outside the chamber as an observer."  *Id.* at 4 n.3.

28.     "To the extent that [the] declaration might be read to imply otherwise, the Court construes [the] use of the word 'monitor' to mean that the anesthesiologists will take all medically appropriate steps to ensure that Plaintiff is and remains unconscious after Plaintiff is injected with sodium thiopental and before he is injected with pancuronium bromide or potassium chloride."  *Id.*

29.     "Defendants themselves as well as the anesthesiologists are presumed to understand and comply with the order . . .   It has been demonstrated to the Court's satisfaction that the anesthesiologists designated by Defendants . . . will use their professional judgment not merely to observe the execution but to ensure that Plaintiff is and remains unconscious . . ."  *Id.* at 5.

## Defendants Failed to Comply with the Court's Conditions for the Morales Execution

30.     Defendants' representations to this Court and the U.S. Court of Appeals for the Ninth Circuit – that Defendants would execute Plaintiff Morales in the presence of two board certified anesthesiologists "to monitor plaintiff throughout the execution" and to "convey[] the necessary verification" ordered by the Court (ECF No. 63 at 2, 5) – were knowingly false.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

31.     It is undisputed that Defendants approved the request of anesthesiologist A2 "to be allowed, during the execution, to stand in the small room off the anteroom where the lethal drugs are mixed – an area where it would be impossible for A2 to see into the execution chamber.  When A2 left San Quentin on February 18, 2006 [three days before the scheduled execution], it was his understanding that, in attending the execution of Michael Morales . . .  he would have to do nothing other than show up at the prison and stand in that little room."  ECF No. 277, Undisputed Facts 108* and 109*.  "It was A2's assessment, based upon his conversations with Darc Keller, Assistant Secretary, Office of Health Care Policy of CDCR, that CDCR was requesting his presence merely as a 'warm body.'  A2 had no plans to do anything but stand there."  *Id.* at 106*.  A2 believed that he "had no responsibilities," he "agreed to be present as a backup after confirming his understanding that he would not be in the chamber, that he would have no responsibilities other than to be present," he "never had any understanding that he was ever to give any professional opinion," and he "had no understanding that 'if there was a problem with the primary anesthesiologist, [his] role would escalate to something else.'"  *Id.* at 96*-99*.  At an execution rehearsal on February 18, 2006, A2 refused to participate in communicating with the other anesthesiologist (Dr. Robert Singler) by use of a headset or other signals whether Plaintiff Morales "was unconscious."  *Id.* at 107*.

32.     This Court generously characterized Defendants' misconduct as a "disconnect," with "reasons that remain somewhat unclear," and noted that the Defendants "told the anesthesiologists that [they] merely would have to observe the execution, while Defendants' counsel represented to the Court that the anesthesiologists would ensure that Plaintiff would remain unconscious after he was injected with sodium thiopental."  *Morales*, 465 F. Supp. 2d at 976.  The Court's benevolence does not undermine the

- 14 -

*undisputed* facts: while Plaintiff Morales's appeal was pending in the Ninth Circuit, Defendants made arrangements that anesthesiologist A2 did not have to be physically present for the execution (instead, A2 would be standing in a small box room outside the antechamber which afforded no visibility of the execution or the condemned prisoner), but Defendants knowingly and falsely represented to the courts otherwise.  There would be – at a minimum – no observation of the execution by A2, let alone the ability to "take all medically appropriate steps" to ensure unconsciousness.

33.     It is *undisputed* that Defendants made no arrangements to have sodium thiopental present at the execution.  ECF No. 277, Undisputed Facts 26j; Ex. 76.  *See also* Undisputed Facts 25b-25o, 26-26i.  Without sodium thiopental available, Defendants would conduct the execution without anesthesia by paralyzing Plaintiff Morales with pancuronium bromide and letting him suffocate, and thereafter, infusing potassium chloride to stop his heart, if it was still beating, in a torturous undertaking.  No one – including the anesthesiologists – would have been able to determine whether anesthesia had been administered or whether Plaintiff Morales was unconscious.  *Morales*, 465 F. Supp. 2d at 980 ("pancuronium bromide masks any outward signs of consciousness"); RT 366 [Dr. Ebling] ("You can't breathe.  You can't move.  You can't grimace.  You can't blink.  You are paralyzed.  That doesn't mean that you are not experiencing sensations and you're not registering those sensations.").  *See also Morales*, 465 F. Supp. 2d at 983.  Proceeding in this manner would have masked Defendant CDCR's 64% failure rate of infusing anesthesia (*id.* at 980) and prevented critical observation by board certified anesthesiologists (who were required to be present) of Defendant CDCR's actions.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

34.     It is undisputed "that a person injected with either of these two drugs [pancuronium bromide or potassium chloride] while conscious would experience excruciating pain . . ." *Morales*, 415 F. Supp. 2d at 1040.

35.     Much of Defendants' misconduct resulted from directives received from the State's Executive branch – the Governor and his Legal Affairs Secretary.  The directives were received by Defendant CDCR's employees whose jobs and careers are tethered to acquiescence, notwithstanding whether federal court orders or the Constitution dictates otherwise.  Ultimately Defendant CDCR's Warden stepped down from proceeding with Plaintiff Morales's execution mid-day on February 21, 2006, only to be fired by the Executive branch for doing so.  "They said, You know better than to ask; just suffice it to say that you serve at the pleasure of the governor, and it's no longer pleasurable." Ornoski Depo. Vol. 2, at 253 (Steven Ornoski, Warden, San Quentin State Prison).

36.     Defendant CDCR's Secretary, who also serves at the pleasure of the Governor, recounted the events for the Governor's Legal Affairs Secretary as being the result of a "lack of understanding" by this Court.  Letter, J.S. Woodford, Mar. 13, 2006.  Defendant CDCR's Secretary offered these additional insights to justify Defendants' disregard of the orders of this Court and the Ninth Circuit (*Morales v. Hickman*, 438 F.3d 926 (9th Cir. 2006)): "the Ninth Circuit issued a decision purporting to affirm Judge Fogel's order"; court's "concern was more one of perception than reality"; "loose language used by the Ninth Circuit" should not be controlling; and the Court "imposed two impossible conditions on the State." *Id.*

37.     After knowingly making misrepresentations to both federal courts, the public, and Plaintiff Morales, Defendants returned to this Court on February 21, 2006 and moved to

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

execute Plaintiff Morales at 7:30 p.m. using this Court's first alternative execution procedure.

38.     This Court granted the motion, this time adding that its order was "subject to Defendants' strict compliance."  ECF No. 78 at 2.  Defendants could "proceed with the execution . . . using only sodium thiopental, [and] do so only if the sodium thiopental is injected in the execution chamber directly into the intravenous cannula by a person or persons licensed by the State of California to inject medications intravenously."  *Id.* at 3.  This was necessary because, as the Court found, "[a]n insufficient dose . . . has the potential to cause irreversible brain damage while not causing death," and the evidence demonstrated a history of inadequate administration of sodium thiopental.  *Id*. at 2.

39.     State law prohibited Defendant CDCR's deviation from their execution protocol. *See Morales v. Cal. Dept. of Corrs. & Rehab.*, 85 Cal. Rptr. 3d 724 (Cal. Ct. App. 2008). Plaintiff Morales immediately challenged Defendants' use of this execution procedure in the California Supreme Court, Case No. S141245, for, *inter alia*, Defendants' failure to vet this Court's new procedure under the State's Administrative Procedures Act ("APA").

40.     Plaintiff Morales was advised by Defendants at 5:30 p.m. on February 21, 2006, that Defendant Warden had "stepped-down" from proceeding with the execution, and that Morales would be returned to his normal cell.  Defendants allowed the death warrant to expire at midnight, triggering this Court's stay of execution order.

41.     Plaintiff Morales's immediate APA challenge was dismissed by the California Supreme Court without prejudice as moot when Defendants canceled the February 21, 2006 execution.

42.     After the death warrant expired, Defendant CDCR's Secretary stated to, among others, the Governor's Legal Affairs Secretary that: "We are fully confident that when we

- 17 -

have the opportunity to present all of the facts and science regarding the use of lethal injections we will prevail in the federal courts and that no other lawful execution will be subject to the same unconscionable delay we experienced with Michael Morales."  Letter, J.S. Woodford, Mar. 13, 2006.

**Trial in September 2006 Confirmed the Lethal Injection System is Broken**

43.     Defendants' opportunity to present all of the facts and science took place at a non-jury trial on the merits of Plaintiff Morales's claims commencing on September 26, 2006 (ECF No. 249) and concluding on September 29, 2006 (ECF No. 253).  The Court also took evidence for the trial at San Quentin State Prison's execution facility on March 30, 2006.  ECF No. 123.

44.     The Court undertook "a thorough review of every aspect of the protocol, including the composition and training of the execution team, the equipment and apparatus used in executions, the pharmacology and pharmacokinetics of the drugs involved, and the available documentary and anecdotal evidence concerning every execution in California since lethal injection was adopted as the State's preferred means of execution in 1992 . . ."  *Morales*, 465 F. Supp. 2d at 974.

45.     Notably, the foregoing trial far exceeded a limited review of the written execution protocol.  The trial was with respect to "every aspect of the protocol," including the behavior required to conduct an execution, the equipment used, the drugs selected for use, as well as all lethal injection execution history; to wit, the Defendants' past and current practices, and the culture that controls Defendant CDCR's operations.

46.     Upon conclusion of this comprehensive trial, this Court concluded that Defendants' "implementation of lethal injection is broken."  *Id.*  This conclusion was not restricted to the written execution protocol – it was regarding the *implementation* of

- 18 -

executions.  "[T]he record in this case, particularly as it has been developed through discovery and the evidentiary hearing, is replete with evidence that in actual practice [the written protocol] does not function as intended."  *Id.* at 979.

47.     Defendants tried their case and lost.  The evidence was "more than adequate to establish a constitutional violation."  *Id.* at 980.  Plaintiff Morales proved beyond a preponderance of the evidence that there were "systemic flaws in the implementation of the protocol," not simply a substandard written execution protocol.  *Id*.  Defendants displayed a "pervasive lack of professionalism in the implementation" of their executions which "at the very least is deeply disturbing."  *Id.*

48.     "Whatever the merits of the protocol in the abstract, there can be no real doubt that Defendants' implementation of [the written protocol] has major flaws, many of which are apparent from the *undisputed* facts to which Defendants stipulated in the amended joint pre-hearing conference statement."  *Id.* at 981 (emphasis in original).

49.     After this comprehensive trial on Plaintiff Morales's Eighth Amendment claims, this Court concluded that "Defendants' implementation of California's lethal-injection protocol lacks both reliability and transparency."  *Id.*  This Court cautioned that "if Defendants' goal is to resume executions as soon as possible, the Court respectfully suggests that their unwillingness to see the situation for what it is and to be proactive is self-defeating."  *Id.* at 982 n.13.

50.     This Court made expressly clear that if a one-drug execution protocol was ever to be adopted by Defendants to correct, in part, Defendants' unconstitutional conduct, "implementation of adequate, verifiable procedures to ensure that the inmate actually receives a fatal dose of the anesthetic" is compulsory.  *Id.* at 984.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

51.     This Court reiterated its earlier guidance that the State "is in a particularly good position to address these issues and put them to rest. . . . [T]he particulars of California's lethal-injection protocol are and should remain the province of the State's executive branch." *Id.* at 975 (quoting *Morales*, 415 F. Supp. 2d at 1046-47).

52.     Defendants were ordered on December 15, 2006 to advise the Court and Plaintiff Morales whether Defendants intended to review and revise their execution practices.  *Id.*

53.     Taking the cues from this Court's orders, and after exposure at trial of the State's misconduct, the Governor issued a press release on December 18, 2006, claiming that his Legal Affairs Secretary, Andrea Hoch, would undertake remedial action.  ECF No. 291.

**<u>Defendants' Review Process to Fix the System Was Inadequate</u>**

54.     Defendants advised this Court that they were "committed to reviewing, evaluating, and revising the current lethal injection protocol with respect to the identified deficiencies and any others that may emerge during the evaluation."  ECF No. 292 at 3. Defendants added that "[c]are must be taken [] to ensure that the efforts are comprehensive and effective."  *Id.*  They concluded that "[t]o allow a thorough review and opportunity to take corrective action, Defendants will submit to the Court and Plaintiff a report setting forth a revision of OP 770 and identifying corrective actions addressing deficiencies in the implementation of lethal injection executions by May 15, 2007."  *Id.*

55.     Notwithstanding their commitments, however, Defendants refused to undertake these actions with transparency and/or with public participation and oversight under the State's APA.  The Governor's Legal Affairs Secretary's decision to implement an execution protocol without public participation was erroneous as a matter of state law. *Morales v. Cal. Dept. of Corrs. & Rehab.*, 85 Cal. Rptr. 3d 724 (Cal. Ct. App. 2008).

- 20 -

56.     The May 15, 2007 review and revision deadline was arbitrary and self-imposed. Once Defendants' review began, the need for additional time became clear to those tasked with the undertaking.  Their request to the Governor and his Legal Affairs Secretary for additional time was rejected.  Cal. Senate Pub. Safety Comm. Hearing, May 8, 2007.

57.     The Governor's Legal Affairs Secretary composed a team of five CDCR employees and CDCR retirees to review the execution protocol and Defendants' unconstitutional conduct.  The team members were plainly unqualified, and unable to provide independent oversight of Defendant CDCR's purported remedial actions that were needed to correct Defendant CDCR's unconstitutional conduct, knowing misrepresentations to the federal courts, and intentional misconduct.  Further, the CDCR remedial team was rushed and able to make only very minor revisions to meet the Legal Affairs Secretary's deadline.  The review process was superficial.  Among other things, Defendants concluded that they would limit their review, evaluation, and revisions to only five issues raised in the District Court's December 15, 2006 order, despite that order's express notation that it was not meant as an exhaustive recitation of the failings of Defendant CDCR's procedures.  Moreover, the review process yielded no improvements responsive to the Court's December 15, 2006 post-trial order.

- Defendant CDCR's employee Kingston "Bud" Prunty, Undersecretary of Operations (Parole), managed the team and reported to the Governor's Legal Affairs Secretary, Andrea Hoch.  Prunty lacked independence, qualifications, education, and experience to manage the team, review the constitutional violations, and develop necessary remedial solutions;

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

- Prunty made no record of his revision activities, thoughts, considerations, and/or recollections.  He estimated that he attended over 50 meetings regarding the revision, several with Ms. Hoch, but he never took a single note;

- Despite this Court's findings, and the undisputed facts regarding Defendant CDCR employee Darc Keller's misconduct in the handling and directions provided to anesthesiologist A2, Keller was selected by Ms. Hoch to review the State's execution practices.  *See* ECF No. 277, Undisputed Facts 106* ("CDCR was requesting his presence merely as a 'warm body.'  A2 had no plans to do anything but stand there.");

- During the review process of Defendants' execution practices, Keller was fired by CDCR for fraud in the work place;

- Prunty did not believe the review team was qualified to address medical issues;

- Team member John McAuliffe (CDCR retiree and contracted "Consultant") was responsible for reviewing the drug mixtures used by other states, but admittedly lacked education, experience, or training to do so;

- CDCR Secretary James Tilton and Warden Robert Ayers falsely stated under oath that McAuliffe was selected to review Defendants' execution practices "because of his medical background," and therefore he "was responsible for reviewing the drug mixtures used by other states and developing the drug mixture set forth in the revised version of O.P. 770.";

- Neither Prunty nor McAuliffe ever attended an execution before the review process began or when it was completed;

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

- Prunty and McAuliffe toured other execution facilities in Virginia, Oklahoma, Indiana, and the federal Board of Prisons in Indiana.  Neither took any notes. They concluded that the facilities had "basic similarities" to California's facility;

- Prunty neither inquired nor learned whether Indiana, Virginia, or Oklahoma ever sought medical expert opinions in designing their lethal injection protocol; he had no knowledge whether Oklahoma, Indiana, or Virginia have ever had an unsuccessful execution procedure; and he never learned of any emergency procedures to be employed in any of these states in the event of a mishap during an execution;

- Prunty was aware of an emergency procedure to be utilized in Oklahoma in the event a stay is issued.  This was not included in any revisions to California's execution practices;

- Prunty did not know what type of execution training takes place in Oklahoma.  He had no information regarding the difficulties encountered in Oklahoma during its executions, the reasons for the difficulties, or its attempted solutions to the problems;

- Oklahoma's executioners purportedly believed that the most difficult part of the execution process is ensuring that there is proper IV access.  Prunty was not sure whether he attended a discussion about that;

- "Virginia has executed sixty-six inmates pursuant to its lethal-injection protocol, which appears to provide for training, physical facilities, and oversight far superior to that provided by California's."  *Morales*, 465 F. Supp. 2d 981 n.12. Neither Prunty nor McAuliffe noted a single practice employed by Virginia (or by

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

Oklahoma, Indiana, or the federal Board of Prisons in Indiana) that they recommended be adopted for California;

- George Sifuentes, CDCR Director of the Office of Facilities Management, evaluated California's execution chamber for modifications.  He did not visit any execution sites in other states;

- Sifuentes fraudulently advised that a new chamber "could be done as a minor capital outlay project for under $400,000," which was the threshold figure for requiring legislative oversight of capital expenditures, and thereby allow CDCR to "do it quietly" – "low profile."  The cost of the new chamber was actually $800,000;

- Sifuentes was disciplined by CDCR for "a pattern" of fraudulent government building cost estimates – it was "the way he had done business for a while.";

- Neither Prunty nor Hoch took any disciplinary action against Sifuentes;

- Defendants' execution facility was re-designed before the trial in this matter, and therefore without regard to this Court's trial findings;

- Defendants' execution facility was re-designed and built before the review team considered the State's execution practices, observed other execution facilities, or recommended any changes to Defendants' execution procedures;

- Defendants falsely claimed that they had been ordered by this Court to build a new execution facility;

- Defendant CDCR Secretary James Tilton later claimed he was not advised of this decision to build a new chamber, or of the commencement of the construction of this facility;

- 24 -

- The review team was told to maintain all documentation generated during its review.  The team used CDCR staff to conduct administrative tasks.  CDCR Correctional Captain John McNitt from the Office of Facilities Management was so utilized and reported to the review team that he would destroy documents gathered in the course of reviewing the protocol.  The team did not report this to Prunty, and Prunty never took corrective or disciplinary action against the team;

- Carl Larson, a CDCR retiree, was responsible to address the selection, recruitment, and retention of the execution team.  Notwithstanding the published revisions that required the most qualified individuals for an execution team assignment, Larson believed that "as long as the warden at San Quentin could get a team that meets that criteria, they're going to use San Quentin people," even if there were people "who were better and brighter and cleaner outside of San Quentin";

- The revisions did not require any psychological tests or evaluations of the team members, screening for any psychiatric diagnosis, or review of files that may disclose such a disability;

- Employees who had served in the condemned housing unit were permitted to be on the execution team, notwithstanding long-term interactions with the inmate that likely affected execution performance and decision making;

- Review of execution team candidate Personnel, Supervisory, and Training files, and review of candidate current Criminal Identification and Information Report files were not undertaken when an execution team was assembled as was required in the revisions; and

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

- Significantly, no independent fiduciary was used to monitor Defendant CDCR and ensure it would comply with the written protocol, court orders, and its constitutional obligations.

**Defendants Misrepresented the Review Process to this Court**

58.     Upon the completion of the review of, and revisions to, the State's execution practices by the Governor's Legal Affairs Secretary, Defendants reported a review process to this Court that was contrary to the facts.  Defendants claimed that "team members were selected on the basis of their background, experience, and expertise." ECF No. 317-1 at 13.  However, the team members had no necessary knowledge, skill, experience, training, or education, discussed *infra*.

59.     Defendants added that the "team members and selected staff . . . prepared working documents" (*id.*); however, the leader of the enterprise (Prunty) made sure to not record a single note over the course of 50 meetings and numerous execution facility site visits, undermining any transparency or reliability.

60.     While Defendants advised this Court that Defendants surveyed the practices of other lethal injection states "to gather relevant lethal injection protocol information" and to learn, "review, analyze, and record" pertinent information (*id.* at 14), Defendants failed to make records of any such matters.  Moreover, CDCR staff obtained and then destroyed documentation in the purported review process, all without disciplinary action. Defendants claimed that the documentation purportedly was "invaluable . . . to this review" and also in making improvements (*id.* at 15); however, this contention is uncorroborated by any documentation, and Defendants' destruction of documentation infers the contrary.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

61.     Defendants contended "[a]s an integral element of the review, physical site visits were made to other jurisdictions" (*id.* at 14), yet Defendants failed to record a single note during these integral undertakings.  Moreover, these integral site visits took place *after* Defendants' new execution facility was designed (*id.* at 21) and after construction had commenced, allowing for no integration of any information gathered.  The Defendants' new facility was built from "schematics" prepared by the Office of Facilities Management well before trial, the issuance of this Court's findings, or Defendants' review process following trial.  *Id.*  The facility neither was designed nor built to address any findings by this Court.

62.     "Defendants commenced construction of the new facility on March 5, 2007, even though the necessary funding had not been authorized by the California Department of Finance or the California Legislature, apparently because of a mistaken belief that this Court had ordered the construction.  *Findings of S. Public Safety Comm. Informational Hr'g on San Quentin Death Chamber*, 2007-08 Sess. (Cal. 2007); *see also S. Public Safety Comm. Informational Hr'g: San Quentin Death Chamber*, 2007-08 Sess., at 26, Supp-5, Supp-8 (Cal. 2007) (emphasis omitted) (funding requested in Defendants' budget proposal because this "Court directed the creation of a separate Lethal Injection Chamber")."  ECF No. 321 at 2 (Order Following Status Conference).[2]

63.     Defendants reported that new execution team member selection rules were in place to eliminate members with certain unacceptable characteristics, but the rules immediately were observed in the breach.  Defendant CDCR's Undersecretary Prunty, a

---

[2]  Construction commenced well before the protocol review team had finalized its review, reached its conclusions or made recommendations, or published its revised protocol. Construction was premised upon "previously prepared schematics" provided by the Office of Facilities Management, apparently "in the years past."  ECF No. 317-1 at 21.

team selection member, failed to review the candidates' supervisory files, training files, and personnel files when reviewing applicants for the execution team.  Execution team applicants were ordained by the Warden to be the execution team members and leaders without regard to the application requirements in the protocol.  One *applicant* was made a member of the three-person execution team selection panel.  Moreover, Defendants' revisions allowed any execution team member who violated a selection rule to continue to participate in executions for up to one year before the violations were subject to review.  ECF No. 317-1 at 16.

64.     Defendants reported that as part of their improvements there would be a "Lethal Injection Record Keeping Team" that would perform "Proper report writing and record keeping."  *Id.* at 17.  There was no mention how this would occur or the content of the records that would be kept, and this function was created by a review team that went to great lengths to make no records of their activities, while intentionally destroying others.

65.     Defendants reported to this Court that "as an integral element of the review, the CDCR considered alternatives to the existing three-chemical protocol including a one-chemical protocol."  *Id.* at 5.  However, on January 31, 2007, San Quentin Legal Affairs Coordinator Denise Dull made contemporaneously prepared notes that stated as early as a few weeks after this Court's December 15, 2006 order, Defendant Governor had instructed Prunty that the "1 drug protocol is now off the table, stick w 3 drugs."

66.     After publishing the revised execution protocol, Defendants' counsel contradicted the Governor's press release regarding their intentions: "Our perspective is basically, we want to speed along the case."  ECF No. 322, RT 9 (June 1, 2007).  These revised intentions were consistent with Defendant CDCR's execution review and revision

- 28 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

undertakings that were controlled and supervised by the Governor's Legal Affairs Secretary.

67.     The Legal Affairs Secretary insisted upon an inadequate time schedule for the review; she employed unqualified and/or unethical CDCR employees to conduct the review; Defendant CDCR continued its unlawful and fraudulent misconduct under her oversight; and she refused to employ an independent receiver or fiduciary to control and audit Defendant CDCR's actions (despite its fully documented record of misconduct). Defendant Governor's Legal Affairs Secretary's conduct prevented "a thorough review of the lethal-injection protocol, including, *inter alia,* the manner in which the drugs are injected, the means used to determine when the person being executed has lost consciousness, and the quality of contemporaneous records of executions, such as execution logs and electrocardiograms."  *Morales*, 415 F. Supp. 2d at 1046-47; *Morales*, 465 F. Supp. 2d at 975-76.  The Legal Affairs Secretary's review process also did not ensure the eradication of "systemic flaws in the implementation," a "pervasive lack of professionalism in the implementation," the absence of quality control methods, "poor quality" record keeping, a lack of "reliability and transparency" and other "major flaws." *Morales*, 465 F. Supp. 2d at 975-76.

/ /

/ /

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**CDCR Published a Revised Execution Protocol in May 2007**

68.      Notwithstanding the foregoing, on May 15, 2007, Defendant CDCR published a revised written execution protocol.  ECF No. 317.  Defendant CDCR again made no attempt to vet the protocol through California's APA.  "A major purpose of the APA is to provide a procedure for persons or entities affected by a regulation to be heard on the merits in its creation, and to have notice of the law's requirements so they can conform their conduct accordingly."  *Morales v. Cal. Dept. of Corrs. & Rehab.*, 85 Cal. Rptr. 3d 724, 728-29 (Cal. Ct. App. 2008).  Defendant CDCR was required by law to comply with the APA with respect to enacting their revised protocol, yet under the direction of the Governor's Legal Affairs Secretary, they failed to do so.

69.      The Governor injected the Executive office into the matters at issue, made assurances and promises to, among others, this Court, and immediately breached them. The State failed "to correct court-identified deficiencies in California's lethal injection protocol to ensure the death penalty procedure is constitutional."  ECF No. 291.  The Governor failed "to implement a screening process and undertake a comprehensive training program for execution team members, create standardized record-keeping, recommend how to improve the death penalty facility and identify the best experts in other states to advise the CDCR on lethal injection and its implementation."  *Id.*  The Governor breached his promise to do "whatever it takes to ensure that the lethal injection process is constitutional . . ."  *Id.*

70.      The revised May 15, 2007 protocol eliminated transparency in the execution process, and therefore reliability.  Among other things, the protocol removed physician observations of inmate vital signs; failed to require medical professionals to infuse the toxins; failed to include a rate of administration of the toxins; required remote

- 30 -

administration of the toxins; failed to require medically trained personnel to assess

sedation; and even failed to require the presence of anesthesiologists after selecting them

as the most qualified personnel to perform the tasks for the Morales scheduled execution.

71.     Notwithstanding the Court's detailed trial order, the Governor's subsequent

promises for remedial actions, and the actions undertaken and coordinated by the Legal

Affairs Secretary, Defendant CDCR then requested that Plaintiff Morales amend his

complaint, claiming "it would be useful" to allow Defendants "to get a more – a better

view of what exactly they are complaining about with this new protocol."  ECF No. 322,

RT 21 (June 1, 2007).  The Court acquiesced to the request.  *Id.*

**Third Amended Complaint and APA Litigation Challenged the May 2007 Protocol**

72.     A third amended complaint was filed on July 2, 2007.  ECF No. 323.  In light of

the Governor's involvement in Defendant CDCR's unconstitutional execution practices,

the Executive's misconduct with regard to the federal courts' February 2006 orders, the

fraudulent promises made by the Governor in response to the Court's December 15, 2006

order, and the control exercised by the Executive over the review process of the State's

execution practices, the Governor was named as a defendant in the third amended

complaint.

73.     This Court noted that "there are a lot of moving parts in the new protocol, and one

of them is a new chamber; and another is a new training program; and another is a

different, you know, mixture of chemicals and the different delivery systems and so forth.

And the Court has to ultimately decide whether that entire package addresses the

constitutional concerns that were raised in this case."  ECF No. 322, RT 14 (June 1,

2007).

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

74.     This Court added that discovery was required, at a minimum, as to "two potential areas of inquiry, one being the sources of the ideas for the protocol, who was consulted and what – what opinions were relied on, and then the other line of inquiry would have to do with the details of implementation going forward, what is going to be the content of the training, for instance, and what are the details of the selection of the team and so forth."  ECF No. 322, RT 8 (June 1, 2007).

75.     Less than six months after the revised execution protocol was published and the third amended complaint was filed, "[o]n October 31, 2007, the Superior Court . . . enjoined implementation . . . of the lethal-injection protocol based upon its conclusions that Defendants were required to and did not comply with California's Administrative Procedures Act, Cal. Gov't Code § 11346 et seq. (West 2007), when they promulgated the protocol.  *Morales v. Cal. Dep't of Corr. & Rehab.*, No. CV061436 (Cal. Super. Ct. Marin County Oct. 31, 2007)."  ECF No. 370 at 1.  Plaintiff Morales then requested that judgment be entered here because "the state has not undertaken the proper review the Court requested."  ECF No. 368 at 3-4.  This Court instead vacated the case management schedule and stayed discovery.  ECF No. 370 at 1-2.

76.     On November 21, 2008, Defendants were permanently enjoined by the California Court of Appeal from using their May 15, 2007 published execution protocol for failing to vet it through the APA process.  *Morales v. Cal. Dept. of Corrs. & Rehab.*, 85 Cal. Rptr. 3d 724 (Cal. Ct. App. 2008).  Defendants asked the California Supreme Court to depublish the decision.  The request was denied on February 25, 2009.

/ /

/ /

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**Defendants Published an Execution Protocol for APA Review in 2009**

77.     On May 1, 2009, Defendants published an execution protocol for APA review

that was "almost identical" to the May 15, 2007 protocol.  *Sims v. Dep't of Corrs. &*

*Rehab.,* 157 Cal. Rptr. 3d 409, 413 n.4 (Cal. Ct. App. 2013).  This Court noted, "indeed,

in most respects the documents are remarkably similar."  ECF No. 424 at 5.  Defendant

CDCR received public comments on the protocol, held a public hearing for further

comments, and on January 4, 2010, provided modifications to the proposed execution

protocol.  On April 29, 2010, Defendant CDCR submitted the new regulations for review

by the Office of Administrative Law ("OAL").  On June 8, 2010, the OAL disapproved

the regulations because Defendant CDCR failed to comply with the clarity, consistency,

and necessity standards of the APA, and several procedural requirements.  On July 6,

2010, Defendant CDCR resubmitted modified regulations to address the issues raised by

the OAL, the execution protocol was approved by the OAL on July 30, 2010, and the

regulations took effect on August 29, 2010.

78.     Notwithstanding the OAL's approval, Defendant CDCR "substantially failed to

comply" with the APA in submitting and publishing its execution protocol.  *Sims v. Dep't*

*of Corrs. & Rehab.,* 157 Cal. Rptr. 3d 409 (Cal. Ct. App. 2013).  Defendants refused to

undertake any remedial actions with transparency and/or with public participation and

oversight under the State's APA.  The Governor's Legal Affairs Secretary's failure in this

regard was erroneous as a matter of state law.  Defendants were notified accordingly.

With valid claims pending regarding Defendants' failures to comply with the APA, under

the direction and control of Defendant Governor's Legal Affairs Secretary, Defendants

immediately pursued the executions of numerous Plaintiffs, including Morales, Mitchell

Sims, and Albert Brown.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**Defendants Unsuccessfully Attempted to Resume Executions**

79.     A public session to set the execution date of Plaintiff Morales was calendared, despite the Legal Affairs Secretary's knowledge of this Court's stay of execution order. An execution date was set for Plaintiff Brown on September 29, 2010.  Plaintiff Brown was allowed to intervene as a Plaintiff in this action but was denied a stay of execution by this Court (ECF No. 401), largely predicated upon and nondisclosures by Defendants, including the fact that Defendant CDCR had an insufficient quantity of sodium thiopental to provide experience and training on mixing the drug and to conduct the execution, and that the limited quantity CDCR did possess expired the day after the scheduled execution.

80.     When Defendants' deceptive conduct surfaced again, this Court advised the U.S. Court of Appeals for the Ninth Circuit, only hours before Plaintiff Brown was to be executed, that "[Defendants] did not disclose that they have an insufficient amount of sodium thiopental to provide members of the execution team with experience and training in the actual mixing of the drug, or that they will be unable to obtain additional sodium thiopental until at least the first quarter of 2011 (citations omitted)."  U.S. Court of Appeals, No. 10-72977 (9th Cir. Sept. 29, 2010), ECF No. 5 at 2 ([This Court's] Response to Petition for Writ of Mandamus).  "[Defendants] did not make any representations or disclosures with respect to the availability of sodium thiopental in either their papers or their oral argument in opposition to [Plaintiff] Brown's motion for a stay of execution. (citation omitted)."  *Id.*  "[This Court] thus did not consider, and Brown did not have an opportunity to address, the implications of the shortage of usable sodium thiopental in connection with whether Brown was entitled to a stay."  *Id.*

81.     After a remand from the Court of Appeals directing this Court to undertake certain considerations, including sufficient time to undertake the necessary review of

- 34 -

California's procedures in light of the 2006 findings (ECF No. 411), a stay of execution was entered in favor of Plaintiff Brown hours before his scheduled execution.  ECF No. 424 at 9.  The stay was predicated upon a finding that California's procedures violated the Eighth Amendment under the standard set forth in *Baze*.

### Plaintiffs Filed a Fourth Amended Complaint to Address the Protocol Published in 2010

82.     In the days following the scheduled execution of Plaintiff Brown, this Court ordered Plaintiffs to amend the complaint in three days to set "forth their claims with respect to California's new lethal-injection regulations."  ECF No. 425 at 1.  The Court noted its "understanding that Defendants will not seek to obtain any execution dates until at least thirty days after the conclusion of any further evidentiary hearing in the present action."  *Id.* at 2.

83.     Plaintiffs amended the complaint (ECF No. 428) to address Defendants' execution protocol that was substantially similar to earlier iterations, and that unlawfully was prepared under the oversight of Defendant Governor's Legal Affairs Secretary.  ECF No. 291.

84.     Defendant CDCR admitted that it substantially failed to comply with many of the requirements of the APA.  *Sims v. Dep't of Corrs. & Rehab.,* 157 Cal. Rptr. 3d 409, 415 (Cal. Ct. App. 2013).  As a result, the review process, revisions, and publication of Defendants' "lethal-injection protocol lacks both reliability and transparency" that this Court required. *See Morales*, 465 F. Supp. 2d at 981; *Sims v. Dep't of Corrs. & Rehab.,* 157 Cal. Rptr. 3d at 420 (affirming that the "public has [not] timely received all available information that is relevant to the proposed regulations, accurate, and as complete as reasonably possible").

85.     Defendant CDCR further admitted in the Superior Court for the County of Marin (and later on appeal) that, *inter alia*, it "falsely represented" – i.e., *it lied* about – the predicate for key execution provisions during the promulgation.  *Sims,* 157 Cal. Rptr. 3d at 415, 421.

### Defendants Unsuccessfully Moved to Dismiss the Fourth Amended Complaint

86.     On October 25, 2010, Defendants moved to dismiss the Fourth Amended Complaint for Failure to State a Claim.  ECF No. 430.[3]  The only determination that the Court was permitted to make at that point was procedural: "whether Defendants have shown beyond doubt that the Court could not grant any relief no matter what Plaintiffs are able to prove."  ECF No. 461 at 3.  There, as in this Fifth Amended Complaint, Plaintiffs set forth: (1) a cognizable legal theory; and (2) minimal threshold plausible facts under the theory.  "In light of this standard, motions to dismiss are viewed with disfavor and rarely are granted."  *Id.* at 4.  The motion was denied on December 10, 2010.  ECF No. 461.

87.     This Court articulated the plausible and already established factual predicate of Plaintiffs' claims embedded in the record of this case (and that remains no different here): "Among other deficiencies in OP 770, the Court found, in large part on the basis of undisputed evidence, that the execution team improperly mixed, prepared, and administered sodium thiopental during executions; that members of California's execution team were insufficiently qualified; that the IV team members were 'not

---

[3] Defendants insisted that Plaintiffs prepare and file an amended complaint to allow a motion to dismiss to be made while continuing to avoid complying with this Court's discovery orders related to, *inter alia*, their execution practices that were to be used on Plaintiff Brown, including execution team selection, execution team qualifications, training on drug preparation, mixing, and infusion, facility use and overcrowding, and record preparation.

- 36 -

adequately prepared to deal with any complications that may arise'; that the walk-throughs in which the execution team participated were incomplete, and the team did not receive meaningful training; that the IV team did not always prepare a backup line; and that the physical conditions in which executions were carried out did not permit effective observation of the condemned inmate (citations omitted)." *Id.* at 11.

88.     In denying the motion, this Court again noted that "[r]ather than simply enter[ing] judgment for Plaintiffs, the Court [] 'respectfully . . . urge[d] the Governor's Office to take this opportunity to address seriously now, rather than later, the significant problems with OP 770 and its implementation.'" *Id.* at 8.  Defendant Governor has not advised this Court of its intentions since issuing its press release on December 18, 2006.  Whatever the Defendant Governor's stated intentions were in 2006, the record is replete with broken promises in this regard since.  The Court's invitation still requires a full and completely updated response.

**Inspection of New Execution Facility Revealed Defects**

89.     On February 8, 2011, the Court conducted an examination of Defendant CDCR's new lethal injection facility.  ECF No. 492.  Numerous components required to conduct an execution were not present or were not set-up for inspection.  Defendants were unable to articulate the purpose for numerous components and failed to make proper demonstrations for review by experts and this Court.  Defendants did not know the design of the apparatus to be used to administer the chemicals.  Reporter's Transcript ("RT") 26 (inspection at San Quentin State Prison, Feb. 8, 2011).  Defendants did not have the rigging device available for inspection or demonstration.  *Id.*  Defendants were unaware whether the rigging device, critical for ensuring proper administration of the chemicals, had been changed since it was seen at the previous execution facility inspection tour.  RT

- 37 -

27.[4]  Defendants did not know the purpose for one set of ports in the infusion room.  RT 25-26.  Secondary inmate restraints were not available for inspection.  RT 44.  Defendants were unable to articulate where executioners and observers would be positioned in the infusion room during an execution.  RT 29.  Defendants did not know the levels of lighting that would be used in the infusion room during an execution.  RT 30, 51.  Defendants stated that the execution facility relies primarily on radio communication between team members yet claimed that the communication system was unavailable for inspection or demonstration.  RT 43.  (Plaintiffs' counsel found the communication devices present in a cabinet in the anteroom after the Court left the site inspection.)  Defendants were unable to identify the execution facility location to be used to keep logs or other documentation of the procedure.  Defendants could not identify the information to be logged in a particular log book.  RT 11.  Defendants had only a cursory, at best, knowledge of the purpose for monitors that were present.  RT 19 ("I have an idea . . . they are used for assessing the vitals of the inmate. . . .").  Defendants were unable to identify the locations where the execution drugs are stored in the infusion room (RT 10, 18, 20), and did not know whether the execution drugs are processed through the San Quentin pharmacy or delivered directly to the infusion room.  RT 22.  Defendants did not know if the tray used for the chemicals would be the same or similar to the one observed at the previous facility inspection.  RT 29.  Defendants could not identify where the post-execution photographs of the inmate take place.  RT 13.  Defendants did not know the purpose of a curtain on a window.  RT 32.

---

[4]  The 2006 and 2011 trial and inspection transcripts are cited as RT followed by the page number and the date of the event.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

90.     The facility inspection was conducted while Defendants did not have an execution team.  *See* ECF No. 524 at 2.[5]  Defendant CDCR presented the facility to the Court without regard to the then-current execution protocol, just as the execution facility was designed and built without regard to this Court's December 15, 2006 findings.  The "new" execution facility has inadequate lighting, has the propensity for overcrowded conditions, has poorly designed facilities in which the execution team must work, and leaves execution team members too far from the condemned inmate to permit effective observation of any unusual or unexpected movements by the inmate, including determining inmate consciousness, just as the previous facility did.

**Court Ordered Discovery in the Litigation to Resume**

91.     On March 11, 2011, this Court ordered Defendants to respond to Plaintiffs' outstanding discovery, this time *forthwith*.  ECF No. 513.  The Court found Defendants' burden to respond to be "minimal."  *Id.*  Each of the disputed discovery requests "has at least some relevance … *to the issues still to be determined by the Court*."  ECF No. 513 at 5 (emphasis added).

92.     On March 25, 2011, Defendants remained unable to assemble an execution team. ECF No. 517 at 2.  (This continued through November 3, 2011.  ECF No. 524 at 2; ECF No. 528 at 2; ECF No. 531 at 2).

93.     Defendants also claimed they were in the process of preparing their discovery responses in compliance with their discovery obligations set forth in the Court's March

---

[5]  The unqualified and untrained team Defendants intended to employ to execute Plaintiff Brown (and other Plaintiffs) was disbanded by Defendants.  Plaintiffs' discovery requests remain outstanding as to the qualifications, training, selection, oversight, and management of the team, as well as all other facts and issues raised in this action.

11, 2011 order and were preparing these materials for disclosure.  ECF No. 524 at 2.

Nonetheless, Defendants have yet to provide the responsive materials.[6]

94.     The parties stipulated that they would complete discovery by January 15, 2012,

and file a joint statement identifying any material issues of fact that would require an

evidentiary hearing by February 15, 2012.  ECF No. 524 at 5.

## Executions Enjoined and Discovery Stayed

95.     On February 21, 2012, the Superior Court for the County of Marin permanently

enjoined Defendant CDCR from administering executions by lethal injection until new

regulations were promulgated in compliance with the APA.  *Sims,* 157 Cal. Rptr. 3d at

415.

96.     On April 5, 2012, with Defendants' discovery obligations subject to this Court's

orders still outstanding, this Court stayed discovery in this action.  ECF No. 534 at 2.

97.     On May 30, 2013, as a result of the *substantial failure* to comply with state law in

publishing its execution protocol, Defendant CDCR was permanently enjoined by the

Court of Appeal "from carrying out the execution of any condemned inmate by lethal

injection unless and until new regulations governing lethal injection execution are

promulgated in compliance with the APA."  *Sims,* 157 Cal. Rptr. 3d at 428-29.

## CDCR Proposed New Regulations to Implement Lethal Injection in 2016

98.     On November 4, 2016, Defendant CDCR submitted to the OAL proposed

regulations to implement the lethal injection process.  On December 21, 2016, in a 25-

---

[6]  At the conclusion of the September 2006 trial, this Court was prepared to issue formal findings of fact and conclusions of law with respect to the deficiencies in the administration of California's execution practices, but it required additional time, in part, because "Defendants still have not fulfilled their discovery obligations."  *Morales*, 465 F. Supp. 2d at 982.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

1   page decision, the OAL notified Defendant CDCR of the disapproval of this regulatory

2   action due to Defendant CDCR's continuing failure to comply with the APA.

3   99.     California Penal Code section 3604.1, enacted through voter initiative under

4   Proposition 66, purports to eliminate Defendants' obligation to comply with the APA in

5   enacting execution protocols, and became effective on October 25, 2017.  ECF No. 625.

6   California's lethal-injection protocol is now solely premised upon Defendants'

7   transparency and reliability.  However, Defendants have been violating the Constitution

8   in this regard since on or before 2006.

9

10  100.    On March 8, 2018, Defendants gave notice "that a one-drug lethal injection

11  protocol was finalized and filed with the California Secretary of State, effective March 1,

12  2018."  ECF No. 635.

13  101.    However, currently, "Defendants are without an execution team, have not trained

14  a team, do not possess execution drugs or all necessary execution equipment, and have

15  not undertaken any other execution-related activities other than drafting a written

16  protocol . . ."  ECF No. 684 at 8.

17  102.    Nevertheless, at Defendants' request, Plaintiffs were ordered to amend their

18  complaint by February 27, 2019.  ECF No. 688.

19  / /

20  / /

21

22

23

24

25

26

27

28

- 41 -

1

## **GENERAL ALLEGATIONS**

2

103.     Plaintiffs reallege and incorporate by reference herein each and every allegation

3

set forth in this complaint.

4

104.     Defendants' implementation of California's lethal-injection protocol lacks both

5

transparency and reliability.  Defendants have an extended history of repeated systemic

6

flaws in the implementation of the protocol.  Notwithstanding Defendant Governor's

7

promises for remedial action in 2006, there remains a "disconnect," with "reasons that

8

9

remain somewhat unclear."  There unquestionably is a "pervasive lack of professionalism

10

in the implementation."  Defendants have:

11

- failed to comply with federal court orders regarding the attempted execution

12

  of Plaintiff Morales;

13

14

- knowingly failed to disclose to this Court that they had "an insufficient

15

  amount of sodium thiopental to provide members of the execution team with

16

  experience and training in the actual mixing of the drug" when attempting to

17

  execute Plaintiff Brown;

18

- made misrepresentations and failed to disclose to this Court the unavailability

19

20

  of sodium thiopental during their attempt to execute Plaintiff Brown;

21

- failed to present the execution facility to this Court to enable complete expert

22

  review and analysis;

23

- failed to respond to pending discovery requests forthwith, as ordered by the

24

  Court;

25

26

- attempted to set execution dates for Plaintiff Morales despite the existence of

27

  stay of execution orders from this Court;

28

- attempted to execute Plaintiff Brown while circumventing this Court's review of its execution procedures;

- failed to comply with state law in preparing a new protocol;

- failed to follow state law when compelled to comply with it;

- made knowing misrepresentations of fact when compelled to comply with and follow state law; and

- received numerous OAL rejections of their proposed execution protocols.

105.   At a minimum, Plaintiffs must conduct discovery – and there should be transparency and reliability – regarding the Defendant Governor's promises "to correct court-identified deficiencies in California's lethal injection protocol to ensure the death penalty procedure is constitutional" (ECF No. 291), "to implement a screening process and undertake a comprehensive training program for execution team members, create standardized record-keeping, recommend how to improve the death penalty facility and identify the best experts in other states to advise the CDCR on lethal injection and its implementation." *Id.*

106.   Plaintiffs have served discovery, Defendants have been ordered to respond forthwith, Defendants have not responded, a discovery stay order was entered, the discovery issues articulated by this Court remain germane to the lawsuit and are now required on at least "two potential areas of inquiry, one being the sources of the ideas for the protocol, who was consulted and what – what opinions were relied on, and then the other line of inquiry would have to do with the details of implementation going forward, what is going to be the content of the training, for instance, and what are the details of the selection of the team and so forth."  ECF No. 322, RT 8 (June 1, 2007).

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**1.      Defendants' Selection and Qualifications of Execution Team Members Under the Regulations Will Cause a Substantial Risk of Severe Pain and Suffering During the Implementation of an Execution and Will Subject Inmates to Arbitrary and Capricious Processes.**

107.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

108.    The 2018 Regulations contain insufficient criteria to guarantee that lethal injection team members are properly selected as qualified individuals to administer the lethal injection protocol and to resolve any complications that may arise during an execution.

109.    There are "critical deficiencies" in Defendants' execution protocol and its implementation including "[i]nconsistent and unreliable screening of execution team members." *Morales*, 465 F. Supp. 2d at 979.  The 2018 Regulations have not cured these deficiencies and neither transparently nor reliably specify how Defendants will select execution team members to correct the "pervasive lack of professionalism in the implementation" of executions.  *Id.* at 980.

**A.      Selection and Screening of Candidates.**

110.    Under the 2018 Regulations, the recruitment and selection of the Team Administrator (*i.e.*, the Associate Warden responsible for managerial oversight of the Lethal Injection Team's training, preparation, and performance (Cal. Code Regs., tit. 15, § 3349.2(a)(1))), Team Supervisor (i.e., the Captain responsible for providing direct supervision of the Lethal Injection Team's training, preparation, and performance (*id.* at 2)), and the Lethal Injection Team (*i.e.*, the execution team (*id.*)), is to be conducted by the Director – Division of Adult Institutions and the San Quentin Warden.  Cal. Code Regs., tit. 15, § 3349.2(a)(1).  There is no compulsory quality control or required oversight in the 2018 Regulations to ensure that the Director – Division of Adult

- 44 -

Operations has the knowledge, education, training, and/or experience to properly recruit and select persons to fill these positions.

111.    The recruitment and selection can be conducted by a "designee" in place of the Director – Division of Adult Operations.  "Designee" is not defined in the 2018 Regulations.  Cal. Code Regs., tit. 15, § 3349.1.  Although the term appears in the Regulations four times, never is it specified who the person is designated by, reports to, is managed or controlled by, or is employed by.  Nor do the 2018 Regulations identify the designee's necessary qualifications, training, experience, education, employment, or expertise.

112.    The provision permitting an undefined designee to be integral to the recruitment and selection of the Team Administrator, Team Supervisor, and the Lethal Injection Team, precludes the recruitment and selection process from being transparent and reliable.  In all respects, the way the Team Administrator, Team Supervisor, and Lethal Injection Team are recruited and selected is precisely the same as at trial, when the Court found that process constitutionally infirm.

113.    None of the individuals tasked with recruiting execution team members or assessing their skills and qualifications are required to have any medical expertise, nor are they required to have any expertise or experience in conducting executions or administering death.  *See* Cal. Code Regs., tit. 15, § 3349.1(s).

114.    During the screening process, the Selection Panel, consisting of the Associate Director Reception Centers, the San Quentin Warden, and the Team Administrator, must screen candidates to ensure each meets the selection criteria for membership on one of the three sub-teams.  Cal. Code Regs., tit. 15, § 3349.2(b)(1).  This includes interviewing each candidate to "determine" their personal history, as well as their professional

- 45 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

experience, including experiences that would aid the candidate in performing team member duties, and assessing their knowledge, composure, training, related skill and ability.  Cal. Code Regs., tit. 15, § 3349.2(b)(3).  Thus, individuals with no medical knowledge or skill, and no experience with conducting executions or administering death, are tasked with assessing candidates' skill in these areas.

115.     Although the Selection Panel reviews qualifications, conducts interviews, and recommends candidates, the ultimate decision on team membership is controlled by the Director – Division of Adult Institutions.  Cal. Code Regs., tit. 15, § 3349.2(a)(2)(A) ("All recommendations shall be subject to the review and approval of the Director, Division of Adult Institutions.").  Like the members of the selection panel, the Director – Division of Adult Institutions is not required to have any medical expertise or any experience conducting an execution.

116.     Once selected, team members serve at the will of the Director – Division of Adult Institutions.  This is the same defective process that Defendants always have employed – execution team members served at the pleasure of a single person, the Warden.  *See* ECF No. 277, Undisputed Facts 7-10.

117.     The 2018 Regulations allow, as in the past, an unqualified designee to recruit and select the Team Supervisor and the Lethal Injection Team members.  *Compare* Cal. Code Regs., tit. 15, § 3349.2(a)(2) (permitting an unidentified "designee" to "recruit and select the Team Supervisor and the Lethal Injection Team members") *with* ECF No. 277, Undisputed Fact 11 ("Warden Ornoski left it to Witness #5 to select the teammates.").

118.     Now, as in the past, the Regulations permit the person primarily responsible for selection, the Director – Division of Adult Institutions, to avoid "'review [of] any of [the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

candidates'] qualifications, or their experience, or their training.'"  *Compare* Cal. Code Regs., tit. 15, § 3349.2(a)(2) *with* ECF No. 277, Undisputed Fact 10a.

119.    Now, as in the past, the Regulations do not require the person primarily responsible for selection, the Director – Division of Adult Institutions, to review the candidate's personnel file.  *Compare* Cal. Code Regs., tit. 15, § 3349.2(b)(1) (specifying that the Selection Panel to performs the screening) *with* ECF No. 277, Undisputed Fact 12 ("Witness #5 did not review the personnel files of any team members before extending invitations to them to join the team.  Witness #5 never periodically reviewed the personnel file of any execution team member while he was the execution team leader.").

120.    Although the Selection Panel is required to interview candidates and review state employee candidates' personnel files, performance reviews, and Criminal Identification and Information Report from the California Department of Justice, the Director – Division of Adult Institutions is not required to review these items (or any criteria) in the "review and approval" of the Selection Panel's recommendations.

121.    The 2018 Regulations require that team members "be selected based on general qualifications and specific expertise necessary to effectively carry out the duties of one of the specialized sub-team functions."  Cal. Code Regs., tit. 15, § 3349.2(c).

122.    Many of the "general criteria" provided for selection of state-employed Lethal Injection Team members include the same or substantially similar qualifications as those contained in past versions of the execution procedures and that resulted in findings of "pervasive unprofessionalism" and unconstitutionality.  For example, then-Warden Jeanne Woodford, who presided over four lethal injection executions, and was Defendant CDCR's Secretary during the scheduled February 21, 2006 execution of Plaintiff Morales, "personally assured herself that each member of the execution team had a high

- 47 -

degree of skill, competence, professionalism, patience, and stability necessary to be on

the team." ECF No. 277, Undisputed Fact 8.  Although Woodford may have been

personally assured in their qualifications, this Court was not; her efforts resulted in the

selection of "one former execution team leader, who was responsible for the custody of

sodium thiopental (which in smaller doses is a pleasurable and addictive controlled

substance), [who] was disciplined for smuggling illegal drugs into San Quentin; another

prison guard [who] led the execution team despite the fact that he was diagnosed with

and disabled by post-traumatic stress disorder as a result of his experiences in the prison

system and he found working on the execution team to be the most stressful

responsibility a prison employee ever could have." *Morales*, 465 F. Supp. 2d at 979.

123.    In addition, Witness #1 was invited to join the execution team in 1997 and

participated in the executions of eight inmates between 1999 and 2006.  Witness #1 was

diagnosed with psychiatric disorders, including clinical depression.  Witness #1 was

treated for these psychiatric disorders from 1995 to 1998.  ECF No. 277, Undisputed

Facts 13-15.

124.    Just as former procedures did not require that execution team members undergo

psychological testing, ECF No. 277, Undisputed Fact 17, the 2018 Regulations continue

to fail to require that candidates undergo psychological testing prior to joining the Lethal

Injection Team, or at any time after joining the team.

125.    Although the 2018 Regulations now contain a list of criteria that "shall be

utilized" in the selection of state-employed Lethal Injection Team Members, including

reliable job performance, good attendance record, and no corrective action, the 2018

Regulations do not specify that deficiencies in any of the criteria are automatically

disqualifying, nor do they require immediate removal from the team if it is found that a

- 48 -

team member no longer meets these criteria, or in response to disciplinary infractions. Cal. Code Regs., tit. 15, § 3349.2(c)(1).

126.     The 2018 Regulations require only that the Team Administrator conducts an annual review of team members to "ensure continued compliance with the selection criteria." Cal. Code Regs., tit. 15, § 3349.2(e).  Thus, any infractions, criminal activity, or other disqualifying activity that occurred immediately after the annual review would be ignored for up to a year, during which the team member would continue participating on the team, including in over 20 executions, before those disqualifiers were considered by the Team Administrator.  Further, because the 2018 Regulations are vague as to exactly how the selection criteria should be applied, and contain no provision requiring removal of a team member, it is unclear what activity would warrant removal from the team.  As in the past, the 2018 Regulations allow a team member to remain on the team despite disciplinary action and/or criminal activity.  ECF No. 277, Undisputed Facts 14, 20 (Witnesses #1 remained on the execution team despite continued psychiatric problems and arrest and conviction for driving while intoxicated.  Witness #1 subsequently was promoted to team leader and oversaw the attempted execution of Plaintiff Morales on February 21, 2006.  Witness #13 remained on the execution team despite being convicted on drunk driving charges, and thereafter participated in the executions of Donald Beardslee, Stanley Williams, and Clarence Allen.).

127.     Even where clear directives have been in place, Defendant CDCR has ignored hiring criteria in developing their execution team.  The 2018 Regulations require that "a member of the Lethal Injection Team must agree not to work or be assigned to any condemned housing unit."  Cal. Code Regs, tit. 15, § 3349.2(c)(1)(H).  The previous execution protocol included the same bright-line prohibition against execution team

- 49 -

members working in the condemned housing unit.  ECF No. 277, Undisputed Fact 20a.  Nevertheless, Warden Woodford was willing to assign an officer to the execution team who was known by the inmate being executed, the execution team leader had regularly worked in the condemned areas, and Plaintiff Morales greeted his executioners by name while waiting for his scheduled execution.  ECF No. 277, Undisputed Facts, 20b-c and 161 ("On the night of the scheduled execution of Michael Morales, Mr. Morales was housed in the death cell four feet from where Witness #9 was posted.  Mr. Morales greeted Witness #9 by name, and asked him how he was doing.  Witness #9 wore no name tag.").

128.    The 2018 Regulations do not address these deficiencies.  Because selection of the execution team remains at the discretion of one individual, it is likely that Defendant CDCR will continue to ignore some or all of the relevant criteria and that unqualified individuals will be selected for team membership, just as has occurred to date.

129.    Candidates who are not state employees are subject to even less stringent selection criteria.  In assessing the qualifications of non-state employees, the Selection Panel reviews the candidate's current Criminal Identification and Information Report, conducts an interview, verifies current licensure and reviews disciplinary action by any licensing board.  Cal. Code Regs., tit. 15, § 3349.2(c)(2).  The 2018 Regulations do not provide that disciplinary action by a licensing board disqualifies a candidate from team membership, nor do they require that a contracted candidate demonstrate a reliable attendance record, satisfactory performance reviews, or reliable job performance.  In this regard, the 2018 Regulations allow Defendants to circumvent even their minimal selection criteria by stacking the execution team with non-Defendant CDCR employees.

/ /

**B.     Team Administrator and Team Supervisor.**

130.    The Team Administrator is an Associate Warden who is responsible for providing managerial oversight of the Lethal Injection Team's training, preparation, and performance of assigned duties during an execution.  Cal. Code Regs., tit. 15, § 3349.1(u).

131.    The Team Supervisor is a Captain who is responsible for providing direct supervision of the Lethal Injection Team's training, preparation, and performance of assigned duties during an execution.  Cal. Code Regs., tit. 15, § 3349.1(v).

132.    Although the Team Administrator and Team Supervisor are responsible for overseeing the training, preparation, and performance of the Lethal Injection Team, the Regulations include no requirement that these individuals have any medical expertise, any expertise or education in conducting executions, or any prior experience on an execution team.  Thus, the Regulations make it permissible for the people responsible for oversight of the Lethal Injection Team to lack the knowledge, skill, experience, training, and education requisite to conducting an execution and/or training and overseeing others in doing so.  The 2018 Regulations remain inadequate in this regard; they must prohibit the absence of qualifications and mandate the existence of same.

**C.     Sub-Team Qualifications.**

133.    The Regulations require that the Lethal Injection Team contain at least twelve members, consisting of Defendant CDCR employees, or contracted medical personnel, or a combination of both.  These twelve members are assigned to one of three Sub-Teams – Intravenous, Infusion, and Record-Keeping.  Each Sub-Team shall consist of at least four members.  Cal. Code Regs., tit. 15, § 3349.2(a)(2)(A).

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

134.    Any team leader for the Intravenous or Infusion Sub-Team must be "qualified in his or her profession to supervise medically trained personnel." Cal. Code Regs., tit. 15, § 3349.2(a)(2)(B)-(C). The 2018 Regulations contain no further explanation for what "qualified" means in this provision, nor do they provide any further criteria or guidance for selection of the team leaders. This task of determining qualification is left to the unfettered discretion of the Team Administrator, who is not required to have any medical training, knowledge, or experience. *See* Cal. Code Regs., tit. 15, § 3349.1(u). The Team Administrator therefore is unfit to determine who among the team members is qualified to perform the duties of team leader for either the Intravenous or Infusion Sub-Teams.

135.    The 2018 Regulations require that all Intravenous Sub-Team members be "medically trained personnel" defined as "physician, physician assistant, registered nurse, emergency medical technician, paramedic, or medic." Cal. Code Regs., tit. 15, § 3349.2(d)(1). These options cover the similar medical gambit of personnel to be used in the scheduled execution of Plaintiff Morales – the use of only unqualified, uncertified, unlicensed, and legally prohibited LVNs during the execution (ECF No. 277, Undisputed Facts 51, 51b, 52), later supplemented with board certified anesthesiologists, one of whom was permitted to be sequestered in a closet. ECF No. 277, Undisputed Fact 109*.

136.    The 2018 Regulations do not require that all members of the execution team are licensed to handle the lethal chemicals.

137.    The 2018 Regulations do not contain any assurance that appropriate medical personnel will conduct executions. The wide range of medical personnel identified in the Regulations all have different and varying degrees of medical training and experience, which could adversely impact the ability of any given team member to perform the tasks required in an execution. For example, a typical emergency medical technician ("EMT")

- 52 -

course consists of only 120-150 hours of instruction, whereas a paramedic training course typically is between 1,200-1,800 hours of instruction.  As a result, an EMT, without additional coursework, can perform only very basic medical services that do not include setting of intravenous catheters or administering intravenous medication.  A basic EMT generally cannot perform any services that require breaking of the skin.

138.    A physician is authorized to use drugs or devices in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, and other physical and mental conditions.

139.    Physicians are ethically prohibited by the American Medical Association Code of Medical Ethics from participating in executions, including: 1) determining a prisoner's competence to be executed; 2) treating a condemned prisoner who has been declared incompetent to be executed for the purpose of restoring competence; 3) prescribing or administering tranquilizers and other psychotropic agents and medications that are part of the execution procedure; 4) monitoring vital signs on site or remotely (including monitoring electrocardiograms); 5) attending or observing an execution as a physician; 6) rendering of technical advice regarding execution; 7) selecting injection sites; 8) starting intravenous lines as a port for a lethal injection device; 9) prescribing, preparing, administering, or supervising injection drugs or their doses or types; 10) inspecting, testing, or maintaining lethal injection devices; and 11) consulting with or supervising lethal injection personnel. *See also* ECF No. 277, Undisputed Fact 112 (Anesthesiologist 2, after reading two pages of the February 19, 2006 order from the Ninth Circuit in this

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

case, potentially requiring active participation by the anesthesiologist, immediately stated: "I can't participate – I can't proceed.").[7]

140.    A physician assistant may perform medical services only when the services are rendered under the supervision of a licensed physician and surgeon.  For each episode of patient care, the medical record must identify the physician and surgeon who is responsible for the supervision of the physician assistant.

141.    A physician assistant may not administer, provide, or issue a drug order to a patient for Schedule II through Schedule V controlled substances without advance approval by a supervising physician and surgeon for that particular patient unless the physician assistant has completed an education course that covers controlled substances and that meets standards, including pharmacological content, approved by the board. Thiopental is a Schedule III controlled substance.  Pentobarbital is a Schedule II controlled substance.  The Regulations contain no requirement that a physician assistant have completed the necessary requirements for administration of controlled substances.

142.    The ethical restrictions on physician participation in executions similarly would prohibit a supervising physician and therefore a physician assistant from participating in an execution.

143.    Registered nurses licensed by the Board of Registered Nursing are ethically prohibited from participating in executions.  The 2018 Regulations therefore seek to employ RNs who are ethically unencumbered by or untethered to various American RN

---

[7] Although California state law provides that a physician cannot be disciplined or divested of a professional license due to participation in certain parts of the execution process, Penal Code § 3604.3 and *Thorburn v. Cal. Dep't of Corrs.*, 78 Cal. Rptr. 2d 584 (Cal. App. 1998), the Code of Medical Ethics has been, and will continue to be, an obstacle to the participation of physicians in executions.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

codes of ethics and RN association recommendations.  This absence of ethics fuels

Defendants' many prior "disconnects" with court orders regarding Plaintiff Morales'

scheduled execution, misrepresentations made to this Court prior to Plaintiff Brown's

scheduled execution, disposition of sodium thiopental taken from the prison pharmacy,

budgeting and building of execution facilities, and observance of its execution protocols.

144.    An EMT is authorized to perform basic medical services during training, while at

the scene of an emergency, during transport of the sick or injured, or during interfacility

transfer.  These medical services include evaluation of the ill or injured, monitoring of

vital signs, performing CPR, administering glucose, administering oxygen, extremity

splinting, and transportation of patients.  An EMT cannot institute intravenous catheters

in peripheral veins or administer or monitor administration of medication through

intravenous lines.  An EMT also cannot utilize electrocardiographic devices or monitor

electrocardiograms.

145.    A paramedic is an individual who is educated and trained in all elements of

prehospital advanced life support (ALS) and who is licensed.  While a paramedic is

authorized to administer approved medications via IV, the list of approved medications

does not include thiopental or pentobarbital.  Paramedics are prohibited by law from

participating in executions as contemplated in the 2018 Regulations.

146.    "Medic" is an undefined term that does not exist under California law or

regulations relating to healthcare professionals and is not defined in the 2018

Regulations.  This catch-all term allows Defendants, as has been done in the past, to use

unqualified individuals during executions, increasing the substantial risk of mis-

administration of the Lethal Injection Chemicals.  Moreover, this nebulous pseudo-

medical title in the 2018 Regulations allows Defendants to circumvent even their minimal

- 55 -

selection criteria by stacking the execution team with undefined, uneducated, unlicensed, untrained, and unqualified "medics" – in lieu of any of the other vocations, just as Defendants did with LVNs at Plaintiff Morales' scheduled execution.

147.     Intravenous Sub-Team members must have current licensure to verify their ability to insert and maintain intravenous catheters and place electrocardiogram leads.  Cal. Code Regs., tit. 15, § 3349.2(d)(1)(A).  The licensure held by some of the identified categories of "medical personnel" does not permit these activities.  Therefore, the 2018 Regulations were prepared by unqualified individuals, just as they allow unqualified individuals to select and manage execution team administrators and team members.

148.     Because the individual charged with reviewing recommendations and ultimately choosing the team members (the Director – Division of Adult Institutions) is not required to have any medical knowledge, training, or experience, nor are the members of the Selection Panel that make recommendations for team membership, they also will be unfamiliar with the licensing requirements and therefore will not know that a licensed EMT cannot set IVs or operate electrocardiographic equipment, or that a physician assistant must have an identified supervisory physician in order to provide any services required by the 2018 Regulations.  To date, Defendants have compelled unqualified individuals such as licensed vocational nurses (LVNs) to attempt to set catheters in inmates despite being prohibited by law from doing so.  *See* ECF No. 277, Undisputed Fact 49 ("Catheters are regularly set in the inmate's arms by LVNs during executions.").

149.     The 2018 Regulations do not specify how the mere possession of a license "verifies" a candidate's *ability* to perform these activities.  In the past, even licensed members of the execution team, including RNs, failed to properly set catheters in inmates during executions.  *Morales*, 465 F. Supp. 2d at 979 ("While the team members who set

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

the intravenous catheters are licensed to do so, they are not adequately prepared to deal with any complications that may arise, and in fact the team failed to set an intravenous line during the execution of Stanley 'Tookie' Williams on December 13, 2005.  Although Defendants' counsel assured the Court at the evidentiary hearing that 'Williams was a lesson well learned, one that will never occur again,' the record shows that Defendants did not take steps sufficient to ensure that a similar or worse problem would not occur during the execution of Clarence Ray Allen on January 17, 2006, or Plaintiff's scheduled execution the following month."); ECF No. 277, Undisputed Facts 50a-g; Doc, 278, Undisputed Facts 228-29.

150.    The 2018 Regulations require only a bare minimum of experience in "setting up intravenous lines", requiring only that the member have experience doing so in the last twelve months in the performance of his or her job duties, unrelated to his or her duties as a Lethal Injection Team member.  Cal. Code Regs., tit. 15, § 3349.2(d)(1)(B).  The regulations do not require that team members have any particular level of experience with this task, that they perform this task *regularly* as part of their jobs, or that they have any experience in insertion of intravenous catheters, which is distinguished from setting up IV lines.  The Supreme Court noted the importance in *Baze v. Rees*, 553 U.S. 35 (2008) that Kentucky had personnel whose daily assignment was inserting intravenous lines in inmates.

151.    Further, the 2018 Regulations do not require that any Intravenous Sub-Team member has experience in maintaining intravenous lines after they are placed, or any experience in assessing consciousness, despite one team member being required to remain in the Lethal Injection Room throughout the execution to perform these tasks. Cal. Code Regs., tit. 15, § 3349.7(a)(7)-(8).  Typically, anesthetic care is performed by

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

individuals who have received advanced training in the medical subspecialty of anesthesiology, such as physicians who have already completed their residency in the specialty of anesthesiology or nurses who have trained to become Certified Registered Nurse Anesthetists.  The Regulations do not mandate that such personnel be on the team, and in fact no Registered Nurse Anesthetist has ever been a member of the execution team.  ECF No. 278, Undisputed Fact 170.

152.    There is no provision that Registered Nurse Anesthetists will be either selected or trained to monitor anesthetic depth, undermining any effort to reasonably ensure that the Plaintiffs are fully anesthetized throughout the execution.  Without regulations mandating the selection of such a vocation with the requisite experience and training, Defendants are free to continue to recruit unqualified individuals to provide anesthetic services.  *See* Undisputed Fact 237 ("No member of the execution team has training in anesthesiology.").

153.    With respect to the placing of electrocardiogram leads, the 2018 Regulations do not require any experience outside the licensure requirement.

154.    The 2018 Regulations fail to require that Intravenous Sub-Team team members possess knowledge, experience, or training in the "percutaneous portal vein access" specified as an option for the alternate backup location.  Instead, the 2018 Regulations' certification and licensure requirement refers to "peripheral or appropriate veins."  Cal. Code Regs., tit. 15, § 3349.2(d)(1)(A).  Thus, there is no requirement that the Intravenous Sub-Team members will possess the qualifications necessary to obtain additional venous access, such as a percutaneous central line placement which requires highly trained and experienced medical personnel.   Although there is no provision elsewhere in the 2018 Regulations regarding the use of or training on the barbaric cut-down procedure, CDCR

Form 2137, the Monthly Security and Operation Inspection Sheet included with the 2018 Regulations, indicates that equipment to be maintained for use in lethal injection executions includes a cut down tool.  *See* ECF No. 277, Undisputed Fact 87f-g (Witness #5 knew of one doctor who attended an execution who was familiar with the cut-down procedure.  That doctor has since died, and Witness #5 is not aware of any other doctor familiar with the cut-down procedure who attended executions.  Witness #5 did not assign any other team member to discuss the cut-down procedure with any other doctor.).

155.     The 2018 Regulations require that only one member of the Infusion Sub-Team "is a physician, physician assistant, pharmacist, registered nurse, emergency medical technician, paramedic, or medic."  Cal. Code Regs., tit. 15, 3349.2(d)(2).  Some of these vocations (or pseudo-vocations) do not possess the training, licensure, or authorization to conduct the activities required during an execution.  This begs answers to this Court's outstanding discovery inquiries: who are "the sources of the ideas for the protocol, who was consulted and what – what opinions were relied on . . ."  ECF No. 322, RT 8 (June 1, 2007).

156.     The 2018 Regulations do not require that the Infusion Sub-Team member is knowledgeable and properly trained to mix the drugs or oversee mixing of the chemicals, despite being tasked with preparing each of the syringes and/or verifying proper preparation of the syringes.  Cal. Code Regs., tit. 15, § 3349.6(g)(4)(F).  Rather, the Regulations require only that the Infusion Sub-Team members "be able to follow the directions provided by the Lethal Injection Chemical Supplier in preparing the Lethal Injection Chemical."  Cal. Code Regs., tit. 15, § 3349.2(d)(2)(A).  Preparation of drugs, particularly for intravenous use, is a technical undertaking which requires training in pharmaceutical methods and calculations.  Defendants' regularly fail to perform the tasks

- 59 -

properly, including in the presence of licensed medical doctors.  *Morales*, 465 F. Supp. 2d at 979 & n.7, 980.  The packaging for thiopental states, "Use reconstituted solution only if it is clear, free from precipitate and is not discolored."  ECF No. 277, Undisputed Fact 34a.  Witness #4, who was designated with mixing thiopental, and who would meet the criteria for the Infusion Sub-Team under the present Regulations, claimed that he prepared the drugs "by following the instructions", yet obtained a mixed thiopental solution that was a "yellowish, brownish tan color."  ECF No. 277, Undisputed Facts 34, 34b.

157.    There is no requirement in the 2018 Regulations that the individual who pushes the lethal injection chemicals be medically trained or have any expertise in the administration of death.  The Regulations do not require that the one member of the execution team who is a "physician, physician assistant, pharmacist, registered nurse, emergency medical technician, paramedic, or medic" be the executioner responsible for pushing the lethal chemicals, nor would each of these individuals be qualified or allowed to do so (*e.g.*, neither an emergency medical technician nor a pharmacist is authorized under California law to administer medication intravenously).  In the past, only unqualified and untrained Defendant CDCR prison guards or wardens attempted to remotely infuse chemicals into the inmate.  Exacerbating the problems, these individuals were untrained in how to conduct this activity and how to identify a problem if it arose.  *See* ECF No. 277, Undisputed Fact 90 ("Witness #1 never has had training on how to feel for a clogged IV when pushing on a syringe nor about instances where IVs can become clogged after they've started dripping."); Undisputed Fact 87x ("Witness #5 has never received any training with respect to syringe back pressure during the administration of lethal chemicals.").

158.     The 2018 Regulations do not require that the members of the Infusion Sub-Team be able to follow manufacturer's instructions for remotely infusing the chemicals into the inmate; the qualifications for the members of the Infusion Sub-Team are limited to being able to follow the lethal injection chemical supplier's instructions for mixing the chemicals and possessing the organizational skills to label and color code the chemical. Cal. Code Regs., tit. 15, § 3349.2(d)(2)(A) and (B).  The 2018 Regulations therefore carry over the same dangers that cause severe pain – a lack of specificity that allows unqualified individuals to perform medical services that otherwise would be prohibited by legal and ethical restrictions.  *See* ECF No. 277, Undisputed Fact 87y ("Witness #5 does not know the drip rate for the IV bag; he has never known it; and he does not know 'if that drip rate is set forth in the operational procedure' and does not know whether he ever knew this information.").

159.     Members of the Record Keeping Sub-Team are required only to understand the importance of and how to keep accurate records and demonstrate proficiency in report writing and record keeping.  Cal. Code Regs., tit. 15, § 3349.2(d)(3).  The 2018 Regulations do not contain any specific criteria for assessing whether a candidate meets these qualifications, do not require that the Selection Panel review reports or records written by candidates, and do not require that team members actually have any experience in keeping records or writing reports.  These vague criteria for selection of the Record Keeping Sub-Team allow Defendants to employ the same or similarly unqualified individuals as in the past.  These individuals prepared inaccurate, incomplete, and illegible logs that failed to detail whether all of the sodium thiopental had been injected into the inmate, failed to track critical information such as heart rate and that time observations were made, and failed to document the disposition of sodium thiopental

- 61 -

allegedly taken from the pharmacy for use during training.  *Morales*, 465 F. Supp. 2d at 979.  The 2018 Regulations do nothing to correct the dangers noted by the Court and will not ensure that accurate records will be kept.

160.     Defendants' failure to require that the execution personnel possess sufficient education, certification, licensure, training, and experience causes a substantial risk that drugs will be improperly administered and condemned inmates will experience severe pain and will be subject to arbitrary and capricious procedures during the remote infusion process.

**2.     Defendants' Training of Execution Team Members Under the Regulations Will Cause a Substantial Risk of Severe Pain and Suffering During the Implementation of an Execution and Will Subject Plaintiffs to Arbitrary and Capricious Processes.**

161.     Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

162.     The 2018 Regulations promote and permit a lack of meaningful training, supervision, and oversight of the execution team.

163.     The 2018 Regulations provide no specific training or lesson plans for any members of the execution team.  The Regulations require the Team Administrator to "ensure training on the lethal injection process is provided to each Lethal Injection Team member."  Cal. Code Regs. tit. 15, § 3349.3(a).

164.     The training curriculum is to be developed by the Team Supervisor, § 3349.3(c)(1), who is required to be a "Captain," § 3349.1(v), but who is neither a medical professional trained in preserving health, nor a vocationalist or specialist in administering death.  The Team Supervisor also is not required by the Regulations to possess any specific knowledge, experience, education, or training him- or herself on the specifics of the remote lethal infusion process.  The Team Supervisor is the equivalent of what was

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

called the "team leader" under prior iterations of the lethal injection protocol.  The person who was the team leader for the last eight California executions, Witness #5, and who was responsible for the training of the other members of the team, rarely attended team training sessions – attendance logs reflect complete absenteeism during the last six executions while he was Team Leader (although one witness claimed only a 50% absenteeism rate).  ECF No. 277, Undisputed Facts 87d, 162.  That team leader himself was never trained with respect to syringe back pressure, how to avoid infiltration of the IV lines, or about the drip rate for IV bags.  ECF No. 277, Undisputed Facts 87, 87x, 87y.  Although he was responsible for overseeing the preparation of the chemicals used in executions, ECF No. 277, Undisputed Fact 87o, he did not know whether any of the medical personnel assigned to the team had been trained in mixing sodium thiopental prior to their joining the execution team.  ECF No. 277, Undisputed Facts 87a, 87b.  Nor did he have any personal knowledge of the quality of their work.  ECF No. 277, Undisputed Fact 87aa.[8]  Nothing in the 2018 Regulations or Defendant CDCR's practices ensures that a person with a similar lack of qualifications, training, or professional responsibility is not assigned as Team Supervisor and tasked with the training of the rest of the executioners.

165.    Consistent with Defendants' ongoing practices, the 2018 Regulations provide no specific training or lesson plans for the Team Administrator, Team Supervisor, or Sub-

---

[8]  Witness #5 was a licensed peace officer employed as a guard at San Quentin State Prison.  Prior to his joining and then becoming the leader of the execution team, he was terminated by Defendant CDCR, then reinstated with a five-month suspension without pay, for bringing illegal narcotics into San Quentin State Prison.  ECF No. 277, Undisputed Fact 9*.  Thereafter, he was selected by the Wardens to be an execution team member, and then the team leader.  Witness #5 participated in ten California executions, and was the team leader for the last eight California executions.  ECF No. 277, Undisputed Fact 10.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

Team Leaders.  The Team Supervisor and Sub-Team Leaders are tasked with creating the training curricula, but each Sub-Team Leader is required only to "be qualified in his or her profession to supervise medically trained personnel."  Cal. Code Regs. tit. 15, § 3349.2 (a)(2)(B) and (C).  None of these individuals is required to have any experience developing or implementing a training program, have any specialized medical or pharmaceutical knowledge, have any specialized knowledge or training in administering death, or have any experience with remote infusion of chemicals.  *See id*.  *See also* ECF No. 277, Undisputed Fact 30c ("[w]e don't have training, really."  "We get together a few days before and just practice."  "We just get to the chamber and we back there.  Then we go home."  "An hour or two."); ECF No. 277, Undisputed Facts 87*, 87b, 87j, 87k, 87l, 87t (Witness #5, team leader for the eight most recent executions, did not know whether there was more than one syringe of sodium thiopental used during an execution, did not know what the other two lethal chemicals were, did not know how long it took to inject a syringe during an execution, did not know the amount of sodium thiopental that was administered during executions, and did not know whether the package insert for thiopental contained instructions on mixing the chemical); ECF No. 278, Undisputed Facts 142, 149 (Witness #9, designated to succeed Witness #1 as team leader, has no educational background in pharmacology or formal medical training and is not sure how to mix the lethal chemicals).

166.     Under the 2018 Regulations, neither the Team Administrator, the Team Supervisor, or the Sub-Team leaders must have prior team membership, execution training or experience.  *See* Cal. Code Regs., tit. 15, §§ 3349.1(u) & (v), 3349.2(a)(2)(B) & (C).  Defendants' 2018 Regulations do not require the Team Supervisor even to have observed an execution prior to serving in that role.  Witness #5 had more experience than

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

that required by the 2018 Regulations (served as an observer in two executions prior to being promoted to team leader), and yet this Court determined that he was unqualified and untrained. *Morales*, 465 F. Supp. 2d at 979.

167.    The 2018 Regulations permit individuals like Witness #9, the team member assigned to succeed Witness #1 as team leader, to serve in that leadership position without the skills required to do so.  Witness #9 was tasked with recording information during the most recent three executions, that of Donald Beardslee, Stanley Williams, and Clarence Ray Allen, and was situated in a location in which he could not see what was going on during the executions themselves.  ECF No. 278, Undisputed Facts 130, 131. Witness #9 practiced only "the roles that are performed by execution members that take the inmate from the deathwatch cell into the chamber," not any of the other roles.  ECF No. 277, Undisputed Fact 136.

168.    Consistent with Defendant CDCR's past practices, the 2018 Regulations allow persons with a similar lack of qualifications, training, or professional responsibility to be assigned Team Leader and tasked with the training of the rest of the executioners.

169.    All training sessions are to be conducted by the Team Administrator and Team Supervisor, in conjunction with the Intravenous Sub-Team Leader in the case of the Intravenous Sub-Team, and with the Infusion Sub-Team Leader in the case of the Infusion Sub-Team.  However, there are no specific requirements that the Team Administrator, Team Supervisor, or either Sub-Team Leader has ever participated in an execution or has mastered the specifics of the proposed remote infusion process.  Cal. Code Regs. tit 15, § 3349.1.2(a).  Thus, the training of execution team members will be conducted by people who lack knowledge, skill, experience, training, and education, and are therefore unqualified to instruct others.  Witness #5, the team leader for the most

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

recent eight executions, never received any training in infiltration of the IV line or back

pressure during the administration of lethal chemicals.  ECF No. 277, Undisputed Facts

87*, 87x.  Witness #5 was the person who trained the next team leader, Witness #1, on

how to administer lethal chemicals.  The only other person to train Witness #1 on the

administration of the chemicals was a nurse who improperly set the catheter in the

Stanley Williams execution, failed to recognize it was not set properly, and then failed to

advise Witness #5 of this failure until after the execution.  ECF No. 277, Undisputed Fact

87*.  Witness #1 never had training on how to feel for a clogged IV when pushing on a

syringe nor about instances in which IVs can become clogged after they have started

dripping.  ECF No. 277, Undisputed Fact 90.  Nothing in the 2018 Regulations or

Defendant CDCR's practices ensures that persons with a similar lack of qualifications,

training, or professional responsibility are not assigned Team Administrator, Team

Supervisor, or Sub-Team Leaders and tasked with the training of the rest of the

executioners.

170.     The 2018 Regulations provide that the training curriculum of the Infusion Sub-

Team and the Intravenous Sub-Team be determined by the leaders of each of those sub-

teams.  Cal. Code Regs., tit. 15, §§ 3349.2(a)(B) & (C).  Although the leader of the

Intravenous Sub-Team must be "medically trained personnel," Cal. Code Regs., tit. 15, §

3349.2(d)(1), this can range from a medic (as noted above, an undefined, nebulous

pseudo-medical title), to a physician's assistant, to a registered nurse.  And the leader of

the Infusion Sub-Team need not be "medically trained personnel" at all; only one

member of the Infusion Sub-Team is required to be medically trained, § 3349.2(d)(2),

and there is no requirement that this member be selected Sub-Team leader, §

3349.2(a)((2)(C ("The Team Administrator shall select an Infusion Sub-Team leader

from among the Infusion Sub-Team members.").  Although the Regulations provide that

the Infusion Sub-Team leader "shall be qualified in his or her profession to supervise

medically trained personnel," § 3349.2(a)(2)(C), this provision does not require that the

Sub-Team leader be qualified him- or herself to prepare the lethal chemical and draw it

into syringes, administer the infusion, or to *train* personnel – medically trained or

otherwise, as the composition of the Infusion Sub-Team members is not limited to

medical professionals – to perform these tasks.  These same deficiencies have existed in

the past and have been a proximate cause of Defendants' unconstitutional conduct.

Witness #9, brought on the team to succeed Witness #1 as team leader, received only

"limited training" from prior team leaders in administering lethal chemicals, received no

training with respect to back pressure in administering lethal chemicals, and was given no

advice whether the push could be too slow.  ECF No. 278, Undisputed Facts 137, 138.

Nothing in the 2018 Regulations or Defendant CDCR's practices ensures that persons

with a similar lack of qualifications, training, or professional responsibility are not

assigned Sub-Team Leaders and tasked with the training of the rest of the executioners.

171.    The 2018 Regulations permit, and past practices are consistent with, nearly all the

training being done without a physician or a person trained and experienced in

administering death to be present.  Under the Regulations, the physician's role is limited

to one (1) session in the six (6) months prior to an execution and the sessions in the three

(3) days prior, and as an observer with no responsibility for assistance with the execution

itself, only as the person responsible for declaring death.  Cal. Code Regs., tit. 15, §§

3349.3(c)(5), 3349.2(a)(2)(D).  These same deficiencies conform to Defendants' past

practices, *see, e.g.*, ECF No. 277, Undisputed Facts 5, 54 (the latter stating that doctors

present at executions have no supervisory responsibilities during the execution); ECF No.

- 67 -

278, Undisputed Fact 163 (Witness #9 testified that he had only seen CDCR doctors attend training sessions once for each execution and on the eve of an execution), and have been a proximate cause of Defendants' unconstitutional conduct.

172.    Consistent with Defendants' past practices, the 2018 Regulations do not require persons with qualifications, training, and experience necessary to identify and remedy training errors and oversee the training of team members.  With untrained instructors and vague and ambiguous lesson plans, the training of the execution team will result in team members who are similarly as unable to perform their duties as those of the past.  These same deficiencies are a proximate cause of Defendants' unconstitutional conduct.

173.    The 2018 Regulations set a schedule of monthly training sessions for execution team members but permit team members to absent themselves from these trainings when they are on approved leave.  Cal. Code Regs., tit. 15, § 3349.3(c)(1).  The Regulations also provide that the execution team only "shall train for the three consecutive calendar days immediately preceding the initial scheduled execution date."  Cal. Code Regs., tit. 15, § 3349.3(c)(3).  The Regulations conform to Defendants' past practices where members of the execution team frequently were absent from training sessions.  *See, e.g.*, Doc 277, Undisputed Facts 30d, 55*, 60* (Witness #3, an LVN on the team, was present for only half of the training sessions pursuant to training logs); Undisputed Fact 87d (Witness #5, the team leader through Clarence Ray Allen's execution in 2006, was never present for training for the last six executions), *but see* ECF No. 278, Undisputed Fact 162 ("was present about half the time" for the last three executions).  There is no mechanism under the 2018 Regulations to compel execution team training attendance, or to test knowledge or proficiency.  The Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, to ensure that those

- 68 -

responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

174.     Consistent with Defendants' past practices, the 2018 Regulations also do not require that team members, including members of the Infusion Sub-Team, personally practice preparing the lethal injection chemical, such as mixing the drugs and putting the correct quantities and concentrations in the syringes.  *See* Cal. Code Regs., tit. 15 at §§ 3349.3(e)(2) & (f)(1); ECF No. 277, Undisputed Fact 26 ("[t]he execution team use[d] regular saline or water in the syringes during training or practice sessions.  The execution team [did] not practice mixing thiopental."); ECF No. 277, Undisputed Fact 33 ("During the last eight California executions, there were no practice sessions where people practiced mixing Pentothal."); *see also* ECF No. 278, Undisputed Facts 182, 194. Defendants are or should be aware that the failure "to provide members of the execution team with experience and training in the actual mixing of the drug," is a fundamental failure to remedy their unconstitutional conduct.  U.S. Court of Appeals, No. 10-72977 (9th Cir. Sept. 29, 2010), ECF No. 5 at 2 ([This Court's] Response to Petition for Writ of Mandamus)).  The Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, to ensure that those responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

175.     The training deficiencies related to preparing the lethal chemical are magnified by the vagueness and guidance-less provisions in the 2018 Regulations regarding the preparation of the lethal chemical.  The Regulations provide that the "Lethal Injection Chemical shall be prepared according to the instructions provided by the Lethal Injection Chemical Supplier."  Cal. Code Regs., tit. 15, § 3349.6(g)(3).  Although the Regulations

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

require that one "medically trained Infusion Sub-Team member" prepare the lethal chemical and a second "shall verify proper preparation," Cal. Code Regs., tit. 15, § 3349.6(g)(4)(F), consistent with Defendants' past practices, these instructions are silent as to whether either person must have knowledge, training, or experience to be able do so properly.  ECF No. 278, Undisputed Facts 203, 206, 210, 231(b), 297 (Witness #6, who mixed the thiopental for eight executions, "has not received or given any training on how to mix thiopental.  She learned to mix thiopental 'at the chamber.'  'Nobody taught her.'"); ECF No. 277, Undisputed Fact 34 (other of Defendants' purportedly "medically trained" team members "mixed Pentothal [for the first time] on the evening of a scheduled execution.  Prior to mixing Pentothal for an execution, Witness #4 had never received any training in doing that.").  Even the medically trained execution team members failed to follow the directions of the manufacturer.  *Morales*, 465 F. Supp. 2d at 980 (finding that team members "admitted" that they failed "to follow the simple directions provided by the manufacturer of sodium thiopental").

176.   Substantially similar instructions directing execution team members simply to follow the manufacturer's instructions – without more – resulted in the substantial risk of severe pain from the execution.  For example, although the packaging for thiopental stated, "Use reconstituted solution only if it is clear, free from precipitate and is not discolored," Witness #4, who was designated to mix thiopental, and who would meet the criteria for the Infusion Team under the present Regulations, claimed that he prepared the drugs "by following the instructions," but improperly obtained a mixed thiopental solution that was a "yellowish, brownish tan color."  ECF No. 277, Undisputed Facts 34. But as Defendants' expert Dr. Ekins testified, if a thiopental solution looked "brownish," he would double-check that it was mixed properly.  RT 890-91 (Sept. 28, 2006).  In

addition, the executioners in the past mixed 5 grams of thiopental into 25 cc of diluent, a 20 percent concentration of thiopental, which is "an off-the-charts concentration," wholly inconsistent with any manufacturer's instructions.  RT 503 (Sept. 27, 2006) (Mark Heath, M.D.).  This concentration has "very injurious" effects if it extravasates the vein and goes into the tissue.  *Id*. at 504.

177.    At a minimum, correct knowledge and training is required in order to understand and follow the manufacturer's directions, and to train others as to how to do so.  The Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, to ensure that those responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

178.    The 2018 Regulations' requirement that the executioners follow the Lethal Chemical Supplier's instructions in preparing and administering the chemical will provide no guidance in practice.  Because the drugs are not available to Defendant CDCR through FDA approved manufacturers, the chemicals will be supplied by a compounding pharmacy.  It is common for compounding pharmacies to label compounded chemicals without the standard instructions required to be provided for FDA approved chemicals.  Any instructions that are provided are designed for the preparation and administration of chemicals to heal or save a human being, not to kill a human being.  Manufacturers' and suppliers' instructions for preparing and administering drugs are based on clinical studies seeking to avoid adverse effects on patients.  They are not designed to provide guidance to result in death while avoiding a risk of severe pain.

179.    Consistent with Defendants' past practices, the 2018 Regulations do not require the executioners to be trained to and/or to rehearse drawing the syringes in the proper

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

volumes.  ECF No. 278, Undisputed Fact 225 ("the syringes [were] not drawn 'according to the volume that you are going to inject' during an execution.  Witness #6 testified that '[w]e just draw the syringes and pretending [sic].'  'Just whatever volume we pretend to play with and we do.'  If the formula says 25 cc's, they might decide for a practice session to do 50 cc's.").  The 2018 Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, to ensure that those responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

180.    The 2018 Regulations permit the executioners to continue to use saline or water during training sessions without practicing pushing the lethal injection chemicals themselves, the viscosity of which may be different from saline or water and different from one another.  In the past, members of the execution team practiced pushing drugs through IV tubing into a bucket.  ECF No. 277, Undisputed Facts 30.  A catheter neither was connected to the IV tubing, nor inserted into a human vein.  There was no training regarding the flow characteristics and back pressure of infusion of the lethal chemicals into a subject.  RT 572-73 (Sept. 27, 2006) (Heath).

181.    The more accurate or realistic the simulation is, the more meaningful it is.  The executioners' failure to practice mixing the thiopental contributes to enduring confusion surrounding the mixing process.  The major departures of the trainings from the actual executions grossly reduces the utility of the trainings.  RT 571 (Sept. 27, 2006) (Heath).  The 2018 Regulations do not correct these training deficiencies.  The 2018 Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, to ensure that those responsible can properly conduct an execution.  These same

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

deficiencies existed in the past and were a proximate cause of Defendants'

unconstitutional conduct.

182.    The 2018 Regulations do not provide for any training of the Intravenous Sub-

Team members (or any other members of the execution team) regarding vein assessment

or access to percutaneous portal veins, even though the Regulations require the Sub-

Team to assess each prisoner's veins and make assessments about primary and backup

locations.  *See* Cal. Code Regs., tit. 15, § 3349.5(f)(6)&(7).  Although the Regulations

allow for "percutaneous portal vein access" for the alternate backup intravenous site, §

3349.5(f)(6), no team members are required to possess knowledge, experience, or

training in this procedure, which is, among other things, a placement of a catheter in an

interior vein that requires surgical skill and training.  The Regulations require members of

the Intravenous Sub-Team to be certified and licensed to insert and maintain intravenous

catheters into "peripheral or appropriate veins," § 3349.2(d)(1)(A)1, but do not

specifically require those executioners to be trained in percutaneous portal vein or central

line placement.  The 2018 Regulations contain inadequate compulsory training

opportunities and requirements, and proficiency tests, to ensure that those responsible for

vein assessment or to obtain access to percutaneous portal veins are able to properly

conduct an execution.  These same deficiencies existed in the past and were a proximate

cause of Defendants' unconstitutional conduct.

183.    Consistent with Defendants' practices, the 2018 Regulations provide that training

for lethal injection team members "shall include . . . a simulation of an execution by

lethal injection."  Cal. Code Regs., tit. 15, § 3349.3(d)(1).  There is no requirement that

any members of the execution team engage in training to properly secure the inmate to

the gurney in such a manner that permits the proper setting of the catheter and IV and

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

precludes the restraints from dislodging them. *See* Cal. Code Regs., tit. 15, §§3349.6(k) and 3349.7(a).  There is no express requirement that executioners are trained to set intravenous lines on a live subject, that they train or practice connecting the IV lines to catheters, or that they personally practice doing so or pushing any substance through an IV line and catheter that is properly set into a vein.  *See* §§ 3349.3(e) and (f).  Members of the execution team did not engage in such practice in the past.[9]  ECF No. 277, Undisputed Fact 61 ("An LVN who is training for an execution does not practice setting the catheter in the simulated inmate's arm; they tape the catheter to the outside of the simulated inmate's arm.").  Such training was identified by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008) as a "significant" safeguard.  The Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, in this regard to ensure that those responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

184.    The 2018 Regulations do not provide that the executioners are trained to monitor anesthetic depth.  Although the Regulations specify that training of the members of the Intravenous Sub-Team include "Performance of consciousness checks," Cal. Code Regs., tit. 15, § 3349.3(e)(4), they define "consciousness checks" as only requiring "brush[ing]

---

[9]  Defendants used a prison guard with no medical knowledge, experience, or training to attempt to deliver the lethal chemicals through the IV line to the inmate.  *See* ECF No. 277, Undisputed Fact 272.  Defendants' practices were unconstitutional in this regard. *See Morales*, 465 F. Supp. 2d 975, 980 ("inmates' breathing may not have ceased as expected in at least six out of thirteen executions by lethal injection in California"; "Massie well may have been awake when he was injected with potassium chloride."). The 2018 Regulations fail to remedy these constitutional failures and conflict with Defendants' expert's opinions that someone medically trained should infuse the lethal chemicals because they are familiar with what it feels like to push an IV through a small tube.  *See* RT 898 (Sept. 28, 2006) (Ekins).

the back of his/her hand over the inmate's eyelashes, and speak[ing] to and gently

shak[ing] the inmate," § 3349.7(c)(4)(A).  This training is insufficient to ensure that the

Intravenous Sub-Team member observing the inmate during the execution can recognize

when the inmate is or if the inmate remains anesthetized and is not aroused by the

occurrence of noxious stimuli, including circulatory and respiratory collapse

(suffocation), the killing method of a lethal dose of a barbiturate, or pulmonary edema,

another effect of the administration of the lethal chemicals that produces sensations

similar to drowning and asphyxiation.  *See* RT 340, 344-45, 419 (Sept. 26, 2006)

(Ebling).

185.     Monitoring anesthetic depth requires understanding how the lethal chemical and

the nervous system work and how the chemical interacts with the nervous system; it

involves more than simply determining whether the inmate responds visibly to minor

stimuli including eyelid brushing, questions, or "gentle shak[ing]."  RT 335 (Sept. 26,

2006) (Ebling); RT 487 (Sept. 27, 2006) (Heath).  Reasonably ensuring that inmates are

adequately anesthetized requires monitoring by an individual trained in anesthesiology.

RT 487 (Sept. 27, 2006) (Heath).  Defendants cannot plausibly challenge this fact: this

Court ordered Defendants to retain "qualified individual(s)" to confirm that Plaintiff

Morales was fully anesthetized during his execution.  *Morales*, 415 F. Supp. 2d at 1047.

Defendants returned with two board certified anesthesiologists to do so.  Defendants'

execution team had no training in anesthesiology, ECF No. 278, Undisputed Fact 237,

and "[n]one of the persons who have administered the lethal chemicals in California

executions, or [team leaders or team leaders in training] Witness #5, Witness #1 or

Witness #9, are familiar with or trained or educated in anesthetic depth."  ECF No. 278,

Undisputed Fact 272.  The Regulations contain inadequate compulsory training

- 75 -

opportunities and requirements, and proficiency tests, with regard to anesthesiology to ensure that those responsible can properly conduct an execution.

186.     Although the 2018 Regulations provide very generally that execution team members be trained on "[i]dentification of potential problems and recommendations for avoidance or resolution," Cal. Code Regs., tit. 15, § 3349.5(d)(2), consistent with Defendants' ongoing practices, they do not provide that the executioners be trained to resolve common problems that arise when setting an IV or administering the lethal chemicals.  For example, the Regulations do not require the execution team members to be trained as to what to do in the event there is an air bubble in the IV or tubing; or if each of the veins to which the primary, backup, and alternate backup catheters are attached is blown or becomes unusable.  Defendants' executioners are not trained to resolve such problems.  ECF No. 277, Undisputed Fact 91; *id*. at 50-50g (describing Stanley Williams' execution in which the backup line was unusable because the vein blew several times during the setting of the IV, but during which the Warden simply ignored this problem and proceeded with the execution nevertheless).  In the past, the members of the execution team testified that there were too many possibilities for what could go wrong during an execution for them to enumerate them or address them.  *See* RT 640-42 (Sept. 27, 2006) (Heath testifying that the team members had "no articulated plan for the various what-ifs . . . [and thus] they were unprepared for what they should have foreseen to be a real situation"); *see also* ECF No. 278, Undisputed Fact 314; *id*. at 313 (there is no procedure in place if there is a problem in all of the IV lines).  The 2018 Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, in this regard to ensure that those responsible can properly conduct an execution.

- 76 -

187.    Consistent with Defendants' practices, the 2018 Regulations do not designate who is to make decisions about what actions to take to resolve a problem should it arise, and do not require the members of the execution team to be trained to follow directions and instructions should a problem arise.  Members of the execution team do not have a uniform understanding about who is responsible for making decisions in the event something did not go as planned or anticipated during an execution.  ECF No. 278, Undisputed Fact 314 (team leader Witness #1 "believes there is a policy that if an observation of a malfunction occurs, the team leader and warden should be notified and 'there would be a discussion at that point,'" but no such policy exists).  Nothing in the 2018 Regulations or Defendant CDCR's practices ensures that the executioners will be better prepared to respond to such an event.  The 2018 Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, in this regard to ensure that those responsible can properly conduct an execution under such foreseeable yet unanticipated circumstances.

188.    The 2018 Regulations provide that members of the Record Keeping Sub-Team be trained in accurate record keeping, report writing, and the preparation of specific records used to document an execution, Cal. Code Regs., tit. 15, §§ 3349.3(g)-(g)(3), but do not make any provision for who is responsible for developing the curriculum and conducting the training.  The 2018 Regulations do not require this Sub-Team to have a leader.  The 2018 Regulations provide no guidance about what Record Keeping Sub-Team members are required to record on the execution logs other than "Time" and "Comments" (*see, e.g.*, CDCR Forms 2177-A and 2177-B), or what training and practice they must undergo to complete these logs.  There is no form or requirements under the 2018 Regulations that any record be kept of the disposition of unused lethal chemicals, either during training

- 77 -

sessions or actual executions. *See* CDCR Form 2176. The 2018 Regulations do not

remedy the deficiencies found by this Court with regard to the "inconsistent and

unreliable record-keeping," including incomplete execution logs that failed to report

whether the full dose of sodium thiopental actually was injected and that failed to provide

critical data such as the prisoner's heart rate, and absence of reliable documentation as to

the disposition of sodium thiopental taken from the prison pharmacy for training

purposes. *Morales*, 465 F. Supp. 2d at 979 & n.9; *see also* ECF No. 277, Undisputed

Facts 25, 26, 27 (stating that although thiopental was never mixed during training

sessions, numerous vials of sodium thiopental were released to Witness #1 for practice

between January 2005 and January 2006 and were never returned to the pharmacy, and

no documentation was made of what these drugs were used for); ECF No. 278,

Undisputed Fact 125a ("The doctor's log which lists, among other things, the number of

doses of potassium chloride given to the inmate, is missing for the Thompson

execution"); *id*. at 156, 157 (although Witness #9 testified that after the execution is

complete, the team videotapes the postmortem examination of the inmate and prepares an

evidence sheet, an incident package, and a postmortem report, Defendants claim that this

testimony was inaccurate). The 2018 Regulations contain inadequate compulsory

training opportunities and requirements, and proficiency tests, in this regard to ensure that

those responsible can properly conduct an execution.

189.    The 2018 Regulations do not require that the Team Supervisor or any other

member of the execution team or employee of Defendant CDCR maintain documentation

of which training session(s) each member of the execution team attends. Documentation

for training sessions under prior protocols noted a high rate of absenteeism from training

sessions, particularly by the team leader who conducted the executions and the staff

labeled by Defendants as medical personnel.  ECF No. 277, Undisputed Fact 30d

(Witness #3, an LVN, was present for only half of the training sessions); ECF No. 278,

Undisputed Fact 162 (Witness #5 "was present about half the time" for the training

sessions for the Beardslee, Williams, and Allen executions).  Although the 2018

Regulations require executioners to attend a specific number of training sessions prior to

participating in an execution, Cal. Code Regs., tit. 15, § 3349.3(c), there is no mechanism

to ensure that each participating member has complied with this requirement.  *See* §

3349.3(h).  The 2018 Regulations contain inadequate compulsory training opportunities

and requirements, and proficiency tests, in this regard to ensure that those responsible can

properly conduct an execution.

190.     The 2018 Regulations also do not remedy Defendant CDCR's failure to document

adequately what actually takes place during the training sessions, including but not

limited to what training each member of the team received; whether any problems arose,

were discussed, or were resolved during a training session; the duration of the training

session; the supplies and equipment used during a training session; the size, medical

condition(s), and condition of the veins of the surrogate for the condemned inmate.  *See*

Cal. Code Regs., tit. 15, § 3349.3(h) (requiring the Team Supervisor to maintain a lethal

injection training file but failing to require anything other than simulation logs to be

completed and, as noted below and above, the 2018 Regulations do not indicate what

information is to be included on those logs).  The 2018 Regulations contain inadequate

compulsory training opportunities and requirements, and proficiency tests, in this regard

to ensure that those responsible can properly conduct an execution.  These same

deficiencies existed in the past and were a proximate cause of Defendants'

unconstitutional conduct.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

191.    The 2018 Regulations fail to require meaningful evaluation of team member performance during training.  The Regulations fail to specify the proficiency level that each member of the execution team is required to reach though training in order to be permitted to participate in an execution, and thus fail to require that each member achieve and maintain any minimal level of expertise.  The 2018 Regulations require that the sub-team leaders assess team member performance during training, but provide no standards for assessment, and do not require that the sub-team leaders document the members' proficiency.  The 2018 Regulations require that the Sub-Team leaders report any concerns to the Team Administrator and Team Supervisor, but do not require any action to be taken by the Team Administrator and Supervisor in such a case.  Cal. Code Regs., tit. 15, § 3349.2(a)(2)(B).  The 2018 Regulations contain inadequate compulsory training opportunities and requirements, and proficiency tests, in this regard to ensure that those responsible can properly conduct an execution.  These same deficiencies existed in the past and were a proximate cause of Defendants' unconstitutional conduct.

/ /

/ /

- 80 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**3.      Defendants' Selection and Use of Lethal Chemicals Will Cause a Substantial Risk of Severe Pain and Suffering During the Implementation of an Execution and Will Violate Plaintiffs' Rights to Due Process.**

192.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

193.    The 2018 Regulations provide that Plaintiffs' executions will be carried out using one of two Lethal Injection Chemicals: pentobarbital or thiopental.  Cal. Code Regs., tit. 15, § 3349.5(f)(2)(C).

194.    The determination of which Lethal Injection Chemical will be used will be made by the Warden of San Quentin.  The Warden, who is not a medical professional, has no prior execution experience, serves at the pleasure of Defendant Governor, and is replaced with regular frequency, has full discretion to choose between the two options for each condemned inmate.

195.    Although the Warden decides between pentobarbital and thiopental "in consultation with medical personnel," § 3349.5(f)(2)(A), the 2018 Regulations do not provide guidance on what type(s) of medical personnel can fulfill this role; how and on what basis said medical personnel shall contribute to the selection; or that such consultation, or the chemical selection itself, shall take into account any factors specific to the medical needs of individual Plaintiffs.

196.    The 2018 Regulations permit the Warden to select the lethal chemical prior to referring the prisoner to the Intravenous Sub-Team for a vein assessment to determine the primary, backup, and alternate backup locations.  *See* Cal. Code Regs., tit. 15, § 3349(f)(4) and (7).  The 2018 Regulations do not require the medically unqualified Warden to take into consideration the prisoner's personal medical condition(s) or history when determining which lethal chemical will be administered.  Nor do the Regulations

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

ensure that the medically unqualified Warden (or any consulting medical professional)

takes into consideration the possible adverse interactions between the lethal chemical and

any medications the prisoner is prescribed and takes.  These same deficiencies existed in

the past and were a proximate cause of Defendants' unconstitutional conduct.  ECF No.

277, Undisputed Fact 74 (inmates were "not evaluated to determine if they have any

condition or characteristic that may alter the effect of any of the drugs administered

during the lethal injection process.").

197.    The only specific guidance provided to the Warden to assist in making the

chemical selection is that it "shall be done on a case-by-case basis, taking into account

changing factors such as the availability of a supply of chemical."  Cal. Code Regs., tit.

15 § 3349.5(f)(2)(A).  The 2018 Regulations contain no provision for how to proceed if it

is found that no chemical supply is available, or that neither chemical is suitable for a

particular Plaintiff.

198.    The 2018 Regulations provide Defendant CDCR's Warden with unfettered

discretion to choose whether to obtain the selected chemical through FDA approved

sources, if available, or compounded drugs, which carry a substantial risk of causing

unnecessary severe pain and suffering.

199.    The 2018 Regulations provide that the Lethal Injection Chemical shall be

"obtained from a Lethal Injection Chemical Supplier as defined in subsection 3349.1(i)."

Cal. Code Regs., tit. 15 § 3349.5(f)(2)(D).

200.    Subsection 3349.1(i) does not define Lethal Injection Chemical Supplier.

Subsection 3349.1(i) provides only that "*Lethal Injection Chemical* means a barbiturate

used to perform an execution."

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

201.     Subsection 3349.1(j) provides that "*Lethal Injection Chemical Supplier* means a licensed pharmacy, pharmacist, compounding pharmacy, manufacturer, supplier, wholesaler, or distributor."  Cal. Code Regs. tit. 15, § 3349.1(j).  This provision does not ensure that either of the Lethal Injection Chemicals will be acquired, compounded, stored, or prepared in a lawful manner, following state and federal regulations, and in a manner that guarantees the quality and efficacy of the chemicals.

202.     The 2018 Regulations do not require the source of the lethal chemical to be licensed in California.

203.     In the past, Defendants have unlawfully procured lethal substances from unreliable overseas sources (including a drug vendor operating out of a London driver's education school) and from unapproved and unregulated compounding facilities. Nothing in the 2018 Regulations would prevent Defendants from repeating this conduct.

204.     In 2012, The Food and Drug Administration (FDA) demanded that Defendant CDCR return its supply of imported sodium thiopental because the FDA determined that Defendant CDCR's supply was illegally obtained.  Defendant CDCR refused.  Nothing in the 2018 Regulations would prevent Defendants from repeating this conduct.

205.     In developing the current Regulations, Defendant CDCR continued to consider acquiring chemicals from disreputable foreign sources, including foreign online suppliers of pentobarbital, and online pharmacies that offer inexpensive pentobarbital without a prescription.

206.     Neither thiopental nor pentobarbital can be obtained from FDA-approved manufacturers for use in executions, as the manufacturers have either discontinued manufacture of the chemicals and/or placed restrictions on their distribution to correctional facilities for use in executions.  As a result, Defendants will be unable to

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

obtain the chemicals from a licensed pharmacy, pharmacist, manufacturer, supplier, wholesaler, or distributor, leaving compounding pharmacies as their only viable source of obtaining the chemicals.

207.    The 2018 Regulations contain no specifications regarding the use of compounding pharmacies for obtaining the Lethal Injection Chemicals.

208.    The compounding referenced in the Regulations is without any degree of medical assurance, does not adopt federal regulations regarding sterile compounding, is without FDA approval, and is prone to contamination, dilution and alteration of the lethal substances proposed.  As a result of the absence of any regulatory or lawful procedures regarding the substances proposed, they will not be safe or efficacious for use in executions.

209.    Nothing in the 2018 Regulations provides that execution team members are qualified to, or will be trained to, recognize when compounded chemicals are improperly constituted.

**A.  Thiopental.**

210.    Thiopental was invented in the early 1930s and is an ultra-short-acting barbiturate that currently is used only infrequently in clinical settings and in typical surgical doses produces only transient anesthesia.

211.    Thiopental currently is not available for purchase in the United States.  It will not be obtained by Defendants through legal, regulatory, and/or approved medical means that will ensure its safety, purity, and efficacy.

212.    Historically, thiopental was administered only during the preliminary phase of anesthesia administration and was not administered remotely in the manner proposed in the 2018 Regulations.

- 84 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

213.    In the remote infusion process, thiopental is intended to anesthetize the condemned inmate, causing unconsciousness and eventually death.  As this Court has found, if it is not successfully delivered into the condemned inmate's blood stream, thiopental will cause a painful, lingering death or a vegetative state.  ECF No. 78 at 2 (Order) ("An insufficient dose . . . has the potential to cause irreversible brain damage while not causing death.").

214.    A high dose of thiopental (as is called for pursuant to the 2018 Regulations) causes respiratory and cardiovascular collapse that is an "ugly death."  RT 419, 429-30 (Sept. 26, 2006) (Ebling).  Defendants' expert has opined that thiopental infusion to an inmate in execution dosages induces death by suffocation.  It cannot safely be determined whether an inmate with a favorable airway will not suffer death by suffocation in response to the infusion of thiopental alone, and that the subsequent likely brain damage represents unconstitutional suffering.

215.    Failure to deliver the entire dose of thiopental in the correct medical manner is a foreseeable occurrence given the inadequacy of the procedures, remote administration, and selection and training of execution team members as contained in the 2018 Regulations and as demonstrated in practice by Defendants.

216.    Defendants have a documented history of improper mixing, preparation, and administration of thiopental during executions.  *Morales*, 465 F. Supp. 2d 980 ("admitted failure to follow the simple directions provided by the manufacturer of sodium thiopental . . ."; "based upon the heart rates reflected in the execution log, Massie well may have been awake when he was injected with potassium chloride").

217.    Thiopental traditionally has been sold in powder form and must be mixed into a solution to be injected into an inmate.  It must be mixed and administered by a qualified

individual.  To inject a 7.5 gram dose of thiopental into an inmate successfully, the Defendants must prepare a solution that will deliver the dose in the proper concentration, a process that requires mixing multiple vials of thiopental powder with the correct quantity of diluent, combining multiple vials into appropriate syringes, and ensuring that the entire amount of properly mixed powder is drawn into the syringes and then properly delivered to the inmate via remote infusion.  If this process is not performed accurately, as has occurred in past executions using this remote infusion procedure, it will result in an incorrect concentration of thiopental, which will prevent delivery of a reliable dose sufficient to execute Plaintiffs without them suffering irreversible brain damage, or a painful, lingering death.

218.    The 2018 Regulations, as written and based on past practice, do not reasonably assure that the personnel who will mix the thiopental, prepare the syringes, and remotely infuse the drugs have adequate and appropriate training and experience to perform the tasks properly.  On information and belief, other states use licensed pharmacists or physicians to mix the drugs, including thiopental, for executions.  Defendants have ignored the advice of their expert to engage such qualified personnel in this mixing process and have continued the use of unqualified personnel despite the repeated inability of such personnel to mix thiopental properly.

219.    Thiopental is an effervescent drug that, if improperly administered, will not achieve or maintain Plaintiffs' unconsciousness, and therefore will result in a lengthy and painful execution process, if killing the inmate at all.

220.    The 2018 Regulations, as written and in practice, contain no provision for the proper rate of infusion so as to achieve an execution without a substantial risk of severe

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

pain and suffering.  As written and in practice, the Regulations contain inadequate qualifications, selection, and training for the individuals involved in the remote infusion.

221.    There is a present substantial risk that thiopental will be improperly prepared and ineffectively delivered, given the inadequacy of the administration procedures and the personnel involved, and as a result will result in a substantial risk of a painful, lingering death, or irreversible brain damage without death.  This has occurred in over 60% of California's remote infusion executions, as well as in executions in other states.

**B.  Pentobarbital.**

222.    Pentobarbital is a short-acting barbiturate, invented in 1916, and clinically indicated for use as a pre-anesthetic, a sedative, and for treatment of seizures and insomnia.  It is a "sluggish barbiturate that has slow onset and slow offset."  RT 425 (Sept. 26, 2006) (Ebling).

223.    Pentobarbital can cause an individual to be in a "never-never land between wakefulness and sleep with an obstructed airway bubbling away and . . . with all kinds of secretions . . . it's not pretty."  RT 429-30 (Sept. 26, 2006) (Ebling).

224.    Pentobarbital has an alkaline pH that is significantly higher than normal blood pH.  When inadvertently injected into tissue other than a vein, it causes severe tissue damage, causing severe pain.

225.    The administration of pentobarbital, due to its highly caustic nature in conjunction with the slowness of its administration pursuant to the remote infusion process, leads to fulminant pulmonary edema, the effects of which include the presence of fluid in alveolar sacs that produce sensations similar to drowning and asphyxiation.  Because the condition is sudden and severe, the process carries a substantial risk of severe pain to Plaintiffs before the chemical renders Plaintiffs unconscious.

- 87 -

226.     Manufacturers of pentobarbital object to and/or prohibit the use of their product for the purpose of capital punishment, will not sell to any department of corrections, and have implemented distribution controls to ensure that their distributors and wholesalers do not distribute or sell the drug for use in executions.  Thus, in order to obtain this substance, Defendants may have to resort to unauthorized, illegal and unapproved sources, as they have done in the past with respect to thiopental, or will have to rely on compounding pharmacies lacking safeguards to ensure the safety, purity, and efficacy of the drug.

227.     Even if pentobarbital were available to Defendants commercially, the 2018 Regulations do not provide sufficient safeguards that an individual with the necessary qualifications and training will mix, prepare, and administer the drug.

### C.  Amount/Dose of the Lethal Injection Chemicals.

228.     The two chemicals provided by the Regulations are not pharmacologically equivalent. The chemicals differ in their ability to obtain access to the brain from the blood.  The 2018 Regulations' claim that "CDCR considers the listed chemicals to be equally effective in carrying out the purpose of the regulations" is misleading, inaccurate, and not supported by the scientific and medical literature.  Cal. Code Regs., tit. 15, § 3349.5(f)(2)(C).  Because Defendant CDCR relied on faulty science regarding drug propensities, it then arrived at a faulty conclusion that using 7.5 grams of each drug would be sufficient.

229.     The 2018 Regulations, therefore, provide no assurance that team members are familiar with the properties of each of the chemicals, nor do they require that team members receive training in each of the chemicals and the differences between them.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

230.     According to the manufacturer, there is no average intravenous dose of pentobarbital that can be relied upon to produce similar effects in different persons. Determination of the appropriate dose of thiopental or pentobarbital is an individualized determination that must take into consideration factors such as each patient's age, weight, and medical conditions, as well as the rate of administration of the drug.  The 2018 Regulations provide no specificity or guidance regarding these items, instead picking an equal dose for each drug without consideration of these, or any, relevant factors.

231.     Rather, Defendants allege that their chosen dosage of thiopental is based on a designation by corrections officials that a 5 gram dose of thiopental is deemed fatal, that documentation indicates that some inmates continued to breathe after receiving the 5 gram dose, and thus Defendant CDCR decided to add an additional 2.5 gram dose to take into account the size, weight, age, or chemical tolerance of any given inmate.  However, Defendant CDCR did not provide any explanation as to why this dosage increase was necessary or sufficient to address these variables.  Defendants applied this same dosage to pentobarbital because it determined, without explanation or scientific support, that it considers the chemicals to be equally effective.

### D.     Preparation and Administration of the Lethal Injection Chemicals.

232.     The 2018 Regulations provide that "the Lethal Injection Chemical shall be prepared according to the instructions provided by the Lethal Injection Chemical Supplier."  Cal. Code Regs. tit. 15, § 3349.6(g)(3).  "Lethal Injection Chemical Supplier means a licensed pharmacy, pharmacist, compounding pharmacy, manufacturer, supplier, wholesaler, or distributor."  Cal. Code Regs. tit. 15, § 3349.1(j).  Whether obtaining a manufactured version of the Lethal Injection Chemical or a compounded version, multiple entities in the distribution chain will fall under this definition.  The 2018

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

Regulations do not specify which entity in a supply chain is *the* supplier for purposes of this provision, nor do they specify which instructions to follow if instructions are obtained from the manufacturer as well as from the pharmacy ultimately handing the drug over to Defendant CDCR.  Further, the 2018 Regulations provide no guidance should the drug be obtained unaccompanied by instructions.

233.    The 2018 Regulations require that the selected Lethal Injection Chemical, whether thiopental or pentobarbital, and whether produced by an FDA-approved manufacturer or by a compounding pharmacy, be prepared three hours prior to the scheduled execution date and time.  Cal. Code Regs., tit. 15, § 3349.6(g)(3).  This requirement does not account for exceptionally short shelf-lives of some compounded sterile injectables.  Furthermore, the provision fails to account for unexpected, but predictable, delays in the commencement of the execution and the deterioration of or other adverse changes to the prepared chemical.

234.    There is no assurance that the proper infusion rate for either chemical has been determined or will be applied.  This was one likely explanation why more than 60% of executions in California involved a failure to deliver anesthesia to the inmate – not only did the procedures not specify a rate, but the rate was inconsistently applied without any attention to or knowledge of its importance.  Infusion rate is referenced in the training of the Infusion Sub-Team, but there are no rates established.  *See* Cal. Code Regs., tit. 15, § 3349.3(f)(2).  Defendants' records contain substantial inconsistencies concerning rates, with references to taking 30 minutes to administer a single syringe of thiopental, meaning that infusion of all five syringes would take two and a half hours or more, and will result in a lingering death with a substantial risk of severe pain and suffering.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

235.    Manufacturers' instructions for the preparation and administration of pentobarbital advise that slow infusion is essential, and infusion should be limited to no more than 50 mg per minute.  At this rate of infusion, administration of a single 2.5 gram syringe of pentobarbital will take nearly an hour, and administration of all three syringes will take three hours or more.  These time frames greatly increase the risk of error and failure in the delivery process.

236.    The 2018 Regulations do not specify concentrations of the chemicals, another problem in the past noted by the Court.  The 2018 Regulations provide only that three trays of three syringes of pentobarbital, containing 2.5 grams each, or three trays of five syringes of thiopental, containing 1.5 grams each, shall be prepared.  As a result, the solubility of the concentrations and the degree of possible precipitation out of solution cannot be determined or assured.  The concentration also alters the volume, which in turn affects the delivery (the rate of push) for each.  The 2018 Regulations are silent as to these issues, which have posed unconstitutional risks in executions in California.

237.    There is no assurance in the 2018 Regulations that anyone remotely familiar with these challenges will be involved in the preparation and administration of the chemicals.  All the 2018 Regulations require is a "medically trained" member (§3349.6(g)(4)(F)), which they define as a physician, physician's assistant, registered nurse, emergency medical technician, paramedic or a "medic" (§3349.2(d)(1)).  Many of these vocations are not trained for this undertaking, nor do the Regulations require sufficient training to ensure that the executioners are proficient.  This is precisely what the Court already has deemed constitutionally deficient.

238.    The 2018 Regulations do not set a time limit, nor a limit on the number of attempts, for the setting of the three intravenous lines.  That is, the Regulations permit the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

unqualified members of the Intravenous Sub-Team to repeatedly attempt to set these lines an unlimited number of times for an unlimited amount of time, without regard for the condition of the prisoner's veins or the damage that unsuccessful attempts have caused to the prisoner's veins or surrounding tissue.  Repeated attempts over extended periods of time present a substantial risk of severe pain, as such have on at least fifteen well-documented occasions led to severe pain.  The *Baze* Court approved a one-hour time limit for the setting of two intravenous lines, holding that "merely because the protocol gives the IV team one hour to establish intravenous access does not mean that team members are required to spend the entire hour in a futile attempt to do so."  553 U.S. at 55.

239.    Penal Code 3604.1(b) establishes that access can be established by methods <u>other than intravenous venous injection</u>, where the condition of the prisoner makes intravenous access impractical.  The 2018 Regulations contain no provisions for implementing this statute, such as what alternative methods are permitted, how they will be accomplished, and whether and how the members of the execution team will be selected and/or trained to perform them.  There is no determination whether thiopental or pentobarbital can be administered effectively by any method other than intravenously.  Undertaking an unknown procedure will create a substantial risk of undue pain and suffering.

240.    There is a present substantial risk that the chemicals will be ineffectively delivered thereby causing severe pain or irreversible brain damage, given the inadequacy of the administration procedures and the personnel involved, and as a result will not produce a constitutionally acceptable execution process.  This has occurred in more than 60% of California's remote infusion executions, as well as in executions in other states.

241.    The 2018 Regulations require the remote administration of certain toxins at an unidentified or controlled rate of delivery and will lead to sensations similar to drowning or asphyxiation by Plaintiffs during the administration of death and will result in an intolerable state that produces panic, terror, and serve pain and suffering.  The Regulations also require the remote delivery of toxins through the IV infusion of a large volume of fluid with a highly abnormal acidic or alkaline pH and will exert a caustic effect on lung tissue causing severe pain and suffering by Plaintiffs.

**E.  Supply Issues.**

242.    American healthcare providers and patients have long relied on the regulation of pharmaceutical manufacturers by the FDA in order to set the standard for identity, purity, potency, and efficacy of prescription medications.  According to Defendants, neither thiopental nor pentobarbital is available from FDA-approved pharmaceutical manufacturers, a fact they knew well prior to the promulgation of the 2018 Regulations.  Defendants sought procurement from disreputable distributors, or undetermined sources of compounded chemicals that violate federal and state law.  Neither are acceptable, and both create a substantial risk of severe pain and suffering.

243.    The 2018 Regulations contemplate that the drugs may be obtained from a compounding pharmacy, but provide no specifics relating to this option.  They fail to provide any information about the identity, capacity, reliability or history of error of any compounding pharmacy that Defendant CDCR intends to employ to make the compounded chemicals, nor is there information about the ingredients needed to make the chemicals, the circumstances under which the chemicals will be made, or the manner in which the chemicals will be stored, handled, and transported.

244.     Compounding pharmacies are specialty pharmacies that can prepare batches of drugs to order.  Traditionally, compounding pharmacies are used when the commercially available manufactured product contains ingredients that a patient is allergic to, is not available in the dosage needed, when two or more drugs need to be combined, or when a manufactured drug is not available.

245.     Compounding pharmacies mix drugs from component ingredients of unknown provenance or origins.  Compounded drugs often are not FDA-approved, therefore there is no assurance of their identity, purity, potency, or effectiveness.

246.     Most compounding pharmacies are regulated by state pharmacy boards, only recently with minimal oversight by the FDA.  While large-scale compounding pharmacies may register as "outsourcing facilities," allowing them to produce larger quantities of compounded drugs subject to FDA regulations, compounders that do not register may still mix prescriptions for individual patients or produce limited quantities ahead of prescriptions without federal oversight.

247.     The 2018 Regulations do not require the Lethal Injection Chemical Supplier, if a compounding pharmacy, to be accredited by the Pharmacy Compounding Accreditation Board (PCAB).  PCAB requires that accredited pharmacies use high-quality chemicals and equipment, give pharmacists and technicians regular training, test products for quality, and have an effective recall mechanism in place.

248.     Compounding pharmacies not accredited by the PCAB have been responsible for distributing contaminated drugs that caused a national fungal meningitis outbreak in 2012 and bacterial bloodstream infections in Texas in 2013.

249.     Unlike FDA-approved drugs, most compounding pharmacies do not go through stringent and routine testing, audits, and drug approval processes to ensure the

- 94 -

manufacturing of sterile and efficacious drugs.  The FDA does not verify the safety or effectiveness of drugs prepared in most compounding pharmacies or the quality of their manufacture.  Compounded drugs made at these facilities remain largely outside the FDA regulatory framework that assures safe and efficacious drugs for dispensing.  Further, drugs that have not been manufactured in an FDA-approved facility under current Good Manufacturing Practices have no assurance of consistent quality from lot to lot or from container to container.

250.     Compounding pharmacies use an Active Pharmaceutical Ingredient ("API") as a base for the compounded solution.  The API is the chemically active substance of any drug.  There are significant questions about the quality and provenance of APIs used in compounding, which often are sourced from a grey market (produced in non-FDA-registered, non-FDA inspected facilities).  There are APIs in the compounding pharmacy market that are not FDA-approved, which carry with them a high risk of adulteration and are highly susceptible to tampering and adulteration.  A chemical labeled as a certain API may actually contain a different ingredient, and there is no way to have confidence that the APIs are not contaminated.  APIs often come from plants in China or India, which may not be registered with or have records of inspections by the FDA.  There are documented instances of these types of plants that use the same equipment to make pesticides as they do to make APIs, raising a serious risk of contamination.   There are no provisions in the 2018 Regulations to ensure proper and adequate API supply.

251.     Compounding pharmacies use formulas or "recipes" to compound various ingredients into a finished compounded form.  Defendant CDCR has not promulgated any regulations to ensure the formulas used for compounding the chemicals are validated, tested, endorsed, or proven safe for administration.

- 95 -

252.     The chemicals Defendant CDCR likely will compound are classified as high-risk sterile injectables under the United States Pharmacopeia.  The compounding of these drugs, therefore, is subject to strict provisions and requirements under the U.S. Pharmacopeia to ensure a safe injectable.  The compounding of these drugs must be in a highly sterile process under highly sterile conditions, using precise equipment and highly trained personnel.  The 2018 Regulations provide no assurance that Defendants will use a compounding pharmacy that has the type of sophisticated equipment required to make the chemicals delineated in the Regulations.  Further, the Regulations contain no provisions that the compounded drugs will have short beyond-use dates, leading to an increased risk the drugs will become contaminated, diluted, or degraded.  Typically, high-risk sterile injectables have short beyond-use dates, and it is unclear how Defendant CDCR will ensure proper administration of these drugs within the framework of their regulations.

253.     More importantly, it is not possible for Defendant CDCR to obtain compounded drugs in a manner that complies with state and federal laws.  First, a compounding pharmacy and pharmacist should not compound a drug if there is no prescription. California law states that no drug shall be compounded without "the receipt by a pharmacy of a valid prescription for an individual patient."  Cal. Code Regs., tit. 16, § 1735.2.  The prescription also must be issued "for a legitimate medical purpose."  *Id.*; *see also* Cal. Health & Safety Code § 11153 ("A prescription for a controlled substance shall only be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice.").  Compounding a barbiturate for use as an execution chemical is not a "legitimate medical purpose"; therefore, compounding of either of the specified chemicals to be used in the execution protocol would violate state law.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

254.    Both California law and federal law set forth numerous other requirements for the handling, preparation, labeling, and documenting of compounded drugs with which Defendant CDCR will not be able to comply in the event it sources drugs from a compounding pharmacy.

255.    A compounding pharmacist or pharmacy is not permitted to compound drugs that are essentially copies of drugs that are commercially available, such as pentobarbital.  A compounding pharmacist may not receive, store, or compound drugs without obtaining written assurance from the supplier of each ingredient that each ingredient and lot of the drug was manufactured or supplied from an FDA-approved and registered facility.

256.    If Defendants intend to compound lethal injection drugs in contravention of these federal and state laws, they will be administering non-FDA approved, adulterated and/or contaminated drugs with ingredients of unknown origins, an uncertain and unknown chain of custody, unknown and possible non-sterile storage, and uncertain and unknown compounding processes.

257.    As a result, there is a substantial risk that the chemical will be counterfeit, adulterated, sub-potent, super-potent, will precipitate, will have an unbalanced pH, will be cloudy or contain undissolved ingredients, or will be contaminated with bacteria, allergens, or other contaminants.  Any of these substantial risks will cause Plaintiffs to experience severe pain and suffering upon administration, may lead to irreparable brain damage and not death, and severe pain and suffering from mental anguish leading up to the execution.

258.    In light of the foregoing risks, and highly publicized executions in other states using compounded drugs that did not perform as intended (Michael Lee Wilson, Oklahoma; Eric Robert, South Dakota; Kelly Gissendaner, Georgia), Defendants and/or

- 97 -

the compounding pharmacy retained by them have actual knowledge of the substantial

risk of severe pain and suffering that administering the compounded lethal injection drugs

entails.  Additionally, members of the lethal injection team have actual knowledge of the

substantial risk of severe pain and suffering that administering compounded lethal

injection drugs entails.  The Defendants are intentionally refusing or intentionally failing

to take reasonable protective measures to resolve the risks of administering compounded

drugs to the Plaintiffs.

259.    Both the American Pharmacists Association (APhA) and International Academy

of Compounding Pharmacists (IACP) discourage their members from compounding

drugs for use in executions.

260.    Use of compounded drugs would introduce increased risks that executions would

not comply with the Eighth Amendment protections against cruel and unusual

punishment due to the greater risk of obtaining lower quality drug formulations from

compounding pharmacies than from FDA-approved manufacturers.  Regulation and

conformity to good manufacturing practices are most stringent for FDA-approved

pharmaceutical manufacturers, and virtually non-existent for traditional compounders.

261.    Improperly compounded drugs have led to significant harm.  Several studies

enumerate the serious problems associated with compounded drugs, including issues with

the acquisition of the ingredients, the compounding itself, and the dispensing of the

drugs.  In one study, the FDA found that 33% of sampled compounded drug products

failed at least one quality test.  Testing done by the Missouri State Board of Pharmacy

showed that drug product failure rates averaged 20%, with some drug potency tests

showing results of 0% to 450% of what the dose should be.  In contrast, the failure rate of

FDA-approved prescription drugs, made by regulated pharmaceutical firms, was less than

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

2%.  Since 2000, the FDA has issued warnings about quality tests and compounded drug products, including problems with potency, sterility, and the presence of contaminants or particulate matter not fully dissolved.

262.    The 2018 Regulations provide no assurance that any testing of compounded drugs will be done to ensure their potency, sterility, and proper manufacture, or that compounding pharmacies used will conform to standards of education and training for compounding of sterile solutions.

**4.      Defendants' Design and Construction of their Execution Facilities and the Use of the Facilities Under the Regulations Will Cause a Substantial Risk of Severe Pain and Suffering During the Implementation of an Execution and Will Subject Prisoners to Arbitrary and Capricious Practices.**

263.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

264.    Defendants have "poorly designed facilities in which the execution team must work."  *Morales*, 465 F. Supp. 2d at 980.  Defendants' execution facilities are a fundamental component and cause of the systemic flaws in the implementation of Defendants' execution activities.  *Id.*

265.    This Court identified specific physical and operational deficiencies regarding Defendants' execution facilities: "inadequate lighting, overcrowded conditions, and poorly designed facilities in which the execution team must work."  *Id.*

266.    Defendants have built a new execution facility since this Court's trial conclusions.  The 2018 Regulations do not require Defendants to use this facility.  The former facility remains available for Defendants' use.  Upon damage, inhabitability, non-functioning equipment or furnishings of the new facility – or other reason, even whim – Defendants may use the former facility for lethal infusion executions.  As defined in the 2018 Regulations, the Lethal Injection Facility equally refers to either facility – a space with

witness viewing rooms (undefined), an Infusion Control Room (antechamber), the Lethal Injection Facility Holding Area (inmate cell), restrooms, and the Lethal Injection Room (chamber).  Cal. Code Regs. tit. 15, § 3349.1(k).  No modifications have been made to the design of the original lethal injection facility, and this Court's findings that the facility was a proximate cause of a substantial risk of severe pain during an execution remain precisely the same now.

267.    Defendant CDCR designed the new execution facility before this Court made its trial findings, and before this Court set forth examples of certain reasons for its conclusions.  ECF No. 317-1 at 21.  It was designed in the blind, without regard to the trial evidence, Undisputed Facts, or the Court's trial conclusions, Defendants' subsequent examinations of execution facilities at other venues, implementation at San Quentin State Prison, or the 2018 Regulations (the facility was designed when Defendants' OP 770 was operative).  Defendants designed and built the new lethal injection facility solely to justify a proposed $356 million expansion of death row at San Quentin State Prison (which subsequently was rejected by state government).

268.    Defendants did not consider or design a facility to address this Court's express concerns, including the height for IV bags for the lethal chemicals and saline flush, the passage of IV lines from one room to another, the lighting to be used during an execution, the distance of the executioners and execution managers from the inmate, sight-lines between executioners, managers, and inmate, including the insertion points for the catheters leading to the intravenous lines, for effective observations of the inmate during the execution or foreseeable emergency procedures, and doorways and access to the inmate.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

269.    Any nexus between the Court's findings of deficiencies causing unconstitutional conduct and remedial designs in the new facility, if they exist, would be despite Defendant CDCR's conduct, not as a result of its efforts.  However, there are no remedial designs in the facility, or its intended use as proscribed by the 2018 Regulations.  For example, a larger antechamber simply allows for greater overcrowding absent controls on the quantum of people present.  There are no controls on the quantum of people that can be present during an execution that are present in the design, construction, or 2018 Regulations, yet numerous feasible, readily implemented available alternatives exist, discussed *infra*.

270.    By Defendants' own admissions, the execution facility currently is inoperable for its stated purpose.  ECF No. 684 at 8 ("Defendants are without . . . all necessary execution equipment" to conduct executions).  Defendants' admission is consistent with this Court's February 8, 2011 examination of the facility where Defendants' were unable to display and present remedial lighting, remedial crowd control, and a properly designed facility where the execution team can work.  ECF No. 492 (unknown design of the apparatus to administer the chemicals, RT 26 (Feb. 8, 2011); infusion rigging device unavailable for review, *id.*; unexplained ports in the infusion room, RT 25-26; secondary inmate restraints unavailable for examination, RT 44; inability to articulate number and positioning of executioners, witnesses, observers, and various state employees, RT 29; lighting levels for executions unknown, RT 30, 51; communication systems unavailable for review, RT 43).

271.    The inoperability of the new facility also is in disregard of the 2018 Regulations which require Defendant CDCR's Team Supervisor to conduct and document monthly

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

operational inspections to ensure the functionality of the equipment, supply inventory, and building maintenance.  Cal. Code Regs. tit. 15, § 3349.4(d).

272.    The facility design conditions that the Court identified as proximately causing a substantial risk of severe pain remain unresolved.  Defendants' 2018 Regulations provide no safeguard that compels the use of the new facility, or that remediates old facility design deficiencies in the new facility, and thus continue to create a demonstrated risk of severe pain during the execution process.

273.    The Court previously identified inadequate lighting conditions as a proximate cause of a substantial risk of severe pain during an execution.  These design issues are unresolved as noted above, despite numerous feasible, readily implementable available alternative methods to provide adequate lighting for the execution team to see and conduct executions that would significantly reduce a substantial risk of severe pain (e.g., abandon Defendants' practice of turning the lights off during the execution; use of adequate number of light bulbs with high wattage properly located in areas throughout the antechamber (now referred to as the Infusion Control Room) and the execution chamber, etc.).

274.    This Court identified overcrowded conditions as a proximate cause of a substantial risk of severe pain during an execution.  These design issues are unresolved, despite numerous feasible, readily implementable and available alternative methods to provide adequate work space in the new facility in order to conduct execution practices that would significantly reduce a substantial risk of severe pain.

275.    Defendants represented to this Court that "the CDCR will prohibit observers in the area designated for the Lethal Injection Team to prevent overcrowding during an execution and maintain the dignity of the process."  ECF No. 317-1 at 22.  The 2018

- 102 -

Regulations define Lethal Injection Team as any member of the three lethal injection Sub-Teams, including Infusion, Intravenous, and Record Keeping teams.  Cal. Code Regs., tit. 15, § 3349.1(n).  Contrary to Defendants representations to this Court, nothing in Defendants' 2018 Regulations prohibits additional persons from being present in the areas where the Lethal Injection Team will perform its functions.  In fact, the 2018 Regulations expressly provide for the presence of non-participants in the Infusion Control Room; they define the Infusion Control Room as "the room designed to accommodate . . . one representative each from the Governor's Office, the Inspector General's Office, and the Attorney General's Office" (in addition to the execution team).  Cal. Code Regs., tit. 15, § 3349.1(f).  The 2018 Regulations also allow the presence of observers upon undocumented "oral approval" by the Warden or an unidentified, undefined "designee" to give oral approval.  Cal. Code Regs., tit. 15, § 3349.4(a).

276.    Overcrowded conditions are two-fold: 1) the facility has inadequate space for necessary and indispensable parties to perform their designated functions; and 2) satisfying the first prong, the space is inadequate to house dispensable persons.

277.    Defendants' 2018 Regulations identify the indispensable persons required to be present in the anteroom of the execution facility (Infusion Control Room) as the Infusion Sub-Team (at least four people), designated members of the Intravenous Sub-Team (at least four people), the Team Administrator, Team Supervisor, designated members of the Record Keeping Sub-Team (at least four people), San Quentin Litigation Coordinator, and one representative each from the Governor's Office, the Inspector General's Office, and the Attorney General's Office.  Cal. Code Regs. tit. 15, § 3349.1(f).  The number of purported indispensable parties is unknown, impossible to calculate, lacks transparency, and is unreliable.  As a result, the 2018 Regulations fail to remedy the deficiencies of the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

unconstitutional setting in the original execution facility.  There is nothing set forth in the

2018 Regulations to change, regulate, or control Defendants' unconstitutional

overcrowding practices in the use of the execution facility.

278.     Defendants also fail to control the attendance of dispensable persons.  Defendants

have allowed and encouraged execution voyeurs to be present in the execution facility in

such substantial numbers that even simple movement by the executioners was so difficult

that it created unreasonable risks and dangers to conduct an execution.  *Morales*, 465 F.

Supp. 2d at 980.  The anteroom of the original execution facility can "comfortably

accommodate" 16 or 17 people, "but certainly not any more than that."  RT 185 (Mar. 30,

2006) (Hon. J. Fogel); ECF No. 277, Undisputed Fact 43.  During executions, however,

there are "so many people . . . in the room that you didn't even know who they were and

[why] they were there."  The Warden would "shuffle from side to side a foot or two, but .

. . [t]here's not much room . . . to maneuver."  During Clarence Allen's execution, "it

was even more crowded" and the Warden could barely move at all.  *Id.*  It "was a packed

house" during the Thompson execution.  ECF No. 277, Undisputed Fact 46.  Between

twenty-nine and thirty-three people were to be present in the anteroom for the scheduled

execution of Plaintiff Morales (ECF No. 277, Undisputed Fact 46a); two times the

maximum number the space can accommodate.[10]

---

[10]  Execution attendance is uncontrolled because the list of attendees is dictated by
Defendant Governor, and Defendant Governor's edicts cannot be refused by untenured
rank and file employees at Defendant CDCR.  This conflict of interest only can be
remediated by a disinterested third-party vested with complete control over the matter
who can provide transparent and reliable oversight.  This feasible, readily implemented
and available alternative would significantly reduce a substantial risk of severe pain
caused by an overcrowded execution facility.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

279.   Defendants' practice of doubling the attendance of the maximum appropriate working capacity of the antechamber creates a demonstrated risk of severe pain and suffering during the execution because the execution team cannot attend to assigned tasks, monitor tasks, see the inmate and/or other team members, move, communicate with one other, and/or gain access to various devices used to administer death.  The 2018 Regulations fail to limit the attendance in the execution facility with specificity (*see* Cal. Code Regs. tit. 15, § 3349.1(f)); to wit, Defendants must identify the appropriate number of people that the room can accommodate to allow executioners to properly perform their assigned tasks and identify transparent and reliable measures to ensure the attendance does not exceed this figure.

280.   The 2018 Regulations allow Defendants Governor and CDCR to continue to "pack the house" for executions.  The attendance at an execution remains at Defendants' whim.  A larger execution facility merely allows for more people but fails to resolve the overcrowding dangers of twice as many people present for the available functional space for the execution team.  Defendants' pervasive lack of professionalism in the implementation of an execution creates reason for substantial doubt that attendance will be properly controlled and limited for the available work space and square footage.

281.   The Court's previously identified condition of overcrowding that proximately caused a substantial risk of severe pain remains unresolved.

282.   The facility design and execution protocol fail to ensure that execution team members can see, hear, communicate, and perform their assigned tasks.  When Defendants conduct executions, "there are a lot of individuals who are not team members present" in the anteroom during executions.  "[M]any of them [are] from CDCR from Sacramento."  ECF No. 277, Undisputed Fact 324.  An unidentified "big man" stood

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

between execution team members and the inmate during one execution. "They're officials from Sacramento, I guess. I don't really know what their function is, and they're there. They wear suits. They come in. They stand there. They leave." ECF No. 277, Undisputed Facts 307, 308. Defendant CDCR's Warden and/or execution team members have no control over the attendees' behavior, their placement, or their interference in the implementation of the execution protocol. The 2018 Regulations fail to provide written proscriptions to control the actions of the attendees in the execution facility, failing which, expulsion from the facility should be automatic and immediate; to wit, Defendants must identify what attendees are they permitted to do, where, and why, and the transparent and reliable measures to be taken to ensure these limitations are enforced. Dispensable observers standing in sight lines, preventing movements by execution team members, and interfering with critical execution team communications are the normal practices allowed by Defendants.

283.   The 2018 Regulations require that the Warden remain in close proximity to the prisoner in the lethal injection room during the course of the execution. Cal. Code Regs., tit. 15, § 3349.7(b)(1). From here, he or she must direct the Infusion Sub-Team, located in a separate room, to administer the Lethal Injection Chemical, direct discontinuation of the intravenous catheters if they fail, and direct the Lethal Injection Chemical administration to be restarted in the backup or alternate backup lines. The removal of the Warden from the infusion room will prevent the Warden from observing, monitoring, and directing the remote infusion process, conferring with the personnel who purportedly are monitoring the infusion, and taking appropriate action, including ordering use of a backup or halting the execution because of infusion errors, as is required. It will also prevent the Warden from receiving calls directing suspension of the execution, ordering

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

procedures for reviving Plaintiffs, or consulting with the physician monitoring the execution.

284.     The 2018 Regulations must have provisions, and Defendants must employ practices, to control the dispensable attendees' behavior and movements, i.e., where they can be located, and in what activities they may be involved in order to not interfere with execution team members' views, movements, or communications.  The 2018 Regulations are silent regarding these key control components that can render the facility's design fully dysfunctional.  Neither Defendants nor their 2018 Regulations prohibit cell phone use for photographs, video, social media distribution, audio recording, or telephone conversations – all matters that Defendants' guests undertake and that interfere with the execution team's movement and ability to communicate regarding the tasks at hand.  The 2018 Regulations simply ignore this Court's express findings that overcrowding has an unconstitutional operational impact on the implementation of the execution protocol.

285.     The actual facility design and the furnishing of its equipment and components must ensure execution team members can perform their function of remote chemical infusion and inmate monitoring during the execution.  The unconstitutional deficiencies present in Defendants' original and available facility remain in the new facility, causing systemic flaws in the implementation of the execution protocol.

286.     Defendant CDCR employees Prunty and McAuliffe were tasked with examining other venues' execution facilities, but only after Defendants' new execution facility was designed.  At that time, neither Defendant employee had ever seen an execution, let alone participated in administering death.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

287.    Neither Defendant CDCR employee was qualified by knowledge, skill, experience, training, or education in the issues associated with conducting an execution or administering death.

288.    Neither Defendant CDCR employee was qualified by knowledge, skill, experience, training, or education in reviewing facility schematics or designs, architecture, design, construction, visibility, lighting, human factors engineering, communications, crowd control, the use of medical devices such as gurneys, IV lines, catheters, stopcocks, lethal chemicals, and/or activities involving infusion or infusion rates, chemical preparation, or chemical storage.

289.    Defendant CDCR employees Prunty and McAuliffe neither attended trial nor read the trial transcripts, including the testimony of Defendants' expert witnesses.  Neither read or reviewed the parties' Undisputed Facts.

290.    Defendant CDCR employees Prunty and McAuliffe were tasked with examining other venues' execution facilities for design enhancements for California's execution facilities.  ECF No. 317-1 at 21.  They were unqualified to do so.  Their absence of qualifications prevented them from suggesting any necessary modifications or changes to Defendants' existing design for the new facility or to resolve the deficiencies in Defendants' execution Regulations noted herein.

291.    Defendant CDCR employees Prunty and McAuliffe's lack of qualifications resulted in meaningless and unhelpful insights from their facility reviews – the other venues had "basic similarities, including a lethal injection room where the condemned inmate is executed in view of witnesses, and separate viewing rooms for official witnesses, members of the victim's families, and other witnesses.  There were separations, either a curtain or a wall, between the condemned inmate and the infusion

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

team.  In addition, there were cells for the confinement of the condemned inmate immediately before an execution."  ECF No. 317-1 at 21.

292.    Defendant CDCR employees did not return with a single observation that addressed the Court's expressed concerns, or Defendants' experts' expressed concerns, regarding the height for IV bags for the lethal chemicals, the apparatus used and the passage of IV lines from one room to another, the lighting during an execution, the gurney used, the restraints used, the distance of the executioners and execution managers from the inmate, sight-lines between executioners, managers, and inmate for effective observations of the inmate during the execution or foreseeable emergency procedures, and doorways and access to the inmate.  The site reviews did not result in a single change order or modification to the pre-existing facility design.

293.    While Defendants' new facility design now has separate rooms for witness viewing, nothing was noted on Defendant CDCR employees' return to address overcrowding practices in the area where the execution team must perform their tasks.

294.    When these CDCR employees witnessed an Oklahoma execution, they were sequestered in the witness viewing room and could not observe the execution team's work or the designed workspace to return any insights for Defendants' design of their new facility.

295.    There is no evidence in the design, examination, or disclosures by Defendants that the design deficiencies identified by this Court regarding the height for IV bags for the lethal chemicals, the apparatus used and the passage of IV lines from one room to another, the lighting during an execution, the distance of the executioners and execution managers from the inmate, sight-lines between executioners, managers, and inmate for effective observations of the inmate during the execution or foreseeable and unexpected

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

emergency procedures, and doorways and access to the inmate, have been resolved at the new facility or the old facility.

296.    Defendants' execution facilities are stocked with off-the-shelf execution gurneys, the type seen in Hollywood productions or media press releases.  These devices are unsafe for their intended purpose, interfere with the setting of catheters, prohibit adequate infusion of the lethal chemicals into inmate veins, unnecessarily and substantially interfere with professional observations of the status of the infusion, and facilitate irreversible brain damage, suffering, and substantial pain during the execution.

297.    Under the 2018 Regulations, not fewer than three intravenous lines will be established in not fewer than three separate vein locations in the prisoner to be executed. Cal. Code Regs., tit. 15, § 3349.7(a)(3).  Medical studies have demonstrated that there are serious risks associated with the use of multiple IV lines, including infusion rate or line mix-ups, IV lines not attaching properly, and errors associated with piggyback infusions. These errors tend to occur during setup.  *See, e.g.*, "Multiple IV lines pose risk to patients: 7 things to know," Becker's Healthcare (May 27, 2015), https://www.beckershospitalreview.com/quality/multiple-iv-lines-pose-risk-to-patients-7-things-to-know.html, (last visited Jan. 14, 2019).  The Regulations do not include provisions to minimize the occurrence of any of these risks (such as labeling of the intravenous lines), and the fact that the Regulations require remote administration through long intravenous lines spanning from one room to another increases the risks of mix-ups, tangles, and improper attachment of lines to catheters.  *See, e.g.*, Quick Guide: Improving the Safe Use of Multiple IV Infusions, AAMI Foundation (2016), https://www.ivenix.com/wp-content/uploads/2017/04/Infusion_Therapy_Quick_Guide-Multiple-IV-Infusions.pdf, (last visited Jan. 14, 2019).

- 110 -

298.    Defendants' use of its execution facilities to administer death by lethal infusion will create a demonstrated risk of severe pain to the inmate.

**5.      Defendants' Repeated Violations of State and Federal Law and Recurring Deviations from Written Execution Procedures Render Executions Under the Regulations Likely to Cause a Substantial Risk of Severe Pain and Suffering and Will Violate Plaintiffs' Rights to Due Process.**

299.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

300.    Defendant CDCR violates state and federal law in conducting lethal injection executions.

301.    Although California Penal Code section 3604 and the 2018 Regulations generally use mandatory language with regard to Defendant CDCR's procedures, the CDCR's practices demonstrate repeated and unpredictable deviation from the statute and written procedures.  *See Morales v. Tilton*, 465 F. Supp. 2d 972, 978 (2006) (holding that "in actual practice OP 770 does not function as intended").

302.    Defendant CDCR has deviated from state and federal law and its written execution procedures in ways ranging from minor to fundamental.  It has done so repeatedly during the course of executions without explanation.  These deviations have occurred with no forethought, no preparation, and no discussion, and the executioners have been unable to explain later what went wrong or how to avoid the problem in the future.  ECF No. 277, Undisputed Facts 50-50g, 85, 313, 314 (noting that there is no procedure in place for members of the execution team to take if they observe something wrong with the IV drip; "those are the what-ifs that can go a thousand long").  Thus, "[w]hatever the merits of the protocol in the abstract, there can be no real doubt that Defendants' implementation of [the lethal injection procedures] has major flaws, many of which are apparent from the *undisputed* facts to which Defendants stipulated." *Morales*,

465 F. Supp. 2d at 981.  As a result, Plaintiffs are likely to be subjected to procedures that create a substantial risk of severe harm.  Furthermore, each Plaintiff is likely to be subjected to procedures different in meaningful respects from those to which the other Plaintiffs are subjected, not due to any relevant difference in the inmates themselves, but simply due to whim, uncertainty, thoughtlessness, and lack of preparation.

303.     The 2018 Regulations provide that the lethal chemical will be administered not by injection, as required by Penal Code section 3604, but instead by remote infusion into many feet of intravenous lines (undefined in length) that extend from one room, through a wall, and into a second room in which the prisoner is tethered to a gurney.  Cal. Code Regs., tit. 15, § 3349.7.  The Constitution requires "adequate, verifiable procedures to ensure that the inmate actually receives a fatal dose of the anesthetic," *Morales*, 465 F. Supp. 2d at 983, but the use of remote administration fails in this regard.  ECF No. 78 at 2 ("An insufficient dose . . . has the potential to cause irreversible brain damage while not causing death.").

304.     Defendant CDCR has violated federal and state law requiring the proper dispensation of the lethal injection chemicals, maintenance of accurate records of the use of those chemicals and proper disposal of any extra chemicals, and avoidance of improper diversion of the chemicals.  Execution team members have obtained the lethal chemicals purportedly for training purposes, including the controlled substance thiopental, from the San Quentin State Prison pharmacy, but then have not mixed them or otherwise used them for training purposes, and have failed to return them to the pharmacy or otherwise account for their whereabouts.  ECF No. 277, Undisputed Fact 25-25o.  The execution team obtained from the San Quentin pharmacy more vials of sodium thiopental than were mixed or used during executions and failed to return them to

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

the pharmacy or otherwise account for them.  ECF No. 277, Undisputed Fact 26-26q.

Furthermore, one of the team leaders was being treated with medications for clinical

depression and Post-Traumatic Stress Disorder at the time he personally obtained the

thiopental from the San Quentin pharmacy.  ECF No. 277, Undisputed Facts 13, 16, 19,

25d, 25f.  That team leader and another member of the team had criminal convictions for

drunk driving.  ECF No. 277, Undisputed Facts 14, 20.

305.    Members of the execution team have obtained the lethal chemicals a week before

the scheduled execution, rather than the day before the scheduled execution as required

by the written procedures.  ECF No. 277, Undisputed Fact 25b, 25c.

306.    Defendant CDCR has failed to comply with state law by requiring licensed

vocational nurses to "[s]tart and superimpose intravenous fluids" while not under the

direction or supervision of a physician.  Cal. Bus. & Prof. Code § 2860.5; ECF No. 277,

Undisputed Facts 51-51b, 54.

307.    The executioners have not followed the manufacturers' instructions for mixing

sodium thiopental, as required by the procedures.  *Morales*, 465 F. Supp. 2d at 980.

308.    Defendant CDCR has failed to set back-up intravenous lines required by the

written procedures.  *Morales*, 465 F. Supp. 2d at 979 (noting that the executioners failed

to set an intravenous line during the execution of Stanley Williams and although

"Defendants' counsel assured the Court at the evidentiary hearing that 'Williams was a

lesson well learned, one that will never occur again,' the record shows that Defendants

did not take steps sufficient to ensure that a similar or worse problem would not occur

during the execution of Clarence Ray Allen on January 17, 2006, or Plaintiff [Morales]'s

scheduled execution the following month."); *see also* ECF No. 277, Undisputed Facts 50,

62, 63 (there was a difficulty with one of the IV lines during Massie's execution); ECF

No. 278, Undisputed Fact 245 ("A procedure for notifying the team leader and Warden if one or both of the IVs was not set properly should have been in place for the Allen execution, but wasn't."); ECF No. 278, Undisputed Fact 339.

309.     The executioners administered a second dose of one of the lethal chemicals, potassium chloride, to four condemned inmates – Allen, Anderson, Massie, and Siripongs.  They disagreed about who ordered the administration of the second dose during the Allen execution.  They could not articulate a reason why these inmates received a second dose of potassium chloride other than "because after 'a reasonable time' 'he didn't die', and the team 'waited and waited.'"  ECF No. 278, Undisputed Facts 125, 196-201.

310.     The executioners have worked in the areas of the prison in which condemned inmates are housed, engage in recreation, and obtain medical treatment, in violation of the written procedures.  ECF No. 277, Undisputed Facts 20-23, 25; Doc 278, Undisputed Fact 161 (noting that Plaintiff Morales knew Witness #9 and greeted him by name on the night of his scheduled execution).  In addition, one of the persons requested to serve as an anesthesiologist monitoring the execution in response to this Court's order was the chief psychiatrist at San Quentin who was responsible for and provided care and treatment to condemned inmates.  ECF No. 277, Undisputed Fact 118a, 118b.  This doctor, Dr. Rosko, also was designated by then-Warden Ornoski to assist in revising the lethal injection protocol.  ECF No. 277, Undisputed Fact 119.

311.     The executioners have failed to keep reliable and consistent contemporaneous records of executions.  Their execution logs "are incomplete or contain illegible or overwritten entries with respect to critical data such as the inmate's heart rate and the time at which the observations were made."  *Morales*, 465 F. Supp. 2d at 979.  These

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

failures were in violation of the written procedures, which required that a "designated team member shall keep accurate records of time that each phase of the execution takes place." OP 770, Revised 2003, at 25. Anomalies and inconsistencies in record-keeping "raised substantial questions as to whether [six] certain inmates may have been conscious when pancuronium bromide or potassium chloride was injected." *Morales*, 465 F. Supp. 2d at 980.

312.     After promising to establish procedures by which there would be "[p]roper report writing and record keeping," ECF No. 317-1 at 17, Defendants eliminated from the procedures the requirement that the attending physician keep observation logs detailing breathing, body movements, and heart function in real time during executions that had established constitutional violations in 64% of California's executions. This was an intentional effort to eliminate transparency and reliability, and thwart judicial review of executions eliminating potential evidence of mishap.

313.     Defendants have deviated from – that is, violated – orders by this Court, the Ninth Circuit Court of Appeals, and California state courts requiring particular actions to be taken to minimize the risk of severe pain to the inmate.

314.     After this Court and the Court of Appeals ordered Defendants to engage anesthesiologists to take all medically appropriate steps to ensure that Plaintiff Morales was and remained unconscious when injected with pancuronium bromide, Defendants informed their selected anesthesiologists that they merely would have to observe the execution, rather than intervene if Plaintiff was not unconscious. *Morales v. Tilton*, 465 F. Supp. 2d 972, 976 (2006); *see also* ECF No. 277, Undisputed Facts 93-99, 106-07, 109, 111-13; ECF No. 278, Undisputed Fact 120h. When the selected anesthesiologists learned the truth, only several hours before the scheduled execution, they declined to

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

participate.  RT 985-88 (Sept. 28, 2006) (Singler); ECF No. 277, Undisputed Facts 111, 112.

315.    After this Court issued its February 14, 2006 order, the then-Warden of San Quentin stated that he did not "think the Court actually gets to set our policy."  ECF No. 277, Undisputed Facts 117, 117a.

316.    In 2010, Defendant CDCR ensured this Court that it was able to proceed to execute Albert Brown with a 5-gram dose of sodium thiopental and that it would require three days to train on this method prior to executing Brown, ECF No. 394 at 2-3.  The CDCR failed to advise the Court that it had in its possession only 7.5 grams total of thiopental, that its supply had an expiration date of October 1, 2010 (two days following the scheduled execution date), and that the CDCR was unable to obtain more until several months later, precluding the executioners from training on mixing the chemical and having the necessary back-up amount to conduct Brown's execution.  Doc 404 at 2-3.

317.    Defendant CDCR admitted that it substantially failed to comply with many of the requirements of the California Administrative Procedure Act when developing and promulgating the lethal injection procedures.  *Sims v. Dep't of Corrs. & Rehab.,* 157 Cal. Rptr. 3d 409, 415 (Cal. Ct. App. 2013).

318.    The 2018 Regulations fail to assign responsibility for the implementation and oversight necessary to insure going forward Defendant CDCR's compliance with court orders that require alterations or deviations to be made from Defendants' execution practices, including the scheduling of additional training sessions, adjustments to the lethal injection facility, acquisition of additional equipment, or the employment of required staff.  *See* ECF No. 278, Undisputed Fact 323.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

319.    Such regulations do not promote a remedy for Defendants' unconstitutional conduct, but instead create an environment that will cause Defendants' unconstitutional conduct to continue.  Defendants' failure to commit to, and its deviations from, central aspects of the execution process threaten serious pain in violation of the Eighth Amendment.  *Arthur v. Thomas*, 674 F.3d 1257, 1263 (11th Cir. 2012); *First Amendment Coalition of Arizona, Inc. v. Ryan*, 188 F. Supp. 3d 940, 951-52 (D. Az. 2016).

320.    Defendants' failure to commit to, and its deviations from, their stated execution process, are so significant, made at the last minute, provide Plaintiffs no meaningful opportunity to be heard, and risk a constitutionally intolerable risk of pain, that they also violate Plaintiffs' rights to procedural due process under the Fourteenth Amendment.  *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012).

**6.      Defendants' Secrecy and Lack of Transparency Create an Absence of Consistency and Reliability in the Implementation of Executions, Resulting in a Substantial Risk of Severe Pain and Suffering, and Violating Plaintiffs' Rights to Due Process.**

321.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

322.    The implementation of Defendants' lethal injection protocol "lacks both reliability and transparency."  *Morales*, 465 F. Supp. 2d at 981.  Application of the state Administrative Procedure Act to the creation of a protocol, and responsible participation by Defendants in that process, would bring reliability and transparency to the process. The effectiveness and reliability of the 2018 Regulations therefore solely is based on Defendants' transparency.

323.    Defendants have not cured the lack of reliability and transparency in the implementation of the lethal injection protocol.  In many respects, Defendants have redoubled the opacity and lack of clarity that have contributed to a substantial risk of

- 117 -

severe pain in violation of the Eighth Amendment.  This lack of transparency makes it impossible for Plaintiffs, or this Court, to effectively review the 2018 Regulations and determine whether Defendants have resolved identified constitutional deficiencies.

324.     The 2018 Regulations are inexcusably vague, shrouded in secrecy, allow Defendants unfettered ability to alter the execution protocol with little or no notice, and/or contain unknown variables that create an absence of consistency and reliability and a substantial risk of severe pain and suffering.  Defendants can develop, amend, or deviate from their execution protocol on a whim, without oversight or review to ensure constitutional execution procedures, just as they did prior to trial.  *See* ECF No. 277, Undisputed Facts 87, 117 (Warden Ornoski reduced the dose of thiopental after brief consultation with CDCR officials and observation of an execution in Texas).

325.     Revisions and amendments to Defendants' execution procedures now require no notice to Plaintiffs or their counsel.  Although adoption or amendment of regulations must be made available to the public and to inmates sentenced to death, prompt notice of the same is required only to "the Attorney General, the State Public Defender, and counsel for any inmate for whom an execution date has been set or for whom a motion to set an execution date is pending."  Cal. Penal Code § 3604.1.

326.     Numerous provisions in the 2018 Regulations allow Defendants to conduct executions without disclosing information vital to the process.

327.     The Warden makes the selection between pentobarbital and thiopental following receipt of the execution warrant.  Cal. Code Regs. tit. 15, § 3349.5(f).  The Warden has unfettered discretion to make this selection, despite having no training, expertise, or knowledge in medicine or the administration of death.

- 118 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

328.     Although the selection of the lethal chemical is made in consultation with "medical personnel," the category of medical personnel that may be consulted includes "other appropriate expert."  Cal. Code Regs. Tit. 15, § 3349.5(f)(2)(B).  The 2018 Regulations do not require that the Warden disclose what medical personnel will be consulted, what criteria will be used in deciding who is an "appropriate" expert, or who will make that determination.  The Regulations further do not require disclosure after the fact of who was consulted, how they were chosen, or what criteria they and/or the Warden used in making the decision between thiopental and pentobarbital.  This nebulous "expert" designation allows the Warden to consult with an undefined, uneducated, unlicensed, untrained, and unqualified individual who may rubber stamp the Warden's choice of chemical without substantive input.  The 2018 Regulations also permit the Warden to disregard meaningful information and input the medical personnel may provide during consultation.  Because the Regulations do not require disclosure of any information relating to this individual or the chemical selection itself, the Warden retains unfettered discretion to choose which toxin will be injected into a condemned inmate without any oversight or review of the decision.

329.     The 2018 Regulations allow the selection of Lethal Injection Team members to be conducted by an unidentified and undefined "designee" and permit "medics," a term that is not defined in the Regulations or in state law, to serve as "medical personnel" on the Lethal Injection Team.  This absence of clarity or transparency results in the unreliable implementation of lethal injection practices.

330.     The 2018 Regulations do not require disclosure of any specific information regarding the selected Lethal Injection Chemical other than whether it is pentobarbital or thiopental.  Whether the Lethal Injection Chemical will be obtained from an FDA

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

approved manufacturer through approved distribution, or whether it will be through a

compounding entity or itself compounded, is entirely up to Defendants' discretion, and

this information does not have to be disclosed to an inmate prior to execution, or

disclosed before, during, or after an execution.  Nor do the Regulations require the

disclosure of the chemical composition of compounded chemicals.  *See* Cal. Code Regs.,

tit. 15, §§ 3349.1(j), 3349.5(f)(2)(D).  It is unlikely that Defendants will be able to obtain

either Lethal Injection Chemical from an FDA-approved manufacturer, or otherwise

lawfully from a third-party distributor, leaving compounding pharmacies as the likely

source of the Lethal Injection Chemical.  Compounded drugs carry a significantly higher

risk of contamination, dilution, and alteration of the lethal substances, none of which the

Regulations address or take measures to alleviate.  This absence of clarity or transparency

results in the unreliable implementation of lethal injection practices.

331.    The 2018 Regulations do not require Defendants to disclose the supplier of the

Lethal Injection Chemical.  Plaintiffs therefore have no ability to review the

qualifications, history, or record of disciplinary action of the supplier.  In the past,

Defendants have obtained chemicals from disreputable foreign sources and considered

continuing to do so in developing the 2018 Regulations.  This absence of clarity or

transparency results in the unreliable implementation of lethal injection practices.

332.    The 2018 Regulations allow for the use of compounded drugs, without requiring

disclosure of the compounder's identity, or whether the compounder has experience in

compounding the particular Lethal Injection Chemical selected, whether the supplier

undergoes routine inspections, or whether the supplier has a history of distributing

contaminated drugs.  The Regulations do not require the compounding entity to test the

chemicals, to disclose records of any testing completed, to disclose chain of custody

- 120 -

documentation, or to disclose the compounding formula.  Without requiring disclosure of the source of the Lethal Injection Chemical, its precise composition, or any instructions for preparing or administering it, Plaintiffs, and this Court, cannot determine whether the chemical will function as intended.  As a result, there is a substantial risk that Plaintiffs will suffer severe pain due to inconsistently and unreliably manufactured toxins.

333.    The 2018 Regulations do not require Defendants to disclose to Plaintiffs or their counsel which Lethal Injection Chemical will be used until after an execution warrant has issued, and until after the inmate has chosen his or her method of execution.  Cal. Code Regs. Tit. 15, § 3349.5(f)(2).  The 2018 Regulations do not set a timeline for when the Warden is required to notify the prisoner which lethal chemical will be used to execute him or her.  *See* Cal. Code Regs., tit. 15, § 3349(f)(4).  This provides Plaintiffs and their counsel insufficient time to review, assess, and bring a legal challenge to the use of the Warden's selected chemical.

334.    The 2018 Regulations provide for administration of a sedative prior to the execution but include no information about what types of sedatives are available, how such sedative would be administered, or whether the physician approving administration would be required to consider interactions between the sedative and the Lethal Injection Chemical before approving it.  Additionally, the Regulations do not contain any provision permitting the administration of a sedative in the event that a physician is not available to approve administration due to ethical prohibitions against participating in any part of an execution.  *See* Cal Code Regs., tit. 15, § 3349.6(g)(2)(B).  This absence of clarity or transparency results in the unreliable implementation of lethal injection practices.

335.    In disapproving Defendants' 2016 Proposed Regulations, the OAL noted that the timeline provided lacked clarity because the use of the word "approximately" before each

of the time triggers allowed unspecified leeway in interpreting when the tasks outlined in the Regulations must be carried out.  The 2018 Regulations contain the same "approximately" modifier throughout the execution timeline, and therefore continue to provide Defendants with the ability to deviate from their procedures at will, without requiring any justification, or any notice to Plaintiffs or their counsel.  This absence of clarity or transparency results in the unreliable implementation of lethal injection practices.

336.     The 2018 Regulations exacerbate this issue by allowing the already loose timeline "to change if needed to accommodate unforeseen events."  Cal. Code Regs., tit. 15, § 3349.6.  The 2018 Regulations contain no guidance on what types of unforeseen events warrant deviation from the timeline, no indication whether there is any limit on the amount of deviation, or whether any of the tasks required of the staff, or obligations promised to the inmates and their counsel, may be avoided or eliminated due to unforeseen circumstances.  This lack of clarity resulted in execution team members obtaining the execution chemicals one week before the execution rather than the afternoon before the execution as required under OP 770.  This deviation occurred in at least eight executions, with no explanation as to why this deviation was warranted.  ECF No. 277, Undisputed Facts 25b, 25c.  For the scheduled February 21, 2006 execution of Plaintiff Morales, no thiopental was removed from the pharmacy prior to the execution, and no documentation exists to explain this failure to obtain the chemical as required.  Documentation also does not exist to explain the disappearance of thiopental ostensibly removed for use in training.  *Compare* Cal. Code Regs., tit. 15, § 3349.6(e)(2)(B) ("Ensure the Lethal Injection Chemical is properly controlled and secured in the Lethal Injection Facility safe or refrigerator.") *with Morales*, 465 F. Supp. 2d at 979 n.9 ("team

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

members testified that the actual drugs are not used in training, yet it appears that substantial quantities of sodium thiopental – again, an addictive controlled substance – were not returned to the pharmacy.").  Inmates Allen, Anderson, Massie, and Siripongs received a second dose of potassium chloride during their executions.  In one instance, Warden Woodford ordered a second dose of potassium chloride just by nodding her head, because after "a reasonable time" the inmate "didn't die", and the team "waited and waited."  There never was a previous scientifically supported and established line of communication between the Warden and the team for this purpose.  ECF No. 278, Undisputed Facts 125a, 196, 197.  During the execution of Stanley Williams, Warden Ornoski ordered the execution to proceed despite being informed that the IV line in Williams' left arm was not flowing.  ECF No. 277, Undisputed Fact 50g.  Under OP 770, Defendant CDCR's legal affairs secretary did not know whether there was anyone authorized to determine when to deviate from the protocol.  ECF No. 278, Undisputed Fact 323.  The 2018 Regulations lack transparency and therefore reliability in failing to specify standards warranting deviation from the timeline and failing to require documentation to record any deviations and why they occurred.

337.    The 2018 Regulations provide that the Lethal Injection team shall include a minimum of 12 members assigned to one of three sub-teams.  Cal. Code Regs., tit. 15, § 3349.2(a)(2) and (a)(2)(A).  The Regulations lack transparency and therefore reliability in failing to specify how each of these 12 or more members of the execution team will participate in each execution.

338.    Penal Code 3604.1(b) establishes that access can be established by methods other than intravenous venous injection, where the condition of the prisoner makes intravenous access impractical.  The 2018 Regulations contain no provisions for implementing this

- 123 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

statute, such as what alternative methods are permitted, how they will be accomplished,

and whether and how the members of the execution team will be trained to perform them.

339.    The 2018 Regulations do not require trained medical professionals to make and

document transparent and reliable observations of the condition of the inmate prior to and

during the administration of the lethal chemical, including respirations or respiratory

effort, that members of the team or observing physicians have been required to observe

and document under previous California execution protocols, and that demonstrated a

64% failure rate.  The failure to require such transparent and reliable observations and

documentations thereof preclude recognition of malfunctions in the execution, including

the ineffective administration of the lethal chemical, and the ability to make corrections

to prevent a substantial risk of severe pain.  *Morales*, 465 F. Supp. 2d at 979-80.  This

absence of clarity or transparency results in the unreliable implementation of lethal

injection practices.

340.    The 2018 Regulations do not mandate the use of assistive medical equipment,

employed in other states, to monitor vital signs that would confirm infusion has taken

place and ensure unconsciousness, nor do they mandate the participation of qualified

personnel to operate and make findings from this equipment and direct other members of

the execution team accordingly.  Although a physician is required to monitor the inmate's

electrocardiogram, the 2018 Regulations do not require that the physician take any action,

or even notify the Lethal Injection Team, if the electrocardiogram indicates that the

Lethal Injection Chemical is not performing as intended.  Cal. Code Regs., tit. 15, §

3349.7(c)(9).

341.    Consistent with Defendants' unconstitutional implementation of the lethal

injection practices, the 2018 Regulations provide for "[i]nconsistent and unreliable

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

record-keeping." *Morales*, 465 F. Supp. 2d at 979.  There remain no provisions for contemporaneous records reflecting "critical data such as the inmate's heart rate and the time at which observations were made.  Inexplicably, Defendants use[d] blank paper for their electrocardiogram (EKG) tracings instead of the graph paper that typically is used, and provide[d] neither standardization markings nor paper-speed documentation, thereby precluding accurate interpretation of the tracings, even as to heart rate." *Id.*  The Regulations contain no provision requiring that the electrocardiogram readings be printed out and placed in the Master Execution File.  Defendants thus may still use blank paper for their EKG readings rather than graph paper, and may continue to fail to include standardized markings or paper-speed designations.  Defendants may choose not to print the readings at all.  The 2018 Regulations provide no remedy for the poor record-keeping which was a predicate for the Court's adverse findings against Defendant CDCR at trial, and continue to allow practices that will preclude accurate review and interpretation of an inmate's vital signs to determine whether the Lethal Injection Chemical functioned appropriately, or whether there was a substantial risk the inmate was subjected to severe pain and suffering. *Id.*

342.    The 2018 Regulations contain no transparency regarding procedures to be followed in the event that the execution cannot continue after administration of the Lethal Injection Chemical has begun.  The 2018 Regulations do not require medical personnel to be onsite to assist to promote life in the event the execution is stayed or stopped after infusion has commenced.  Instead, the 2018 Regulations provide that in such an event medical personnel – either San Quentin medical personnel, "or contracted medical personnel if there is no state civil service employee who is available and willing to provide the prescribed duties" – should be summoned to the Lethal Injection Facility to

- 125 -

provide care deemed necessary.  Cal. Code Regs., tit. 15, § 3349.7(d).  The 2018

Regulations do not require that specific medical personnel be identified and ready to be

summoned should the need arise.  Delays in obtaining medical care under these

circumstances are likely to result in irreversible brain damage, other serious harm, or an

agonizing death.  The 2018 Regulations lack transparency and reliability by failing to

provide adequate protections to prevent a prisoner from being wrongly harmed should a

reprieve or stay be granted after the process has begun but before death has occurred.

343.    The 2018 Regulations fail to ensure reasonably prompt notification to the

inmate's counsel and fail to ensure counsel's reasonable access to the inmate when

changes in circumstances require a delay or postponement of a scheduled execution.  The

lack of any reliable mechanism for informing inmates of the nature and probable duration

of delays in the execution process raises an unacceptable risk that inmates will be

subjected to one or more mock executions, and unnecessarily interferes with counsel

taking action on behalf of the inmate.  During the February 21, 2006 attempted execution

of Plaintiff Morales, neither Morales nor his counsel were informed until after 2:30 a.m.

that the scheduled 12:01 a.m. execution would not proceed, even though it was clear as

early as 8:15 p.m. that it would not proceed.  ECF No. 277, Undisputed Facts, 113, 114.

344.    The lack of transparency created by the intentional vagueness, omissions, and

identified loopholes in the regulations make it clear that Defendants' intention is not to

address the constitutional deficiencies identified by this Court.  The systemic lack of

transparency in the 2018 Regulations will make it impossible to determine with any

degree of certainty whether executions are carried out in a constitutional manner.  In the

past, Defendants' measure of a successful execution protocol was merely whether "the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

1  inmate ends up dead at the end of the process."  ECF No. 278, Undisputed Fact 340.  The

2  2018 Regulations continue to guarantee no more than that.

3  **7.      Feasible, Readily Implemented Alternative Method(s) of Execution Available**

4  **to Defendants Significantly Reduce the Substantial Risk of Severe Pain Posed**
   **by the Regulations.**

5  345.    Plaintiffs reallege and incorporate by reference herein each and every allegation

6  set forth in this complaint.

7

8  346.    The CDCR's execution methods in practice and pursuant to the 2018 Regulations

9  carry a significant risk of severe pain.  *Baze v. Rees*, 553 U.S. 35, 50 (2008).

10 347.    Known and available alternatives to the CDCR's execution regulations and

11 methods would entail a significantly less substantial risk of severe pain.  These

12 alternatives, as set forth below, eliminate the risks detailed above, address the

13 constitutional violations already identified by this Court, and prevent improper

14 administration of the mechanism of death.

15

16 348.    An independent fiduciary who reports to this Court must be employed to monitor

17 and audit Defendants' conduct during the implementation of the lethal injection process

18 to ensure transparency and reliability that Defendants comply with a satisfactory written

19 protocol, court orders, and Defendants' constitutional obligations.

20 349.    Proffer of these alternatives is not a waiver as to any challenges to the

21 constitutionality of any regulation that may subsequently adopt the alternative(s).

22

23 Judicial review of procedures implementing adoption of the alternatives will be necessary

24 to determine whether they effectuate a significant reduction in the risk of severe pain and

25 suffering.

26

27

28

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

### A.     Selection and Qualifications of Executioners.

350.     The demonstrated risk of severe pain presented by Defendants' execution team selection practices that continue under the 2018 Regulations is substantial when compared to the known and available alternatives.  There are numerous feasible, readily implemented, available alternative methods of execution team selection that would significantly reduce the substantial risk of severe pain.  These include but are not limited to the following:

351.     Appoint a person or persons who are qualified experts in conducting an execution or administering death; assessing veins; setting catheters; connecting IV lines to catheters; setting multiple IV lines with extended tubing in a single individual; mixing drugs and/or lethal chemicals; infusing drugs and/or lethal chemicals; monitoring IV lines and catheters for patency and avoidance of infiltration; administering anesthesia; monitoring and maintaining anethestic depth; distinguishing respiration from respiratory effort; and recognizing responses to noxious stimuli to review the trial transcripts and evidence, this Court's findings, and Defendants' current written execution protocol.

352.     Have the appointed person(s) prepare written selection criteria and experience requirements for the person(s) charged with selecting execution team managers, and all members of the execution team.  Such criteria should include, in addition to the requirements contained in the current Regulations, at a minimum:

a.     For members of the Intravenous and Infusion Sub-Teams:  Licensure, training, and authority under California law, as well as at least one year's experience performing the following on a regular basis in the course of their job duties outside their duties on the Lethal Injection Team:

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

i. Assessing an individual's veins to select primary and backup IV locations, and determining what to do if any or all of the selected locations may not be used effectively;

ii. Setting IV catheters in a number of different vein locations;

iii. Monitoring IV lines for patency, infiltration, occlusion, dislodgment, air bubbles, and other complications; and in particular, monitoring these factors in lengthy IV tubing;

iv. Re-placing catheters and/or IV lines when infiltration, occlusion, dislodgment, air bubbles, or other complications occur;

v. Monitoring a subject's anesthetic depth, including the subject's response to various benign and noxious stimuli;

vi. Setting electrocardiogram leads and utilization of electrocardiographic equipment;

b. For the Record Keeping Sub-Team:  At least one year's regular experience keeping detailed records and writing reports in the regular course of their job duties;

c. For the Team Administrator and Team Supervisor:  Sufficient medical knowledge, experience, and training to provide oversight over selection, training, and performance of the members of the Lethal Injection Team.

353.    Require that the criteria established be mandatory for management of or membership on the Lethal Injection Team and for assignment to designated roles.

354.    Require that each manager and candidate for the Lethal Injection Team submit to a psychological evaluation prior to becoming a manager or being placed on the team and

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

require that the results of the psychological exam be considered in determining the manager's suitability or candidate's suitability for team membership.

355.   Require that Defendant CDCR adhere to the requirement that no Lethal Injection Team manager or member may work in the condemned housing unit or have worked with the condemned inmates.

356.   Require that at least one member of the Selection Panel be required to possess sufficient medical experience and training to adequately assess candidates' qualifications.

357.   Require that the recommendations of the Selection Panel may not be overridden, or failure to meet selection criteria excused, by the Director – Division of Adult Institutions,  or any other individual.

358.   Establish a review board to conduct regular review of Lethal Injection Team licensure requirements and team qualifications that occurs semi-annually and also as soon as a death warrant is issued for an execution.

359.   Require regular verifiable and published reviews of each team member's employment files, including personnel and supervisory files, and eliminate the exemption for private contractors that allows them to participate without such reviews.  Require such reviews prior to each execution.

360.   Require that any disciplinary action taken against a manager or member of the Lethal Injection Team, or any arrest or conviction, be immediately reported to the Team Supervisor, Team Administrator, and review board.

361.   Require that disciplinary action against, or criminal conviction of, any manager or Lethal Injection Team member result in that manager's or member's immediate suspension from the Lethal Injection Team or its management.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

362.    Require that the review board immediately review any disciplinary action, arrest, or conviction to determine whether the manager or member should be permanently removed from management or the Lethal Injection Team.

363.    Submit the requirements to this Court to allow the Court to consider whether remedial action has taken place regarding selection and recruitment.

**B.    Training of Executioners.**

364.    The demonstrated risk of severe pain presented by Defendants' training practices that continue under the 2018 Regulations is substantial when compared to the known and available alternatives.  There are numerous feasible, readily implemented, available alternative methods of execution training that would significantly reduce the substantial risk of severe pain.  These include but are not limited to the following:

365.    Appoint a person or persons who are qualified experts in conducting an execution; administering death; assessing veins; setting catheters; connecting IV lines to catheters; setting multiple IV lines with extended tubing in a single individual; mixing drugs and/or lethal chemicals; infusing drugs and/or lethal chemicals; monitoring IV lines and catheters for patency and avoidance of infiltration; administering anesthesia; monitoring and maintaining anesthetic depth; distinguishing respiration from respiratory effort; and recognizing responses to noxious stimuli to review the trial transcripts and evidence, this Court's findings, and Defendants' current written execution protocol.

366.    Have the appointed person(s) prepare written curricula for all members of the execution team.  Such curricula should include instruction, and proficiency tests, on topics including, at a minimum:

   a.    Assessing an inmate's medical, mental health, and substance use conditions and
         history to determine possible complications in an execution, including difficulty

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

setting intravenous lines; adverse or impaired functioning of the selected Lethal Injection Chemical; and impediments in the setting of restraints;

b. Assessing an inmate's veins to select primary and backup IV locations, and determination of what to do if it is likely that any or all of the selected locations cannot be used;

c. Restraining an inmate on the execution gurney to ensure the inmate is not experiencing severe pain on the gurney and to prevent interference with the catheters and IV lines that might cause the catheter to dislodge, the IV to infiltrate, or the infusion to slow or cease;

d. Setting IV catheters in a number of different vein locations on a restrained inmate;

e. The properties of the Lethal Injection Chemicals and their mechanisms when infused into the human body, including their effects on respiration; consciousness; and heart, brain, and muscle function;

f. Preparing the Lethal Injection Chemicals, including instructions as to the color, transparency, viscosity, and odor of the chemicals when properly prepared;

g. Drawing the appropriate amount of the prepared chemicals into properly-sized syringes;

h. Pushing the Lethal Injection Chemicals and the saline flush, including the proper pressure and speed of the push and the back pressure to expect;

i. Pushing the Lethal Injection Chemicals into reasonable length IV lines through bedside infusion rather than remote administration;

j. Monitoring reasonable length IV lines for patency, infiltration, occlusion, dislodgment, air bubbles, and other complications; and in particular monitoring these factors in lengthy IV tubing extending from one room to another;

- 132 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

k.   Re-placing catheters and/or reasonable length IV lines when infiltration, occlusion, dislodgment, air bubbles, or other complications occur;

l.   Monitoring a subject's anesthetic depth, including the subject's response to various benign and noxious stimuli;

m.  Monitoring the inmate's respiration and respiratory effort; and heart, brain, and muscle function;

n.   Record-keeping, including the purpose of completing each portion of execution-related forms, the information that must be recorded in each portion of the form, standardized abbreviations to ensure consistency in records maintained by different team members, transparent and reliable approaches to amending incomplete or inaccurate documentation, and maintenance of records;

o.   Team work, team building, and resolution of disputes.

367.    Submit the curricula to this Court to allow the Court to consider whether remedial action has taken place regarding the content of training.

368.    Upon receipt of the Court's findings regarding the curricula, revise curricula if necessary to comply with this Court's orders.

369.    Have the appointed person(s) instruct the execution team members using the prepared and approved written curricula.

370.    Require that the Team Administrator and the Team Supervisor attend and participate in instruction sessions, and during proficiency testing, by the appointed person(s).

371.    Require that the Team Administrator, the Team Supervisor, and the Sub-Team leaders attend leadership and management training, and undertake proficiency testing, that includes at a minimum, the following:

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

a.  Project management;

b.  Communication and team interaction and dynamics;

c.  Coaching, motivation, and empowerment;

d.  Assessing and keeping records of performance;

e.  Providing developmental feedback;

f.  Delegation of tasks.

372.    Require that candidates for Team Administrator attend and observe at least three executions from the room(s)/location(s) where each of the executioners perform their assigned tasks prior to assuming this position.

373.    Require that candidates for Team Supervisor and Sub-Team leader participate in at least three executions prior to assuming one of these leadership positions.  The Team Supervisor should participate in all aspects of an execution prior to assuming this position.  The Sub-Team leader should participate in the aspects of the execution for which s/he is responsible prior to assuming his/her position.

374.    Require that training sessions, and proficiency testing, include preparing the Lethal Injection Chemicals.

375.    Require that training sessions, and proficiency testing, include pushing the Lethal Injection Chemicals through an IV line attached to a catheter set to replicate the back pressure and other conditions of an IV set in a live subject.

376.    Require that training sessions, and proficiency testing, include practice setting catheters on a live subject, and attaching IV tubing to the catheters set in the live subject.

377.    Require that training sessions, and proficiency testing, include operating stopcocks, and practice pushing and infusing saline into IV lines set in a live subject.

- 134 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

378.     Require that training sessions, and proficiency testing, include instruction on what actions to take when problems arise during each step of an execution.

379.     Require that training sessions, and proficiency testing, include training on the process and chain-of-command for decision-making when problems arise.

380.     Require that documentation of each training session include the following information:

a.   The names of the attendees;

b.   The date and duration of the training session;

c.   The amount of time each attendee was present during the training session;

d.   The name(s) and qualifications of the instructor(s);

e.   The topic(s) covered;

f.   Details of any simulations that are performed, including the supplies and equipment used, which Lethal Injection Chemicals are prepared, and the amount of each; the restraining of the surrogate for the inmate; the medical and mental health condition(s) of the surrogate inmate and the condition of the surrogate inmate's veins; the setting of catheters and IVs and the locations in which they are set; the pushing of chemicals, including saline; the members of the team who perform each task; the problems that arise during the simulation (including difficulties setting restraints, failures in the setting of catheters, dislodging of catheters, infiltration of IV lines, improper mixing of the Lethal Injection Chemicals, missing equipment) and the solutions attempted to solve these problems;

g.   An assessment of the performance and proficiency test results of each attending team member with assigned tasks and a performance plan for each team member

- 135 -

requiring additional skill development and/or other actions taken or planned to ensure the team member develops the required skill(s).

381.   Require that team members attend all scheduled training sessions.  If a team member is unable to attend a training session due to approved leave or illness, reschedule the training session so that all members of the team are present.  Because the coordination of tasks between the various members of the team is critical to avoid the demonstrated risk of severe pain and to ensure a smooth execution, all team members must be present at each training session.

382.   Perform regular assessments of execution team members, document the performance of each team member with regard to his or her assigned tasks, review each team member's performance with that individual, create a written performance plan for development when a team member's performance is deficient, and ensure that the team member receive any additional training necessary to gain proficiency, or is removed from active execution team duties if performance is deficient.

383.   Submit documentation of training sessions to this Court to allow the Court to consider whether remedial action has taken place regarding the training and preparation of the execution team members.

### C.   Selection and Use of Lethal Injection Chemicals.

384.   The demonstrated risk of severe pain created by the Defendants' selection and use of Lethal Injection Chemicals is substantial when compared to the known and available alternatives.  There are feasible, readily implemented available alternatives to the selection and use of Lethal Injection Chemicals set forth in the 2018 Regulations, including but not limited to the following:

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

385.    The lethal chemical should not be selected by the Warden, an individual with no medical training, expertise, or experience.  Instead, the chemical should be selected by a medical professional familiar with the medical condition(s) of the inmate, including but not limited to the condition of his or her veins, medical illnesses or diseases affecting the inmate, medications the inmate is prescribed and takes, and the inmate's height and weight.

386.    Nor should the selection of the lethal chemical rely upon such non-medical considerations as "the availability of a supply of chemical."  Cal. Code Regs., tit. 15, § 3349.5(f)(2)(A).

387.    Sodium thiopental should not be used to execute an inmate in California. Defendant CDCR's history of failing to ensure that its executioners are qualified, trained, and proficient at properly mixing thiopental creates a demonstrated risk of severe pain to the inmate.  Instead, only a lethal chemical that does not require preparation by means of mixing should be used to execute an inmate.

388.    Using an FDA-approved injectable solution of a fast-acting barbiturate, rather than a compounded chemical; or a compounded chemical that complies with all state and federal compounding requirements, and is tested, and with the records of this testing, chain of custody documentation, and the compounding formula disclosed to Plaintiffs and their counsel, are reasonable protective measures that would entail a significantly less substantial risk of severe pain and suffering.

389.    The amount of the lethal chemical should not be fixed at 7.5 grams, as required under the 2018 Regulations, but rather it should be determined following a thorough medical examination of the inmate and a thorough review of his or her medical records.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

390.    The lethal chemical should not be administered remotely from another room but injected in the execution chamber directly into the inmate by a person licensed by the State of California to inject medications intravenously.

391.    Licensed vocational nurses should not be permitted to set the intravenous lines and start and maintain the intravenous fluids unless they are under the direction and supervision of a physician as required by state law.

392.    Medically trained personnel should be allowed to set the intravenous lines and start and maintain intravenous fluids only to the extent permitted by state law.  Such a person should be prohibited from making more than two unsuccessful attempts to set an intravenous line; following two unsuccessful attempts, that person should be replaced by another licensed and qualified medical professional who should undertake to set the line at a different site.

393.    Only medically trained professionals licensed by the State of California and with experience in and knowledge of assessing IV access and patency, administration of the lethal injection chemical, and assessing anesthetic depth should be tasked with determining whether the inmate attains a fully unconscious state and remains in that state throughout the execution.

394.    The time permitted to establish the three intravenous lines should not exceed one hour.

395.    A licensed anesthesiologist in the State of California should determine the appropriate back-up procedure to employ if peripheral intravenous access is impractical, and any procedure other than peripheral intravenous access must be fully described, including the qualifications of those undertaking the procedure.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

396.    Submit these revised procedures to this Court to allow the Court to consider whether remedial action has taken place.

**D.    Execution Facility Design, Construction, and Use.**

397.    The demonstrated risk of severe pain presented by Defendants' use of their execution facilities vis a vis their 2018 Regulations is substantial when compared to the known and available alternatives.  There are numerous feasible, readily implemented, available alternative methods of execution that would significantly reduce a substantial risk of severe pain.  Alternatives include but are not limited to the following:

398.    Limiting the quantum of people allowed in the Infusion Control Room, and compelling persons who are not members of the execution team to be located in a remote area that does not interfere with the execution team's activities, observations, and communications.

399.    The facility should be furnished with available operable equipment, lighting, communications equipment, IV lines, stopcocks, catheters, and bags that allow execution experts to make chemical infusions, communicate easily and clearly, and observe the chemical infusion.

400.    Appoint a person or persons who are qualified experts in conducting an execution; administering death; designing execution facilities; reviewing facility schematics or designs; architecture; design; construction; visibility; lighting; human factors engineering; communications; crowd control; the use of medical devices such as gurneys, IV lines, catheters, stopcocks, and vital signs monitors; lethal chemicals; and/or activities involving infusion or infusion rates, chemical preparation, or chemical storage to review the trial transcripts and evidence, this Court's findings, and Defendants' current written execution protocol.

- 139 -

401. Have the appointed person(s) prepare an architectural design and architectural rendering of an execution facility that will remediate the demonstrated risk of severe pain to the inmate during the execution that results from issues including: the facility's design; architecture; construction; visibility; lighting; human factors; communication; attendance; or use of medical devices such as gurneys, IV lines, catheters, stopcocks, and vital signs monitors; lethal chemicals; and/or activities involving infusion or infusion rates, chemical preparation, or chemical storage.

402. Submit the architectural plans for peer review and analysis for the intended purpose of the facility.

403. Review and revise the architectural plans and design based upon the peer review.

404. Install video equipment in multiple locations to monitor all execution team activities from two hours prior to the commencement of an execution that can be used for quality control and to ensure transparency and reliability of the execution process, for training, and for remedial improvements of the implementation of the execution protocol.

405. Prior to commencing construction, submit the design to this Court to allow the Court to consider whether remedial action has taken place regarding the facility design and renderings.

406. Upon receipt of the Court's findings regarding the design and renderings, submit a proposed facility for state legislative oversight and funding approval for construction.

407. Upon receipt of required legislative approval, construct the facility as designed within budget for review by this Court and the parties.

/ /

**E.      Deviation from State and Federal Law and Written Procedures.**

408.      The demonstrated risk of severe pain created by the Defendants' failure to adhere to state and federal law and written procedures is substantial when compared to the known and available alternatives.  There are feasible, readily implemented, available alternatives to Defendants' ad hoc, unplanned deviations from law and procedure that would substantially reduce the risk of severe pain.  These include but are not limited to the following:

409.      Require the Team Administrator, the Team Supervisor, and all members of the execution team to read Penal Code sections 3604 and 3604.1 and the Regulations finally approved by this Court prior to joining the execution team, as well as at the beginning of each training session, and immediately prior to each execution, and ensure their familiarity with written procedures through proficiency testing.

410.      Require the executioners to comply with approved procedures.  Impose disciplinary measures, including dismissal from the execution team, adverse performance reviews, and other sanctions, including criminal prosecution, for failure to comply with state law and approved procedures (including the improper handling, diversion, or disposal of the lethal injection chemical).

411.      Require the executioners and those who supervise them, including the Team Supervisor, the Team Administrator, the Warden, and the Governor and members of the Governor's staff to review and understand all orders issued by this Court or any other federal or state court with regard to the conduct of executions by Defendant CDCR. Require the execution team to meet as a whole to discuss these court orders and to seek advice from counsel to ensure that they understand what is required of them pursuant to the orders.

- 141 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

412.     Require the executioners and those who supervise them, including the Team Supervisor, the Team Administrator, the Warden, and the Governor to comply with all orders of this Court and other federal and state courts.

413.     Submit these revised procedures to this Court to allow the Court to consider whether remedial action has taken place.

### F.     Transparency in the Implementation of Executions.

414.     The demonstrated risk of severe pain presented by Defendants' secrecy and lack of transparency that continues under the 2018 Regulations is substantial when compared to the known and available alternatives.  There are numerous feasible, readily implemented, available alternatives that would significantly reduce the substantial risk of severe pain.  These include but are not limited to the following:

415.     Require that creation and amendment of Defendants' lethal injection protocol be subject to a public notice and comment period, to ensure transparency and reliability in the process.

416.     Require that Defendants maintain a file detailing the process used to develop the lethal injection protocol, including experts consulted and reasons for adopting or rejecting recommendations made, and make this file available to condemned inmates and their counsel.

417.     Require that the condemned inmates and their counsel receive immediate notice upon creation and/or any amendment of the lethal injection protocol.

418.     Require that Defendants maintain criteria for selecting any Lethal Injection Chemical to utilize during an execution and make these criteria available to all condemned inmates and their counsel.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

419.     Require the Warden to consult with an appropriate expert regarding the selection of any Lethal Injection Chemical, establish guidelines for allowing the Warden to deviate from recommendations made by the expert, and require that the Warden document the reasons for choosing the particular Lethal Injection Chemical.

420.     Develop a form to be utilized in making the Lethal Injection Chemical selection, including documentation of the consulting expert's qualifications, the consulting expert's recommendation of Lethal Injection Chemical, whether the Warden deviated from that recommendation, and the reasons for such deviation.  Require that the form indicate which Lethal Injection Chemical shall be utilized, the source of that chemical, the manufacturer, lot number, and expiration date.

421.     Require that Defendants maintain and disclose to condemned inmates and their counsel a list of intended suppliers for any Lethal Injection Chemicals to be used.

422.     Require that Defendants disclose to condemned inmates and their counsel any problems or issues they encounter obtaining the Lethal Injection Chemical.

423.     Require that the Regulations provide a clear timeline that specifies the exact time triggers for each step of execution procedures, including clear definitions of any deviations permitted.  Require that the Regulations contain criteria for when the lethal injection team may deviate from the timeline due to unforeseen circumstances and who is authorized to make the determination to deviate.

424.     Require that any deviations from the timeline or any other aspect of the Regulations are documented, including who ordered the deviation and why it was necessary.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

425.    Require that the condemned inmate's counsel be notified promptly of any deviations from the timeline or any aspect of the Regulations, including who ordered the deviation and why it was necessary.

426.    Require that the role of each team member during an execution and the specific tasks performed by each member during each execution be documented and maintained.

427.    Require that trained medical personnel make and document transparent and reliable observations of the condition of the inmate throughout the administration of the lethal chemicals, including respirations or respiratory effort, as has been required under previous California execution protocols.

428.    Establish procedures to be followed in the event the execution cannot continue after administration of the Lethal Injection Chemical, including requiring that a medical professional trained in advanced life support techniques be onsite and available to respond immediately.

429.    Submit these revised procedures to this Court to allow the Court to consider whether remedial action has taken place.

/ /

/ /

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**<u>CLAIM I</u>**

**VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND TO BE FREE FROM ARBITRARY AND CAPRICIOUS PROCESSES PURSUANT TO THE FIFTH, EIGHTH, AND FOURTEENTH <u>AMENDMENTS TO THE UNITED STATES CONSTITUTION</u> (42  U.S.C. § 1983)**

430.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

431.    Defendants' selection of unqualified execution team members by persons unqualified to make such selections; inadequate training of execution team members; selection, mixing, remote delivery, dose, variable and uncertain infusion rates, and use of certain lethal chemicals without any provision to assure they are properly obtained under state and federal law; design, construction, and use of their execution facilities; repeated violations of state and federal law and recurring deviations from written execution procedures; historical failure rates in the implementation of executions free from severe pain and suffering; absence of consistency and reliability in the implementation of their executions due to secrecy and a lack of transparency; and failures to employ feasible, readily implemented alternative method(s) of execution available to defendants, among other deficiencies, cause a substantial risk of severe pain and suffering to Plaintiffs during the implementation of an execution, and deprive Plaintiffs of their rights to be free from arbitrary and capricious procedures, in violation of the Fifth, Eighth, and Fourteenth Amendments to United States Constitution, and in violation of 42 U.S.C. § 1983.

432.    Defendants are acting under color of California law in subjecting Plaintiffs to the foregoing practices.

433.    The 2018 Regulations, which set forth Defendants' written lethal injection protocol, and the Defendants' actual practice of implementing the protocol, violate

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

Plaintiffs' rights to be free from cruel and unusual punishment protected by the Eighth Amendment because: (a) the protocol creates a present and substantial risk of severe pain; (b) the protocol does not comport with contemporary norms and standards of society; (c) the protocol offends the dignity of the person and society; and (d) alternatives that significantly reduce the risk of harm are feasible and readily available to Defendants.

434.    The 2018 Regulations require utilization of dangerous chemicals but do not ensure that the personnel entrusted to administer them are qualified or possess the proper and necessary training, experience, or expertise to do so.  Moreover, the 2018 Regulations fail to provide specific guidelines for the selection and administration of the chemicals, which is an essential requirement for their proper administration.

435.    The 2018 Regulations do not demand that personnel involved in the remote lethal infusion procedure established by the Regulations possess the qualifications, credentials, certifications, experience, or proficiency required to conduct such a complex procedure requiring expertise in order to be performed correctly.  The Regulations, and Defendants' actual practice, do not ensure that the unqualified personnel conducting the execution are trained to perform the execution correctly.

436.    The 2018 Regulations do not require at the execution the presence of any personnel who possess sufficient qualifications or expertise to insert an intravenous line properly, determine if there is an obstruction in or infiltration of the intravenous line, or evaluate whether a prisoner is being remotely infused with the lethal chemicals.  Nor is it Defendants' actual practice to require the participation of such personnel.

437.    Defendants' proposed procedure creates a present and substantial risk that Plaintiffs will experience severe unconstitutional pain and suffering, and/or will suffer irreversible brain damage but will not die during the remote infusion process.

Suffocation and/or pulmonary edema while inadequately sedated or otherwise aware, as caused by the administration of the chemicals selected by Defendants, violates the Eighth Amendment because death by asphyxiation is itself a form of cruel and unusual punishment, and constitutes severe physical and psychological pain in violation of the Eighth Amendment.  Defendants' past practices establish a 64% failure rate in delivering remotely infused chemicals to the inmate.  These failures could have occurred because of unqualified and untrained personnel, improper insertion of the intravenous line, an unrecognized obstruction in or infiltration of the line, or various other reasons.

438.    Defendants' decision to reject their own experts' opinion in the selection of chemicals to be used, or the equipment and facilities necessary to avoid serious risks of severe pain, and their decision to maintain the attempted remote infusion of the chemicals, and Defendants' adherence to a procedure that lacks necessary transparency, reliability, and medical safeguards and personnel, despite evidence that such a process has resulted in a severe risk of pain and suffering in past executions and in the executions undertaken by other jurisdictions, constitutes deliberate indifference; Defendants are knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue to do so into the future.

439.    Defendants' remote lethal infusion protocol and practices fail to address any reasonably foreseeable complications with any appropriate medical response, such as difficulty obtaining access to a peripheral vein, or damage to such veins as a result of a Plaintiff's medical condition or history, or Defendants' repeated failed attempts to insert the catheter or infuse chemicals remotely.  Employing untrained personnel to perform executions exacerbates the present and substantial risks created by the deficiencies in the 2018 Regulations, and the methods and circumstances of its implementation, because

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

unqualified and untrained personnel will be unable to react to and remedy problems that arise during an execution.  Allowing unqualified and untrained personnel to develop deviations from the protocol also increases the risk of inhumane executions due to the lack of vetting by qualified experts and the danger that execution team turnover will lead to confusion as to how to perform the execution.

440.     Moreover, the protocol and practices include no safeguards that would protect the prisoner in the event a stay of execution is entered or a reprieve granted after the remote lethal infusion process has begun.  Thus, the protocol and actual practices fail to provide any protections to prevent Plaintiffs from being wrongly executed should a reprieve or stay be granted after the process has begun but before death has occurred.

441.     At any time before the lethal amounts of chemicals are administered, the Plaintiff can be readily resuscitated if trained personnel and routine resuscitation medication and equipment are present at the execution site.  Any resuscitation, however, would require the close proximity of the necessary equipment, medication, and properly trained personnel.  The omission of such personnel and equipment under the 2018 Regulations, expressly made, further undermines the constitutionality of the procedure.

442.     Although it is possible to conduct executions in a constitutionally compliant manner, Defendants have deliberately chosen not to do so.  Defendants could choose to use different chemicals that do not cause severe risk of irreversible brain damage and/or excruciating pain and therefore do not carry extraordinarily grave and present consequences to Plaintiffs if not properly administered.  Instead, Defendants have knowingly and recklessly chosen to use chemicals that will subject the inmate to severe risk of irreversible brain damage and/or excruciating pain in the likely event of administration error.  Moreover, Defendants have not taken precautions to ensure that the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

personnel who are involved in the process, including the preparation and administration of the remote lethal infusion chemicals, possess the qualifications, experience, and expertise needed to prepare those chemicals properly, nor that the personnel they select to conduct executions are adequately trained to administer the chemicals.  Defendants also have deliberately continued their dangerous practice of remote infusion of the lethal chemicals, rife with administration risks and errors, despite being advised by their own experts that administration of the chemicals should be performed bedside.

443.    Feasible, readily implemented alternative procedures exist that would significantly reduce the substantial risk of excruciating pain created by Defendants' deficient protocol. These alternative procedures include, but are not limited to, a protocol that remedies the deficiencies set forth herein, as set forth above.

444.    These numerous deficiencies in the 2018 Regulations and their implementation are the direct result of Defendants' conscious disregard of the present substantial risk that the execution procedure will result in the wanton and unnecessary infliction of extreme pain.  The failure of the Defendants to take sufficient measures to minimize the risk of substantial, extreme, and excruciating pain and mutilation, when such risk could readily be prevented by adopting an alternative procedure to remove the risks in their procedures violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

//

//

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

**CLAIM TWO**

**THE ALTERNATIVE-METHOD AND METHOD SELECTION
REQUIREMENTS VIOLATE PLAINTIFFS' RELIGIOUS LIBERTY AND
EQUAL PROTECTION RIGHTS UNDER THE
FIRST, FIFTH, AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
(42 U.S.C. § 1983)**

445.     Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in this complaint.

**A.      The Alternative-Method Execution.**

446.     Notwithstanding any allegation of an alternative execution method asserted in this Fifth Amended Complaint, Plaintiffs cannot be required to plead or prove an alternative method of execution, because such a requirement is a substantial burden on their sincerely held religious beliefs, does not further a compelling governmental interest, and is not the least restrictive means for the government to accomplish its stated interest.

447.     In *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015), the Supreme Court held that the religious liberty protections in the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb-1 et seq., apply to prisoners through its "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq.

448.     The provisions of RLUIPA governing religious exercise by institutionalized persons "mirrors RFRA," such that RLUIPA "allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'"  *Holt*, 135 S. Ct. at 860.

449.     RFRA/RLUIPA's protections and provisions apply to all federal law, and the implementation of that law, whether statutory or otherwise.  *See* 42 U.S.C. § 2000bb-3(a).

- 150 -

450.    A requirement may exist that Plaintiffs must plead or prove an alternative execution method or manner in order to state a claim that the implementation of Defendants' execution Regulations is cruel and unusual in violation of the Eighth Amendment.  *See Glossip v. Gross*, 135 S. Ct. 2726 (2015); *Baze v. Rees*, 553 U.S. 35 (2008).

451.    Plaintiffs have "sincerely held religious beliefs" and "religious objections" to participating in decisions and planning events that "facilitate" suicide.  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014).[11]  These sincerely held religious beliefs and religious practices pre-date the Court's decisions in *Baze* and *Glossip*.

452.    Defendants are aware of these beliefs and sponsor faith-based programs at San Quentin State Prison to facilitate Plaintiffs' genuine religious practices.  Defendants' 2018 Regulations expressly acknowledge Plaintiffs' sincerely held religious beliefs and make "religious accommodations" for Plaintiffs and their spiritual advisors "to perform their spiritual functions at [Plaintiff's] cell front" during the implementation of the execution protocol.  Cal. Code Regs. tit. 15, § 3349.1(t) & § 3349.6 (b) (6) & (A)(B).

453.    The alternative-method requirement – imposing on Plaintiffs the requirement to participate in orchestrating their own deaths – burdens Plaintiffs' exercise of religion.[12]

---

[11]  For example, certain Plaintiffs are, *inter alia*, Christians and have committed to "honoring the Lord in all they do" and acting "in a manner consistent with Biblical principles."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2766 (2014).

[12]  The Federal Government is prohibited "from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2759 (2014).

454.    Pleading and proving an alternative execution method would make Plaintiffs complicit in their own death in a way that is akin to suicide or assisting suicide, which is contrary to and violates their sincerely held religious beliefs.[13]

455.    Assuming arguendo that the act of pleading or proving an alternative method of execution might, itself, be an "innocent" action, it is certainly an act that has the effect of enabling or facilitating the commission of their deaths and is thus a sinful and immoral act that presents a significant burden on Plaintiffs' honest convictions. *See Burwell,* 134 S. Ct. at 2778.

456.    Thus, being required to choose, or plead, or prove, the manner or method of their deaths or otherwise assist Defendants to kill them violates Plaintiffs' sincerely held religious beliefs, and they cannot be compelled to do so.

457.    The alternative-method requirement does not further a compelling governmental interest.

---

[13] While Plaintiffs' individual sincerely held religious beliefs vary, there is a uniform belief amongst them all that prohibits participating in the assistance of suicide.  This is a widely accepted and fundamentally normal liturgical belief.  For example, assisting in suicide and suicide is forbidden by Jewish law, viewed as a sin, may result burial in a separate part of a Jewish cemetery, and may bar certain mourning rites.  Assisting in suicide and suicide is objectively a sin in the Roman Catholic Church, which violates the commandment "You shall not commit murder."  Christian Protestants (including Evangelicals, Charismatics, Pentecostals, and other denominations) believe that suicide is self-murder, and so anyone who commits it is sinning, which may result in the unpardonable sin of the refusal of the gift of salvation.  The Orthodox Church normally denies a Christian burial to a person who has committed suicide.  The Church of Jesus Christ of Latter-day Saints (LDS Church) view suicide as wrong.  Virtually all Muslim scholars and clerics consider suicide forbidden, as the Quran instructs: "And do not kill yourselves, surely God is most Merciful to you."  To break out of samsara, Buddhism advocates the Noble Eightfold Path, which is contrary to participating in suicide.  In Hinduism, suicide is spiritually unacceptable.  Taking one's own life is considered a violation of the code of ahimsa (non-violence) and therefore equally sinful as murdering another.

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

458.     Because *Baze* and/or *Glossip* may add a pleading requirement to a claim raised under a federal statute, it is the federal government's interest, not states' interests, which must be examined.

459.     The federal government has no interest in allowing a state to carry out an execution in a manner that violates the Eighth Amendment.

460.     The only role that the federal government can legitimately have with respect to a state judgment is determining whether that judgment and the method of carrying out that judgment comports with the Constitution.

461.     There is no compelling federal governmental interest in states carrying out executions other than requiring that they do so within the limits of the Constitution.

462.     The pleading requirement, added to § 1983 actions asserting a certain type of Eighth Amendment claim and requiring plaintiffs challenging a method of execution to propose a feasible alternative method, does not further that governmental interest.

463.     Therefore, applying that standard to Plaintiffs violates their rights under RFRA/RLUIPA.

464.     Even if the relevant governmental interest is California's interest in carrying out executions, that interest is not classified under the law as a compelling one permitting the infringement of Plaintiffs' constitutional rights to religious freedom.  *See Morales*, 415 F.Supp.2d at 1046 (noting that the State has only a "'strong interest in proceeding with its judgment'" (quoting *Gomez v. U.S. Dist. Ct. N.D. Cal.,* 503 U.S. 653, 654 (1992))).

465.     The alternative-method requirement is not the least restrictive means of furthering the governmental interest in question here.

466.     Even if the federal government has a compelling governmental interest in the states' ability to carry out an execution, or even if the relevant governmental interest is

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

California's interest in seeing criminal sentences and judgments finalized, the method used here – requiring an inmate to choose the manner or method of his death and to assist the State by demonstrating that manner or method is available and readily implemented – is not the least restrictive method to achieve those interests.

467.    In creating the new pleading requirement for certain § 1983 challenges under the Eighth Amendment to a state's method of execution, the Supreme Court's justification was that capital punishment is legal and there must be a way to carry it out.  Requiring Plaintiffs to violate the fundamental tenets of their religions, however, and tell the State how to kill them, is not the least restrictive means to accomplish the goal of executions that comply with the Eighth Amendment.

468.    There is no logical connection between the burden to prove that a method of execution is unconstitutional and the imposition of a requirement that it is up to the *inmate*, not the Defendants, to come up with a constitutionally sound method of execution.

469.    There is no logic in requiring inmates and their attorneys to propose alternative methods of execution.  They do not have the expertise to do so.  They do not have access to all of the information about executions to be able to do so.  *See* ECF No. 317-1 at 14 (Defendants distributed a survey "to [] 37 states and the federal government that utilize lethal injection as a method of execution.  The CDCR received responses from 15 jurisdictions.  The responses were reviewed, analyzed, and recorded"; "physical site visits were made [by Defendants] to other jurisdictions to examine both the implementation of the existing lethal injection protocols and the facilities in which executions were conducted"); ECF No. 534 at 2 (discovery stay order, Apr. 5, 2012, pre-*Glossip* and 2018 Regulations).

- 154 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

470.    The least restrictive means to accomplish the goal of a constitutional execution also is the most logical means; *i.e.*, requiring Defendants to follow the Constitution and not use methods of execution that violate the Eighth Amendment by causing a substantial risk of severe pain.

471.    Requiring the Defendants to propose to use an alternative execution method is also a less restrictive means of carrying out the relevant governmental interests.

472.    Plaintiffs have alleged that the alternative pleading requirement of *Baze* and/or *Glossip* burdens their exercise of religion by violating their sincerely held religious beliefs, does not further a compelling governmental interest, and even if it did further that interest, it is not the least restrictive method of furthering that interest.

473.    Applying the alternative-method requirement to Plaintiffs therefore violates RFRA/RLUIPA, and cannot be enforced here.

474.    Consequently, under the religious freedom protection statutes, Plaintiffs can sufficiently allege an Eighth Amendment challenge without needing to plead or prove an alternative execution method or manner.

475.    Any allegations of an alternative execution method presented in this Fifth Amended Complaint are presented only in the alternative and without waiving any of Plaintiffs' arguments alleged herein.

**B.    California's Method-Selection.**

476.    Plaintiffs incorporate by reference each and every allegation set forth herein as though fully set forth in this claim.

477.    California Penal Code section 3604(b) requires Plaintiffs to participate in selecting the way they may be killed by the State – between lethal injection and lethal gas (both of which violate their rights to avoid cruel and unusual punishment under the

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

Eighth Amendment).  The fact that Penal Code section 3604(b) provides that the inmate shall be executed by lethal injection rather than by lethal gas if the inmate fails or refuses to participate in this decision does not remove the element of selection of method from the process; an inmate who does not actively select a method is aware that he or she is thereby choosing lethal injection by default.

478.     Being forced to select affirmatively or by statutory default also makes Plaintiffs complicit in their own death in a way that is akin to suicide or assisting suicide, which is contrary to and violates their sincerely held religious beliefs.

479.     Assuming arguendo that the act of selecting and execution method might, itself, be an "innocent" action, it is certainly an act that has the effect of enabling or facilitating the commission of their deaths and is thus a sinful and immoral act that presents a significant burden on Plaintiffs' honest convictions.  *See Burwell*,  134 S. Ct. at 2778.

480.     Thus, being required to choose the manner or method of their deaths or otherwise assist Defendants to kill them substantially burdens Plaintiffs' sincerely held religious beliefs, and they cannot be compelled to do so.  *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997) (noting that a state prison policy "'putting substantial pressure on an adherent to modify his behavior and to violate his beliefs' infringes on the free exercise of religion") (quoting *Thomas v. Review Bd. Of the Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981)).

481.     The selection method or default requirement does not further a compelling governmental interest.

482.     Therefore, applying that choice or default requirement to Plaintiffs violates their rights under RFRA/RLUIPA.

483.    The choice or choice by default execution method requirement is not the least restrictive means of furthering the governmental interest in question here.

484.    Even if California has an interest in seeing criminal sentences and judgments finalized, the method used here – requiring an inmate to choose the manner or method of his death to assist the State – is not the least restrictive method to achieve those interests.

485.    Requiring Plaintiffs to violate the fundamental tenets of their religions and tell the State how to kill them affirmatively or by default is not the least restrictive means to accomplish the goal of executions that comply with the Eighth Amendment. *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005) (holding that the CDCR's inmate hair grooming policy that required Muslim prisoners to violate their beliefs by cutting their hair was not least restrictive means to maintain prison security when other prison systems meet their penological goals without such a policy).

486.    There is no logic in requiring inmates to select amongst unconstitutional methods of execution.  They do not have the expertise to do so.  They do not have access to all of the information about executions to be able to do so.  *See* ECF No. 317-1 at 14 (Defendants distributed a survey "to [] 37 states and the federal government that utilize lethal injection as a method of execution.  The CDCR received responses from 15 jurisdictions.  The responses were reviewed, analyzed, and recorded"; "physical site visits were made [by Defendants] to other jurisdictions to examine both the implementation of the existing lethal injection protocols and the facilities in which executions were conducted"); ECF No. 534 at 2 (discovery stay order, Apr. 5, 2012, pre-*Glossip* and 2018 Regulations).

487.    The least restrictive means to accomplish the goal of a constitutional execution also is the most logical means; *i.e.*, requiring Defendants to follow the Constitution and

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

not use methods of execution that violate the Eighth Amendment by causing a substantial risk of severe pain.

488.     Requiring the Defendants to propose to use a constitutional execution method is also a less restrictive means of carrying out the relevant governmental interests. *Warsoldier*, 418 F.3d at 999 ("CDC[R] cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.").

489.     Plaintiffs have alleged the choice of method of execution requirement of Penal Code section 3604(b) burdens their exercise of religion by violating their sincerely held religious beliefs, does not further a compelling governmental interest, and even if it did further that interest, it is not the least restrictive method of furthering that interest.

490.     Applying the choice of method of execution requirement to Plaintiffs therefore violates RFRA/RLUIPA and cannot be enforced here.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

1.     Temporary, preliminary, and permanent injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing Plaintiffs by lethal injection using 2018 Regulations or any progeny of OP 770, or any similar practices or protocol;

2.     In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from using unqualified, untrained, uncredentialed, uncertified, or

- 158 -

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

inexperienced persons to participate in the selection, hiring, employment, or retention of persons who participate in conducting California's executions;

3.      In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from allowing persons who lack sufficient understanding, qualifications, training, credentials, certification, experience, or proficiency to participate in or conduct an execution;

4.      In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from failing to provide training for persons tasked with participating in executions, to assess their proficiency and performance with assigned tasks, and to prohibit persons who do not demonstrate competence from participating in or conducting an execution;

5.      In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering chemicals or toxins that cause excruciating and prolonged pain or irreversible brain damage but not death during the execution process;

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

6.     In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from utilizing facilities that contain inadequate lighting, overcrowded conditions, and inadequate ability for communication and observation during the execution process;

7.     In the event that 2018 Regulations or any progeny of OP 770, or any similar protocol, is not enjoined in its entirety as violating the First, Fifth, Eighth, and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from deviating from the protocol during the execution process.

8.     That the Court conduct appropriate and necessary evidentiary hearings and discovery to permit Plaintiffs to prove their constitutional claims;

9.     Reasonable attorneys' fees pursuant to 42 U.S.C. § 1983 and the laws of the United States;

10.     Costs of suit; and

11.     Any such other relief as the Court deems just and proper.

MCBREEN & SENIOR
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS

1

MCBREEN & SENIOR

2

3

DATED: February 27, 2019          By:_____/s/_____

4                                 DAVID A. SENIOR
                                  SARA M. COHBRA
5                                 ANN K. TRIA

6                                 Richard P. Steinken
                                  JENNER & BLOCK
7
                                  John R. Grele
8                                 LAW OFFICE OF JOHN R. GRELE

9                                 Attorneys for Plaintiffs
                                  HECTOR AYALA, RONALDO AYALA,
10                                ALBERT BROWN, RICHARD BOYER,
                                  TIEQUON COX, ALBERT CUNNINGHAM,
11                                RONALD DEERE, HARVEY HEISHMAN,
                                  DOUGLAS MICKEY, MICHAEL MORALES,
12                                DAVID RALEY, GUY ROWLAND,
                                  RICHARD SAMAYOA, RICARDO
13                                SANDERS, ANTHONY SULLY, AND
                                  CONRAD ZAPIEN
14

15

16  DATED: February 27, 2019          By:_____/s/_____
                                  Susan Elizabeth Garvey
17                                HABEAS CORPUS RESOURCE CENTER
                                  Attorneys for Plaintiff
18                                MITCHELL SIMS

19

20  DATED: February 27, 2019          By:_____/s/_____
                                  Margo Ann Rocconi
21                                DEPUTY FEDERAL PUBLIC DEFENDER
                                  Attorneys for Plaintiffs
22                                TRACY CAIN, RAYNARD CUMMINGS,
                                  ROBERT FAIRBANK, WILLIAM PAYTON,
23                                SCOTT PINHOLSTER, AND JOHN
                                  VISCIOTTI
24

25  DATED: February 27, 2019          By:_____/s/_____
                                  Norm C. Hile
26                                ORRICK HERRINGTON & SUTCLIFFE LLP
                                  Attorneys for Plaintiff
27                                KEVIN COOPER

28

MCBREEN & SENIOR
1900 Avenue of the Stars, 11ᵗʰ Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

- 161 -

# CIVIL LOCAL RULE 5-1(i) ATTESTATION

I hereby attest that the concurrence in the filing of this document has been obtained from all signatories.

DATED:        February 27, 2019                    _____/s/_____
                                                    Ann K. Tria

MCBREEN & SENIOR
1900 Avenue of the Stars, 11th Floor
Los Angeles, California 90067
Telephone: (310) 552-5300

FIFTH AMENDED COMPLAINT
Case Nos. 06-cv-219 RS; 06-cv-926 RS